JUDGE KAPLAN

ANDREW M. CALAMARI
Regional Director
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)
Attorney for Plaintiff

15 CV 1465



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

GREGORY W. GRAY, JR., ARHCIPEL CAPITAL LLC,
BIM MANAGEMENT LP,

Defendants,

-and-

ARCHIPEL CAPITAL – AGRIVIDA LLC,
ARCHIPEL CAPITAL – AMYRIS
    BIOTECHNOLOGIES LP,
ARCHIPEL CAPITAL – BLOOM ENERGY LP,
ARCHIPEL CAPITAL – LATE STAGE FUND LP,
ARCHIPEL CAPITAL – LINEAGEN LP,
ARCHIPEL CAPITAL – SOCIAL MEDIA FUND LP,
ARCHIPEL CAPITAL – SOCIAL MEDIA FUND II LP,
ARCHIPEL CAPITAL – SOCIAL MEDIA FUND LP 3,
ARCHIPEL CAPITAL – SOCIAL MEDIA FUND LP 4,
BENNINGTON – EVERLOOP LP,

Relief Defendants.

---

15 Civ.    (  )
ECF Case

COMPLAINT

JURY TRIAL
DEMANDED

RECEIVED
FEB 2    2015
U.S.D.C. S.D. N.Y.

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Gregory W. Gray, Jr. ("Gray"), Archipel Capital LLC ("Archipel"), BIM

Management LP ("BIM") (collectively, "Defendants"), and Archipel Capital – Agrivida LLC

("Agrivida LLC"), Archipel Capital – Amyris Biotechnologies LP ("Amyris LP"), Archipel
Capital – Bloom Energy LP ("Bloom Energy LP"), Archipel Capital – Late Stage Fund LP
("Late Stage Fund LP"), Archipel Capital – Lineagen LP ("Lineagen LP"), Archipel Capital –
Social Media Fund LP ("Social Media Fund LP"), Archipel Capital – Social Media Fund II LP
("Social Media Fund II LP"), Archipel Capital – Social Media Fund LP 3 ("Social Media Fund
LP 3"), Archipel Capital – Social Media Fund LP 4 ("Social Media Fund LP 4"), and
Bennington – Everloop LP ("Everloop LP") (collectively, "the Archipel Entities" and "Relief
Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This is an emergency action brought to stop Gray, individually and through his
entities, Archipel and BIM, from engaging in ongoing fraudulent conduct designed to defraud
investors and various Archipel-managed investment funds.  From 2011 through present, Gray
has raised nearly $20 million from at least 140 investors throughout the United States and
abroad.  While each of the Archipel Entities has its own bank account, from at least September
2011 Gray has commingled and transferred funds among the Archipel Entities as needed,
funding one Archipel Entity's investment in a portfolio company with funds transferred from
other Archipel Entities.

2.      From at least June 2014 through the present, Gray has also been operating a
classic Ponzi-like scheme, using over $5 million of funds from three different Archipel Entities
to provide fictitious returns to investors in another Archipel Entity, the Social Media Fund LP.

3.      Gray solicited investors in the Social Media Fund LP by promising that the fund
would buy pre-IPO shares of Twitter, Inc. ("Twitter") for $19 to $25 per share, that it would
deliver out to them once Twitter went public.  Gray raised over $5.2 million, which, under the

fund's offering documents, represented approximately 230,000 pre-IPO Twitter shares, but he only purchased 80,000 pre-IPO Twitter shares at an average price of $23.44 per share by the time Twitter went public in November 2013.

      4.      To make up the shortfall, and under increasing pressure from investors, Gray stalled and stole.  First, after Twitter's IPO, he bought time by falsely telling investors that the delay in the delivery of shares was caused by technical difficulties in transferring the shares to a new broker-dealer.  But there simply were no pre-IPO shares to transfer.  Second, he engaged in blatant Ponzi-type conduct by misappropriating nearly $5.3 million from three other Archipel Entities to pay off the Social Media Fund LP investors, including nearly the entire $5 million investment made in June 2014 by an investor ("Investor A") in Archipel's newest fund, the Late Stage Fund LP.

      5.      The purpose of the Late Stage Fund LP was to acquire pre-IPO shares of Uber Technologies, Inc. ("Uber") (among other stocks).  Instead, Gray used these funds to pay off the Social Media Fund LP investors (including Investor A himself, who was also an investor in the Social Media Fund LP) in either cash or with Twitter shares that he had purchased on the public market in June and July 2014 for $37.40 to $41.05 per share.

      6.      When Investor A sought proof of the Late Stage Fund LP's ownership of Uber shares, Gray sent Investor A's business manager a fabricated stock transfer agreement that bore a cut-and-pasted signature from a prior legitimate purchase of stock by another Archipel Entity. The purported seller of these "Uber" shares, "Seller A," never owned or signed any documents related to a sale of Uber shares.

      7.      In sworn testimony before the Commission staff on Tuesday, February 24, 2015, Gray authenticated this sham document and falsely testified that it was a legitimate stock transfer

agreement for the Uber shares, executed by Seller A.

8.      Additionally, in sworn testimony to the staff, Gray repeated the same lies he told investors to explain the delay in delivery of pre-IPO Twitter shares when in fact no such shares existed at the time.

9.      Gray's misappropriation of the $5 million from the Late Stage Fund LP to pay off investors in the Social Media Fund LP has left the Late Stage Fund LP with at least a $5 million hole that Gray appears to be frantically trying to fill.  Gray has continued to solicit investors for the partnership, raising in excess of $1 million from eight investors, since October 2014.  In addition, Gray has obtained what appears to be $470,000 in February 2015 from an investor in China, the final tranche of which is expected to close soon.  Moreover, Gray claims to be in ongoing negotiations with another investor in China for an additional $30 million investment.

10.      By this action, the Commission seeks, among other things, to terminate this fraudulent activity, prevent the dissipation of any remaining assets, compel an accounting of the missing funds, and prevent the destruction or alteration of documents.

## VIOLATIONS

11.      By virtue of the conduct alleged herein, each of the Defendants, directly or indirectly, singly or in concert, has engaged and is engaging in transactions, acts, practices and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8]; and Gray, directly or indirectly, singly or in concert, has aided and abetted, or has control person

4

liability pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for, the other Defendants' and Relief Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

12.     Unless the Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

13.     The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and Section 209 of the Advisers Act [15 U.S.C. § 80b-9), seeking to restrain and permanently enjoin the Defendants from engaging in the acts, practices, transactions and courses of business alleged herein.

14.     The Commission also seeks, as immediate relief, a temporary restraining order and a preliminary injunction against Defendants, prohibiting them from future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1),(2), and (4) of the Advisers Act and Rule 206(4)-8 thereunder, an order freezing Defendants' and Relief Defendants' assets, requiring Defendants to provide verified accountings, permitting the Commission to conduct expedited discovery, prohibiting Defendants from destroying or altering any documents and temporarily, prohibiting Defendants from soliciting additional investors or accepting additional investments from existing investors and prohibiting Defendants or Relief Defendants or their creditors from filing a voluntary or involuntary petition in bankruptcy.

15.     Finally, the Commission seeks a final judgment permanently enjoining

Defendants from future violations of the securities laws provisions that Defendants violated as alleged in this Complaint, ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon, and imposing civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Certain of the events constituting or giving rise to the alleged violations occurred in the Southern District of New York.  For instance, certain wire transfers to Archipel Entities were done through the Manhattan offices of several major banks.  In addition, when Gray made his fraudulent purchase of Twitter shares on the public market with funds misappropriated from the Late Stage Fund LP, Twitter was traded on the New York Stock Exchange in Manhattan.

18.     In connection with the conduct alleged in this complaint, the Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, or of the facilities of a national securities exchange.

## DEFENDANTS

19.     **Gray**, age 39, lives in Buffalo, New York, and has additional residences in Chicago, Illinois, and Lake Worth, Florida.  Gray founded Archipel Capital, LLC in 2005, and is its Managing Partner.  Gray is also the General Partner of BIM Management LP.  In December 2008, Gray was barred for three years from association with NYSE member firms based on findings that he had (a) engaged in unauthorized trades in his customers' accounts and (b) threatened and/or harassed complaining customers and/or their family members.  This bar was upheld by the Commission on July 22, 2009 (*In the Matter of Gregory W. Gray*, Jr., Rel. No. 60361 (July 22, 2009).).

20.     **Archipel** is a New York limited liability company, founded in 2005 and incorporated on May 15, 2006, with its principal place of business in Buffalo, NY.  Gray owns 65.1% of Archipel's membership interests, and Archipel co-owns BIM.  Archipel's other membership interests are owned by two of Gray's business associates, Archipel Owner 2 (25%) and Archipel Owner 3 (9.9%).  Archipel has no assets or employees, but is used by Gray primarily as a "brand."

21.     **BIM** is a Delaware limited partnership incorporated on May 10, 2011, with its principal place of business in Buffalo, NY.  BIM is owned by Archipel and a Toronto, Ontario-based entity, Bennington Investment Management, Inc. ("Bennington").  Like Archipel, BIM is owned by Gray, and his two business associates, in the same percentages as the ownership of Archipel.  BIM is the General Partner or Managing Member of each the Archipel Entities, and Gray directed BIM's investment and operational activities.  Although BIM was entitled to take a 5% up-front management fee on each new investment into the Archipel Entities, in practice, Gray simply helped himself to the Archipel Entities' bank accounts when he needed to pay

personal expenses.

## RELIEF DEFENDANTS

22.     **Archipel Capital – Agrivida LLC** ("Agrivida LLC") is a Delaware limited liability company incorporated on July 28, 2011, with its principal place of business in Buffalo, NY, with the purpose of acquiring Series B+ Preferred Stock of Agrivida, Inc.  BIM is the Managing Member of Agrivida LLC.  Since its inception, Agrivida LLC raised $385,000.00 from 13 investors.

23.     **Archipel Capital – Amyris Biotechnologies LP** ("Amyris LP") is a Delaware limited partnership incorporated on June 27, 2008, with its principal place of business in Buffalo, NY.

24.     **Archipel Capital – Bloom Energy LP** ("Bloom Energy LP") is a Delaware limited partnership incorporated on February 24, 2012, with its principal place of business in Buffalo, NY with the purpose of acquiring common stock and capital stock of Bloom Energy Corp.  BIM is the General Partner of Bloom Energy LP.  Since its inception, Bloom Energy LP has raised $3,160,566.25 from 32 investors.  An investor residing in China has agreed to invest $470,000 in Bloom Energy LP in recent weeks, with the last tranche of his investment set to close next week.

25.     **Archipel Capital – Late Stage Fund LP** ("Late Stage Fund LP") is a Delaware limited partnership incorporated on May 9, 2014, with its principal place of business in Buffalo, NY with the purpose of acquiring shares in a portfolio of companies, largely venture-capital-backed, late-stage companies, and with pre-IPO shares of Uber being the partnership's primary intended holding.  BIM is the General Partner of Late Stage Fund LP.  Since its inception, Late Stage Fund LP has raised $6,020,640.00 from nine investors.

26.    **Archipel Capital – Lineagen LP** ("Lineagen LP") is a Delaware limited partnership incorporated on February 24, 2012, with its principal place of business in Buffalo, NY with the purpose of acquiring Series B and Series C Convertible Preferred Stock of Lineagen, Inc.  BIM is the General Partner of Lineagen LP.  Since its inception, Lineagen LP has raised $1,888,876.91 from 28 investors.

27.    **Archipel Capital – Social Media Fund LP** ("Social Media Fund LP") is a Delaware limited partnership incorporated on May 17, 2012, with its principal place of business in Buffalo, NY with the purpose of investing in portfolio companies in the social media industry, in particular Twitter.  BIM is the General Partner of Social Media Fund LP.  Since its inception, Social Media Fund LP has raised $2,396,618.99 from 46 investors.

28.    **Archipel Capital – Social Media Fund II LP** ("Social Media Fund II LP") is a Delaware limited partnership incorporated on September 11, 2013, with its principal place of business in Buffalo, NY with the purpose of investing in portfolio companies in the social media industry, in particular Twitter. BIM is the General Partner of Social Media Fund II LP.  Since its inception, Social Media Fund II LP has raised $1,268,473.50 from one investor.

29.    **Archipel Capital – Social Media Fund LP 3** ("Social Media Fund LP 3") is a Delaware limited partnership incorporated on March 20, 2014, with its principal place of business in Buffalo, NY with the purpose of investing in portfolio companies in the social media industry, in particular Twitter.  BIM is the General Partner of Social Media Fund LP 3. Since its inception, Social Media Fund LP 3 has raised $1,300,000.00 from two investors.

30.    **Archipel Capital – Social Media Fund LP 4** ("Social Media Fund LP 4") is a Delaware limited partnership incorporated on March 20, 2014, with its principal place of business in Buffalo, NY with the purpose of investing in portfolio companies in the social media

industry, in particular Twitter.  BIM is the General Partner of Social Media Fund LP  4.  Since its inception, Social Media Fund LP 4 has raised $275,000.00 from three investors.  Social Media Fund LP, Social Media Fund II LP, Social Media Fund LP 3, and Social Media Fund LP 4 are collectively referred to in this Declaration as "Social Media Fund LP."  The four partnerships did not have separate offering documents and shared one bank account.

31.     **Bennington – Everloop LP** ("Everloop LP") is a Delaware limited partnership incorporated on May 10, 2011, with its principal place of business in Buffalo, NY with the purpose of acquiring Series A and Series A1 Preferred Stock in Everloop, Inc.  BIM is the General Partner of Everloop LP.  Since its inception, Everloop LP has raised $2,913,131.19 from 68 investors.

## FACTS

**Archipel Background**

32.     Gray founded Archipel in 2005.  Archipel styles itself as a venture capital company.  Gray is its Senior Managing Director.  Around 2011, Gray began to solicit investments from individual investors and small investment entities promising interests in the Archipel Entities, each of which would, in turn, invest the funds raised in a private company or companies that Gray believed would soon realize a "liquidity event" (*i.e.*, an initial public offering or merger or acquisition).

33.     From 2011 to present, Archipel has attracted at least $19.6 million in investments from at least 140 individuals and entities for at least six offerings of its Archipel Entities.  The various Archipel Entities and the amounts raised for each are as follows:

| Offering | Purported Investment | Dates Funds Were Raised | Amount Offered | Amount Raised | Number of Investors |
|---|---|---|---|---|---|
| Bennington – Everloop LP | Everloop, Inc. | 4/2011 to 10/2012 | $5.5 million, up to $10 million | $2,913,131.19 | 68 |
| Archipel Capital – Agrivida LLC | Agrivida, Inc. | 7/2011 to 2/2013 | $7.5 million | $385,000.00 | 13 |
| Archipel Capital – Bloom Energy LP | Bloom Energy Corp. | 3/2012 to present | $5 million | $3,160,566.25 | 32 |
| Archipel Capital – Social Media Fund LP | Twitter, Inc. and "portfolio companies in the social media industry" | 6/2012 to 11/2013 | $5.5 million | $5,240,092.49 | 51 |
| Archipel Capital – Lineagen LP | Lineagen, Inc. | 4/2012 to 10/2012; 3/2014 to present | $7 million | $1,888,876.91 | 28 |
| Archipel Capital – Late Stage Fund LP | Uber Technologies, Inc. and "a portfolio of companies, with the majority of them being venture capital backed, late stage companies" | 6/2014 to present | $15 million | $6,020,640.00 | 9 |

34.     At least as early as September 2011, when Gray transferred $50,000 from Agrivida LLC to Everloop LP, Gray has commingled and transferred money between the funds.

35.     Gray set up each Archipel Entity in roughly the same way:  Investors bought interests in a limited partnership or limited liability company that supposedly invested the pooled funds entirely or primarily into a specific company or companies.  BIM was the Managing Member or General Partner of each, with broad investment and operational discretion.  Gray is listed in private placement memoranda ("PPMs") for the Archipel Entities as the contact for

11

BIM, on occasion with Archipel Owner 2.  Gray, on behalf of BIM, signed all, or substantially

all, of the subscription agreements.  Gray opened separate bank accounts and brokerage accounts

for each Archipel Entity, and has signatory authority on each bank account and trading

authorization over each Entity's brokerage account.  Archipel Owner 2 has signatory authority

on five of the bank accounts—including two with nearly all of the Archipel Entities' current

liquid assets.

36.      Under the subscription agreements for each Archipel Entity, BIM is given the

power to "carry out any and all of the objects and purposes of the Partnership and to perform all

acts and enter into and perform all contracts and other undertakings that it may in its reasonable

and good faith discretion deem necessary or advisable or incidental thereto."  The PPMs for the

Archipel Entities' offerings provide that  BIM will "provide various advisory and management

services to the Partnership," including "negotiating" and "structuring the Partnership's

investment," "evaluating and monitoring the Partnership's investment," "monitoring the industry

in which" the companies operate," and "providing periodic reports to Partnership investors" on

the investments.  BIM has the power for Social Media Fund LP and Late Stage Fund LP to

choose the identity of the portfolio companies themselves, as well as the "sole discretion" to

"determin[e] to make distributions, whether cash, in kind, or a combination thereof . . . . even if

such securities have been registered for resale under the 1933 Act."

37.      In exchange for its management and investment advisory services, the PPMs

provide that BIM will be compensated with a management fee of 5% (paid up-front) of the total

capital raised by each Archipel Entity, as well as a performance-based payment of 10% carried

interest on the partnerships' profits.  BIM also has the right to reserve investor money for

expenses, not anticipated to exceed 2.5% (for Agrivida LLC) and 5% (for the other Archipel

Entities) of total capital raised.

38.     To date, Twitter is the only portfolio company that has undergone a positive liquidity event (having gone public in November 2013), and Social Media Fund LP, which invested solely in Twitter shares, is the only Archipel Entity that has given investors a positive return on their investment (albeit by misappropriating assets from three other Archipel Entities). Bloom Energy LP and Late Stage Fund LP are open for investment and may accept additional investors.  Lineagen LP and Agrivida LLC are no longer accepting investors.  Neither Lineagen Inc. nor Agrivida, Inc. has yet undergone a liquidity event so no investors have been redeemed. Everloop, Inc. collapsed, and Everloop LP received funds from a settlement as described more fully below, but it is not now accepting new investor money.

**The Twitter Scheme**

39.     From 2012 to 2013, Gray raised $5.24 million for Social Media Fund LP, and promised investors, when totaled, more than 230,000 shares of Twitter at prices ranging from $19 to $25 per share.  But by the time Twitter went public in November 2013, Gray had only purchased 80,000 shares at an average price of $23.44 per share, for a total cost of $1.875 million.  After distributing nearly all of the 80,000 shares after Twitter's IPO, Gray used funds from at least three other Archipel Entities to make Ponzi-like payments to Social Media Fund LP investors.

### Social Media Fund LP's Pre-IPO Twitter Share Purchases Fall Short

40.     Around May 2012, Gray began to solicit investors for Social Media Fund LP. Social Media Fund LP issued a PPM describing its purpose as "raising capital to target investments in portfolio companies in the social media industry" with "the first of its investments" to be common stock of Twitter "at a price not to exceed $26.00 per share."

41.     In September 2012, Social Media Fund LP agreed to purchase 25,000 Twitter

shares for $25.50 per share, for a total of $637,500.  By this point, although Gray had raised enough investor money in the fund to cover this purchase, he had transferred more than half out of the partnership's bank account to other Archipel Entities.  For example, on June 27, 2012, Gray transferred $150,000 from Social Media Fund LP to Agrivida LLC, which he then used to invest in Agrivida Inc. on the same day, and on August 1, 2012, he transferred another $200,000 to Everloop LP, which he then used to invest in Everloop Inc. on the same day.

42.     Because more than half of the Social Media Fund LP's funds had been transferred out of the partnership's bank account, Gray paid for the September 2012 pre-IPO Twitter shares in part with $207,500.00 taken from other Archipel Entities' bank accounts.  For example, on September 5, 2012, Gray took $25,000 from Agrivida LLC, $55,000 from Bloom Energy LP, $7,500 from Lineagen LP, and $120,000 from Everloop LP and transferred those monies to the Social Media Fund LP's account.

43.     After learning that Gray had bought Twitter shares at $25.50, certain investors complained that they had expected the price per share of Twitter to be lower.  Gray responded in November 2012 by having Social Media Fund LP issue "Supplement No. 1" to the PPM.  The Supplemental PPM stated that the fund "intend[ed] to use proceeds from the continued fundraising to acquire additional shares of stock of Twitter with a targeted price per share of any future purchases not in excess of $20 per share."  In April 2013, Social Media Fund LP issued an "Amended and Restated" PPM, which reiterated the $20.00 targeted acquisition price.

44.     In August 2013, Social Media Fund LP purchased an additional 55,000 shares of Twitter common stock for $22.50 per share, for a total of $1,237,500.  This purchase was funded by an investor, Investor B, which had invested $1,268,437.50 in Social Media Fund LP one day before the fund's Twitter purchase.

45.    Social Media Fund LP made no additional purchases of Twitter shares before

Twitter's IPO on November 6, 2013.  In sum, between June 2012 and November 2013, Social

Media Fund LP raised $5,240,092.49 from investors, promising to acquire approximately

230,000 shares, but it only had purchased 80,000 pre-IPO shares for $1,875,000.00, at an

average cost of $23.44 per share.

**Gray Funds Ponzi-Like Payments to Social Media Fund LP Investors Using Investor Money from Other Archipel Entities**

46.    The pre-IPO Twitter shares the Social Media Fund LP purchased were restricted

and could not be sold to the general public until six months after the IPO.  Thus, Gray knew that

Social Media Fund LP investors would expect either a distribution of the Twitter shares

themselves or the cash equivalent of their post-IPO value by May 2014, or six months after

Twitter's IPO.  But by May 2014, Social Media Fund LP's bank account held less than

$100,000, and Gray had only purchased 80,000 of the expected 230,000 Twitter shares in the

pre-IPO period.  Thus, Gray knew that he needed either an additional 150,000 shares of Twitter

or $4,777,500, the value the Twitter shares would have held for fund investors if the fund

actually held those shares.

47.    As he was facing these investor expectations, in April 2014, Gray began to solicit

investments in a new partnership, Late Stage Fund LP.  He told potential investors he had a $5

million to $10 million allocation in shares of Uber.  By the end of May 2014—as Gray was

under increasing pressure from Social Media Fund LP investors to give them their promised

returns—he sweetened the deal for prospective Late Stage Fund LP investors, offering one

prospective investor, Investor A, a nearly riskless investment.  Investor A had invested

$1,865,035.00 in other Archipel Entities, including Social Media Fund LP.  Gray now proposed

that Investor A invest $5 million into the Late Stage Fund and he, Gray, would find another

investor to buy that position out once Uber's next (and doubled) pre-IPO valuation was set:
"[T]ake the full $5m of UBER at a $6b valuation- then once the next UBER valuation is set
(estimate is $12b) we [i.e., the Late Stage Fund LP] would sell [Investor A] out at the $12b."
Gray pressed Investor A to act quickly, telling him that his $5 million would be "needed by June
10."

48.     Based on these and other favorable terms, on June 10, 2014, Investor A
transferred $5,000,000 to the Late Stage Fund LP bank account.  Also in June 2014, Gray
received a $650,000 settlement in connection with a claim that Everloop LP had brought against
Everloop, Inc. for alleged misrepresentations Everloop, Inc. had made in connection with that
fund's investment in the company.

49.     As he was waiting to receive funds from Investor A and the Everloop settlement,
Gray assured Social Media Fund LP investors repeatedly that a distribution of their Twitter
shares was forthcoming, blaming transfer agent issues for the delay.   On June 19, 2014, Gray
emailed certain Social Media Fund LP investors to assure them that the transfer agent issues had
been resolved and that the shares had been transferred to Brokerage Firm X, but that further
delays had been encountered relating to Brokerage Firm X's account-opening policies.  He
claimed: "We have already provided Brokerage Firm X the transfer instructions for each of you"
and the shares would be transferred "next week."

50.     These statements were false, as Gray knew.  At that time, Gray had only 1,798
pre-IPO Twitter shares, which he ultimately took for himself months later, in November 2014.

51.     Instead, upon opening the account with Brokerage Firm X, Gray, in late June,
took nearly all of Investor A's $5,000,000 Late Stage Fund LP investment, as well as
approximately $350,000 from the Everloop settlement, and transferred it to Social Media Fund

LP investors, to give them their expected return on investment.  This included a $2,129,366 cash payment that went directly from the Late Stage Fund LP bank account to Investor B that had invested $1,268,437.50 in Social Media Fund LP, and $2,449,500 that indirectly went back to Investor A, who had invested $1,200,000 in Social Media Fund LP.

52.     The redemption payment to Investor A occurred in two steps.  First, in late June, Gray transferred $1,185,000.00 to Investor A from the Social Media Fund LP account (using funds that Gray had transferred into that account from Investor A's own investment in the Late Stage Fund LP).   Gray then purchased 30,000 shares of Twitter at $39.50 in June 2014, sold the shares at $42.60 in July 2014, receiving $1,277,963.80, and gave a cash payment of $1,264,500.00 to Investor A, which supposedly was the second half of his expected return.

53.     Gray also bought approximately 30,000 shares of Twitter on the open market for $37.70 to $40.83 per share, and days later distributed the shares to various Social Media Fund LP investors.  In total, Gray used $2,390,951.10 of Late Stage Fund LP's proceeds to purchase post-IPO Twitter shares to distribute to Social Media Fund LP investors.

54.     Certain investors in Social Medial Fund LP complained that they had still received fewer Twitter shares or less money than expected.  On August 1, 2014, Gray told investors that he would distribute on a pro rata basis the remaining $136,657.04 that his expense summary revealed as still owing to investors.  As of August 11, 2014, however, Social Media Fund LP had only $50,388.25 in its bank account.  To cover that shortfall, on August 11, 2014, Gray moved $100,000 from the Lineagen LP bank account to the Social Media Fund LP bank account, and, from August 15 to October 1, 2014, Gray distributed approximately $135,000 to Social Media Fund LP investors.

**Gray Fabricates a Stock Transfer Agreement to Cover up His Misappropriation of Investor Funds**

55.     On June 12, 2014, Gray and Investor A executed a letter agreement for Investor A's Late Stage Fund LP investment of $5 million.  The agreement gave the fund 21 days to acquire "at least 142,857 shares of UBER at $25.00 per share price" which "represents an approximate $6 billion valuation for UBER."

56.     Afterwards, Investor A's business manager repeatedly asked Gray for documentation that Late Stage Fund LP owned Uber shares.  On August 8, 2014, Gray ultimately sent the business manager the "proof": a fabricated document.  Gray claimed the document was "the executed [stock-transfer agreements] by 1.) UBER 2.) the seller and 3.) Archipel / GP."  The document purported to reflect that an individual, Seller A (purportedly the seller of the Uber shares) "sells, assigns and transfers" 175,438 shares of "Uber Technology Inc." to the Late Stage Fund LP.  But no such stock transfer agreement had ever been executed by Seller A to sell anyone any Uber shares.  Instead, Gray (or someone acting at his direction) copied and pasted Seller A's signatures from an earlier, legitimate stock-transfer agreement by which Seller A had transferred shares he owned in an entirely different entity, Bloom Energy Corp., that he had executed on or about November 8, 2013 in connection with a purchase of Bloom Energy Corp. stock by Bloom Energy LP, a different Archipel Entity.  Seller A has never owned or sold any Uber shares nor signed any documents relating to a sale of Uber shares.

57.     The stock transfer agreement purporting to evidence a purchase of Uber stock was a sham, a fact Gray knew or was reckless in not knowing, and no Uber shares were ever acquired by Late Stage Fund LP, as Gray has more recently acknowledged.  While Gray now claims that Investor A's "allocation" was moved into Lyft Inc. (an Uber competitor), and other well-known pre-IPO stocks, he had not told Investor A that no Uber shares were bought by the Late Stage

Fund LP as recently as December 2014.  In addition, as of February 20, 2015, Late Stage Fund

LP bank records show a balance of only $481,184.05.

**Gray's Fraud Is Ongoing**

58.     Gray's fraud is ongoing.

59.     Since July 2014, Gray has raised in excess of $1 million from at least eight

additional investors in Late Stage Fund LP.  In December 2014, Gray claimed to be in ongoing

negotiations with another investor in China for a potential investment that would "buy out" the

current Late Stage Fund LP investors and provide additional funds for a Late Stage Fund LP II.

60.     Bank records show investor money has been accepted at least by Bloom Energy

LP, and Gray, himself, confirmed that he is currently accepting a $470,000 investment in Bloom

Energy LP from a Chinese investor who is due to fund the last tranche of his investment by next

week.  Over $340,000 has been deposited into the Bloom Energy LP bank account in February

2015.

61.     Gray is thus continuing to solicit investors.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (All Defendants)

62.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 61 of this Complaint.

63.     From around September 2011 through the present, Defendants, directly or

indirectly, singly or in concert, by use of the means or instruments of transportation or

communication in interstate commerce, or of the mails, in connection with the offer or sale of

securities, have: (a) employed, and are employing, devices, schemes and artifices to defraud; (b)

obtained, and are obtaining, money or property by means of untrue statements of material fact, or

have omitted, and are omitting, to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged, and are engaging, in transactions, acts, practices and courses of business which would operate as a fraud or deceit upon the purchaser.

64.     By reason of foregoing, Defendants, directly or indirectly, singly or in concert, have violated, are violating, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**(All Defendants)**

65.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 61 of this Complaint.

66.     From around September 2011 through the present, Defendants, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, have: (a) employed, and are employing, devices, schemes and artifices to defraud; (b) made, and are making, untrue statements of material fact, or have omitted, and are omitting, to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged, and are engaging, in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person.

67.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, are violating, and unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Violations of Sections 206(1), 206(2) of the Advisers Act
### (All Defendants)

68.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 61 of this Complaint.

69.     From around September 2011 through the present, Defendants, while acting as investment advisers, directly or indirectly, singly or in concert, by use of the mails or any means or instrumentality of interstate commerce or of the mails, have employed, and are employing, devices, schemes or artifices to defraud their clients or prospective clients, have engaged, and are engaging, in transactions, acts, practices or courses of business which operate as a fraud or deceit upon their clients or prospective clients.

70.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, are violating, and unless enjoined, will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## FOURTH CLAIM FOR RELIEF

### Violations of Section 206(4) and Rule 206(4)-8 Thereunder of the Advisers Act
### (All Defendants)

71. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 61 of this Complaint.

72. From around September 2011 through the present, Defendants, while acting as investment advisers to one or more pooled investment vehicles, directly or indirectly, singly or in concert, by the use of the mails or any means or instrumentality of interstate commerce or of the mails, have made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not

misleading, to an investor or prospective investor in the pooled investment vehicle or otherwise engaged in acts, practices or courses of business that are fraudulent, deceptive or manipulative with respect to an investor or prospective investor in the pooled investment vehicle.

73.   By reason of the foregoing, Defendants have violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4) and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8].

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting and Control Person Liability for Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5] (Gray)

74.   The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 61 of this Complaint.

75.   By engaging in the conduct above, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Gray, directly or indirectly, singly or in concert, aided and abetted the primary violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] of Archipel, BIM or the Archipel Entities because he knowingly or recklessly provided substantial assistance to each of those Defendants' or Relief Defendants' violations.

76.   At all times relevant herein, Gray was a control person of Archipel, BIM, and the Archipel Entities for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

77.   Gray exercised actual power and control over Archipel, BIM and the Archipel Entities, including through serving as Senior Managing Director and majority owner of Archipel, general partner and majority owner of BIM, and, through BIM, as the general partner or managing member of each of the Archipel Entities, and managing the operations, directing investment strategy and possessing authority to execute documents for Archipel, BIM and each

of the Archipel Entities.

78.    By reason of the foregoing, Gray is liable as control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for Archipel, BIM, or the Archipel Entities' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

An Order temporarily and preliminarily, and a Final Judgment permanently, restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### II.

An Order temporarily and preliminarily, and a Final Judgment permanently, restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

### III.

An Order temporarily and preliminarily, and a Final Judgment permanently, restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in

active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8].

### IV.

An Order temporarily and preliminarily prohibiting Defendants from soliciting additional investors or accepting additional investments from existing investors.

### V.

An Order freezing all of Defendants' and Relief Defendants' assets.   .

### VI.

An Order directing Defendants and Relief Defendants to file with this Court and serve upon the Commission, within three (3) business days, or within such extension of time as the Commission staff agrees to, a verified written accounting, signed by each such Defendant, and under penalty of perjury.

### VII.

An Order permitting the Commission to conduct expedited discovery.

### VIII.

An Order enjoining and restraining Defendants and each of the Relief Defendants, and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing, or otherwise interfering with the access of the Commission to relevant documents, books and records.

### IX.

An Order prohibiting Defendants or Relief Defendants or their creditors from filing a voluntary or involuntary petition in bankruptcy on behalf of or against the Defendants or Relief Defendants without further Order of the Court.

### X.

A Final Judgment ordering Defendants to disgorge their ill-gotten gains, plus prejudgment interest, and such other and further amount as the Court may find appropriate.

### XI.

A Final Judgment ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

### XII.

Such other and further relief as this Court deems just and proper.


Dated:        February 27, 2015
              New York, New York


By: _____
Andrew M. Calamari
Sanjay Wadhwa
Steven G. Rawlings
Nancy A. Brown
Hane L. Kim
Victor Suthammanont
SECURITIES AND EXCHANGE COMMISSION
Regional Director
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)
Email: BrownN@SEC.gov