UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

GREGORY W. GRAY, JR., ARCHIPEL CAPITAL
LLC, BIM MANAGEMENT LP,

Defendants,

-and-

ARCHIPEL CAPITAL – AGRIVIDA LLC,
ARCHIPEL CAPITAL – AMYRIS
        BIOTECHNOLOGIES LP,
ARCHIPEL CAPITAL – BLOOM ENERGY LP,
ARCHIPEL CAPITAL – LATE STAGE FUND LP,
ARCHIPEL CAPITAL – LINEAGEN LP,
ARCHIPEL CAPITAL – SOCIAL MEDIA FUND LP,
ARCHIPEL CAPITAL – SOCIAL MEDIA FUND II LP,
ARCHIPEL CAPITAL – SOCIAL MEDIA FUND LP 3,
ARCHIPEL CAPITAL – SOCIAL MEDIA FUND LP 4,
BENNINGTON – EVERLOOP LP,

Relief Defendants.

15 Civ.    (    )
ECF Case

## DECLARATION OF GEORGE O'KANE

I, George O'Kane, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am over 18 years of age and am employed as a Supervisory Staff Accountant in the Investigations Unit of the Division of Enforcement at the New York Regional Office of Plaintiff Securities and Exchange Commission ("Commission"). I have been employed by the Commission for over nine years. My duties include, but are not limited to, assisting in the investigation of possible violations of the federal securities laws. In February 2015, I was assigned to assist in an investigation of Archipel Capital LLC ("Archipel").

2.      I make this Declaration in support of the Commission's Emergency Application

for a Temporary Restraining Order, Preliminary Injunction, Order to Show Cause, Asset Freeze,

and Other Relief (the "Application") against Defendants Archipel, Gregory W. Gray Jr.

("Gray"), BIM Management LP ("BIM"), and Relief Defendants Archipel Capital – Agrivida

LLC ("Agrivida LLC"); Archipel Capital – Amyris Biotechnologies LP ("Amyris LP"); Archipel

Capital – Bloom Energy LP ("Bloom Energy LP"); Archipel Capital – Late Stage Fund LP

("Late Stage Fund LP"); Archipel Capital – Lineagen LP ("Lineagen LP"); Archipel Capital –

Social Media Fund LP ("Social Media Fund LP"); Archipel Capital – Social Media Fund II LP

("Social Media Fund II LP"); Archipel Capital – Social Media Fund LP 3 ("Social Media Fund

LP 3"); Archipel Capital – Social Media Fund LP 4 ("Social Media Fund LP 4"); and

Bennington – Everloop LP ("Everloop LP") (collectively the "Archipel Entities").[1]

3.      I am familiar with the facts and circumstances herein.  I make this Declaration

based upon, among other things: (i) interviews Commission staff conducted of investors in one

or multiple of the Archipel Entities as well as an individual who sold shares of Bloom Energy

Corp. to the Archipel Entities; (ii) review and analysis of bank and brokerage records produced

---

[1] True and correct copies of the private placement memoranda ("PPMS") for the Archipel
Entities are appended hereto as Ex. 5 (Agrivida LLC PPM, Sept. 2011 ("Agrivida PPM")); Ex. 4
(Everloop LP PPM, May 2011 ("2011 EL PPM")); Ex. 9 (Everloop LP PPM, June 2012 ("2012
EL PPM")); Ex. 6 (Bloom Energy LP PPM, March 2012 ("2012 BE PPM")); Ex. 20 (Bloom
Energy LP PPM, Jan. 2014 ("2014 BE PPM")); Ex. 7 (Lineagen LP PPM, March 2012 ("2012 L
PPM")); Ex. 21 (Lineagen LP PPM, Feb. 2014 ("2014 L PPM")); Ex. 10 ((Social Media Fund
LP PPM, June 2012 ("June 2012 SMF PPM")); Ex. 14 (Supp. No. 1 to the Social Media Fund
LP PPM, Nov. 2012 ("Nov. 2012 SMF PPM")); Ex. 17 (Social Media Fund LP PPM, April 2013
("2013 SMF PPM")); and Ex. 24 (Late Stage Fund LP PPM, May 2014 ("LSF PPM").)
References to "Ex." throughout this Declaration are to true and correct copies of each such
document.  Each document was either produced to the Commission staff by investors in the
Archipel entities, financial institutions, Defendants and Archipel Entities, Defendants and the
Archipel Entities' accountants and attorney, and individuals and entities that purportedly sold
shares to the Archipel Entities, or obtained by the staff from publicly available sources.

by financial institutions holding accounts in the name of Gray, Archipel, BIM, the Archipel

Entities, and investors in the Archipel Entities; (iii) review and analysis of documents produced

by Gray, Archipel, BIM, and the Archipel Entities; (iv) review of documents produced by the

accountant for BIM and the Archipel Entities; (v) review of documents produced by the

attorneys that represented Archipel, BIM, and the Archipel Entities in connection with the

formation of the Archipel Entities; (vi) review of documents produced by investors in the

Archipel Entities; (vii) review of documents produced by individuals and entities that

purportedly sold shares to the Archipel Entities; and (vii) Gray's sworn testimony.

**I.      The Defendants**

      4.      **Gregory W. Gray, Jr.** ("Gray"), age 39, lives in Buffalo, New York, and has

additional residences in Chicago, Illinois, and Lake Worth, Florida.  As reflected on Archipel

Capital's website, Gray founded Archipel in 2005. (Ex. 49 ("About" section of

www.archipelcapital.com, and retrieved by Commission staff on Feb. 25, 2015).)  Gray is

Archipel's Senior Managing Director (controlling 65.1% of the LLC's interests).  (*Id.*; Ex. 47

(Relevant excerpts from the Transcript of the Testimony of Gray, given February 24, 2015

("Gray Tr.") at 45:8-12; 73:14-16); Ex. 24 (LSF PPM at NP-SEC-0000713).)  Gray is also the

General Partner of BIM Management LP.  (Ex. 47 (Gray Tr. at 101:1-2).)  Gray first became

registered with FINRA in March 1998 (CRD No. 2905821), and has passed Series 6, 7, 63, and

66 exams.  (Ex. 3 (BrokerCheck Report for Gregory W. Gray, Jr., obtained Feb. 26, 2015).)  In

December 2008, Gray was barred for three years from association with NYSE member firms

based on findings that he had (a) engaged in conduct inconsistent with just and equitable

principles of trade by effecting unauthorized trades in two of his customers' accounts and (b)

engaged in acts detrimental to the interest or welfare of the Exchange by threatening and/or

harassing complaining customers and/or their family members.  (Ex. 2 (*In the Matter of Gregory W. Gray*, Jr., Rel. No. 60361 (S.E.C. July 22, 2009).)

5.      **Archipel Capital, LLC** ("Archipel"), is a New York limited liability company, founded in 2005, (Ex. 49 ("About" section of www.archipelcapital.com, and retrieved by Commission staff on Feb. 25, 2015)), and incorporated on May 15, 2006, (Ex. 50 (New York Secretary of State Division of Corporations entity information report for Archipel, printed from its website on February 26, 2015)), with its principal place of business in Buffalo, NY.  (Ex. 47 (Gray Tr. at 64:2-4); Ex. 48 ("Contact" section of www.archipelcapital.com, and retrieved by Commission staff on Feb. 25, 2015).)  Gray testified that he owns 65.1% of Archipel's membership interests; two business associates of Gray ("Archipel Owner 2" and "Archipel Owner 3") own 25%; and 9.9%, respectively of the firm.  (Ex. 47 (Gray Tr. at 45:8-12).) Offering Documents state that Archipel co-owned BIM.  (*See, e.g.,* Ex. 20 (2014 BE PPM at NP-SEC-0000223).)  Gray testified that Archipel is an entity without assets or employees, and that it is used primarily as a "brand."  (Ex. 47 (Gray Tr. at 44:22-45:4).)

6.      **BIM Management LP** ("BIM") is a Delaware limited partnership incorporated on May 10, 2011, (Ex. 52 (Delaware Department of State Division of Corporations entity information report for BIM[2])), with its principal place of business in Buffalo, NY, (Ex. 47 (Gray Tr. at 64:2-4)).)  Offering documents state that BIM was co-owned by Archipel and a Toronto, Ontario-based entity, Bennington Investment Management, Inc. (Ex. 47 (Gray Tr. at 45:8-12); Ex. 20 (2014 BE PPM at NP-SEC-0000223).)  According to Gray, percentage ownership of BIM is split among the same three individuals, and in the same percentages, as the ownership of Archipel.  (Ex. 47 (Gray Tr. at 93:20-94:5).)  Offering documents list BIM as the General Partner

---

[2] The Delaware Department of State Division of Corporations entity information reports referenced in this declaration were all printed from its website on February 26, 2015.

4

or Managing Member of each of the Archipel Entities, (*see*, Section II, below.) Gray directed BIM's investment and operational activities. (Ex. 47 (Gray Tr. at 70:15-16).) Gray testified that BIM received the 5% up-front management fee on each new investment. (Ex. 47 (Gray Tr. at 101:24-102:1).)

## II.    The Relief Defendants

7.    **Archipel Capital – Agrivida LLC** ("Agrivida LLC") is a Delaware limited liability company incorporated on July 28, 2011, (Ex. 53 (Delaware Department of State Division of Corporations entity information report for Agrivida LLC), with its principal place of business in Buffalo, NY, (Ex. 47 (Gray Tr. at 64:2-4)), with the purpose of acquiring Series B+ Preferred Stock of Agrivida, Inc. (Ex. 5 (Agrivida PPM at ARCHIPEL 00917).) BIM is the Managing Member of Agrivida LLC. (Ex. 5 (Agrivida PPM at ARCHIPEL 00917).) Since inception, Agrivida LLC raised $385,000.00 from 13 investors. (Ex. 66 (Staff Analysis of Archipel Investor Charts[3]).)

8.    **Archipel Capital – Amyris Biotechnologies LP** ("Amyris LP") is a Delaware limited partnership incorporated on June 27, 2008, (Ex. 54 (Delaware Department of State Division of Corporations entity information report for Amyris LP), with its principal place of business in Buffalo, NY (Ex. 47 (Gray Tr. at 64:2-4)), with an unknown purpose. Amyris LP appears not to be operational. Gray testified that "we never did anything" with the Amyris investment, (Ex. 47 (Gray Tr. at 88:25-89:2)), and the staff knows of no bank account associated with it, offering documents issued to investors respecting it, nor any investors who invested in it.

---

[3] Ex. 66 is an analysis prepared by the staff of the Investigations Unit, analyzing Ex. 41 Investor Chart for Everloop LP, Agrivida LLC, Bloom Energy LP, Social Media Fund LP, and Lineagen LP (ARCHIPEL002091); Ex. 42 (Investor Chart for Late Stage Fund LP (ARCHIPEL002092)); and Exs. 4-7, 9-10, 17, 20-21, and 24 (PPMs for Archipel Entities).

9.      **Archipel Capital – Bloom Energy LP** ("Bloom Energy LP") is a Delaware limited partnership incorporated on February 24, 2012, (Ex. 55 (Delaware Department of State Division of Corporations entity information report for Bloom Energy LP), with its principal place of business in Buffalo, NY, (Ex. 47 (Gray Tr. at 64:2-4)), with the purpose of acquiring common stock and capital stock of Bloom Energy Corp. (Ex. 6 (2012 BE PPM at NP-SEC-0000146); Ex. 20 (2014 BE PPM at NP-SEC-0000219).)  BIM is the General Partner of Bloom Energy LP. (Ex. 6 (2012 BE PPM at NP-SEC-0000150); Ex. 20 (2014 BE PPM at NP-SEC-0000223).)  Since inception, Bloom Energy LP raised $3,160,566.25 from 32 investors. (Ex. 66 (Staff Analysis of Archipel Investor Charts).)  Gray testified that a recent investor from China, whose investment is set to close next week, directed his $470,000 to this fund. (Ex. 47 (Gray Tr. at 168:6-8).)

10.     **Archipel Capital – Late Stage Fund LP** ("Late Stage Fund LP") is a Delaware limited partnership incorporated on May 9, 2014, (Ex. 56 (Delaware Department of State Division of Corporations entity information report for Late Stage Fund LP), with its principal place of business in Buffalo, NY, (Ex. 47 (Gray Tr. at 64:2-4)), with the purpose of acquiring shares in a portfolio of companies, largely venture-capital-backed, late-stage companies, and with pre-IPO shares of Uber Technologies, Inc. ("Uber") intended to be the partnership's primary holding. (Ex. 24 (LSF PPM at NP-SEC-0000709).)  BIM is the General Partner of Late Stage Fund LP. (*Id.*)  Since inception, Late Stage Fund LP raised $6,020,640.00 from nine investors. (Ex. 66 (Staff Analysis of Archipel Investor Charts).)

11.     **Archipel Capital – Lineagen LP** ("Lineagen LP") is a Delaware limited partnership incorporated on February 24, 2012, (Ex. 57 (Delaware Department of State Division of Corporations entity information report for Lineagen LP), with its principal place of business in

Buffalo, NY, (Ex. 47 (Gray Tr. at 64:2-4)), with the purpose of acquiring Series B and Series C

Convertible Preferred Stock of Lineagen, Inc. (Ex. 7 (2012 L PPM at NP-SEC-0000307); Ex. 21

(2014 L PPM at NP-SEC-0000484).) BIM is the General Partner of Lineagen LP. (Ex. 7 (2012

L PPM at NP-SEC-0000307); Ex. 21 (2014 L PPM at NP-SEC-0000484).) Since inception,

Lineagen LP raised $1,888,876.91 from 28 investors. (Ex. 66 (Staff Analysis of Archipel

Investor Charts).)

      12.    **Archipel Capital – Social Media Fund LP** ("Social Media Fund LP") is a

Delaware limited partnership incorporated on May 17, 2012, (Ex. 58 (Delaware Department of

State Division of Corporations entity information report for Social Media Fund LP), with its

principal place of business in Buffalo, NY, (Ex. 47 (Gray Tr. at 64:2-4)), with the purpose of

investing in portfolio companies in the social media industry, in particular Twitter, Inc.

("Twitter"). (Ex. 10 (June 2012 SMF PPM at NP-SEC-0000610); Ex. 14 (Nov. 2012 SMF

PPM); Ex. 17 (2013 SMF PPM).) BIM is the General Partner of Social Media Fund LP. (Ex. 10

(June 2012 SMF PPM at NP-SEC-0000610); Ex. 17 (2013 SMF PPM at NP-SEC-0000662).)

Since inception, Social Media Fund LP raised $2,396,618.99 from 46 investors. (Ex. 41

(Archipel Investor Chart (ARCHIPEL002091)).)

      13.    **Archipel Capital – Social Media Fund II LP** ("Social Media Fund II LP") is a

Delaware limited partnership incorporated on September 11, 2013, (Ex. 59 (Delaware

Department of State Division of Corporations entity information report for Social Media Fund II

LP), with its principal place of business in Buffalo, NY, (Ex. 47 (Gray Tr. at 64:2-4)), with the

purpose of investing in portfolio companies in the social media industry, in particular Twitter.

(Ex. 10 (June 2012 SMF PPM at NP-SEC-0000610); Ex. 14 (Nov. 2012 SMF PPM); Ex. 17

(2013 SMF PPM).) BIM is the General Partner of Social Media Fund LP. (Ex. 10 (June 2012

SMF PPM at NP-SEC-0000610); Ex. 17 (2013 SMF PPM at NP-SEC-0000662).)  Since inception, Social Media Fund II LP raised $1,268,473.50 from one investor.  (Ex. 41 (Archipel Investor Chart (ARCHIPEL002091)).)

14.    **Archipel Capital – Social Media Fund LP 3** ("Social Media Fund LP 3") is a Delaware limited partnership incorporated on March 20, 2014, (Ex. 60 (Delaware Department of State Division of Corporations entity information report for Social Media Fund LP 3), with its principal place of business in Buffalo, NY, (Ex. 47 (Gray Tr. at 64:2-4)), with the purpose of investing in portfolio companies in the social media industry, in particular acquiring Twitter. (Ex. 10 (June 2012 SMF PPM at NP-SEC-0000610); Ex. 14 (Nov. 2012 SMF PPM); Ex. 17 (2013 SMF PPM).)  BIM is the General Partner of Social Media Fund LP.  (Ex. 10 (June 2012 SMF PPM at NP-SEC-0000610); Ex. 17 (2013 SMF PPM at NP-SEC-0000662).)   Since inception, Social Media Fund LP 3 raised $1,300,000.00 from two investors.  (Ex. 41 (Archipel Investor Chart (ARCHIPEL002091)).)

15.    **Archipel Capital – Social Media Fund LP 4** ("Social Media Fund LP 4")[4] is a Delaware limited partnership incorporated on March 20, 2014, (Ex. 61 (Delaware Department of State Division of Corporations entity information report for Social Media Fund LP 4), with its principal place of business in either Buffalo, NY, (Ex. 47 (Gray Tr. at 64:2-4)), with the purpose of investing in portfolio companies in the social media industry, in particular Twitter.  (Ex. 10 (June 2012 SMF PPM at NP-SEC-0000610); Ex. 14 (Nov. 2012 SMF PPM); Ex. 17 (2013 SMF PPM).)  BIM is the General Partner of Social Media Fund LP.  (Ex. 10 (June 2012 SMF PPM at NP-SEC-0000610); Ex. 17 (2013 SMF PPM at NP-SEC-0000662).)  Since inception, Social

---

[4] Social Media Fund LP, Social Media Fund II LP, Social Media Fund LP 3, and Social Media Fund LP 4 are collectively referred to in this Declaration as "Social Media Fund LP."  The four partnerships did not have separate offering documents and shared one bank account.

Media Fund LP 4 raised $275,000.00 from three investors.  (Ex. 41 (Archipel Investor Chart (ARCHIPEL002091)).)

16.    **Bennington – Everloop LP** ("Everloop LP") is a Delaware limited partnership incorporated on May 10, 2011 (Ex. 51 (Delaware Department of State Division of Corporations entity information report for Everloop LP), with its principal place of business in Buffalo, NY, (Ex. 47 (Gray Tr. at 64:2-4)), with the purpose of acquiring Series A and Series A1 Preferred Stock in Everloop, Inc.  (Ex. 4 (2011 EL PPM); Ex. 9 (2012 EL PPM).)  BIM is the General Partner of Everloop LP.  (Ex. 4 (2011 EL PPM at NP-SEC-0000005); Ex. 9 (2012 EL PPM at NP-SEC-0000085).)  Since inception, Everloop LP raised $2,913,131.19 from 68 investors.  (Ex. 66 (Staff Analysis of Archipel Investor Charts).)

**III.    Archipel Background**

17.    Around 2011, Gray began to solicit investments from individual investors and small investment entities promising interests in the Archipel Entities, (Ex. 47 (Gray Tr. at 49:1-9); Section II, above), which would, in turn, invest the funds raised in a private company or companies that Gray believed would soon realize a "liquidity event" (i.e., initial public offering or merger/acquisition).  (Ex. 30 (June 17, 2014 email chain between Gray and investors and PowerPoint attachment); Ex. 47 (Gray Tr. at 70:25-71:25).)  From 2011 to present, Archipel has attracted at least $19.6 million in investments in its Archipel Entities from at least 140 individuals and entities.  (Ex. 66 (Staff Analysis of Archipel Investor Charts).)

18.    Each Archipel Entity was set up as a limited partnership or limited liability company and sold either limited partnership or membership interests to investors.  ((*See, e.g.,* Ex. 20 (2014 BE PPM at NP-SEC-0000219); *see also* Section II, above).)  Each Archipel Entity was intended to invest the pooled funds entirely or primarily into a specific company or companies.

(*See, e.g.,* Ex. 20 (2014 BE PPM at NP-SEC-0000223); *see also* Section II, above.)  BIM was the

Managing Member or General Partner of each, (*see* Section II, above), and Gray is listed as the

contact for BIM.  (*See, e.g.,* Ex. 20 (2014 BE PPM at NP-SEC-0000222).)  Gray opened separate

bank accounts and brokerage accounts for each Archipel Entity, (Ex. 65 (Chart of financial

accounts associated with Gray and the Archipel Entities))[5]; although he routinely comingled

funds among the Entities' accounts as shown below, and has signatory authority on each bank

account.  (*Id.* (Chart of financial accounts associated with Gray and the Archipel Entities); Ex. 69

(relevant account opening documents).)  At least as early as September 2011, when Gray

transferred $50,000 from Agrivida LLC to Everloop LP, Gray has commingled money between

the funds, transferring money from one Archipel Entity's account to another as the need arose.

(Ex. 71 (September 2011 bank statement of Agrivida LLC account showing transfer of $50,000

out to account "8522" on September 27, 2011; September 2011 bank statement of Everloop LP

account (ending in 8522) showing $50,000 "counter credit" on September 28, 2011).)  Archipel

Owner 2 has signatory authority on five of the bank accounts—including two with nearly all of

the Archipel Entities' current liquid assets (approximately $1 million).  (Ex. 69 (relevant account

opening documents).)

      19.    BIM (and thus Gray) has the power under all of the Archipel Entities' offering

documents to "carry out any and all of the objects and purposes of the Partnership and to perform

all acts and enter into and perform all contracts and other undertakings that it may in its

reasonable and good faith discretion deem necessary or advisable or incidental thereto." (*See,*

*e.g.,* Ex. 20 (2014 BE PPM at NP-SEC-0000244).)  Under the PPMs, BIM agrees to "provide

various advisory and management services to the Partnership," including "negotiating" and

---

[5] This chart summarizes the staff's review of financial records produced during the course of the investigation.

"structuring the Partnership's investment," "evaluating and monitoring the Partnership's investment," "monitoring the industry in which" the companies operate," and "providing periodic reports to Partnership investors" on the investments. (*See, e.g.,* Ex. 20 (2014 BE PPM at NP-SEC-0000223).)  BIM has the power for Social Media Fund LP and Late Stage Fund LP to choose the identity of the portfolio companies themselves, as well as the "sole discretion" to "determin[e] to make distributions, whether cash, in kind, or a combination thereof . . . . even if such securities have been registered for resale under the 1933 Act." (Ex10 (June 2012 SMF PPM at NP-SEC-0000610 & 617); Ex. 24 (LSF PPM) NP-SEC-0000709 & 718).)

20.    In exchange for its services, BIM is entitled to a management fee of 5% (paid up-front) of the total capital raised by each Archipel Entity, as well as a performance-based payment of 10% carried interest on the partnerships' profits. (*See, e.g.,* Ex. 20 (2014 BE PPM at NP-SEC-0000224); Ex. 47 (Gray Tr. at 70:25-71:8).)  BIM also had the right to reserve investor money for expenses, not anticipated to exceed 2.5% (for Agrivida LLC) and 5% (for the other Archipel Entities) of total capital raised. (Ex. 5 (Agrivida PPM at ARCHIPEL 00918); *see, e.g.,* Ex. 20 (2014 BE PPM at NP-SEC-0000224).)

21.    To date, Twitter is the only portfolio company that has undergone a positive liquidity event (having gone public in November 2013), (Ex. 47 (Gray Tr. at 71:19-72:10), and Social Media Fund LP is the only Archipel Entity that has given investors a positive return on their investment. (*Id.*)  Bloom Energy LP and Late Stage Fund LP are open for investment and may accept additional investors. (Ex. 47 (Gray Tr. at 166:19-25).)  Lineagen LP and Agrivida LLC are no longer accepting investors. (Ex. 47 (Gray Tr. at 167:1-9).)  Everloop, Inc. collapsed, and Everloop LP received funds from a settlement. (Ex. 47 (Gray Tr. at 72:1-10).)

IV.    **The Twitter Scheme**

22.    Around May 2012, Gray began to solicit investors for Social Media Fund LP.

(Ex. 8 (May 30, 2012 email from the Archipel Entities' attorney to Gray, attaching Social Media

Fund LP offering documents).)  Social Media Fund LP issued a PPM that claimed that the

partnership was "raising capital to target investments in portfolio companies in the social media

industry" with "the first of its investment" to be pre-IPO common stock of Twitter "at a price not

to exceed $26.00 per share."  (Ex. 10 (June 2012 SMF PPM).)

23.    In September 2012, Social Media Fund LP agreed to purchase 25,000 Twitter

shares for $25.50 per share, for a total of $637,500.00, as well as $15,000 in fees.  (Exs. 11 – 13

(September 2012 Stock Transfer Agreements ("STAs").)  By this point, although Gray had

raised enough investor money to cover this purchase, he had transferred more than half out of the

partnership's bank account.[6]  As a result, Gray paid for the shares in part with $207,500.00

taken from other Archipel Entities' bank accounts.[7]

_____

[6] Gray transferred $150,000 from Social Media Fund LP to Agrivida LLC on June 27, 2012 (Ex.
72 (June 2012 bank statement for Social Media Fund LP, showing $150,000 wire transfer on
June 27, 2012 to account 9335; June 2012 bank statement for Agrivida LLC, account number
9335, showing receipt of $150,000 wire transfer on June 27, 2012), which he then used to invest
in Agrivida Inc. on the same day, and transferred $200,000 to Everloop LP on August 1, 2012
Ex. 73 (August 2012 bank statement for Social Media Fund LP, showing $200,000 transfer to
account 8522 on August 1, 2012; August 2012 bank statement for Everloop LP, account 8522,
showing $200,000 transfer in on August 1, 2012), which he then used to invest in Everloop Inc.
on the same day.

[7] Gray took $25,000 from Agrivida LLC (Ex. 74 (September 2012 Agrivida LLC bank
statement, showing $25,000 transfer out to account 2102 on September 5, 2012; September 2012
Social Media Fund LP bank statement (account 2102), showing $25,000 transfer in on
September 5, 2012)), $55,000 from Bloom Energy LP (Ex. 75 (September 2012 Bloom Energy
LP bank statement, showing $55,000 transfer out to account 2102 on September 5 2012); Ex. 74
(September 2012 Social Media Fund LP bank statement (account 2102), showing $55,000
transfer in on September 5, 2012)); $7,500 from Lineagen LP (Ex. 76 (September 2012 Lineagen
LP bank statement, showing $7,500 transfer out to account 2012 on September 5, 2012); Ex. 74
(September 2012 Social Media Fund LP bank statement (account 2012), showing $7,500 transfer
in on September 5, 2012)); and $120,000 from Everloop LP (Ex. 77 (September 2012 Everloop

24.     When certain investors began to complain that they had expected the price per share of Twitter to be lower, Gray responded by having Social Media Fund LP issue in November 2012 "Supplement No. 1" to the private placement memorandum that lowered the price at which the fund would acquire the targeted Twitter shares.  (Ex. 15 (Nov. 7, 2012 email chain with Gray and investors regarding "Twitter phone calls"); Ex. 16 (Nov. 9, 2012 email chain with Gray and investors chain regarding a draft of the Nov. 2012 SMF PPM); Ex. 14 (Nov. 2012 SMF PPM).)  The Supplemental PPM stated that the partnership "intend[ed] to use proceeds from the continued fundraising to acquire additional shares of stock of Twitter with a targeted price per share of any future purchases not in excess of $20 per share."  (Ex. 14 (Nov. 2012 SMF PPM).)  In April 2013, Social Media Fund LP issued an "Amended and Restated" private placement memorandum, in which it stated that the "General Partner's objective [was] that the holdings of the Partnership [would] reflect an overall acquisition price per Twitter Share not to exceed $20.00 . . . ."  (Ex. 17 (2013 SMF PPM).)

25.     In August 2013, Social Media Fund LP purchased an additional 55,000 shares of Twitter common stock for $22.50 per share, for a total of $1,237,500.  (Ex. 19 (August 22, 2013 STA between Social Media Fund LP and Twitter Seller 4).)  This purchase was funded by the investment of Investor B, which had invested $1,268,437.50 in Social Media Fund LP one day before the purchase.  (Ex. 78 (August 2013 Social Media Fund LP account statement, showing $1,268,437.50 wire in on August 21, 2013 from Investor B.))

26.     Social Media Fund LP made no additional purchases of Twitter shares before Twitter's IPO on November 6, 2013.  In sum, between June 2012 and November 2013, Social

LP bank statement, showing $120,000 transfer out to account 2012 on September 5, 2012); Ex. 74 (September 2012 Social Media Fund LP bank statement (account 2102), showing $120,000 transfer in on September 5, 2012)).  All of these transactions are depicted on page 2 of Ex. 67.

Media Fund LP raised $5,240,092.49 from individuals and entities, (Ex. 66 (Staff Analysis of Archipel Investor Charts)), representing an obligation to provide investors approximately 230,000 shares if bought at the prices promised in the PPM and Supplemental PPM, (Ex. 47 (Gray Tr. at 219:12-220:3), but it only had purchased 80,000 pre-IPO shares for $1,875,000.00, at an average cost of $23.44 per share.

27.     Investors expected to receive either the Twitter shares that the Social Media Fund LP had promised to buy, or a cash equivalent, at the end of the stock's lock up period, or May 2014.[8]   But by the end of this "lock-up" period, Social Media Fund LP's bank account held less than $100,000, leaving it with no ability to purchase the Twitter shares it had promised to buy and distribute.  (Ex. 80 (May 2014 Social Media Fund LP bank statement, showing an opening balance of $74,236.70).)  Investors were expecting an additional 150,000 shares over the 80,000 pre-IPO Twitter shares that Gray had purchased—or the cash equivalent (at that time, approximately $4,777,500 based on per share price $31.85 as of the close of business on May 6, 2014).  (Ex. 81 (Print out from Yahoo.Finance.com of May 6, 2014 price per share of Twitter common stock, reflecting a closing price of $31.85).)

28.     In June, Gray repeatedly told Social Media Fund LP investors that he had submitted transfer paperwork Twitter's Transfer Agent.  (*See, e.g.,* Ex. 27 (June 4, 2014 email chain between Gray and Investor A's business manager); Ex. 28 (June 11, 2014 email chain between Gray and investors, copying his attorney).)  Gray also emailed certain Social Media Fund LP investors on June 19, 2014, and claimed that the partnership had "moved the remaining fund shares from [Twitter's Transfer Agent] to the funds [sic] brokerage account at [Brokerage Firm X]" and that continued delays in transferring the shares were caused by issues relating to

---

[8]     Because pre-IPO Twitter shares were restricted, they could not be sold or transferred to investors for six months after their purchase.  (Ex. 47 (Gray Tr. at 220:25-221:6).)

Brokerage Firm X's account-opening policies.  He wrote:  "We have already provided [Brokerage Firm X] the transfer instructions for each of you" and the shares would be transferred "next week."  (Ex. 31 (June 19, 2014 email from Gray to "Social Media LP's").)

29.     Staff has found no evidence that Gray attempted to transfer shares from Twitter's Transfer Agent to Brokerage Firm X.  (Ex. 62 (Twitter's Transfer Agent Account Statement, (reflecting Gray had transferred all but 1,798 shares out of the Social Media Fund LP account by June 19, 2014)); Ex. 40 (Fidelity statements from June 23, 2014 to November 30, 2014 at SEC-FBS-E-0000080-83 (reflecting beginning balance of $0, additions of $2,142,000 in cash, and no transfers in of Twitter shares in June, only purchases)).)  On June 19, Gray had only 1,798 pre-IPO Twitter shares, which he ultimately took for himself months later, in November 2014.  (Ex. 62 Twitter's Transfer Agent Account Statement; Ex. 40 (Fidelity statements at SEC-FBS-E-0000113); Ex. 82 (November 24, 2014 email from Gray to Brokerage Firm X stating intent to close Social Media Fund brokerage account).)

30.     In the meantime, in April 2014, Gray began to solicit investments in a new partnership, Late Stage Fund LP.  (*See, e.g.*, Ex. 22 (April 13, 2014 email chain between Gray and an investor regarding Bloom Energy and Uber); Ex. 23 (April 21, 2014 email chain between Gray and an investor who is also Investor A's business manager).)  He told potential investors in that fund that he had a $5 million to $10 million allocation in shares of Uber (or an agreement that he could buy a certain number of Uber shares for $5 to $10 million), including Investor A who had invested $1,865,035.00 in prior Archipel Entities, including Social Media Fund LP.  (*Id.*; Ex. 41 (Archipel Investor Chart (ARCHIPEL002091)).)  At the end of May 2014, Gray asked Investor A, to "take the full $5m of UBER at a $6b valuation- then once the next UBER valuation is set (estimate is $12b) we [i.e., the Late Stage Fund LP] would sell [Investor A] out at

15

the $12b [valuation-driven price]." (Ex. 25 (May 27, 2014 email chain between Gray and Investor A's business manager).) Gray wrote that the $5 million would be "needed by June 10." (*Id.*) On May 29, 2014, Investor A agreed to the deal. (Ex. 26 (May 29, 2014 email chain between Gray and Investor A's business manager).) On June 10, 2014, Investor A transferred $5,000,000 to the Late Stage Fund LP bank account. (Ex. 83 (June 10, 2014 Late Stage Fund bank statement showing wire transfer of $5 million); Ex. 84 (June 2014 Late Stage Fund bank account records showing the same).)

31.    Also in June 2014, Gray received a $650,000 settlement in connection with a mediation between Everloop LP and its portfolio company Everloop, Inc.  Everloop LP had asserted that Everloop, Inc. had made certain misrepresentations to Everloop LP in connection with its investment in the company. (Ex. 85 (June 2014 Everloop LP bank statement showing wire transfer from insurance company of $650,000); Ex. 64 (June 20, 2014 Everloop Settlement Agreement).)

32.    In late June, Gray transferred nearly all of Investor A's $5,000,000 Late Stage investment, as well as approximately $350,000 from the Everloop settlement, and used it to pay out Social Media Fund LP investors their expected return on investment. (Ex. 86 (June 26, 2014 Social Media Fund Bank records reflecting a receipt of $195,000); Ex. 88 (June 23, 2014 Late Stage Fund bank record reflecting receipt of $200,000); Ex. 85 (June 2014 Everloop LP bank record reflecting a $195,000 withdrawal from a $200,000 withdrawal).) This included a $2,129,366 cash payment that went directly from the Late Stage Fund LP bank account to Investor B, which had invested $1,268,473.50 in Social Media Fund LP, and $2,449,500 that

indirectly went back to Investor A, who had invested $1,200,000 in Social Media Fund LP.[9] (Ex. 84 (June 2014 Late Stage Fund bank record showing outgoing transfer of $2,129,366); Ex. 83 (June 2014 Late Stage Fund bank record showing said transfer went to MV Liquidity Fund); Ex. 89 (June 2014 Social Media Fund bank statement reflecting a receipt of $995,000); Ex. 84 (June 2014 Late Stage Fund bank statement reflecting a withdrawal of the same amount); Ex. 90 (June 2014 Late Stage Fund bank withdrawal of $152,207 for checks made payable to Social Media Fund investors).)   Gray also bought approximately 30,000 shares of Twitter on the open market for $37.79 to $40.83 per share, and days later distributed the shares to various Social Media Fund LP investors. Ex. 91 (June 30, 2014 letter from Gray to Brokerage Firm X regarding instructions to transfer shares to Social Media Fund investors); Ex. 92 (July 1 2014 and July 8, 2014 letter regarding the same).)

33.     After Gray distributed the shares he had purchased on the open market, certain investors in Social Medial Fund LP complained that they had still received fewer shares than expected. (Ex. 63 (June 23, 2014 email from investor to Gray re Twitter); Ex. 32 (July 18, 2014 Email from investor to Gray re: Twitter); Ex. 33 (July 24, 2014 email from investor to Gray); Ex. 34 (July 28, 2014 email from investor to Gray re: Twitter cash).)  In reality, Gray had spent $1,875,000.00 of Social Media Funds' money to purchase pre-IPO shares, and $2,125,110.55 of Late Stage Fund LP's proceeds to purchase post-IPO Twitter shares.  On August 1, 2014, Gray stated he would distribute the remaining $136,657.04 to investors on a pro rata basis.  (Ex. 35

---

[9] Gray transferred $1,185,000.00 to Investor A from the Social Media Fund LP account in late June.  (Ex. 89 (June 2014 Social Media Fund bank statement reflecting wire transfer of $1,185,000); Ex. 93 (June 2014 Investor A brokerage account statement reflecting wire transfer of $1,185,000); Ex. 94 (July 8, 2014 bank statement showing wire transfer of $1,264,500).  Gray then purchased 30,000 shares of Twitter at $39.50 in June 2014, sold the shares at $42.60 in July 2014, receiving $1,277,963.80, and gave Investor A a $1,264,500.00 cash payment, which supposedly was the second half of his return.  (Ex. 40 (Fidelity brokerage account statements).)

(August 1, 2014 email from Gray to investors).)  As of August 11, 2014, however, Social Media

Fund LP had only $50,388.25 in its bank account.  On August 11, 2014, Gray moved $100,000

from the Lineagen LP bank account, (Ex. 68 (Check dated August 8, 2014, reflecting payment

from the account of Lineagen LP and paid to Social Media Fund); Ex. 95 (August 2014 bank

account statement reflecting payment of $100,000),) and, from August 15 to October 1, 2014,

Gray distributed approximately $135,000 to Social Media Fund LP investors.  (Ex. 87 (bank

records from August to October 2014 reflecting redeemed checks from at least 40 Social Media

Fund investors).)

34.     On June 12, 2014, Gray and Investor A executed a letter agreement for Investor

A's Late Stage Fund LP investment.  (Ex. 29 (June 12, 2014 email chain between Gray and

Investor A's business manager and attachment).)  The agreement gave the partnership 21 days to

acquire "at least 142,857 shares of UBER at $35.00 per share price" which "represents an

approximate $6 billion valuation for UBER." (*Id.*)

35.     Afterwards, Investor A's business manager repeatedly asked Gray for

documentation proving that Late Stage Fund LP owned the Uber shares.  (Ex. 37 (August 5,

2014 email chain between Gray and Investor A's business manager with the subject "UBER");

Ex. 38 (August 5, 2014 email chain between Gray and Investor A's business manager with the

subject "From McEssy Lake Forest Office").)  On August 8, 2014, Gray sent Investor A's

business manager a fabricated document.  Gray claimed the document was "the executed [stock-

transfer agreements] by 1.) UBER 2.) the seller and 3.) Archipel / GP." (Ex. 39 (Aug. 8, 2014

email from Gray to Investor A's business manager).)  The document stated that Seller A

(purportedly the seller of the Uber shares) "sells, assigns and transfers" 175,438 shares of "Uber

Technology Inc." to the Late Stage Fund LP.  (*Id.*)  In fact, the signatures for Seller A appear to

have been copied from an earlier stock-transfer agreement between Bloom Energy Corp., Seller A, and Bloom Energy LP (a different Archipel Entity) that was executed on or about November 8, 2013. (Ex. 18 (Bloom Energy STA).)  Submitted herewith as Exhibit A to the Declaration of Hane L. Kim, executed February 27, 2015 ("Kim Decl."), is a declaration from Seller A, who attests that, while he did sell Bloom Energy shares to Archipel's Bloom Energy LP in November 2013, he has never owned or sold any Uber shares or signed any document selling any Uber shares. (Kim Decl. Ex. 1.)  Uber's counsel informed the staff that it has no record of stock ownership by Seller A, Gray, Archipel, Late Stage Fund LP, BIM, or Bennington. (Ex. 46 (Feb. 5, 2015 Letter from counsel for Uber to staff).)

36. The staff showed this fabricated document to Gray during his sworn testimony on February 24, 2015. Gray identified the document as the stock transfer agreement for the Uber shares. (Ex. 47 (Gray Tr. at 186:18-22).)  Gray testified that the stock transfer agreement "never got done" because in October or November of 2014, Uber exercised a "right of first refusal" to interpose itself as the purchaser of the Uber shares. (Ex. 47 (Gray Tr. at 187:1-10).)  Gray further stated that since then, Investor A's "allocation" moved into Lyft Inc. (an Uber competitor), and other well-known pre-IPO stocks. (Ex. 47 (Gray Tr. at 187:19-188:13).)  But the staff interviewed Investor A on December 23, 2014, and Investor A stated that he believed at that time that the Last Stage Fund owned Uber shares. Moreover, in December 2014, Gray represented to Investor A that he was negotiating with a potential Chinese investor to purchase Investor A's interest in the Late Stage Fund, the purchase price of which would be based on Uber's valuation. (Ex. 43 (December 26, 2014 email from Gray to Investor A's business manager, attaching a "Letter of Intent"); Ex. 44 (December 26, 2014 email chain between Gray and Investor A); Ex. 45 (December 30, 2014 email chain between Gray and Investor A's

19

business manager attaching an updated "Letter of Intent.").) Gray testified that he was negotiating with another investor in China for an investment that would "buy out" the current Late Stage Fund investors and provide additional funds for a Late Stage Fund II. (Ex. 47 (Gray Tr. at 227:3-16).) The staff does not know what, if any, securities Gray actually purchased for the Late Stage Fund, but bank records as of February 20, 2015 showed a balance of only $481,184.05. (Ex. 1 (M&T Bank Statements for January 2015 and recent wire transfers).)

37.     During Gray's testimony, the staff learned for the first time of an investment in the amount of $470,000 in Bloom Energy LP by a Chinese investor. (Ex. 47 (Gray Tr. at 168:6-8).) Gray claimed the investment was structured in three "tranches" and that the final tranche is schedule to close sometime next week. (*Id.*) The staff has identified over $340,000 in funds deposited into the Bloom Energy LP bank account in February. (Ex. 1 (M&T Bank Statements for January 2015 and recent wire transfers).).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 27, 2015, New York, New York

George O'Kane