# EXHIBIT 4

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## MAY 2011

**\*\*\* ACCREDITED INVESTORS ONLY \*\*\***

# Bennington - Everloop LP

**(a Delaware Limited Partnership)**

Limited Partnership Interests

 



Bennington – Everloop LP, a Delaware limited partnership (hereinafter referred to as the "**Partnership**"), is offering by means of this Confidential Private Placement Memorandum (this "**Memorandum**") the limited partnership interests described herein ("**Interests**") (the "**Offering**").   As further described herein, the Partnership will be investing in convertible preferred stock of Everloop, Inc., a California corporation.

Each investor must meet the Investor Suitability Requirements set forth herein (the "**Investor**"), and must agree to purchase the Interests for investment purposes only.   The sale of the Interests is subject to the provisions of, and each of the Investors purchasing the Interests will be required to execute, the Subscription Agreement of the Partnership (the "**Subscription Agreement**"), which includes a power of attorney enabling the general partner of the Partnership to execute the Limited Partnership Agreement of the Partnership (the "**Limited Partnership Agreement**") on behalf of the Investor.   Any purchase of the Interests should be made only after a complete and thorough review of the provisions of the aforementioned Partnership documents.   In the event that any of the terms, conditions or other provisions of the Limited Partnership Agreement or the Subscription Agreement are inconsistent with or contrary to the description or terms in this Memorandum, the terms of the Limited Partnership Agreement or the Subscription Agreement, as applicable, will be controlling.

Confidential

Confidential treatment requested by Nixon Peabody LLP     NP-SEC-0000001

**IMPORTANT NOTICE TO ALL INVESTORS**

THESE INTERESTS ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK
(SEE "RISK FACTORS")

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE INTERESTS IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION IN SUCH JURISDICTION.

THESE INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY UNITED STATES OR FOREIGN SECURITIES COMMISSION NOR HAS ANY SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY JURISDICTION, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ANY SIMILAR LAWS. THE PROSPECTIVE INVESTOR WILL BE REQUIRED TO MAKE REPRESENTATIONS AS TO THE BASIS UPON WHICH IT QUALIFIES AS AN ACCREDITED INVESTOR.  AS THE INTERESTS ARE NOT REGISTERED UNDER ANY SECURITIES LAWS AND THERE IS NOT A PUBLIC OR OTHER MARKET FOR THE SALE OF THE INTERESTS, AN INVESTOR MAY BE REQUIRED TO RETAIN THE INVESTMENT FOR AN INDEFINITE PERIOD.

UNLESS REQUIRED UNDER APPLICABLE LAW, NEITHER THE PARTNERSHIP NOR BIM MANAGEMENT LP (THE "GENERAL PARTNER") WILL, RESPECTIVELY, BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OR AS AN INVESTMENT ADVISOR UNDER THE INVESTMENT ADVISER'S ACT. CONSEQUENTLY, INVESTORS WILL NOT BE AFFORDED THE PROTECTIONS OF EITHER SUCH ACTS.

THE PROSPECTIVE INVESTOR, BY ACCEPTING DELIVERY OF THIS MEMORANDUM AND RELATED DOCUMENTS, AGREES TO KEEP SUCH DOCUMENTS CONFIDENTIAL, TO ONLY USE THEM FOR PURPOSES OF CONSIDERING AN INVESTMENT IN THE PARTNERSHIP, AND PROMPTLY RETURN THIS MEMORANDUM AND ANY OTHER DOCUMENTS OR INFORMATION FURNISHED TO THE PROSPECTIVE INVESTOR REGARDING THE PRIVATE PLACEMENT OR THE PARTNERSHIP TO THE GENERAL PARTNER IF THE PROSPECTIVE INVESTOR DECIDES NOT TO INVEST, OR UPON THE WRITTEN REQUEST OF THE PARTNERSHIP.

THE CONTENTS OF THIS MEMORANDUM SHALL NOT BE CONSTRUED AS LEGAL, TAX OR INVESTMENT ADVICE.  INVESTOR SHOULD SEEK HIS OWN LEGAL, TAX AND INVESTMENT ADVICE FROM QUALIFIED PROFESSIONALS PRIOR TO MAKING

Confidential

A DECISION TO INVEST.  FOR A MORE DETAILED TAX DISCLOSURE CONCERNING THE INTERESTS, PROSPECTIVE INVESTORS SHOULD CAREFULLY READ THE "TAX CONSIDERATIONS" CONTAINED HEREIN.

PROSPECTIVE INVESTORS SHOULD CAREFULLY REVIEW THIS MEMORANDUM AND ANY ACCOMPANYING DOCUMENTS, INCLUDING THE LIMITED PARTNERSHIP AGREEMENT AND THE SUBSCRIPTION AGREEMENT.  IN MAKING AN INVESTMENT DECISION, YOU MUST RELY ON YOUR OWN EXAMINATION OF THE PARTNERSHIP AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  INVESTORS SHOULD ALSO REVIEW THE PRIVACY POLICY OF THE PARTNERSHIP, ATTACHED HERETO AS EXHIBIT C.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

THIS MEMORANDUM AND THE ATTACHMENTS HERETO CONTAIN FORWARD-LOOKING STATEMENTS THAT INVOLVE KNOWN AND UNKNOWN RISKS AND UNCERTAINTIES AND OTHER FACTORS THAT MAY CAUSE ACTUAL RESULTS, LEVELS OF ACTIVITY, PERFORMANCE OR ACHIEVEMENTS TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, LEVELS OF ACTIVITY, PERFORMANCE, OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS.  SUCH FACTORS INCLUDE, AMONG OTHER THINGS, THOSE LISTED UNDER "RISK FACTORS" AND ELSEWHERE IN THIS MEMORANDUM.

IN SOME CASES, FORWARD-LOOKING STATEMENTS CAN BE INDICATED BY TERMINOLOGY SUCH AS "MAY," "WILL," "SHOULD," "COULD," "EXPECTS," "PLANS," "ANTICIPATES," "BELIEVES," "ESTIMATES," "PREDICTS," "POTENTIAL," OR "CONTINUE" OR THE NEGATIVE OF SUCH TERMS OR OTHER COMPARABLE TERMINOLOGY.  THE GENERAL PARTNER CANNOT GUARANTEE FUTURE RESULTS, LEVELS OF ACTIVITY, PERFORMANCE OR ACHIEVEMENTS. MOREOVER, NEITHER THE PARTNERSHIP, THE GENERAL PARTNER NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THE ACCURACY AND COMPLETENESS OF SUCH STATEMENTS.  THE PARTNERSHIP IS UNDER NO DUTY TO UPDATE ANY OF THE STATEMENTS CONTAINED IN THIS MEMORANDUM AFTER THE DATE HEREOF.

---

Confidential treatment requested by Nixon Peabody LLP                                    NP-SEC-0000003

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION ON BEHALF OF THE PARTNERSHIP RELATED TO THIS OFFERING OTHER THAN AS SET FORTH IN THIS MEMORANDUM.

THE GENERAL PARTNER OF THE PARTNERSHIP HAS AGREED TO PROVIDE, PRIOR TO THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREIN, TO THE INVESTOR, THE OPPORTUNITY TO ASK QUESTIONS AND TO RECEIVE ANSWERS CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING, AND ALSO TO OBTAIN ANY ADDITIONAL INFORMATION FROM THE PARTNERSHIP, TO THE EXTENT IT POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN.  ANY REQUESTS FOR INFORMATION SHOULD BE MADE TO THE GENERAL PARTNER:

**BIM Management LP**

| | |
|---|---|
| **Gregory W. Gray** | **Gregory P. Edwards** |
| **1716 Main Street** | **12 Moorehill Drive** |
| **Suite 100** | **Toronto, ON M4G 1A1** |
| **Buffalo, NY 14209** | **Canada** |
| **(716) 884-1500** | **(416) 425-9702** |

Confidential treatment requested by Nixon Peabody LLP                                    NP-SEC-0000004

# BENNINGTON – EVERLOOP LP

## SUMMARY OF TERMS

The following information is presented as a summary of certain key terms for an investment in Bennington – Everloop LP (the "**Partnership**"), a Delaware limited partnership.  This summary is qualified in its entirety by the more detailed Limited Partnership Agreement of the Partnership (in substantially the form attached hereto as **Exhibit A**) and the Subscription Agreement for the Partnership.

**Partnership:**

Bennington - Everloop LP, a Delaware limited partnership.

**Investment Objective:**

The Partnership is raising capital to invest in Series A Preferred Stock of Everloop, Inc., a California corporation ("**Everloop**"). It is currently anticipated that the Partnership will raise approximately $5.5 million[1] to invest in Everloop and to fund management fees and expenses of the Partnership (as described herein).

Everloop is a social media company focused on providing a safe, educational and fun online platform for tweens (ages 8 to 13).  Everloop will also provide a COPPA (Children's Online Privacy Protection Act) complaint platform to the US public school system (k-12) that will be used to distribute educational and other services.  The current Business Plan of Everloop is attached hereto as **Exhibit B**.

Everloop is currently seeking to raise approximately $10,000,000 in proceeds through the offer and sale of Series A Preferred Stock at a price per share of $.8562.  The offering is based upon a pre-money valuation of Everloop of $20,000,000, and if the Everloop offering is fully subscribed, a post-money valuation of $30,000,000.

On behalf of the Partnership, the General Partner will use commercially reasonable efforts to obtain customary Series A Preferred Stock terms in the definitive agreements with Everloop, including liquidation preferences, protective voting provisions, a seat on the Board of Directors of Everloop, registration rights, tag-along rights, and drag-along rights.

**General Partner:**

BIM Management LP, a Delaware limited partnership, will be "**General Partner**" to the Partnership. The General Partner is owned by Archipel Capital (Buffalo, NY) and Bennington Investment Management (Toronto).

---

[1]  Subject to discussions with Everloop, the Partnership shall retain the flexibility to raise additional capital to invest in Series A Preferred Stock of Everloop, provided that the Partnership shall not invest more than $10 million in Everloop as part of this offering of Series A Preferred Stock by Everloop.

Confidential

The General Partner will provide various advisory and management services to the Partnership collectively, the ("**Management Services**"), including without limitation, negotiating and structuring the Partnership's investment in Everloop, evaluating and monitoring the Partnership's investment in Everloop, monitoring the industry in which Everloop operates, serving as a representative on the board of directors of Everloop, and providing periodic reports to Partnership investors on the investment.

**Limited Partners:**

Investors in the Partnership ("**Limited Partners**") must be "accredited investors", as defined by the US Securities and Exchange Commission.

**Minimum Investment in the Partnership**:

$100,000 (subject to waiver at the discretion of the General Partner**)**.

**Term of the Partnership**:

Approximately one year after the date on which the Partnership's investment has been liquidated, subject to extension to ensure an orderly winding down.

**Management Fee:**

To fund the "Management Services", the Partnership will pay a one-time management fee to the General Partner equal to 5% of the total capital raised by the Partnership.

**Partnership Expenses:**

The Partnership will pay all expenses incurred in organizing and operating the Partnership, including the fees and expenses of professional advisors (legal, accounting) to the Partnership. The General Partner anticipates that such expenses will not exceed 5% of the total capital raised by the Partnership.

**Carried Interest:**

After Limited Partners receive a return of all of their invested capital, the General Partner will be entitled to receive 10% of the profits of the Partnership.

**Distribution Waterfall:**

To the extent the Partnership receives any proceeds resulting from its investment in Everloop (dividends, sale proceeds, etc.), after payment of any Partnership expenses, the General Partner shall distribute such proceeds as follows:

First, 100% to the Partners, on a pro rata basis, until the Partners have received a return of all of their invested capital (including capital used to fund management fees and Partnership expenses).

Second and finally, all remaining distributions will be distributed 90% to the Limited Partners, on a pro rata basis, and 10% to the General Partner.

Confidential treatment requested by Nixon Peabody LLP                                                      NP-SEC-0000006

**Reports:** The General Partner will cause the auditors to the Partnership to annually prepare a Schedule K-1 for the Partnership, with such Schedule K-1 distributed to Limited Partners on an annual basis as soon as practicable. The General Partner will also provide periodic reports to the Limited Partners on the status of the Partnership's investments.

**Transfers** A Limited Partner will not be permitted to sell, assign, or transfer its interest in the Partnership except under very limited circumstances and then only with the prior written consent of the General Partner (which will be granted or withheld in its sole discretion).

**Indemnity** The Partnership will release and indemnify the General Partner and its partners, representatives, agents and affiliates from and against all claims, liabilities, damages and expenses (including legal fees) to which they may be or become subject by reason of their activities on behalf of the Partnership, so long as the action giving rise to the claim does not involve fraud by the indemnified party.

**Tax Matters** The General Partner intends to cause the Partnership to be treated as partnership for US federal income tax purposes. Each Limited Partner is advised to consult with their tax advisor regarding the income tax consequences applicable to an investment in the Partnership.

**Counsel to the Partnership:** Nixon Peabody LLP.

Confidential treatment requested by Nixon Peabody LLP                                                        NP-SEC-0000007

*General*.   This Offering is a private offering.   On behalf of the Partnership, the General Partnership will screen potential Investors and the General Partner has the right, in its sole discretion, to reject the potential Investor or to reduce the proposed amount of any Investor's investment in the Partnership. The Investor will acquire the Interests for such Investor's own account, for investment, and not with any intention of distribution or resale of such interest, either in whole or in part.

*Subscription Agreement and Limited Partnership Agreement*.   The purchase of the Interests will be made pursuant to the Subscription Agreement and the Limited Partnership Agreement. The Subscription Agreement shall contain, among other things, appropriate representations and warranties from the Investor to the General Partner and Partnership.   Investors will be bound by, and the Partnership will be governed in accordance with, the Limited Partnership Agreement of the Partnership, in substantially the form attached hereto as **Exhibit A**.   Until the General Partner has delivered a counter-signed Subscription Agreement to the Investor, there will not exist a binding obligation on the part of the Partnership to consummate the transaction with any particular Investor.

## INVESTOR SUITABILITY STANDARDS

*Accredited Investors Only*.   Without the specific prior approval of the General Partner, Interests will be sold only to an "accredited investor" within the meaning of Rule 501(a) of Regulation D of the Securities Act of 1933, as amended.   The Investor will be required to execute and deliver to the Partnership an Investor Questionnaire to confirm such Investor's status as an "accredited investor".

*Ability and Willingness to Accept Risks*.   An investment in the Partnership is only suitable for an Investor who is capable of evaluating the merits and risks of such an investment and who can afford to bear the economic risk of his or her investment for an indefinite period of time and has no need for liquidity in this investment.

*Representations of Investor*.   Investor will be required to make a number of representations regarding his, her or its accredited investor status, willingness to accept risks, and other matters, as set forth in the Subscription Agreement.

*Reservation of Rights in the Partnership by its General Partner*.   The General Partner reserves the right to make its own judgment as to whether any prospective Investor meets these suitability standards.   The suitability standards set forth above are minimum requirements for prospective Investors and the General Partner, in its sole discretion, may impose additional requirements for prospective Investors.   The General Partner reserves the right to allot to any prospective purchaser less than the amount subscribed for by such prospective purchaser.

Confidential treatment requested by Nixon Peabody LLP                                             NP-SEC-0000008

## GENERAL PARTNER MANAGEMENT

The following individuals will manage the General Partner and oversee its operations:

**Gregory P. Edwards, CFA**

Mr. Edwards was a founder of YMG Capital Management Inc. ("YMG") of Toronto in 1983 and President and CEO of YMG from 1992 to July 2003. YMG managed $15 billion in assets for pension funds, financial institutions, foundations and "high net worth" investors. YMG was listed on the Toronto Stock Exchange in January of 1998 until February 2006 at which time YMG was sold to another portfolio management organization. Mr. Edwards was a Director of YMG from the time of its TSE listing in 1998 until May 2004 and was instrumental in arranging its sale. Mr. Edwards also founded Edbro Software Inc. ("Edbro") of Toronto in 1983 and is its sole shareholder. Edbro designed and developed fixed income and portfolio management software used by more than 100 Canadian and U.S. based financial institutions, pension funds and money managers. The rights to the PC-Bond fixed-income portfolio management software were sold in 2004 to the Bank of Nova Scotia which recently resold the software to the Toronto Stock Exchange. Edbro currently operates as an investment holding company. Mr. Edwards holds a BS degree in Computer Science from the University of Western Ontario, a MBA degree from York University, is a Chartered Financial Analyst and has completed the ICD Corporate Governance College, Directors Education Program.

**Gregory W. Gray**

Mr. Gray is the Co – Founder and Sr. Managing Director at Archipel Capital, which was founded in 2005. He is also an Advisory Board Member of Bennington Investment Management Inc. Mr. Gray has over 12 years of experience in the investment community. His experience includes time spent working for top tier investment banks, including UBS and Morgan Stanley. Mr. Gray is a registered investment advisor for NASD Licenses: Series 6, 7, 63, 65. Mr. Gray has achieved success raising capital for venture capital alliances and has assisted investment bankers in conducting due diligence on potential venture capital deals. Mr. Gray attended Xavier University.

**Devin P. Stelljes**

Mr. Stelljes joined Archipel Capital as its Managing Director in 2010 after spending over a decade working in the financial district of New York City in senior management roles. Over the course of his career, Mr. Stelljes has worked for top tier firms such as PricewaterhouseCoopers, The Guardian, CAST Management Consultants, and Loeb and Troper. Mr. Stelljes has expertise in strategic and executive level due diligence and analysis along with demand and segmentation analysis. He has led multiple merger and acquisition engagement teams across industry. Mr. Stelljes graduated with a BA in Economics and a minor in Environmental Sciences from State University of New York at Geneseo. He later obtained his MBA from Clemson University and also earned his CPA.

Confidential treatment requested by Nixon Peabody LLP
NP-SEC-0000009

## RISK FACTORS

THE INTERESTS BEING OFFERED BY THE PARTNERSHIP PURSUANT TO THIS MEMORANDUM INVOLVE A HIGH DEGREE OF RISK.  **INVESTORS SHOULD BE PREPARED AND ABLE TO REALIZE A COMPLETE LOSS OF THEIR INVESTMENT.  NO ONE SHOULD INVEST WHO IS NOT PREPARED TO LOSE THEIR ENTIRE INVESTMENT.**

THERE IS NO PUBLIC MARKET FOR THE INTERESTS, AND IT IS NOT EXPECTED THAT THERE WILL BE A MARKET FOR THE RESALE OF THE INTERESTS IN THE FORESEEABLE FUTURE.  PROSPECTIVE INVESTORS, PRIOR TO MAKING AN INVESTMENT, SHOULD CAREFULLY CONSIDER, AMONG OTHERS, THE FOLLOWING RISK FACTORS INHERENT IN MAKING SUCH AN INVESTMENT AND AFFECTING THE PARTNERSHIP, THE GENERAL PARTNER AND EVERLOOP'S BUSINESS.

*No Operating Histor*y.  The Partnership and the General Partner are being established in connection with this Offering and neither entity has any operating history.  The Partnership intends to make an investment in Everloop, an early stage company that has limited operating history upon which to evaluate the merits of investing in its shares.  The success of the Partnership is dependent on its ability of Everloop to realize and successfully implement its objectives.  Furthermore, Everloop may not be able to successfully implement its Business Plan (attached hereto as **Exhibit B**).

*Control by the General Partner.*    The Partnership will be managed by the General Partner.  The Limited Partners will not participate in or have any control over decisions with respect to the management, disposition or other realization of the Partnership's investment in Everloop or other decisions regarding the Partnership's business and affairs.  Consequently, the success of the Partnership will depend, in part, upon the skill and expertise of the General Partner.  There can be no assurance that the General Partner will be successful in this role.

*Restrictions on Transfer of Interests*.  The Interests represent highly illiquid investments and should only be acquired by Investors who are able to commit their funds for an indefinite period of time.  Investors will not be permitted to transfer their Interests without the prior written consent of the General Partner, which may be withheld in its sole discretion, and the satisfaction of certain other conditions, including compliance with applicable securities laws and the Partnership documents.  Investors should not expect the General Partner to grant its consent to transfers.  There is currently no market for the Interests in the Partnership, and it is not contemplated that any such market will develop.

*Absence of Market and Limitations on Transferability*.  The Interests have not been nor will they be registered under the Securities Act of 1933, as amended (the "*Act*") or under any other securities laws, and therefore, the Interests cannot be resold unless they are subsequently registered under the Act or an exemption from registration is available.  The Partnership is under no obligation to register the Interests.  The transfer of the Interests may also be affected by restrictions on resale imposed by the laws of some jurisdiction.  Even if such Interests could be freely traded under applicable securities laws, there is no market for the Interests, and none is

Confidential treatment requested by Nixon Peabody LLP                                                    NP-SEC-0000010

expected to develop in the foreseeable future.  As a result, Investor's investment will be illiquid, and Investor must bear the economic risk of its investment for an indefinite period of time.  In view of the foregoing, Investor should be satisfied that it has adequate means of providing for the Investor's current needs and all future contingencies and that the Investor has no need for liquidity in this investment or any of the funds invested therein.

***Lack of Diversification.***  The Partnership intends to invest substantially all of its assets in Everloop.  As a result, the Partnership's returns as a whole may be substantially affected by this lack of diversification.

***Risks Related to Everloop.***  Everloop has a limited operating history in a new and unproven market, which makes it difficult to evaluate Everloop's future prospects and may increase the risk that Everloop's business will not be successful.

***Risks Related to Social Media Products and Services***.  Everloop has a limited operating history in a new and unproven market, which makes it difficult to evaluate Everloop's future prospects and may increase the risk that Everloop's business will not be successful.  The prospective Investor should consider the inherent difficulties that Everloop faces in light of its business as a provider of products and services related to social media and similar technologies.  Such difficulties include, but are not limited to: increasing the number of registered members for its products and services; avoiding interruptions or disruptions in its services of slower than expected website load times; protecting Everloop's website from attacks that degrade or deny the ability of users to access solutions, which could persuade users to curtail using Everloop's service;  developing scalable, high-performance technology infrastructure that can efficiently and reliability handle increased member usage, as well as the deployment for new features and products; increasing revenue from the solutions Everloop provides; processing, storing, and using personal data in compliance with governmental regulation and other legal obligations related to privacy; successfully competing with competition for online and/or social networking sites; hiring and retaining sufficient talent; successfully expanding the business; and developing and maintaining a strong brand in which failure to do so would hurt Everloop's ability to retain or expand its base of members, users, enterprises, professional organizations, or its ability to increase their level of engagement.

***Technological Changes***.  Everloop's failure to further refine its technology and to develop and introduce new products or services could cause its products or services to become uncompetitive or obsolete, which could reduce Everloop's market share and cause its sales to decline.  Everloop may need to acquire additional financial resources from the Partnership or other sources to put towards research and development to keep pace with technological advances and to effectively compete in the future.  It is possible that a variety of competing products or services are under development by other companies that could result in lower manufacturing costs or higher product performance or higher service satisfaction than those expected for Everloop's products or services.

***Government Regulations***.  The Partnership or Everloop's business may be heavily influenced by foreign, federal, state and local government regulations and policies.  Any new government regulations pertaining to Everloop or its products or services may result in significant additional

Confidential treatment requested by Nixon Peabody LLP                    NP-SEC-0000011

expenses to Everloop and its resellers and their customers and, as a result, could cause a significant reduction in demand for Everloop's products or services.

***Intellectual Property.***  Everloop's ability to compete effectively against competing technologies will depend, in part, on its ability to protect its current and future proprietary technology through a combination of patent, copyright, trademark, trade secret and unfair competition laws. Everloop may not be able to adequately protect its intellectual property and may need to defend its products against infringement claims, either of which could result in the loss of its competitive advantage in markets and materially harm its business and profitability.  Third parties may design around Everloop's technologies or seek to challenge or invalidate Everloop's intellectual property rights and there is no assurance that the intellectual property rights will deter infringement or misappropriation of its intellectual property.  Everloop may incur significant costs and diversion of management resources in prosecuting or defending intellectual property infringement suits.  Everloop may not be successful in prosecuting or defending intellectual property infringement suits and, as a result, may need to seek to obtain a license of the third party's intellectual property rights, which may not be available to us, whether on reasonable terms or at all.  The contractual provisions Everloop relies on to protect its trade secrets and proprietary information, such as confidentiality and non-disclosure agreements with its employees, consultants and other third parties, may be breached and its trade secrets and proprietary information may be disclosed to competitors, strategic partners and the public.

***Market Acceptance***.  Everloop's future revenues and any future profits are dependent on the widespread acceptance of Everloop's products or services and Everloop's revenue derived from such products or services.  In order for Everloop to be successful, Everloop must quickly gain market acceptance and market technologies, products deemed critical to customers.  There can be no assurance, however, that Everloop will be able to successfully do so or that competitors will not develop innovations that render Everloop's products or services obsolete or uncompetitive.

***Competition***.  There can be no assurance that Everloop will be able to compete successfully against existing companies or new entrants to the marketplace.  Competition can come from several sources, including from companies currently providing similar products, as well as from new marketplace participants.  The ability of competitors of Everloop to develop products, services or technologies, to obtain exclusive rights or licenses or to obtain and retain customers may, among other events, have a material adverse effect upon the business of Everloop.

***Dependent upon Participation of Founders and Key Management***.  Everloop is dependent upon the continued active participation of its founder and certain key members of management. The departure of the founder and/or any key member of management may have a material adverse effect on the business of Everloop.

***No Right to Control***. Although Everloop has identified generally in the Business Plan how it expects to utilize the proceeds from the Partnership's investment, Everloop will have broad discretion in determining the specific uses of the proceeds.  Although the General Partner intends to condition the Partnership's investment in Everloop on the election of a representative of the Partnership to the Board of Directors of Everloop, Limited Partners in the Partnership will not

Confidential treatment requested by Nixon Peabody LLP                                                          NP-SEC-0000012

have the opportunity to evaluate the economic, financial or other information on which Everloop bases its decisions on how to use the proceeds and neither the Partnership nor its representative on Everloop's Board of Directors will be able to control the business or operations of Everloop..

***Likelihood of Initial Losses***.   Everloop expects to incur significant operating and capital expenditures in Everloop's initial operating phase.   If revenues grow more slowly than anticipated, or if operating expenses exceed expectations or cannot be adjusted accordingly, Everloop's business, results of operations and financial condition will be materially adversely affected.  Everloop expects that it will incur losses and generate negative cash flow within the initial phase of operations, as Everloop develops the operating and marketing programs and builds its brand recognition and client base.  Because the Partnership does not expect to receive dividends or other distributions from Everloop, but will be incurring expenses on a regular basis, it is likely that, until the Partnership liquidates its investment in Everloop, the Partnership will generate operating losses.

***Future Capital Needs; Uncertainty of Additional Financing***.  There can be no assurance that the capital being raised by Everloop will be sufficient to meet the Everloop's ongoing capital requirements.  Everloop may need to raise additional funds through additional debt or equity financings, or otherwise.  No party is obligated to provide financing to Everloop and there can be no assurance that any such additional funding will be available, or, if available, that it will be on reasonable terms.  If additional funds are required by Everloop and are not available, Everloop may be required to delay, reduce the scope of, or eliminate some or all of the implementation of its business strategy as described in the Business Plan.

***Dilution from Subsequent Closings***.  The Partnership will be holding Series A Preferred Stock in Everloop.  Everloop may need to raise additional capital in the future, and such fundraising may dilute the Partnership's ownership in Everloop.

***Unproven Marketing and Brand Name***.  Everloop's marketing efforts have not been proven with customers, investors or others upon whom Everloop may come to rely and Everloop may need to refine or modify its marketing strategy to address unanticipated difficulties.  There can be no assurance that Everloop will be able to market itself successfully, the result being that the attractiveness of Everloop's product or service offerings would be diminished and Everloop's ability to attract and retain customers, to attract additional investment and to generate revenue may be materially adversely affected.

***Adverse Economic Conditions***.  A recession in the general or local economy or a general decline in consumer spending could have a material adverse effect on Everloop's financial performance. The availability of follow-on investor capital is limited during times of recession, and this scarcity may limit Everloop's ability to realize its business objectives.   There can be no assurance that any economic downturn would not have a material adverse impact on Everloop's business, that Everloop's customers would continue to make purchases or that needed investment capital would be available during a recession.

***No Assurances Regarding Business Plan***.  Everloop's Business Plan is a statement of the current intentions of Everloop's management as to the proposed development of the Everloop's business and operations in the future.   The successful implementation of this Business Plan

Confidential treatment requested by Nixon Peabody LLP                                    NP-SEC-0000013

depends upon numerous factors, including, among others, the ability of management to attract on an ongoing basis the necessary capital, to develop the management team capable of carrying out the plan, to win market acceptance for the Everloop's products or services and to generate the sales revenues and levels of profitability forecast in the Business Plan.  While the Business Plan and the financial forecasts contained therein are believed by management to be based upon assumptions that are reasonable, there can be no assurance that the objectives established in the Business Plan will in fact be met, that Everloop will become profitable, or that any levels of revenues, profitability and cash flows projected in the Business Plan will in fact be attained.  The Business Plan has not been reviewed, and no opinion has been rendered by, outside professional advisors.  As implementation of any business plan continues over time, there are inevitably changes in direction and strategy that will be adopted by management based upon actual experience in operating a business.  Thus, there can be no assurance that the actual manner in which the business of Everloop is conducted and the results of Everloop's operations will not vary significantly from the Business Plan.

***Indemnification***.  The General Partner and its affiliates are entitled to indemnification from the Partnership.  The obligation to fund any indemnification will survive the dissolution of the Partnership.  The General Partner may require the Limited Partners to return distributions from its investment in Everloop to the extent the Partnership is required to service indemnification obligations.

***Conflicts of Interest.***  From time to time, the General Partner and its partners and affiliates may invest in, organize, and/or sponsor other entities and investment opportunities, some of which could directly or indirectly compete with the Partnership or Everloop.

***Forward-Looking Statements***.  Some of the information contained in this Memorandum (including the Business Plan) contains forward-looking statements.  Such statements can be identified by the use of forward-looking terminology such as "believes," "expects," "may," "will," "should," or "anticipates" or similar words, or by discussions of strategy that involve risks and uncertainties.  These statements may discuss the Partnership's or Everloop's future expectations or contain projections of the results of operations or financial condition or expected benefits resulting from future developments or transactions.  No party can assure you that the future results indicated, whether expressed or implied, will be achieved.  The risk factors described in this section and other factors noted throughout this Memorandum, including risks and uncertainties, could cause the Partnership's and Everloop's actual results to differ materially from those contained in any forward-looking statement.

*     *     *     *     *     *     *

Confidential treatment requested by Nixon Peabody LLP                    NP-SEC-0000014

## TAX CONSIDERATIONS

The General Partner intends to cause the Partnership to elect to be treated as a partnership for US federal income tax purposes, and expect such treatment to apply to the Partnership.  As a result, (i) the Partnership will be required to file an annual information tax return but will not itself be subject to U.S. federal income tax, and (ii) each Limited Partner, regardless of whether it receives any distributions from the Partnership, will be required to report separately on its income tax return its allocable share of each item of Partnership income, and will be entitled to deduct (subject to applicable laws and regulations) its allocable share of each item of Partnership expense, on its own tax return for each relevant tax period.

Each Partner is taxed on its distributive share of the Partnership's taxable income and gain regardless of whether it has received or will receive a distribution from the Partnership.  The amount and timing of any distributions will be determined in the sole discretion of the General Partner.   Accordingly, a Partner's share of taxable income from the Partnership (as well as the taxes imposed on that income) could exceed the distributions he or she receives from the Partnership.  As a result, Partners may be required each year to pay any applicable federal and state taxes on their respective share of the Partnership's taxable income or gains from sources other than the special tax distribution or other distributions. Partners will be furnished with a tax information report annually stating each Partner's respective share of the Partnership's tax items. All allocations for tax purposes have been structured so as to be made pursuant to the principles of Section 704 of the Code.  The General Partner cannot assure investors, however, that such allocations will not be successfully challenged by the Internal Revenue Service, in which case items of income, gain, loss, deduction or credit may be reallocated among the Partners other than in accordance with the terms of the Partnership Agreement.

The Partnership expects to realize income from dividends and capital gains, which are currently subject to tax at lower federal income tax rates than ordinary income.  If the Partnership is deemed to be engaged in a trade or business for federal income tax purposes, an individual Limited Partner will be able to deduct his or her share of the Partnership's expenses without regard to a limitation on miscellaneous itemized deductions.  If the Partnership is instead considered to be engaged in an investment activity, an individual Limited Partner will be able to deduct his or her share of the Partnership's expenses only to the extent that these expenses (together with his or her other miscellaneous itemized deductions) exceed 2% of his or her adjusted gross income.  In addition, these expenses will not be deductible in computing the alternative minimum taxable income for purposes of the alternative minimum tax.  These limitations are not applicable to corporate Limited Partners.

Whether the Partnership will be deemed to be engaged in a trade or business or in an investment activity will depend on the extent and nature of the Partnership's activity.  The issue is largely resolved on an analysis of facts, many of which will be known only in the future.  Moreover, the legal standards that would be applied in assessing those facts are unclear.  Therefore, no clear guidance can be given at this time as to whether the Partnership will be considered to be engaged in a trade or business or an investment activity for US federal income tax purposes.

A non-US person considering investing in the Partnership should consult his or her own tax advisors with respect to the specific tax consequences to such person of such an investment

Confidential treatment requested by Nixon Peabody LLP   NP-SEC-0000015

under US federal, state and local income tax laws and tax treaties, whether or not the Partnership is treated as engaged in a trade or business for federal income tax purposes, and with respect to the treatment of income and gain from such investment under the tax laws of any foreign jurisdiction in which such person is subject to tax.

In addition to the federal income tax consequences summarized above, prospective investors should consider the potential state and local tax consequences of an investment in the Partnership.   The Partnership may become subject to income and other taxes in states and localities based on the Partnership's conducting of business in those jurisdictions.

**THIS DISCUSSION IS ONLY A SUMMARY OF CERTAIN U.S. TAX ISSUES THAT RELATE TO AN INVESTMENT IN THE PARTNERSHIP.  IT DOES NOT ADDRESS ALL OF THE TAX CONSEQUENCES OF SUCH AN INVESTMENT, NOR DOES IT ADDRESS CONSEQUENCES THAT MAY DEPEND ON THE SPECIAL TAX STATUS OF A PARTICULAR INVESTOR, INCLUDING WITHOUT LIMITATION ANY NON U.S. INVESTORS.  NEITHER THE PARTNERSHIP NOR THE GENERAL PARTNER HAS SOUGHT A RULING FROM THE IRS AS TO ANY OF THE POSITIONS TAKEN OR ISSUES PRESENTED HEREIN, AND WE CANNOT ASSURE INVESTORS THAT ANY POSITION TAKEN BY THE PARTNERSHIP WILL NOT BE CHALLENGED BY THE INTERNAL REVENUE SERVICE.  POTENTIAL INVESTORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS IN CONNECTION WITH THE TAX CONSEQUENCES OF AN INVESTMENT IN THE PARTNERSHIP.**

**TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE INFORM YOU THAT ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS DOCUMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (I) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE, OR (II) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER THAT IS CONTAINED IN THIS DOCUMENT.**

Confidential treatment requested by Nixon Peabody LLP                                                          NP-SEC-0000016

## **EXHIBIT A**

## **LIMITED PARTNERSHIP AGREEMENT**

(Attached)

Confidential treatment requested by Nixon Peabody LLP                    NP-SEC-0000017

**BENNINGTON – EVERLOOP LP**


**LIMITED PARTNERSHIP AGREEMENT**



**Dated as of _____, 2011**




THE LIMITED PARTNERSHIP INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933 OR UNDER THE SECURITIES LAWS OF ANY U.S. STATE OR NON-U.S. JURISDICTION AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH APPLICABLE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. IN ADDITION, TRANSFER OR OTHER DISPOSITION OF THE LIMITED PARTNERSHIP INTERESTS IS RESTRICTED AS PROVIDED IN THIS AGREEMENT.

Confidential

Confidential treatment requested by Nixon Peabody LLP

# TABLE OF CONTENTS

**<u>Page</u>**

Section 1    ORGANIZATION. ...................................................................... 1

    1.1    Formation of Limited Partnership ...................................................... 1

    1.2    Name ................................................................................ 1

    1.3    Character of Business ................................................................ 1

    1.4    Principal Place of Business .......................................................... 1

    1.5    Specified Office and Agent for Service of Process in Delaware ........................... 1

    1.6    Fiscal Year ......................................................................... 1

Section 2    CAPITAL CONTRIBUTIONS; PARTNERS' ACCOUNTS. ............................... 2

    2.1    Capital Contributions of the Partners ................................................. 2

    2.2    Capital Accounts .................................................................... 2

    2.3    Reserve ............................................................................. 2

Section 3    COMPANY DISTRIBUTIONS. ......................................................... 2

    3.1    Withdrawal of Capital ................................................................ 2

    3.2    Distributions ....................................................................... 3

    3.3    Final Distribution .................................................................. 3

    3.4    Valuation ........................................................................... 3

    3.5    Withholding Taxes .................................................................... 4

    3.6    Tax Distributions ................................................................... 5

Section 4    MANAGEMENT. ...................................................................... 5

    4.1    Partnership Investment ............................................................... 5

    4.2    Powers and Authority of General Partner ............................................... 5

Section 5    LIABILITY OF MEMBERS. ............................................................ 5

    5.1    Liability of General Partner, etc. ................................................... 5

Confidential treatment requested by Nixon Peabody LLP                          NP-SEC-0000019

5.2     Liability of Partners ........................................................................... 5

5.3     No Obligation to Replenish Negative Capital Account ...................... 6

Section 6     INDEMNIFICATION OF MANAGER, ETC. ..................................... 6

6.1     Indemnification .................................................................................. 6

Section 7     EXPENSES; MANAGEMENT FEE ................................................. 6

7.1     Expenses ............................................................................................ 6

7.2     Management Fee ................................................................................. 7

Section 8     BOOKS AND RECORDS; REPORTS TO MEMBERS. ................... 7

8.1     Records and Reports .......................................................................... 7

8.2     Confidentiality ................................................................................... 7

Section 9     TRANSFERS, ETC. .......................................................................... 8

9.1     Transfer by General Partner .............................................................. 8

9.2     Transfer by a Limited Partner ........................................................... 8

9.3     Certain Restrictions on Transfers ...................................................... 10

9.4     Further Actions .................................................................................. 10

Section 10     DURATION AND TERMINATION OF THE COMPANY. ............. 10

10.1    Duration ............................................................................................. 10

10.2    Winding Up ........................................................................................ 11

10.3    Final Distribution .............................................................................. 11

10.4    Termination ........................................................................................ 11

Section 11     DEFINITIONS. ................................................................................. 12

11.1    Definitions ......................................................................................... 12

Section 12     MISCELLANEOUS. ......................................................................... 16

12.1    Waiver of Partition ............................................................................ 16

12.2    Modifications ..................................................................................... 16

Confidential treatment requested by Nixon Peabody LLP                    NP-SEC-0000020

12.3    Entire Agreement .................................................................................................. 16

12.4    Severability ........................................................................................................... 16

12.5    Notices .................................................................................................................. 16

12.6    Governing Law ..................................................................................................... 17

12.7    Successors and Assigns ........................................................................................ 17

12.8    Counterparts ......................................................................................................... 17

12.9    Headings ............................................................................................................... 17

12.10   Actions and Power of Attorney ............................................................................ 17

12.11   Pronouns and Plurals ........................................................................................... 19

12.12   Non-Waiver .......................................................................................................... 19

12.13   Construction ......................................................................................................... 19

12.14   Counsel to the Partnership ................................................................................... 19

12.15   Failure to Make Payments .................................................................................... 19

12.16   General Partner Discretion ................................................................................... 19

Section 13      COMPANY ALLOCATIONS .................................................................... 20

13.1    Allocations Generally .......................................................................................... 20

13.2    Transfer of Capital Accounts ............................................................................... 20

SCHEDULES
Schedule I      --      Partners and Capital Contributions

Confidential treatment requested by Nixon Peabody LLP                                    NP-SEC-0000021

This LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of Bennington - Everloop LP, a Delaware limited partnership (the "Partnership"), is made as of _____, 2011 by and between BIM Management LP (the "General Partner") and the partners identified on Schedule I hereto (the "Partners", which term shall include any party hereafter admitted to the Partnership as a Partner and exclude any party that ceases to be a Partner).

## SECTION 1  ORGANIZATION.

    1.1  **Formation of Limited Partnership**.  The Partnership was formed as a limited partnership pursuant to a Certificate of Limited Partnership filed with the Secretary of State of the State of Delaware on May 10, 2011.  The undersigned General Partner and Partners hereby continue the Partnership pursuant to and in accordance with the provisions of the Delaware Revised Uniform Limited Partnership Act, Delaware Code, Title 6, Chapter 17, as amended from time to time (the "Act").

    1.2  **Name**.  The name of the Partnership is and shall be "Bennington - Everloop LP", or such other name as the General Partner may select from time to time. The General Partner will file on the effective date of this Agreement the Certificate of Limited Partnership on behalf of the Partnership and will file such other certificates or instruments, and amendments thereto, as may from time to time be required by law or deemed appropriate by the General Partner.

    1.3  **Character of Business**.  The business of the Partnership shall be to acquire, hold, manage and dispose of stock in Everloop, Inc. ("Everloop"), and engage in such other activities as are permitted hereby or under the Act and are incidental or ancillary thereto as the General Partner shall deem necessary or advisable, all upon the terms and conditions set forth in this Agreement.

    1.4  **Principal Place of Business**.  The Partnership shall have its principal place of business at 1716 Main Street, Suite 100, Buffalo, NY 14209, or at such other location as the General Partner may from time to time select.  The Partnership may have such other place or places of business as the General Partner may from time to time decide.

    1.5  **Specified Office and Agent for Service of Process in Delaware**.  The address of the Partnership's registered office in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, City of Wilmington, Delaware, 19801, or at such other place in the State of Delaware as the General Partner may from time to time decide.  The name of the registered agent of the Partnership for service of process in the State of Delaware is Corporation Trust Company or such other agent as the General Partnership may from time to time designate.

    1.6  **Fiscal Year**.  Except as otherwise required by the Code, the fiscal year of the Partnership (the "Fiscal Year") shall end on the 31st day of December in each year except that, in the case of the last Fiscal Year of the Partnership, the Fiscal Year of the Partnership shall end on the date of the completion of its liquidation, which may be a date

other than December 31.  The Partnership shall have the same Fiscal Year for income tax purposes and for accounting purposes.

## SECTION 2   CAPITAL CONTRIBUTIONS; PARTNERS' ACCOUNTS.

2.1   **Capital Contributions of the Partners**.  The capital contribution of each Partner (the "Capital Contribution") shall be the amount set forth next to such Partner's name on Schedule I hereto.  Each Partner shall fund 100% of its Capital Contribution to the Partnership in immediately available funds prior to the closing date applicable to such Partner.

2.2   **Capital Accounts**.  An individual capital account (a "Capital Account") shall be maintained for each Partner.  The opening balance of each Partner's Capital Account for the Partnership's first fiscal period shall be equal to the amount of such Partner's initial Capital Contribution to the Partnership.  Each Partner's Capital Account shall thereafter be adjusted in accordance with the following provisions:

(a)   Each Partner's Capital Account shall be credited with (i) the amount, if any, of any subsequent Capital Contributions made by such Partner to the Partnership, and (ii) such Partner's allocable share, if any, of Profit and other items of income or gain allocated to such Partner in accordance with Section 13; and

(b)   Each Partner's Capital Account shall be debited with (i) the amount, if any, of cash and the fair market value (as determined by the General Partner pursuant to Section 3.4) of any Partnership property distributed to such Partner pursuant to any provision of this Agreement (net of any liabilities secured by such property), and (ii) such Partner's allocable share, if any, of Loss and other items of loss, deduction or expense allocated to such Partner in accordance with Section 13.

The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with section 1.704-1(b) of the Treasury Regulations, and shall be interpreted and applied in a manner consistent with such regulations.  In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such regulations, the General Partner may make such modification.

2.3   **Reserve**.  In the event and to the extent that the General Partner, in its reasonable discretion, deems the retention of capital to be necessary or advisable, the General Partner may withhold amounts otherwise distributable to the Partners and may create a reasonable reserve account (the "Reserve") from amounts received by the Partnership with respect to its investment in Everloop.  The General Partner shall have the right to apply amounts held in the Reserve in its discretion for Partnership purposes.

## SECTION 3   COMPANY DISTRIBUTIONS.

3.1   **Withdrawal of Capital**.  Except as otherwise expressly provided in this Section 3, no Partner shall have the right to withdraw any amount from the Partnership.

Confidential treatment requested by Nixon Peabody LLP                        NP-SEC-0000023

3.2 **Distributions**. (a) After satisfying all obligations of the Partnership (including those set forth in Section 7 hereof), the General Partner may, at any time and in its discretion, elect to make Distributions to the Partners in accordance with Section 3.2(b) below. Notwithstanding any provision to the contrary contained in this Agreement, the Partnership shall not be required to make a Distribution to a Partner on account of its interest in the Partnership if such Distribution would violate the Act or any other applicable law.

(b) Each Partner's (including the General Partner) share of the Distributions so apportioned to it shall be distributed to in the following manner:

(i) first, 100% to such Partner (including the General Partner) until such Partner has received aggregate distributions pursuant hereto equal to such Partner's Invested Capital to date;

(ii) thereafter, (x) 10% to the General Partner (in respect of its carried interest) and (y) 90% to the Partners (in respect of such Partner's Percentage Interest).

3.3 **Final Distribution**. The Final Distribution shall be made in accordance with the provisions of Section 10.3.

3.4 **Valuation**. (a) The value of the Partnership's interest in Everloop shall be determined by the General Partner.

(b) With respect to any Distribution in kind, prior to the liquidation of a Marketable Security held by the Partnership, the value of such Marketable Security shall be valued at the closing price, or if there is no closing price, at the average of the closing bid and asked prices, in each case based on the average of such prices during the period commencing on the tenth day immediately before and ending on the date of such Distribution of such Marketable Security. Upon liquidation of the Marketable Security, the value of such Marketable Security shall be the liquidation price actually obtained for such Marketable Security. If the valuation of a Marketable Security is for purposes of a report prepared by the General Partner, such Marketable Security shall be valued as of the date of such quarterly report, based on (x) prior to liquidation of such Marketable Security, (i) the closing prices or (ii) the average of the closing bid and asked prices, as the case may be, of such Marketable Security, or (y) upon liquidation of such Marketable Security, the liquidation price actually obtained for such Marketable Security. Any valuation pursuant to this Section 3.4(b) may be determined by the General Partner in reliance upon valuations prepared and delivered by the general partner or manager or other appropriate officer of Everloop.

(c) The General Partner shall value all Non-Marketable Securities held directly by the Partnership at fair market value or such other value as determined by the General Partner, in each case in its reasonable, good faith discretion. Non-Marketable Securities will generally be valued at cost, at the price of subsequent financings by third parties, or at an appropriate discount selected in good faith by the General Partner from

Confidential treatment requested by Nixon Peabody LLP                                    NP-SEC-0000024

publicly traded Securities of similar companies.  Securities of public companies which are held subject to certain restrictions will generally be valued at an appropriate discount selected in good faith by the General Partner from market prices of the same Securities that are not subject to restrictions.  Such valuation may be determined by the General Partner in reliance upon valuations prepared by an appropriate officer or manager of the relevant Portfolio Company.

      3.5 **Withholding Taxes**.  (a) The Partnership shall at all times be entitled to make payments required to discharge any obligation of the Partnership to withhold or make payments to any governmental authority with respect to any federal, state, local or non-U.S. tax liability of a Partner arising out of such Partner's interest in the Partnership (including as a result of a distribution in kind to such Partner).  The Partnership may hold back from any distribution in kind to such Partner property having a value equal to the withholding obligation until the Partnership has received payment of such amount.  The Partnership shall give such Partner prompt written notice of any such tax liability, setting forth the amount of any such withholding or payment and the basis therefor.  Any tax payment withheld from any Distribution to such Partner or from any distribution to the Partnership from Everloop shall be deemed to be a Distribution to such Partner.  Any other such payment shall be deemed to be a loan by the Partnership to such Partner.  The amount of any payment deemed to be a loan made to such Partner, plus interest on such amount from the date of such payment until such amount is repaid to the Partnership at an interest rate equal to the rate from time to time in effect for late payments of the underlying federal, state, local or foreign tax liability in question, shall be repaid to the Partnership by (i) deduction from any Distributions made to such Partner pursuant to this Agreement or (ii) earlier payment of such amounts and interest by such Partner to the Partnership.  In the event that the Partnership receives a distribution from or in respect of which tax has been withheld, the Partnership shall be deemed to have received cash in an amount equal to the amount of such withheld tax, and each Partner shall be treated as having received as a Distribution pursuant to Section 3.2(a) the portion of such amount that is attributable to such Partner's interest in the Partnership as equitably determined by the General Partner.

      (b)    Any withholding taxes withheld or payment made pursuant to this Section 3.5 shall be withheld or made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the General Partner, to the effect that a lower rate is applicable or that no withholding is applicable or payment required.

      (c)    Each Partner shall, to the fullest extent permitted by applicable law, promptly upon request therefor, reimburse the Partnership, the Indemnified Parties (as defined in Section 6.1(a)) and their respective agents, partners, members, officers, directors, employees or shareholders for any and all amounts paid or payable by the Partnership or any such Person arising out of or relating to any claims, liabilities and reasonable costs and expenses of whatever nature relating to the Partnership's or such Person's obligation to withhold and to pay over, or otherwise pay, any withholding or

other taxes payable by the Partnership or such Person with respect to such Partner or as a direct result of such Partner's interest in the Partnership.

3.6     Tax Distributions  Notwithstanding the above, the General Partner may, in its sole discretion, make a special priority distribution to the Carried Interest General Partner in an amount sufficient to enable it to pay its foreign, federal, state and local tax liability with respect to income allocated to it in any taxable year that is in excess of the distributions with respect to such taxable year.  The amount distributable to the Carried Interest General Partner pursuant to this Section 3.6 shall be treated as an advance against, and shall reduce the amount of, the next distribution(s) that the General Partner otherwise would receive pursuant to Section 3.2 hereof.

## SECTION 4   MANAGEMENT.

4.1     **Partnership Investment**.  The General Partner shall make an investment on behalf of the Partnership in Everloop.

4.2     **Powers and Authority of General Partner**.  The management, operation and policy of the Partnership shall be vested exclusively in the General Partner, which shall have the power by itself and shall be authorized and empowered on behalf and in the name of the Partnership to carry out any and all of the objects and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings that it may in its reasonable and good faith discretion deem necessary or advisable or incidental thereto.  The Limited Partners shall not take part in the management or control of the Partnership's business, transact any business in the Partnership's name or have the power to sign documents for or otherwise bind the Partnership.  The General Partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a general partner of a limited partnership, as provided in the Act.

## SECTION 5   LIABILITY OF MEMBERS.

5.1     **Liability of General Partner, etc**.  Notwithstanding any other provision of this Agreement, neither the General Partner, the Carried Interest General Partner nor any of their Affiliates or any of their respective officers, directors, employees, partners, owners, members or their agents, shall be liable to any Partner or the Partnership for any action or omission (in relation to the Partnership, this Agreement, any related document or any transaction or investment contemplated hereby or thereby) taken or suffered by it or him that does not constitute fraud.  The General Partner and such other Persons may consult with counsel and accountants in respect of Partnership affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, provided, that they shall have been selected with reasonable care.

5.2     **Liability of Partners**.  Except as required by law or as expressly provided herein, no Partner, in its capacity as such, shall be personally liable for the expenses, liabilities, or obligations of the Partnership in excess of its Capital Contribution.

Confidential treatment requested by Nixon Peabody LLP                                          NP-SEC-0000026

5.3    **No Obligation to Replenish Negative Capital Account**.   Except as otherwise provided for by law or expressly by the terms hereof, no Partner shall have any obligation at any time to contribute any funds to replenish any negative balance in its Capital Account.

## SECTION 6   INDEMNIFICATION OF MANAGER, ETC.

6.1    **Indemnification**.   (a) The Partnership agrees to indemnify the General Partner, their Affiliates and any of their respective officers, directors, managers, employees, partners, owners, members or their agents, advisors and representatives (collectively, "Indemnified Parties") to the fullest extent permitted by law, and to save and hold them harmless from and in respect of all (i) fees, costs, and expenses, including legal fees, paid in connection with or resulting from any claim, action, proceeding or demand against any of the Indemnified Parties that arises out of or in any way relates to the Partnership, its properties, business, or affairs, and (ii) such claims, actions, proceedings and demands and any losses or damages resulting from such claims, actions, proceedings and demands, including amounts paid in settlement or compromise (if recommended by attorneys for the Partnership) of any such claim, action, proceeding or demand; provided, however, that this indemnity shall not extend to any conduct which constitutes fraud of any Indemnified Party. Expenses incurred by any Indemnified Party in defending a claim or proceeding covered by this Section 6.1 shall be paid by the Partnership in advance of the final disposition of such claim or proceeding, provided that the Indemnified Party undertakes to repay such amount if it is ultimately determined that such Person was not entitled to be indemnified. The provisions of this Section 6.1 shall remain in effect as to each Indemnified Party whether or not such Indemnified Party continues to serve in the capacity that had entitled such Person to be indemnified.

(b)    The Partners agree that, if and to the extent that the assets of the Partnership are not sufficient to satisfy the Partnership's obligations to any Indemnified Party or to satisfy Partnership obligations with respect to the Partnership's investment in Everloop, each Partner will, on demand by the General Partner and whether or not the Partnership has been dissolved, contribute to the Partnership for payment, such Partner's share (based on Percentage Interests) of such obligations (including the return of any Distributions made to such Partner. The provisions of this Section shall be in addition to and not affect the obligations of the Limited Partners under Section 17-607 of the Act or any other provision of applicable law. The provisions of this Section 6.1(b) shall not be for the benefit of or be enforceable by any creditor of the Partnership.

## SECTION 7   EXPENSES; MANAGEMENT FEE.

7.1    **Expenses**.   (a) The General Partner shall bear all expenses incurred in connection with the management of the Partnership on account of salaries and wages of the General Partner's officers and employees, rentals payable for space used by the General Partner or the Partnership and equipment leases and purchases.

(b)    Except for the expenses borne by the General Partner pursuant to Section 7.1(a), all other costs and expenses shall be borne by the Partnership, including

Confidential treatment requested by Nixon Peabody LLP                     NP-SEC-0000027

all costs and expenses incurred in the holding, purchase, sale or exchange of Securities, including, but not by way of limitation, fees charged by third party vendors and service providers, private placement fees, finders fees, interest on borrowed money, real property or personal property taxes on investments, brokerage fees, legal fees, audit and accounting fees, taxes applicable to the Partnership on account of its operations, fees incurred in connection with the maintenance of bank or custodian accounts, and all costs and expenses relating to the preparation and distribution of reports to the Partners.  The Partnership shall also bear expenses incurred by the General Partner in serving as the tax matters partner, the cost of liability and other insurance premiums, all travel and other out-of-pocket costs associated with Partnership meetings and other meetings with the Partners and attendance at annual and other periodic meetings held by Everloop, all legal and accounting fees relating to the Partnership and its activities and all costs and expenses arising out of the Partnership's indemnification obligation pursuant to this Agreement.

(c)     The Partnership shall bear all organizational costs, fees, and expenses actually incurred by or on behalf of the General Partner in connection with the formation and organization of the Partnership, including legal and accounting fees and expenses incident thereto ("Organizational Costs").

(d)     The Partnership shall bear all reasonable costs, fees, and expenses incurred by the General Partner (or its designee) in connection with the winding up of the affairs of the Partnership at the end of the Partnership's term, specifically including but not limited to legal and accounting fees and expenses.

7.2     **Management Fee**.   In exchange for performing various Management Services (as described in the Confidential Private Placement Memorandum), the Partnership shall pay a one-time management to the General Partner in an amount equal to 5% of the aggregate capital contributions received by the Partnership (the "Management Fee").

**SECTION 8   BOOKS AND RECORDS; REPORTS TO MEMBERS.**

8.1     **Records and Reports**.   The General Partner will monitor the Everloop investment on-behalf of the Partnership and will produce a detailed written report on the investment to the Partnership and Limited Partners on a semi-annual or annual basis.  For the avoidance of doubt, as the Partnership is a pass-through special purpose vehicle, it itself will not be audited.

8.2     **Confidentiality**.   (a) The General Partner shall have the right to keep confidential from a Limited Partner for such period of time as the General Partner determines is reasonable (i) any information that the General Partner reasonably believes to be in the nature of trade secrets and (ii) any other information (A) the disclosure of which the General Partner in good faith believes is not in the best interest of the Partnership or could adversely affect the Partnership or its investments or (B) that the Partnership is required by law or by agreement with a third Person to keep confidential.

Confidential treatment requested by Nixon Peabody LLP                                    NP-SEC-0000028

(b)     Each Limited Partner agrees to keep confidential, and not to disclose to any Person, any matter relating to the Partnership and its affairs including this Agreement or any portion thereof and any matter related to Everloop, other than disclosure in good faith to such Limited Partner's directors, officers, employees, agents, advisors or representatives responsible for matters relating to the Partnership and who need to know such information in order to perform such responsibilities (each such Person being hereinafter referred to as an "Authorized Representative"), provided that such Limited Partner or any of its Authorized Representatives may make such disclosure to the extent that (i) the information being disclosed is otherwise generally available to the public, (ii) such disclosure is being made pursuant to a valid subpoena or summons, (iii) such disclosure is required to be made to any governmental body, agency, official or authority having jurisdiction over such Limited Partner or (iv) such disclosure, in the written opinion of legal counsel to such Limited Partner or Authorized Representative (which opinion is reasonably satisfactory in form and substance to the General Partner), is otherwise required by law.  To the fullest extent permitted by law, prior to making any disclosure described in clauses (ii), (iii) or (iv) of this Section 8.2(b), a Limited Partner as soon as reasonably practicable shall notify the General Partner of its intent to make such disclosure.  Each Limited Partner will use reasonable best efforts to cause each of its Authorized Representatives to comply with the obligations of such Limited Partner under this Section 8.2(b).

(c)     Notwithstanding anything to the contrary contained herein, the General Partner agrees that each Limited Partner that itself is an investment partnership or other collective investment vehicle having reporting obligations to its limited partners or other investors shall be permitted to disclose information relating to the Partnership and its investments to such Limited Partner's limited partners or investors; *provided*, *however*, that such disclosure shall not be permitted unless such Limited Partner's limited partners or investors are required, pursuant to such Limited Partner's governing documents, to maintain the confidentiality of Portfolio Company information to the same extent as such Limited Partner's limited partners or investors would be if they were members of the Partnership.

## SECTION 9   TRANSFERS, ETC.

9.1     **Transfer by General Partner**.  The General Partner may assign, pledge, encumber or otherwise transfer its interest as General Partner of the Partnership, in whole or in part, to any Person.

9.2     **Transfer by a Limited Partner**. Subject to Section 9.3 and subject to the General Partner's consent (which consent may be withheld in the General Partner's sole discretion), a Limited Partner may assign or otherwise transfer all or a portion of its interest in the Partnership to one or more other Persons (each an "Assignee"); provided, that all assignments or other transfers shall, in addition to requiring such consent, be subject to the satisfaction of the following conditions:

(i)     the transferring Limited Partner and the transferee shall each provide a certificate to the effect that (A) the proposed transfer will

not be effected on or through (1) a U.S. national, regional or local securities exchange, (2) a foreign securities exchange, (3) PORTAL or (4) an interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers (including, without limitation, the NASDAQ System) and (B) it is not, and the proposed transfer will not be made by, through or on behalf of, (1) a Person, such as a broker or a dealer, making a market in interests in the Partnership or (2) a Person who makes available to the public bid or offer quotes with respect to interests in the Partnership;

(ii)     such transfer will not be effected on or through an "established securities market" or a "secondary market or the substantial equivalent thereof," as such terms are used in section 1.7704-1 of the Treasury Regulations; and

(iii)    such transfer would not result in the Partnership at any time during its taxable year having more than 100 partners, within the meaning of section 1.7704-1(h)(1)(ii) of the Treasury Regulations (taking into account section 1.7704-1(h)(3) of the Treasury Regulations).

(b)      No attempted assignment, transfer or substitution shall be recognized by the Partnership and any purported assignment, transfer or substitution shall be void unless effected in accordance with and as permitted by this Agreement.  No Assignee shall have the right to become a Limited Partner (a "Substitute Limited Partner") upon the assignment or transfer of a Limited Partner's interest in the Partnership, unless all of the following conditions are satisfied:

(i)      the duly executed and acknowledged written instrument of assignment shall have been filed with the Partnership;

(ii)     the transferring Limited Partner and the Assignee shall have executed and acknowledged such other instruments and taken such other action as the General Partner shall reasonably deem necessary or desirable to effect such substitution, including, without limitation, the execution by the Assignee of a counterpart of or an appropriate supplement to this Agreement pursuant to which such Assignee agrees to be bound by the terms and provisions hereof, and a Power of Attorney, if any, similar to that delivered by the transferring Limited Partner;

(iii)    the conditions set forth in Section 9.3 shall have been satisfied, and, if reasonably requested by the General Partner, the transferring Limited Partner or the Assignee shall have provided to the General Partner an opinion of counsel (which, at the request of the transferring Limited Partner, may be counsel to the Partnership) satisfactory in form and substance to the General

Confidential treatment requested by Nixon Peabody LLP

Partner as to (A) such transfer being exempt from the registration requirements of the Securities Act and the registration or qualification requirements of state securities laws, and (B) the matter referred to in clause (c) of Section 9.3; such counsel may rely as to factual matters on a certificate of facts that will be provided to it by its client and by the General Partner;

(iv)    the transferring Limited Partner or the Assignee shall have paid to the Partnership such amount of money as is sufficient to cover all reasonable expenses incurred by or on behalf of the Partnership in connection with such substitution; and

(v)     the General Partner shall have consented in writing to such substitution, which consent may be withheld in the General Partner's sole discretion.

An Assignee shall be admitted as a Substitute Limited Partner effective as of the assignment or transfer of the transferring Limited Partner's interest upon satisfaction of the foregoing conditions of this Section 9.2. If a Limited Partner transfers all of its interest in the Partnership in accordance with this Section 9.2, such transferring Limited Partner shall cease to be a member of the Partnership effective upon such transfer.

9.3    **Certain Restrictions on Transfers**.  Notwithstanding any other provision of this Agreement, to the fullest extent permitted by law, no Limited Partner may assign or otherwise transfer in any manner whatsoever all or any part of its interest in the Partnership, and no attempted or purported assignment or transfer of such interest shall be effective, unless (a) such assignment or transfer would not cause the Partnership to become taxable as a corporation under the Code, (b) such assignment or transfer would not result in a violation of applicable law, including the federal securities laws, or any term or condition of this Agreement, (c) such assignment or transfer would not result in a requirement that the Partnership register as an investment company under the Investment Company Act, and (d) such assignment or transfer is to an entity which the General Partner deems in its reasonable judgment to be a Qualified Investor.  The General Partner shall not unreasonably withhold or delay its judgment as to whether a prospective transferee is a Qualified Investor.

9.4    **Further Actions**.  The General Partner or its substitute shall cause this Agreement and the Certificate of Limited Partnership to be amended to reflect as appropriate the occurrence of any of the transactions referred to in this Section 9, as promptly as is practicable after such occurrence.

**SECTION 10 DURATION AND TERMINATION OF THE COMPANY.**

10.1    **Duration**.  The term of the Partnership shall commence on the date hereof and continue until the occurrence of any of the following events (an "Event of Dissolution"):

(a)      the date on which all of the Partnership's investments have been liquidated (the "Partnership Term");

(b)      the vote or written agreement of the General Partner and a Majority in Interest of the Limited Partners to dissolve the Partnership;

(c)      the occurrence of an Event of Withdrawal or the entry of a decree of judicial dissolution under the Act; or

(d)      at any time that there are no Partners.

10.2    **Winding Up**.   Upon the occurrence of an Event of Dissolution, the business and affairs of the Partnership shall be wound up.   The General Partner shall proceed with the liquidation and distribution of the Partnership's assets; provided, however, that upon an Event of Withdrawal, a Majority in Interest shall appoint another Person to act as liquidating trustee (the liquidating trustee so chosen by the Partners, or the General Partner acting in the capacity of liquidating trustee, is herein called the "Liquidator").   The Liquidator shall be responsible for completing a Dissolution Sale to the extent necessary to satisfy creditors as described in Section 10.3(a) below.   After satisfaction of obligations owed to any creditors, the Liquidator shall distribute to the Partners (i) the balance on account in the Reserve in cash and (ii) the remaining Partnership assets in kind, all in accordance with Section 10.3(b) below.   The Liquidator shall have the power to make reasonable reserves for the payment of any contingent, conditional or unmatured obligations of the Partnership.

10.3    **Final Distribution**.   The Profit or Loss of the Partnership from the Dissolution Sale shall be allocated to the Partners' Capital Accounts in accordance with Section 13 of this Agreement.   All unrealized gains or unrealized losses on any Securities remaining in the Partnership after the Dissolution Sale shall be deemed to be realized for the purposes of final allocations to the Capital Accounts of the Partners pursuant to Section 13.   The proceeds of the Dissolution Sale and any other property remaining in the Partnership after the Dissolution Sale shall be applied or distributed as a final distribution (a "Final Distribution") in one or more installments (or reasonable provisions made therefore) in the following order of priority:

(a)      to creditors of the Partnership (whether by payment or the making of reasonable provision for payment thereof), including Partners who are creditors, in the order of priority as provided by the Act and other applicable law; and

(b)      to the Partners in accordance with Section 3.2.

10.4    **Termination**.   The Partnership shall terminate when all of the assets of the Partnership, after payment of or due provision for all debts, liabilities and obligations of the Partnership, shall have been distributed to the Partners in the manner provided for in Section 10.3, and the Certificate of Limited Partnership shall have been canceled in the manner required by the Act.

Confidential

NP-SEC-0000032

- 12 -

## SECTION 11 DEFINITIONS.

11.1 **Definitions**.  As used herein, the following terms have the following meanings:

Act:  As defined in Section 1.1.

Affiliate:  As to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person.  For the avoidance of doubt, Archipel Capital and BIM Investment Management shall be considered "Affiliates" of the General Partner.

Agreement:  This Limited Partnership Agreement between the General Partner and the Partners, as amended or restated from time to time.

Assignee:  As defined in Section 9.4(a).

Authorized Representative:  As defined in Section 8.2(b).

Business Day:  Any day other than a Saturday, Sunday or other day on which banks are authorized by law to be closed in New York City, New York.

Capital Account:  As defined in Section 2.3.

Capital Commitment:  As defined in Section 2.1(a).

Capital Contribution:  As to each Partner, all capital contributed to the Partnership by such Partner pursuant to Section 2.1.

Carrying Value:  With respect to any Partnership asset, the asset's adjusted basis for U.S. federal income tax purposes, except that the Carrying Values of all Partnership assets shall be adjusted to equal their respective fair market values, in accordance with the rules set forth in Treasury Regulations section 1.704-1(b)(2)(iv)(f), except as otherwise provided herein, as of:  (a) the date of the acquisition of any additional Interest by any new or existing Partner in exchange for more than a de minimis Capital Contribution other than pursuant to the initial closing of the sale of Interests; (b) the date of the distribution of more than a de minimis amount of Partnership property to a Partner as consideration for an Interest in the Partnership; (c) the date an Interest is relinquished to the Partnership or (d) the date of the acquisition of any additional Interest by any new or existing Partner in exchange for services; provided that adjustments pursuant to clauses (a), (b), (c) and (d) above shall made only if the General Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners.  The Carrying Value of any Partnership asset distributed to any Partner shall be adjusted immediately prior to such distribution to equal its fair market value and depreciation shall be calculated by reference to Carrying Value, instead of tax basis, once Carrying Value differs from tax basis.

Confidential

<u>Certificate of Limited Partnership</u>:  The Certificate of Limited Partnership of the Partnership, as amended and/or restated from time to time.

<u>Code</u>:  The Internal Revenue Code of 1986, as amended from time to time.

<u>Confidential Private Placement Memorandum</u>:  The Confidential Private Placement Memorandum of the Partnership dated May 2011, as amended, supplemented, or restated from time to time.

<u>Dissolution Sale</u>:  All sales and liquidations by or on behalf of the Partnership of all or substantially all of its assets in connection with or in contemplation of the winding up of the Partnership.

<u>Distribution</u>:  Any distribution made by the Partnership to any Partner.

<u>Event of Dissolution</u>:  As defined in Section 10.1.

<u>Event of Withdrawal</u>:   (a)  The General Partner withdraws from the Partnership in a manner prohibited by this Agreement;

(b)   the General Partner (i) makes an assignment for the benefit of creditors; (ii) files a voluntary petition in bankruptcy; (iii) is adjudicated a bankrupt or insolvent; (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law, or regulation; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature; or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of its properties;

(c)   if within one hundred twenty (120) days after the commencement of any proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law, or regulation, the proceeding has not been dismissed, or if within ninety (90) days after the appointment without its consent or acquiescence of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of its properties, the appointment is not vacated or stayed, or if within ninety (90) days after the expiration of any such stay, the appointment is not vacated; or

(d)   the dissolution and commencement of winding up of the General Partner, which is prohibited by this Agreement.

<u>Everloop</u>:  As defined in Section 1.3.

<u>Final Distribution</u>:  As defined in Section 10.3.

<u>Fiscal Year</u>:  As defined in Section 1.6.

Confidential

NP-SEC-0000034

General Partner:  BIM Management LP, a Delaware limited partnership, and any substitute general partner of the Partnership that is admitted in accordance with this Agreement, each in its capacity as General Partner of the Partnership.

Indemnified Parties:  As defined in Section 6.1(a).

Interests:  The limited partnership interests in the Partnership.

Invested Capital.  With respect to any Partner, such Partner's Capital Contributions net of any Management Fees paid by such Partner.

Investment Company Act:  The Investment Company Act of 1940, as amended.

Liquidator:  As defined in Section 10.2.

Loss:  As defined in the definition of Profit and Loss.

Majority in Interest:  Partners that at the time in question have an aggregate Percentage Interest in excess of 50% of the Percentage Interests of all Partners.  For the avoidance of doubt, whenever the vote, approval or consent of the Partners is required pursuant to the terms of this Agreement, the vote, approval or consent of any Partner who also is the General Partner shall not be counted.

Marketable Securities:  Securities that are traded on a national securities exchange or reported through the automated quotation system of a registered securities association and which are deemed to be "marketable" by Everloop or which the General Partner reasonably believes (i) are not subject to any "hold-back" or "lock-up" agreement and (ii) are eligible for sale by the distributee (assuming that the distributee is not an affiliate of the issuer of such securities) pursuant to a registration statement effective under the Securities Act, or pursuant to Rule 144(k) of the Securities Act, or any similar provision then in force.

Nixon:  As defined in Section 12.14.

Non-Marketable Securities:  Any Securities other than Marketable Securities.

Organizational Costs:  As defined in Section 7.1(c).

Partners:  As defined in the preamble to this Agreement.

Partnership:  Bennington - Everloop LP, the Delaware limited partnership referred to in the first paragraph of this Agreement.

Partnership Term:  As defined in Section 10.1(a).

Confidential

Confidential treatment requested by Nixon Peabody LLP

Percentage Interest:   With respect to each Partner, the percentage determined by dividing (i) the Capital Contribution of such Partner by (ii) the sum of the aggregate Capital Contributions of all Partners.

Person:   Any individual, estate, company, corporation, general partnership, limited partnership, limited liability partnership, joint venture, unincorporated association, limited liability company, governmental agency or instrumentality or any other entity of any type.

Portfolio Company:   A Person that is the issuer of any equity or debt securities held by the Partnership through the Partnership's investment in Everloop.

Profit and Loss:   For each Fiscal Year or other period, the taxable income or loss of the Partnership, or particular items thereof, determined in accordance with the accounting methods used by the Partnership for U.S. federal income tax purposes with the following adjustments:  (i) any income of the Partnership that is exempt from federal income taxation and not otherwise taken into account in computing Profit and Loss shall be added to such taxable income or loss; (ii) if the Carrying Value of any asset differs from its adjusted tax basis for federal income tax purposes, any depreciation, amortization or gain resulting from a disposition of such asset shall be calculated with reference to such Carrying Value; (iii) upon an adjustment to the Carrying Value of any asset, pursuant to the definition of Carrying Value, the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss; and (iv) any expenditure of the Partnership not deductible in computing taxable income or loss, not properly capitalizable and not otherwise taken into account in computing Profit and Loss pursuant to this definition shall be treated as deductible items.

Qualified Investor:   An institutional or other sophisticated investor to which, in the reasonable opinion of the General Partner, an interest in the Partnership may be offered in a private placement without any violation of the registration requirements of the federal securities laws or any other applicable laws or regulations.

Reserve:  As defined in Section 2.4.

Securities:  Shares of capital stock, limited partnership interests, limited liability company interests, warrants, options, bonds, notes, debentures and other securities and equity interests of whatever kind of any person, partnership, corporation or government, whether readily marketable or not.

Securities Act:  The Securities Act of 1933, as amended.

Substitute Partner:  As defined in Section 9.4(b).

Confidential

Treasury Regulations:  The Regulations promulgated by the U.S. Treasury Department under the Code, as such regulations may be amended from time to time.

**SECTION 12 MISCELLANEOUS.**

12.1   **Waiver of Partition**.  Each Partner hereby irrevocably waives any and all rights that it may have to maintain an action for partition of any of the Partnership's property.

12.2   **Modifications**.  This Agreement may be modified or amended only with the written consent of the General Partner and a Majority in Interest.

12.3   **Entire Agreement**.  This Agreement constitutes the entire agreement among the Partners with respect to the subject matter hereof, and supersedes any prior agreement or understanding among them with respect to such subject matter.

12.4   **Severability**.  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement or the application of such provision to other Persons or circumstances shall not be affected thereby.

12.5   **Notices**.   All notices, requests, demands and other communications hereunder shall be in writing and shall be (a) transmitted by hand delivery, (b) mailed by first class, registered or certified mail, postage prepaid, or (c) transmitted by overnight courier:

> If to the General Partner:
> Bennington – Everloop LP
> c/o BIM Management LP
> 1716 Main Street, Suite 100
> Buffalo, NY 14209
> Attention: Gregory W. Gray
>
> and
>
> 12 Moorehill Drive
> Toronto, ON M4G 1A1
> Canada
> Attention: Gregory P. Edwards
>
> With a copy to:
>
> Nixon Peabody LLP
> 40 Fountain Plaza, Suite 500
> Buffalo, New York 14202
> Attention: John Koeppel

Confidential treatment requested by Nixon Peabody LLP                                NP-SEC-0000037

<u>If to a Partner</u>:

To the address set forth below such Partner's name on
<u>Schedule I</u>,

and if to the Partnership, at the address set forth above for the General Partner, or to such other address as the Partnership, the General Partner or any Partner shall have last designated by notice to the Partners, the General Partner, the Partnership and the other Partners, as the case may be.  Notices mailed or transmitted in accordance with the foregoing shall be deemed to have been given upon receipt.

12.6  **Governing Law**.  This Agreement shall be governed by the laws of the State of Delaware, without regard to its principles of conflicts of law.

12.7  **Successors and Assigns**.  Except as otherwise specifically provided, this Agreement shall be binding upon and inure to the benefit of the Partners and their legal representatives, successors and assigns.

12.8  **Counterparts**.  This Agreement may be executed in one or more counterparts, all of which shall constitute one and the same instrument.

12.9  **Headings**.  The section headings in this Agreement are for convenience of reference only, and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

12.10  **Actions and Power of Attorney**.  (a)  Each Limited Partner shall execute and deliver such other certificates, agreements and documents, and take such other actions, as may be required by law or, upon advice of counsel to the General Partner, advisable and, in such case, requested by the General Partner in connection with the formation of the Partnership and the achievement of its purposes, including, without limitation, (i) any documents that the General Partner deems necessary or appropriate to form, qualify, or continue the Partnership as a limited partnership in all jurisdictions in which the Partnership conducts or plans to conduct business and (ii) all such agreements, certificates, tax statements and other documents as may be required to be filed in respect of the Partnership.

(c)  Each Limited Partner hereby irrevocably constitutes and appoints the General Partner, with full power of substitution, the true and lawful attorney-in-fact and agent of such Limited Partner, to execute, acknowledge, verify, swear to, deliver, record and file, in its or its assignee's name, place and stead, all in accordance with the terms of this Agreement, all instruments, documents and certificates which may from time to time be required by the laws of the United States of America, the State of Delaware, any other jurisdiction in which the Partnership conducts or plans to conduct its affairs, or any political subdivision or agency thereof to effectuate, implement and continue the valid existence and affairs of the Partnership, including the power and authority to verify, swear to, acknowledge, deliver, record and file:

Confidential

Confidential treatment requested by Nixon Peabody LLP

(i)       all certificates and other instruments, including any amendments to the Certificate of Limited Partnership, which the General Partner deems appropriate to form, qualify or continue the Partnership as a limited partnership in the State of Delaware and all other jurisdictions in which the Partnership conducts or plans to conduct its affairs;

(ii)     any amendments to this Agreement or any other agreement or instrument which the General Partner deems appropriate to (A) effect the addition, substitution or removal of any Limited Partner or the General Partner pursuant to this Agreement or (B) effect any other amendment or modification to this Agreement, but only if such addition, substitution, removal, amendment or modification is duly adopted in accordance with the terms hereof;

(iii)    all conveyances and other instruments which the General Partner deems appropriate to reflect the dissolution and termination of the Partnership pursuant to the terms hereof, including the certificate of cancellation required by the Act to cancel the Certificate of Limited Partnership;

(iv)    all instruments relating to transfers of the interests of Partners in the Partnership or to the admission of any Substitute Limited Partner;

(v)     certificates of assumed name and such other certificates and instruments as may be necessary under the fictitious or assumed name statutes from time to time in effect in the State of Delaware and all other jurisdictions in which the Partnership conducts or plans to conduct its affairs; and

(vi)    any election pursuant to section 954(b)(4) of the Code to exclude income of a "controlled foreign corporation" from classification as "subpart F income."

The power of attorney granted herein shall be deemed to be coupled with an interest, shall be irrevocable, shall survive and not be affected by the dissolution, bankruptcy, incapacity or legal disability of a Limited Partner and shall extend to such Limited Partner's successors and assigns.  Any Person dealing with the Partnership may conclusively presume and rely upon the fact that any instrument referred to above, executed by such attorney-in-fact and agent, is authorized, regular and binding, without further inquiry.  If required, each Limited Partner shall execute and deliver to the General Partner within five (5) days after the receipt of a request therefor, such further designations, powers of attorney or other instruments as the General Partner shall reasonably deem necessary for the purposes hereof.

Confidential

Confidential treatment requested by Nixon Peabody LLP

12.11   **Pronouns and Plurals**.  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form on nouns, pronouns and verbs shall include the plural and vice versa.

12.12   **Non-Waiver**.  No provision of this Agreement shall be deemed to have been waived except if the giving of such waiver is contained in a written notice given to the party claiming such waiver, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor the waiver was given.

12.13   **Construction**.   None of the provisions of this Agreement shall be construed as for the benefit of or as enforceable by (a) any creditor (other than Persons entitled to indemnification hereunder) of the Partnership or any Partner or (b) any other Person not a party to this Agreement.

12.14   **Counsel to the Partnership**.  Counsel to the Partnership may also be counsel to the General Partner and its Affiliates.  The General Partner has retained Nixon Peabody LLP ("Counsel") as counsel to the General Partner in connection with the formation of the Partnership and may retain Counsel in connection with the operation of the Partnership and/or on other legal matters related to the General Partner and their Affiliates, including making, holding and disposing of investments.   Each Limited Partner acknowledges that Counsel does not represent any Limited Partner in connection with its investment in the Partnership, and that Counsel shall owe no duties to any Limited Partner.   In the event any dispute or controversy arises between any Limited Partner and the Partnership, or between any Limited Partner or the Partnership, on the one hand, and the General Partner (or an Affiliate thereof) that Counsel represents, on the other hand, then each Limited Partner agrees that Counsel may represent either the Partnership or the General Partner (or its Affiliate), or both, in any such dispute or controversy, and each Limited Partner hereby consents to such representation.   Each Limited Partner further acknowledges that, whether or not Counsel has in the past represented or currently represents such Limited Partner with respect to other matters, Counsel has not represented the interests of any Limited Partner in the preparation and negotiation of this Agreement and any related documents.

12.15   **Failure to Make Payments**.  Notwithstanding anything to the contrary contained herein, the General Partner may bring an action on behalf of the Partnership in respect of the failure of any Partner to make any payment required to be made hereunder and such Partner shall be liable to the Partnership for any and all costs, expenses and liabilities resulting from its failure to make such payment and for the costs and expenses (including attorneys' fees) of collecting such payment.

12.16   **General Partner Discretion**.  Notwithstanding any other provision of this Agreement or otherwise applicable law, whenever in this Agreement, the General Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires, including its own interests, and

shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership or any Partner, or (ii) in its "good faith" or under another expressed standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards.

     12.17   **Limited Partner Representations and Covenants**.  In addition to the representations and covenants set forth in the Subscription Agreement of the Partnership executed by the Limited Partner, the Limited Partner agrees that (i) the Interest being subscribed for by the Limited Partner is not being made with financing, borrowed money or indebtedness, and (ii) the Interest will not be pledged or secured by any liens.  The Limited Partner also agrees that it has been furnished with, and has carefully read, this Agreement, including without limitation Schedule II, and has been given the opportunity to (i) ask questions of, and receive answers from, the General Partner concerning the terms and conditions of the offering and this Agreement and other matters pertaining to an investment in the Partnership and (ii) obtain any additional information which the General Partner can obtain without unreasonable effort or expense that is necessary to evaluate the merits and risks of an investment in the Partnership.  In considering the investment in the Partnership, the Limited Partner has not relied upon any representations made by, or other information (whether oral or written) furnished by or on behalf of, the Partnership, the General Partner or any Affiliate thereof, or any director, officer, employee, or agent of the General Partner or any such Affiliate, other than as set forth in this Agreement.

**SECTION 13 COMPANY ALLOCATIONS.**

     13.1   **Allocations Generally**.  Except as otherwise provided herein, Profit, Loss and each item of income, gain, loss or deduction of the Partnership for each fiscal year or other period shall be allocated among the Partners in proportion to their respective Percentage Interests.  Notwithstanding the foregoing, the General Partner may adjust such allocations for financial accounting, book or income tax purposes if it determines that such adjusted allocations would better give effect to the economic provisions of this Agreement or are necessary or desirable to cause the allocations hereunder to have substantial economic effect or to be in accordance with the interests of the Partners in the Partnership, in each case within the meaning of the Code and the Treasury Regulations.

     13.2   **Transfer of Capital Accounts**.  The original Capital Account established for each Substitute Partner in respect of any Interests shall be in the same amount as the Capital Account in respect of such Interests of the Partner to which such Substitute Partner succeeds, at the time such Substitute Partner is admitted to the Partnership.  The Capital Account of any Partner whose Percentage Interest shall be increased by means of the transfer to him or her of all or part of the Percentage Interest of another Partner shall be appropriately adjusted to reflect such transfer.  Any reference in this Agreement to a Capital Contribution of, or distribution to, a then Partner shall include a Capital Contribution or distribution previously made by or to any predecessor Partner on account of the Interests of such then Partner.

Confidential treatment requested by Nixon Peabody LLP

NP-SEC-0000041

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**GENERAL PARTNER**

BIM MANAGEMENT LP

By:_____
Name:
Title:

**LIMITED PARTNERS**

BIM MANAGEMENT LP
as Attorney-in-fact on behalf of the
Limited Partners

By:_____
Name:
Title:

**Schedule I**

<u>PARTNERS AND CAPITAL CONTRIBUTIONS</u>

| Name | Capital<br>Contribution | Percentage<br><u>Interest</u> |
|---|---|---|
| <u>General Partner</u> | | |
| BIM MANAGEMENT LP | | |
| <u>Limited Partners</u> | | |
| [To be added.] | | |
| **TOTAL OF ALL CAPITAL CONTRIBUTIONS** | | **100%** |

Confidential

**<ins>EXHIBIT B</ins>**

**<ins>EVERLOOP BUSINESS PLAN</ins>**

Attached.

Confidential treatment requested by Nixon Peabody LLP                                                    NP-SEC-0000044

## EXHIBIT C

## PRIVACY STATEMENT

We consider privacy to be fundamental to our relationship with our investors.  We are committed to maintaining the confidentiality, integrity and security of our current and former investors' non-public information.   Accordingly, we have developed internal policies to protect confidentiality while allowing investors' needs to be met.

We respect your right to privacy.  We also know, however, that you expect us to conduct our investment program in an accurate and efficient manner.  To do so, we must collect and maintain certain non-public information about you and our other investors.  We collect this information from sources such as subscription agreements and other documents.

We will not disclose any non-public personal information about investors who are individuals, except to our affiliates and service providers as allowed by applicable law or regulation.  In the normal course of serving our investors, information we collect may be shared with companies that perform various services such as our accountants, auditors, attorneys, broker-dealers and fund administrator.  Specifically, we may disclose to these service providers non-public personal information including:

- Information we receive on subscription agreements or other documents, such as name, address, account or tax identification number and the types and amounts of investments; and

- Information about transactions with us, our affiliates or others, such as participation in other investment programs, ownership of certain types of accounts or other account data.

Any party that receives this information will use it only for the services required and as allowed by applicable law or regulation, and is not permitted to share or use this information for any other purpose.  To protect the personal information of individuals, we permit access only by authorized employees who need access to that information to provide services to us and our investors.  In order to guard investors' non-public personal information, we maintain physical, electronic and procedural safeguards that comply with U.S. federal standards.  An individual investor's right to privacy extends to all forms of contact with us, including telephone, written correspondence and electronic media, such as the Internet.

We note, however, that notwithstanding the foregoing, we reserve the right to disclose non-public personal information about investors to any person or entity, including without limitation any governmental agency, regulatory authority or self-regulatory organization having jurisdiction over us or our affiliates, if (i) we determine in our discretion that such disclosure is necessary or advisable pursuant to or in connection with any United States federal, state or local, or non U.S., law, rule, regulation, executive order or policy, including without limitation any anti-money laundering law and the USA PATRIOT Act of 2001 and (ii) such disclosure is not otherwise prohibited by law, rule, regulation, executive order or policy.

Confidential treatment requested by Nixon Peabody LLP                                                    NP-SEC-0000045