EXHIBIT 47

Gregory Gray, Jr.                                    2/24/2015

**Page 1**

BEFORE THE SECURITIES AND EXCHANGE COMMISSION

In the Matter of:
)
ARCHIPEL CAPITAL    )File No. NY-9143
)

WITNESS:  GREGORY GRAY, JR.

PAGES:  1 - 236

PLACE:    200 Vesey Street
          New York, New York

DATE:     February 24, 2015

The above-entitled matter came on for
Investigation at 9:10 a.m.

**Page 3**

INDEX TO EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Form 1662 | 4 |
| 2 | Subpoena | 4 |
| 3 | Subpoena | 4 |
| 4 | Background Questionnaire | 34 |
| 5 | Email dated August 25th, 2014 | 90 |
| 6 | Archipel Capital PPMs | 105 |
| 7 | Email dated May 12, 2011 | 114 |
| 8 | Email dated May 12th, 2014 | 130 |
| 9 | Email dated March 2, 2011 | 143 |
| 10 | Email dated October 28th, 2012 | 155 |
| 11 | Spreadsheet | 171 |
| 12 | Bloom Energy stock certificate | 171 |
| 13 | Email dated August 8, 2014 | 185 |
| 14 | Spreadsheet | 185 |
| 15 | Agrivida stock certificate | 203 |
| 16 | Email dated April 25, 2011 | 206 |
| 17 | Email dated July 21, 2011 | 207 |
| 18 | Email dated June 30, 2013 | 208 |
| 19 | Email | 216 |

**Page 2**

APPEARANCES:

On Behalf of the Securities and Exchange
Commission:

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
200 Vesey Street
New York, New York  10281
BY:  HANE L. KIM, ESQ.
     VICTOR SUTHAMMANONT, ESQ.
     STEVEN RAWLINGS, Assistant Regional Director
Kimha@sec.gov

ON BEHALF OF THE WITNESS:
CONTI FENN & LAWRENCE LLC
36 South Charles Street, Suite 2501
Baltimore, Maryland  21201
BY:  GREGORY T. LAWRENCE, ESQ.

ALSO PRESENT:
PETER POTTIER, Intern
YAA SARPONG, Intern
GREGGORY HOLDERMAN, Videographer

**Page 4**

(Form 1662 premarked Exhibit 1.)
(Subpoena premarked Exhibit 2.)
(Subpoena premarked Exhibit 3.)
VIDEOGRAPHER: Here begins media number
one in the testimony of Gregory W. Gray Jr. in the
matter of Archipel Capital.
Today's date is February 24th, 2015. The
time on the video monitor is 10:14 a.m.
This deposition is being taken at the
offices of the SEC NYRO and was made at the request of
Michelle Yenchochic.
I am Gregory Holderman, and the court
reporter is Helene Gruber from Esquire Deposition
Solutions, New York, New York.
Counsel, please identify yourselves and
state whom you represent for the record, and please do
speak clearly for our court reporter.
MS. KIM:  I am Hane Kim with the
Securities and Exchange Commission.
MR. SUTHAMMANONT:  Victor Suthammanont
with the Securities and Exchange Commission.
MR. RAWLINGS:  Steve Rawlings with the
Securities and Exchange Commission. We also have two
non-officer interns.
Please introduce yourselves.

1 (Pages 1 to 4)

Gregory Gray, Jr.                                                    2/24/2015

Page 5

1          MR. POTTIER: Peter Pottier.
2          MS. SARPONG: Yaa Sarpong.
3          MR. RAWLINGS: They will just be
4    observing.
5          MR. LAWRENCE: Good morning. My name is
6    Greg Lawrence with Conti Fenn & Lawrence, and I am
7    counsel for Gregory Gray Jr. and Archipel Capital.
8          And I'd also like to, before we roll on,
9    note that this is not a deposition but on-the-record
10   testimony.
11         VIDEOGRAPHER: I believe I said --
12         MR. LAWRENCE: I think you said
13   deposition.
14         VIDEOGRAPHER: Pardon me.
15         Will the court reporter please swear in
16   the witness.
17         GREGORY GRAY, JR.,
18   Having first been duly sworn, testified as follows:
19         EXAMINATION
20   BY MS. KIM:
21      Q.   Can you please state and spell your full
22   name for the record?
23      A.   Gregory Wayne Gray Junior; Gregory,
24   G-R-E-G-O-R-Y, Wayne, W-A-Y-N-E, Gray G-R-A-Y,
25   Junior, J-R, J-U-N-I-O-R.

Page 6

1      Q.   Are you known by any other names?
2      A.   No.
3      Q.   Greg, for example?
4      A.   Greg. Sorry.
5      Q.   So as you heard earlier, I am Hane Kim. I
6    am an attorney with the Division of Enforcement with
7    the United States Securities and Exchange Commission
8    and an officer of the Commission for this -- for the
9    purposes of this proceeding.
10         With me are several colleagues who are
11   also officers of the Commission for purposes of
12   testimony today, Victor Suthammanont and Steve
13   Rawlings, and we are also here with two interns.
14         This is an investigation by the United
15   States Securities and Exchange Commission in the
16   matter of Archipel Capital LLC, NY-9143, to determine
17   whether there have been violations of certain
18   provisions of the Federal Securities Laws; however,
19   the facts developed in this investigation may
20   constitute violations of other federal or state,
21   civil or criminal laws.
22         Prior to the opening of the record I
23   provided you with a copy of Form 1662, which is the
24   Commission's Supplemental Information Form. A copy
25   of that form was previously marked as NY-9143

Page 7

1    Exhibit 1. Have you had an opportunity to review
2    Exhibit 1?
3      A.   Yes.
4      Q.   Do you have any questions concerning
5    Exhibit 1?
6      A.   No.
7      Q.   Prior to the opening of the record you
8    were also provided with a copy of the Formal Order of
9    Investigation in this matter and also the Supplemental
10   Order. It will be available for your examination
11   during the course of the proceeding.
12         Have you had an opportunity to review the
13   Formal Order and Supplemental Order?
14      A.   Yes.
15      Q.   Do you have any questions about the Formal
16   Order or the Supplemental Order?
17      A.   No.
18      Q.   Are you represented by counsel today?
19      A.   Yes.
20         MS. KIM: Counsel, please identify
21   yourself and the firm you work at.
22         MR. LAWRENCE: Gregory Lawrence with Conti
23   Fenn & Lawrence representing both Mr. Gray and
24   Archipel Capital.
25         MS. KIM: Counsel, do you represent any

Page 8

1    other entity or individual in connection with this
2    investigation?
3          MR. LAWRENCE: Yes. In connection with
4    this as counsel for Archipel, I am also counsel for
5    the entities in which Archipel -- I'm sorry --
6    Mr. Gray -- in which Mr. Gray is the general partner
7    for so that is BIM Management and the special purpose
8    entities you are going to discuss today. We can put
9    that in writing as well.
10         MS. KIM: What about any employees of
11   either Archipel Capital or BIM Management LP or any of
12   the special purpose entities?
13         MR. LAWRENCE: Well, I think we have had
14   communications relating to that. I don't want to
15   delineate now because I will get confused, but we
16   represent any employees of those entities in their
17   capacities as employees; not in their individual
18   capacities as of yet. We potentially could if that
19   matter would arise. We would have to evaluate from a
20   conflict basis.
21   BY MS. KIM:
22      Q.   Mr. Gray, do you know that your counsel
23   also represents Archipel Capital, BIM Management LP
24   and the Archipel-related entities?
25      A.   Yes.

2 (Pages 5 to 8)

Gregory Gray, Jr.                                          2/24/2015

Page 9

1    Q.  Are you aware of potential conflicts that
2  may arise, that could arise?
3    A.  I don't know of any conflicts.
4    Q.  Are you okay with him representing you
5  today?
6    A.  Yes.
7    Q.  So before we get started I want to go over
8  a few ground rules about how the testimony should
9  proceed. The court reporter here takes down
10  everything we say, but she can't record gestures, head
11  nods, things like um hum so please make sure your
12  responses are done verbally and with a clear voice
13  loud enough to be heard.
14        The Commission controls the record;
15  therefore, if you need to take a break, you should
16  please ask me. The court reporter will only go off
17  the record at our request, the staff's request.
18        The usual policy is to wait until any
19  pending questions are answered and any follow-up
20  questions are answered before we go on break.
21        If the staff has conversations with
22  either you or your attorney off the record, and they
23  are conversations of substance, when the record is
24  reopened, the staff will briefly summarize the off
25  the record conversations.

Page 10

1        If you don't understand a question, it is
2  really important that you let me know. I will
3  clarify or be happy to rephrase, otherwise if you
4  answer a question and you don't ask me to clarify or
5  rephrase, it is going to be assumed you understood
6  the question.
7    A.  Okay.
8    Q.  If you remember anything later on that you
9  should have said earlier, please let me know so that
10  you can clarify or add to your responses.
11    A.  Okay.
12    Q.  Is there anything that would prevent you
13  from testifying accurately and truthfully today?
14    A.  No.
15    Q.  Any medical condition that would impair
16  your ability to answer?
17    A.  No. It's cold.
18    Q.  Are you on any medications or did you take
19  any medications this morning?
20    A.  No.
21    Q.  Have you spoke with anyone other than your
22  counsel regarding this investigation?
23    A.  Yes. I've spoken with my wife. Do you
24  need her name, like her name?
25    Q.  Yes, please.

Page 11

1    A.  Cynthia, Cynthia is C-Y-N-T-H-I-A, same
2  last name Gray, G-R-A-Y.
3        Greg Edwards, again G-R-E-G, last name
4  Edwards, E-D-W-A-R-D-S. He is the chairman of
5  Archipel Capital.
6        Brad LaSalle, B-R-A-D  L-A capital
7  S-A-L-L-E. He works for Archipel Capital.
8        I believe -- and also I have spoken with
9  Devin Stelljes regarding this matter, D-E-V-I-N, last
10  name Stelljes, S-T-E-L-L-J-E-S.
11    Q.  Starting with Greg Edwards, when did you
12  last speak with him?
13    A.  He called -- I'm sorry. He emailed me
14  yesterday and asked me to call him. I called him and
15  left him a message last night. I have not spoken to
16  him since last Thursday.
17    Q.  What did you speak about last Thursday?
18        MR. LAWRENCE:  I guess I would just
19  instruct the witness at this point to the extent that
20  he is communicating with any of these individuals
21  regarding attorney -- well, I guess Mr. Edwards and
22  Mr. LaSalle regarding communications with the attorney
23  seeking advice from the attorney or advice that the
24  attorneys provided -- that is me or my law firm --
25  that we are asserting the attorney-client privilege

Page 12

1  over that communication.
2        THE WITNESS:  Okay.
3        MR. LAWRENCE:  With that caveat.
4    A.  When I spoke to Mr. Edwards, I just gave
5  him an update on the overall macro point of view of
6  Archipel Capital. I usually speak with Mr. Edwards
7  three times a week, and we discuss every deal, every
8  offering, any developments in any particular offering
9  that we have open at that point in time.
10    Q.  How long have you been speaking with
11  Mr. Edwards three times per week?
12    A.  Approximately 2006.
13  BY MR. RAWLINGS:
14    Q.  Does Mr. Edwards know that you are
15  appearing for testimony today?
16    A.  Yes.
17    Q.  Did you speak with Mr. Edwards about any
18  expected substance about what you might say about your
19  testimony today?
20    A.  Can you clarify the question?
21    Q.  Like did you discuss potential questions
22  you might get and potential answers that you might
23  give, not exempting anything from your counsel, from
24  what your counsel has said? I am just wondering if
25  you and Mr. Edwards discussed not just the fact that

3 (Pages 9 to 12)

Gregory Gray, Jr.                                            2/24/2015

### Page 13

1  there is testimony today, but substantive responses to
2  potential questions that could be asked during
3  testimony today.
4       A.   No, we have not.
5       Q.   Okay.
6  BY MS. KIM:
7       Q.   Going with Mr. Rawlings' question about
8  with Mr. LaSalle, have you discussed the testimony of
9  what you might speak about today with Mr. LaSalle?
10      A.   No.
11      Q.   When is the last time you spoke with Mr.
12 LaSalle?
13      A.   Brad sent me a text message this morning.
14      Q.   And what was that regarding?
15      A.   He just said good luck.
16           MR. LAWRENCE:  You'll need it.
17      It's a joke, for the record.
18      Q.   And when is the last time you spoke with
19 Mr. Stelljes?
20      A.   Approximately two weeks ago.
21      Q.   And did you speak with him at that time
22 about the testimony today, that you are giving today?
23      A.   I've only spoken with him via text
24 communication.
25      Q.   And did you text with Mr. Stelljes about

### Page 14

1  your testimony?
2       A.   No.
3       Q.   And you said you spoke with Mr. Stelljes
4  regarding the investigation?
5       A.   He told -- yes.
6       Q.   And what was that conversation?
7       A.   Just that he went in, and I presume that
8  he testified in front of you a few weeks ago. That's
9  what he communicated to me.
10      Q.   And did he tell you anything about this
11 testimony a few weeks ago?
12      A.   No.
13 BY MR. RAWLINGS:
14      Q.   Just to be clear, he didn't tell you any
15 of the substance about what he may or may not have
16 said?
17      A.   No. He said "I'm going to meet with the
18 SEC tomorrow."
19           I said to him "good luck," and then
20 that's really it.
21      Q.   Just to be clear, he didn't like call you
22 the next day to say "Oh, they asked me this, and this and
23 this"?
24      A.   I have not spoken with him via phone six
25 months. It could be nine months. So minimum of four

### Page 15

1  months, and it could be nine months.
2  BY MS. KIM:
3       Q.   Did he text you anything relating to the
4  investigation?
5       A.   No.
6           MR. LAWRENCE:  Other than what he said
7  already.
8       Q.   Have you spoken with anyone other than
9  your counsel and the four people you mentioned
10 regarding your attendance today to give testimony in
11 this investigation?
12      A.   A few clients.
13      Q.   Who are the clients?
14      A.   Bill McEssy, M-C-E-S-S-Y. To the best of
15 my knowledge, I believe he is the only one.
16      Q.   Who is Mr. McEssy?
17      A.   He is an investor of ours.
18      Q.   When you say "investor of ours," do you
19 mean --
20      A.   Of Archipel Capital.  Sorry.
21      Q.   What does he invest in?
22      A.   Through Archipel Capital?  He invests in
23 our venture capital offerings.
24      Q.   And what was the substance of your
25 conversation with Mr. McEssy?

### Page 16

1       A.   He called me yesterday.  He left me a
2  voice mail to call him back.
3           I tried to call him back when I was done
4  with my meeting.  His offices were closed.  I sent
5  him an email this morning letting him know I am
6  meeting with the SEC, and I will call him tomorrow
7  morning.
8       Q.   And why did he call you yesterday?
9       A.   I usually talk to Bill weekly.
10      Q.   What do you talk about?
11      A.   We seldomly talk about investments.  I
12 met with Bill last week when he was in Florida.  We
13 will talk about him selling his McDonalds
14 restaurants.  He looks to -- he looks to act as a
15 mentor to me and to Archipel.  We talk about a wide
16 variety of things, and keeping his house in Florida,
17 selling his house in Florida, him building up his
18 McDonalds empire to north of 50 stores or selling off
19 29 stores.  That's basically what I can remember at
20 this point.
21      Q.   And when you say McDonalds empire, what do
22 you mean?
23      A.   He is the largest owner of the McDonald
24 franchise I believe in the United States, and it
25 could be larger.

                                    4  (Pages 13 to 16)

Gregory Gray, Jr.                                    2/24/2015

Page 17

1     Q.   You are appearing here today for testimony
2   pursuant to a subpoena, correct?
3     A.   Yes.
4     Q.   A copy of the subpoena and other documents
5   accompanying the subpoena were sent to your attorney
6   on January 13, 2015, was previously marked as NY-914...
7   Exhibit 2.
8          (Pause in the proceedings.)
9     Q.   Mr. Gray, what is Exhibit 2?
10    A.   It is a communication -- an email
11   communication from the SEC to my counsel. I believe
12   this is the subpoena that was just sent to my
13   counsel.
14    Q.   And have you seen Exhibit 2 before or a
15   copy of Exhibit 2 before?
16    A.   I believe this is the subpoena that was
17   sent to me in December, but I can't say for certain.
18    Q.   Let me give you also this one.
19    A.   Okay.
20    Q.   So this is a document dated December 8th,
21   2014 previously marked as NY-9143 Exhibit 3. Was
22   that -- is that the subpoena and other documents
23   accompanying the subpoena that was sent to you on
24   December 8th, 2014?
25    A.   Sorry. Can you say that again, please?

Page 18

1     Q.   Is that a copy of the subpoena in addition
2   to the other documents that came with the subpoena
3   that was sent to you on December 8, 2014?
4     A.   I believe so, yes.
5     Q.   Have you seen Exhibit 3 before?
6     A.   Yes.
7     Q.   Exhibit 2, if you go to the third page in
8   that document --
9     A.   Sorry. Page 3?
10    Q.   Yes, of the actual document, the third
11   page.
12    A.   This one (indicating)?
13    Q.   Yes. Is this a copy of the subpoena you
14   are appearing pursuant to here today?
15    A.   Yes.
16    Q.   Then if you go to Exhibit 3, which is the
17   December 8th document, if you go to a similar page in
18   Exhibit 3, roughly five pages in -- six pages in, this
19   subpoena calls for you to produce documents; is that
20   correct?
21    A.   Yes.
22    Q.   Did you conduct a search for documents
23   that may be responsive to this request?
24    A.   Yes.
25    Q.   Can you describe the search that was

Page 19

1   conducted for the requested documents?
2     A.   We provided everything. We searched my
3   apartment in Chicago, our offices in Buffalo, my
4   laptop computer, my desktop computer working with our
5   counsel Nixon Peabody and our accountant Freed
6   Maxick. Freed is F-R-E-E-D, Maxick is M-A-X-I-C-K.
7     Q.   You said "we searched." Who is "we"?
8     A.   Sorry. Myself. I should clarify.
9     Q.   And have you -- did anyone else help you
10   with that search?
11    A.   My wife helped me put together documents
12   to produce to our counsel in an organized fashion.
13    Q.   What search did you do on your laptop
14   computer?
15    A.   I handed over my laptop computer to -- if
16   I ask my counsel the proper terminology. Was he a --
17   what would you call him?
18        MR. LAWRENCE: IT vendor.
19    A.   Okay. Sorry. An IT vendor who I guess
20   would mimic a copy of my hard drive. I didn't
21   actually see him do it. He just took my laptop, and
22   then I guess handed it to you. What that looks like
23   I don't know.
24    Q.   Do you know who that vendor was?
25    A.   Can I ask my counsel? Do I?

Page 20

1     Q.   Do you know?
2     A.   No.
3   BY MR. RAWLINGS:
4     Q.   Just questions like that, if we ask you a
5   question, if you don't know but you know you might be
6   able to ask somebody else, answer the question "I
7   don't know, but," and if it is your counsel who knows,
8   we will talk to your counsel. We don't want you to
9   tell us anything you talked to your counsel about.
10   When you guys talked, there is a wall, and you
11   understand that, and your counsel has already
12   mentioned that.
13    A.   Okay. I'm sorry.
14    Q.   Not at all.
15        MR. LAWRENCE: Just to be clear, as I am
16   sitting here, he is giving his best recollection. We
17   have had detailed communications with you about this,
18   and we are an open book about the process that we are
19   going through.
20        To the extent that he said Nixon Peabody
21   instead of Conti Fenn Lawrence, for example, he is
22   just probably not that up on all the processes,
23   because a lot, obviously, has gone on in cooperation
24   with the staff.
25        MR. RAWLINGS: Understood.

5  (Pages 17 to 20)

Gregory Gray, Jr.                                                    2/24/2015

Page 21

BY MS. KIM:

1
2    Q.   We discussed your laptop.  What about your
3    desktop; what search was done on your desktop?
4    A.   So how I -- I produced every document on
5    my desktop that was on my email system so my desktop
6    and my laptop mimic each other so everything on my
7    laptop is on my desktop and on my email.
8    Q.   Does that also the mimic the documents
9    themselves that are on the laptop?
10   A.   Yes.
11   Q.   So it is not limited to just the email?
12   A.   Correct.  Yes.
13   Q.   I was going to ask, you said you had
14   worked with counsel at Nixon Peabody to collect
15   documents.  Did you mean Greg Lawrence?
16   A.   There are some documents that Nixon --
17   Nixon Peabody was our previous -- Nixon Peabody was
18   our counsel for each special purpose entity, and I
19   believe you -- I believe the Exchange asked me for
20   documents for -- sub documents for -- sub
21   documents -- subscription documents for clients.
22   And I asked Nixon Peabody to provide
23   copies in their possession to us so I was speaking
24   with regard to Nixon Peabody at that point in time,
25   just to clarify.

Page 22

1    Q.   Did you ask for any other documents from
2    Nixon Peabody to produce to the staff?
3    A.   Outside of subscription documents?  Not
4    to my knowledge.
5    Q.   And you said you also worked with Freed
6    Maxick to produce documents, and Freed Maxick is your
7    accountant?
8    A.   They were our accountant, correct, yes.
9    Q.   Is Freed Maxick no longer the accountant
10   for --
11   A.   Correct -- sorry.  Yes.
12   Q.   Freed Maxick was the accountant for which
13   entities?
14   A.   All of them.  Would you like them -- the
15   names?
16   Q.   Would it be Archipel Capital LLC?
17   A.   No -- well, let me rephrase that.
18   Archipel Capital is a brand name only so there are --
19   there isn't income or expenses associated with
20   Archipel Capital.  To the extent we would need any
21   taxes filed for Archipel, Freed Maxick would have
22   handled it for us in the past.
23   Freed Maxick was our accountant for BIM
24   Management LP, which is the general partner, for
25   Bennington Everloop LP, which was an investment in

Page 23

1    Everloop, E-V-E-R-L-O-O-P.  Archipel Capital-Agrivida
2    LP, Archipel Capital-Social Media Fund, and Archipel
3    Capital-Bloom Energy LP.  I believe that is
4    everything.
5    Q.   When you said it was Archipel
6    Capital-Agrivida LP?
7    A.   I believe it is an LP.  It could be an
8    LLC.  I would have to look.
9    Q.   And for Archipel Capital-Social Media Fund
10   LP, were there multiple Social Media Fund LPs?
11   A.   I, II, III and IV.
12   Q.   Were they all represented by Freed Maxick
13   for accounting purposes?
14   A.   Yes.
15   Q.   What about Archipel Capital-Lineagen?
16   A.   Sorry.  I forgot Lineagen.  Lineagen is
17   L-I-N-E-A-G-E-N.
18   Q.   And then there is also Archipel
19   Capital-Late Stage Fund LP?
20   A.   This would be the first year we do K-1s,
21   and we have hired a new accounting firm to represent
22   us going forward.
23   Q.   What is the new accounting firm?
24   A.   It's going to be KRFS.
25   Q.   And when did you hire KRFS?

Page 24

1    A.   Two weeks ago?  Within the last two
2    weeks.
3    Q.   And are they the accounting firm for BIM
4    Managment LP as well?
5    A.   They will be.  So for every entity that
6    we just described, KRFS will handle not only the
7    accounting needs for us, they are actually going to
8    give our -- give us greater detail for our clients as
9    well so they are going to actually do fund
10   administration for us as well.
11   Q.   And what do you mean by fund
12   administration?
13   A.   So they will handle all the bookkeeping,
14   the compliance, the treasury aspects associated with
15   our investors.
16   Q.   And who is handling bookkeeping now?
17   A.   Can you clarify bookkeeping?
18   Q.   You said that they -- as part of fund
19   administration they are going to do bookkeeping,
20   compliance and treasury --
21   A.   Treasury services.
22   Q.   So the bookkeeping work that you are
23   describing, what does that mean?
24   A.   So the bookkeeping will be more or
25   less -- well, the expenses associated with the fund,

6 (Pages 21 to 24)

Gregory Gray, Jr.                                               2/24/2015

Page 25

1   so we obviously incur legal and accounting expenses
2   for each fund so they will be handling the
3   bookkeeping.
4       Currently as it stands now when an
5   investor sends in his or her subscription booklet to
6   us, we actually input that data into our database.
7   Now that we will all be outsourced into KRFS so that
8   investor.net subscription document will now be sent
9   to KRFS, they will add that information to the
10  database, and they will start to create their own
11  structure for us.
12      Q.   Currently -- so you said now the investor
13  sends in a booklet.  You put that information into
14  "our database"?
15      A.   Yes.
16      Q.   Who puts that information into the
17  database?
18      A.   To clarify, sometimes the investors could
19  also send the documents to Nixon Peabody, our former
20  counsel, or to us.  That information would be
21  inputted into our database either by myself or my
22  former assistant, Kristy, last name Cicchitti,
23  C-I-C-C-H-I-T-T-I.
24      Q.   And does Ms. Cicchitti still work with
25  you?

Page 26

1       A.   No.  She resigned in, I believe,
2   September of 2014.  She took a new job.
3       Q.   So since September 2014 until today,
4   who -- who puts in the investor information into the
5   database?
6       A.   I have been.
7       Q.   And can you describe what the database is?
8       A.   Sure.  So the database would be your
9   name, your address, your social security number.
10      Then we would have boxes associated with
11  the form making sure we have all the necessary
12  paperwork such as a W-9.  A W-9 is a tax form filled
13  out, and to make sure all the information is filled
14  out correctly so think of it name, social, address,
15  how the money was received, whether it was a check
16  an incoming wire, the date it was received, and then
17  subscription booklet filled out, okay; or no, we need
18  to send back, we are missing a signature; and then
19  W-9, if it is missing, we have a red spot for missing
20  w-9, or yellow.  A color.  I forget if it is red or
21  yellow.
22      Q.   And the database is just an Excel
23  spreadsheet?
24      A.   Yes.
25      Q.   You said KRFS is going to be handling

Page 27

1   compliance?
2       A.   Yes.
3       Q.   And what does that mean?
4       A.   Just making sure that everything is
5   being -- I hate to use the word compliant -- I guess
6   there is -- everything is being compliant for our
7   investors.
8       Q.   Everything is being compliant with what?
9       A.   I guess regulatory rules and regulations.
10      Q.   And who does that?  Who handles compliance
11  for Archipel Capital and the related entities now?
12      A.   I'd say it's a combination between Nixon
13  Peabody, our former counsel, and myself.
14      Q.   Has that been the case -- how long has
15  Archipel Capital been in existence?
16      A.   The LLC formation?  I believe it is 2006.
17      Q.   I am going to, just for ease of -- there
18  are a lot of Archipel Capital hyphen name LP so for
19  ease of use I think I am going to set some shorthands.
20      A.   You can call it Bloom Energy.
21  BY MR. RAWLINGS:
22      Q.   Before you move off the topic, I just want
23  to ask, why did Archipel and the entities change their
24  accountants?
25      A.   Why did we change now?

Page 28

1       Q.   Yes.
2       A.   Just to offer greater service to our
3   clients.  At the end of the day, we want to, as our
4   firm continues to grow, we want to offer more to our
5   clients, and we are very good in my eyes at what we
6   are good at, and there's ways we can improve our
7   firm, and we looked at our accounting relationship as
8   a way we could improve our firm and give our clients
9   more.
10      So the fund administration is absolutely
11  the best case scenario to outsource that, and we need
12  a partner for our accounting firm just as we had a
13  partner for our law firm.
14      Q.   Just to be clear, so the record is clear,
15  your former accounting firm, they didn't resign or
16  anything, did they?
17      A.   No.  I had been looking at -- I hate
18  using the word terminating the relationship -- since
19  last year.  We have been interviewing accountants
20  since Q3 since last year, local accountants in
21  western New York, and nobody could offer us the fund
22  administration services we are looking for so we have
23  been looking, working with our counsel, working
24  really nationwide looking at who is the best fit for
25  us going forward.

7 (Pages 25 to 28)

Gregory Gray, Jr.                                                    2/24/2015

Page 29

1      Q.   Thanks.
2   BY MS. KIM:
3      Q.   So I'm just going to set up some shorthand
4   names, and then we will go back to the questions.
5           Archipel Capital LLC I would like to call
6   Archipel or Archipel Capital; does that make sense?
7      A.   Yes.
8      Q.   There is also BIM Management LP. I think
9   that, probably BIM Management?
10     A.   That's fine.
11     Q.   And then for the LPs, I was just going to
12  go with Bloom Energy LP, Lineagen LP when I am
13  referencing the partnership. The Archipel
14  Capital-Bloom Energy LP, I will call it Bloom Energy
15  LP for short.
16     A.   You can call it Bloom Energy if you want.
17  That's fine. However you would prefer is fine by me.
18     Q.   Because there is also a company Bloom
19  Energy, right?
20     A.   Yes.
21     Q.   Just to make it clear, I will add the LP
22  when I am talking about the partnership.
23     A.   Okay.
24     Q.   And you have referenced Nixon Peabody as
25  former counsel --

Page 30

1      A.   Correct.
2      Q.   -- a few times. Why are they former
3   counsel?
4      A.   I guess -- well, due to the investigation
5   by the SEC, both parties decided it's best to move on
6   from each other in the current state.
7      Q.   And do you have -- have you replaced Nixon
8   Peabody with other counsel?
9      A.   We're in final discussions with one of
10  two firms -- with two firms, yes.
11  BY MR. RAWLINGS:
12     Q.   What are the two firms you are
13  considering?
14     A.   Vedder & Price out of Chicago, and
15  something & Thornberg or Thornberg & something.
16        MR. LAWRENCE:  Barnes & Thornberg.
17     A.   They have offices nationwide.
18  BY MS. KIM:
19     Q.   Do you have any documents responsive to
20  the subpoena within your personal possession that have
21  not been produced?
22     A.   Not to my knowledge, no.
23  BY MR. RAWLINGS:
24     Q.   I just want to ask, because you mentioned
25  about receiving texts from Mr. Stelljes and other

Page 31

1   folks, the texts that you have sent, are those on
2   your -- like a personal smartphone or something like
3   that?
4      A.   An iPhone.
5      Q.   IPhone?
6      A.   Correct.
7      Q.   Is that an Archipel iPhone or just your
8   own personal iPhone?
9      A.   Well, I mean, it's used for -- both. I
10  guess to clarify, I'm not really -- the number, my
11  cell phone number, is a number listed on Archipel
12  Capital's website so I guess the number would be
13  both.
14     Q.   And I just want to -- do you know if
15  counsel had access to and searched for texts at all?
16  You might not know the answer to the question.
17     A.   I don't know.
18     Q.   I take it that your smartphone also
19  receives emails as well, right?
20     A.   Yes.
21     Q.   Are those emails -- do you know if your
22  counsel had access to emails that would have been on
23  your smartphone in responding -- in responding to the
24  subpoena?
25     A.   Yes. He and she would have.

Page 32

1      Q.   Okay.
2   BY MS. KIM:
3      Q.   Are there any other documents on the
4   iPhone that wouldn't be otherwise on the laptop or
5   desktop?
6      A.   No.
7      Q.   Do you know of any documents that are
8   responsive to the requests in the documents subpoena,
9   Exhibit 3, that have been previously in your
10  possession but were not given to the staff because
11  they are lost or destroyed or otherwise disposed of?
12     A.   Not my knowledge.
13  BY MR. RAWLINGS:
14     Q.   Just to clarify that, and everybody gets a
15  little on edge when we say lost or destroyed, the
16  question is to get at the -- if a document was
17  destroyed five months ago before we ever even came
18  along on the scene, we want to know if you have a
19  present memory now of that happening, this is the time
20  to tell us, but also if there was a fire or flood
21  where documents were lost, that type of a thing, so we
22  are just wondering if you are aware of any of those
23  events where there might be relevant documents but
24  they just don't happen to exist now for whatever
25  reason?

8  (Pages 29 to 32)

Gregory Gray, Jr.                                                        2/24/2015

Page 33

1      A.   The only event I can recall is the
2   building that we used to have office space in, 1716
3   Main Street, we did have a break-in, and they did
4   steal one or two laptops, and that would have been --
5   it is embarrassing.  I can't tell you if it is 2011
6   or 2012.
7      Q.   It doesn't have to be exact.  That's fine.
8      A.   We had two laptops stolen from our
9   offices.
10     Q.   And I take it information on those laptops
11  at that point in time, it wasn't like there was some
12  server where all the stuff on that laptop would have
13  also existed?
14     A.   The only server where it would have
15  existed would have been our -- we use Intermedia as
16  our email provider, and the other party at that time
17  whose laptop was stolen is Devin Stelljes, and Devin
18  and I would communicate via email back and forth with
19  these documents so those documents would be on the
20  server, the Intermedia Exchange server.
21     Q.   Got it.  But there may have been other
22  documents on those two computers that just -- that
23  they were on the computers and they are gone?
24     A.   Yes.
25     Q.   Thanks.

Page 34

1   BY MS. KIM:
2      Q.   And do you understand you are still under
3   an obligation to produce documents responsive to the
4   subpoena?
5      A.   Yes.
6      Q.   And we understand you are still doing
7   rolling productions?
8      A.   Yes.
9          MS. KIM:  Please mark this exhibit.
10         (Background Questionnaire marked
11  Exhibit 4.)
12  BY MS. KIM:
13     Q.   I have asked the court reporter to mark
14  Exhibit NY-9143 which is labeled Background
15  Questionnaire.  Mr. Gray, what is this document?
16     A.   This is a document that the Exchange
17  asked me to fill out for this hearing.
18     Q.   By "the Exchange" you mean --
19     A.   Sorry.  The SEC.
20     Q.   And did you fill out this document?
21     A.   I provided the information for this
22  document.
23     Q.   Did your counsel prepare it?
24     A.   I prepared it on a Word document typed
25  in, and then I gave that information to his legal

Page 35

1   secretary to put on a cleaner version.
2      Q.   And did you answer the questions in
3   Exhibit 4 completely?
4      A.   Yes.
5      Q.   I want to go over a few of the questions.
6   Your response to question 7, which requests "list all
7   residences you occupied at any time during the last
8   four years," and it continues on after that.
9          The first three properties or the first
10  three entries state that you -- they are your present
11  residences; is that accurate?
12     A.   Yes.
13     Q.   So there is an address in Buffalo, one
14  address in Chicago and one address in Lake Worth,
15  Florida; is that right?
16     A.   Yes.
17     Q.   Which of these is your primary residence?
18     A.   I would say Buffalo, New York.
19     Q.   Are there any addresses that are missing
20  that you resided in the last four years?  For
21  example, did you live in Orchard Park in the last four
22  years?
23     A.   No.
24     Q.   Anc                               New York,
25  is that the address that you gave w....  there was a

Page 36

1   break-in?
2      A.   Yes.
3      Q.   Did you say before that that was a
4   business address?
5      A.   Yes.  So the building, if you would like
6   me to clarify, was a mixed-use building so the first
7   floor was 3200 square feet of almost gallery
8   space/office space.  Above the building was a loft
9   residence; separate entrances, separate parcel post
10  numbers, et cetera.
11     Q.   Was the business entity -- well, which
12  business entity operated out of that Main Street
13  address?
14     A.   Can you clarify?
15     Q.   Is it Archipel Capital working out of
16  there or BIM Management LP working out of there?
17     A.   I would say all the entities that were
18  in -- open at this point in time, we did business out
19  of this office from.
20     Q.   And they were renting space from the art
21  gallery, or was that in the loft?
22     A.   I own the building.  Sorry.
23  BY MR. RAWLINGS:
24     Q.   I just want to -- when you say that
25  Buffalo is your primary residence, can you give it an

9 (Pages 33 to 36)

Gregory Gray, Jr.                                                    2/24/2015

Page 37

1    estimate as to sort of how often you spend in the
2    Buffalo residence versus the Chicago residence versus
3    the Florida residence?
4        A.   Right now it's a little cold.
5        Q.   In both places, Chicago and Buffalo.
6        A.   So I would say my answer is from January.
7    My daughter has a break in Martin Luther King week so
8    we were in Florida extensively in January.
9             She had midwinter break in February,
10   which we just came back from.
11            Then she has spring break, she has two
12   weeks off in March.
13            I would say if you are looking at
14   breaking it down by quarters, Q1 I would say
15   75 percent of my time is Florida, 25 percent of my
16   time is Buffalo.
17            I have not been to Chicago since
18   Thanksgiving. I am flying there tonight.
19            I would say looking at Q2 onward, I would
20   say it is probably 75 percent Buffalo, 25 percent
21   Chicago.
22            And I would say that is fairly true for
23   Q3, and then Q4 it gets cold again.
24            I would say Q4 is probably almost
25   60 percent Buffalo, 70 percent Buffalo, 30 percent

Page 38

1    Florida.
2    BY MS. KIM:
3        Q.   I am a little confused like why you live
4    part of the time in Chicago, part of the time in
5    Buffalo?
6        A.   We have clients in Chicago that we
7    service, and it is easier to maintain a small
8    apartment just to make me feel more at time than
9    renting hotels every single time I go there.
10       Q.   It is not like your whole family moves to
11   Chicago?
12       A.   No, no. Sorry. My daughter was born in
13   Chicago. My wife and I lived there for a period of
14   time. We like to give them culture and experience of
15   city life so we do spend a lot of time there.
16            But, no. My wife works in Buffalo full
17   time. My daughter goes to school in Buffalo only.
18   We are not taking her from school to school. So no.
19   We do travel frequently, but that's it.
20       Q.   And then your response to question 8 on
21   the next page of Exhibit 4, and you have two -- the
22   question requests your telephone numbers and
23   telecommunication services that you use, regularly
24   use. The first one is              Verizon. Is
25   that a cell phone?

Page 39

1        A.   No. It is a home office phone in
2    Buffalo, New York.
3        Q.   Is the 312 number a cell phone?
4        A.   Yes.
5        Q.   Are there any other telephone numbers that
6    you use?
7        A.   Not to my knowledge, no.
8        Q.   Like in the Florida home there isn't a
9    separate landline?
10       A.   Cell phone. No.
11       Q.   What about -- this question also asks for
12   Google Voice, Skype or video conferencing numbers. Do
13   you have any of those?
14       A.   I have spoken to people on Skype. I am
15   unaware if there is a number associated or just a
16   name. Forgive my ignorance. I don't believe I have
17   a number on Skype, and I don't have a number on
18   Google Voice or the other things.
19       Q.   And then if you turn to the next page,
20   which is page 3 of Exhibit 4 -- it is the same exhibit
21   you are in -- question 13, question 13 asks for "all
22   electronic devices including but not limited to
23   desktop computers, laptop computers, mobile phones,
24   computer tablets, external storage devices," and
25   continues on from there.

Page 40

1             I see here you listed the home desktop
2    which you discussed earlier; is that right?
3        A.   Yes.
4        Q.   And the laptop which you also discussed
5    earlier?
6        A.   Yes.
7        Q.   And before 2013, did you have different
8    computers?
9        A.   We had an older -- sorry -- I had an
10   older iMac, yes, whatever the desktop of Mac is
11   called.
12       Q.   Did you have any other laptops?
13       A.   No, other than the one that was stolen a
14   few years ago.
15       Q.   And the laptop that was stolen, was that
16   your laptop?
17       A.   I believe we had two laptops stolen. One
18   was Devin Stelljes that I provided him, and one was
19   mine.
20       Q.   Apart from the Macbook listed here and the
21   two laptops that were stolen, have you had any other
22   laptops in the past four years?
23       A.   No.
24       Q.   This question also asks for mobile phones.
25   Have you had mobile phones in the past four years?

DIVERSIFIED REPORTING SERVICES
(202) 467-9200

Gregory Gray, Jr.                                    2/24/2015

**Page 41**

1    A.  Yes.  Sorry.
2    Q.  And I know you mentioned you currently
3  have an iPhone.
4    A.  Yes.
5    Q.  How long have you had that iPhone?
6    A.  Thanksgiving 2014.
7    Q.  The new iPhone 6?
8    A.  That's the latest one?  The big one, the
9  plus.  I don't know what number it is, but I have the
10  big iPhone, the big one.
11    Q.  Did you have an iPhone before that?
12    A.  Yes.
13    Q.  And how long did you have the iPhone that
14  you had before Thanksgiving 2014?
15    A.  I believe 14 months.
16    Q.  And do you still have that iPhone?
17    A.  I traded it in.
18    Q.  So before these two phones that we just
19  discussed, did you have any other phone?
20    A.  I've had an iPhone before that phone.
21    Q.  And do you still have that iPhone?
22    A.  No.  That was also traded in.
23    Q.  Do you have any computer tablets?
24    A.  I have an iPad.
25    Q.  And how long have you had that iPad for?

**Page 42**

1    A.  About 14 months.
2    Q.  And before the iPad that you currently
3  have, did you have any other computer tablet?
4    A.  No.
5    Q.  Do you have email on the iPad?
6    A.  Yes.
7    Q.  Was that email searched in connection with
8  producing documents for the Commission?
9    A.  That email is the same email that's on my
10  phone.  It is the Archipel Capital email so yes.
11    Q.  Are there any other documents on the iPad
12  that aren't otherwise on your computer or laptop?
13    A.  No.
14    Q.  Do you receive messages on your iPad?
15    A.  No.
16    Q.  By messages I mean like I-messages or text
17  messages.
18    A.  Yes -- yes, no.  My daughter pretty much
19  hijacks my iPad.
20    Q.  And then the last one in this question 13
21  would be external storage devices.  Are there any
22  external storage devices that you regularly use?
23    A.  Like a thumb drive?
24    Q.  Could be a thumb drive or maybe a jump
25  drive.

**Page 43**

1    A.  No external storage devices.
2    Q.  If you turn to page 4 of this Exhibit 4, I
3  want to ask you about question 16.  It says "Are you
4  now or have you ever been a beneficial owner, directly
5  or indirectly, of any privately held company," and
6  then the question continues on from there.
7      I see here that you listed Everloop,
8  Twitter, Agrivida, Bloom Energy Lineagen.  Are these
9  names referencing the LPs or the entities?
10    A.  Say that again.  Sorry.
11    Q.  For example, Everloop, the reference to
12  Everloop here, which is the first two lines of your
13  response, does that mean Everloop Incorporated or does
14  that mean Everloop the limited partnership -- sorry --
15  the Bennington Everloop Limited Partnership?
16    A.  So with regard to Everloop, I had a
17  personal $50,000 investment in Everloop.
18      In addition, we also had a 10 percent
19  carried interest in the Bennington Everloop Limited
20  Partnership.
21      Does that answer your question or no?
22      I just want to make sure I am answering
23  what you wanted from me.
24    Q.  Because it doesn't -- it's hard for me to
25  say -- for example, BIM Management is not included on

**Page 44**

1  this list.
2    A.  Right.
3    Q.  So I am just wondering, are you an owner
4  of BIM Management?
5    A.  Yes.
6  BY MR. RAWLINGS:
7    Q.  What is it that you own in BIM Management?
8  Because it's an LP, right?
9    A.  It is an LP, yes.
10    Q.  It is a partnership interest that you own?
11    A.  Yes.
12    Q.  Okay.
13      MR. LAWRENCE:  Can I keep this copy?  I am
14  writing down.
15  BY MS. KIM:
16    Q.  What percentage -- do you have other
17  partners in BIM Management LP?
18    A.  I do, yes.
19    Q.  Who are those partners?
20    A.  Greg Edwards and Tony Oram, O-R-A-M.
21    Q.  I will go back to those people.
22      So then for number 16, also, you know, it
23  doesn't list Archipel Capital LLC.  Are you an owner
24  of Archipel Capital LLC?
25    A.  I am, yes  Again, to clarify, Archipel

11 (Pages 41 to 44)

Gregory Gray, Jr.                                        2/24/2015

Page 45

1  Capital LLC is the name brand only so there isn't --
2  I don't want to say it is worthless. Obviously we
3  are creating value, but it doesn't have any monetary
4  value.
5      Q.  What is your ownership interest; is it
6  shares?
7      A.  Percentage.
8      Q.  What percentage do you own?
9      A.  Of Archipel Capital?  I own 65.1 percent.
10     Q.  And who owns the other part of that?
11     A.  Greg Edwards owns 25 percent, and Tony
12  Oram owns 9.9 percent.
13  BY MR. RAWLINGS:
14     Q.  And to clarify, is that percent of stock,
15  common stock?
16     A.  It's of the limited partnership.
17     Q.  Because it is an LLC, though.  Archipel
18  LLC.
19         First let me ask this question:  Is it
20  actually a company registered as a company in
21  someplace, a business?
22     A.  Yes.
23     Q.  Where?
24     A.  New York.
25     Q.  You may not know this, but do you know

Page 46

1  like how many shares it has outstanding?
2      A.  I don't know.
3          MR. LAWRENCE:  LLCs don't have shares.
4          MR. RAWLINGS:  So there I just asked a
5  dumb question.  Not a corporate lawyer.
6      Q.  What does it have?
7      A.  To add -- if you don't want this answer,
8  then stop me, but basically Archipel Capital was
9  created to invest in venture capital offerings.
10         When we hired Nixon Peabody in
11  April 2011, they told us we should --
12     Q.  Let me stop you.
13         MR. RAWLINGS:  Counsel?
14         MR. LAWRENCE:  Sorry.
15         MR. RAWLINGS:  I would just sort of say
16  for the record, and I think we will get to this later,
17  there has been an agreement of an attorney-client
18  waiver with respect to the formation of the Archipel
19  entities that has been documented between counsel and
20  the staff.
21         It is my perception that this question,
22  the answer to it which is otherwise privileged, which
23  is you relaying to us things Nixon Peabody said to
24  you, falls within that waiver.
25         I just want to make sure your counsel

Page 47

1  agrees.
2          MR. LAWRENCE:  Yes.
3      Q.  I apologize for stopping you in
4  mid-sentence.
5          MR. RAWLINGS:  Perhaps you could remind
6  him what the question was.
7      Q.  If you remember it, go ahead.
8      A.  I was basically just answering that
9  Archipel Capital was created when we hired Nixon
10  Peabody in May of 2000 -- April, May of 2010.  They
11  told us we needed to create a general partnership to
12  accept the monies.
13         So Nixon Peabody created what is now
14  known as BIM Management LP.
15         So for all intents and purposes, that is
16  why I keep referring to Archipel Capital.  Does it
17  have any value per se?  All the money -- all the
18  money we receive from management fees, et cetera, it
19  is blown through BIM Management LP, just to clarify.
20     Q.  So Archipel Capital LLC does not file a
21  tax return?
22     A.  According to our tax accountants, we
23  don't need to file a tax return because there isn't
24  anything -- any money coming in and coming out.
25         It did in 2011, I believe, because -- so

Page 48

1  when we accepted Greg Edwards and Tony Oram's monies
2  in, obviously that is investment income so we filed a
3  tax return whatever year they invested in our
4  partnership.
5          But since we created BIM Management LP,
6  we haven't needed to file a tax return.
7      Q.  Got it.  Thank you.
8          MR. LAWRENCE:  Just a clarification.  You
9  said 2010 you retained Nixon Peabody.
10         THE WITNESS:  2011.  Sorry.
11         MR. RAWLINGS:  Thank you, counsel.
12  BY MS. KIM:
13     Q.  Did Archipel Capital receive fees from
14  2006 to 2011?
15     A.  No.  Can you clarify fees?
16     Q.  You had said before that Archipel Capital
17  was incorporated in 2006.
18     A.  Correct.
19     Q.  Was it also created in 2006?
20     A.  Created meaning --
21     Q.  Did it exist in -- when did it --
22     A.  The entity existed.  The idea existed and
23  the entity behind it existed.
24     Q.  Before 2006?
25     A.  No.  In 2006.

12  (Pages 45 to 48)

Gregory Gray, Jr.                                              2/24/2015

**Page 49**

1      Q.   And so from 2006 until BIM Management LP
2  was created, what did Archipel Capital do?
3      A.   So I was previously employed with
4  Advanced Equities through 2008, and then after that
5  obviously we had the world economic crisis, not a
6  good time to invest in venture capital, so Archipel
7  Capital really didn't come to fruition until our
8  first offering, which was Everloop, approximately
9  April, May 2011.
10 BY MR. RAWLINGS:
11     Q.   Just to be super clear, during that
12 period, so there wouldn't have been any BIM-related or
13 Archipel entity related fees, did you use Archipel
14 Capital as an entity in which you might have done some
15 consulting or done some sort of work through that it
16 would have received income back then?
17     A.   No.
18     Q.   Okay.
19 BY MS. KIM:
20     Q.   Was Archipel Capital from 2006 to 2011
21 involved in any other investments?
22     A.   From 2006 to 2011?
23     Q.   Yes, 2006 to 2011.  So from formation
24 until BIM Management came around.
25     A.   Archipel Capital was not.  Its partners

**Page 50**

1  were, just to clarify.
2          I'm not sure I'm supposed to say this,
3  but whenever you find a good stopping point for me to
4  use the restroom.
5      Q.   Let's follow up with that one.  So you
6  said 2006 to 2011 Archipel Capital's partners?
7      A.   Yes.
8      Q.   And who are those partners?
9      A.   Greg Gray, Greg Edwards and Tony Oram.
10 We would have been active in venture capital
11 offerings during that period of time.
12     Q.   I'm sorry.  I am confused here.  You said
13 "We would have been active."
14     A.   So from 2006 until 2008, I worked for
15 Advanced Equities.  Greg Edwards and Tony Oram were
16 my clients at Advanced Equities.  We made, "we"
17 meaning the three of us, made investments during that
18 time into portfolio companies.
19         Some of those investments were not liquid
20 until 2008, 2009, 2010.
21         All those monies had nothing to do with
22 Archipel Capital BIM Management.
23     Q.   Was that your -- were you investing your
24 own money?  You said there was an investment into
25 portfolio companies.

**Page 51**

1      A.   Yes.
2      Q.   Whose money?
3      A.   Well, for example, I am an investor in
4  Advanced Equities Green Tech Media I, which is Bloom
5  Energy, as was Greg Edwards, as was Tony Oram.
6          There are other portfolio companies they
7  invested in either directly with my help while I was
8  employed at Advanced Equities.
9          I can give you an example if you need
10 one.
11     Q.   Why don't we go into more of that after a
12 break.
13         VIDEOGRAPHER:  Here ends tape number one
14 The time on the video monitor is 11:20 a.m.
15         (A recess was taken.)
16         VIDEOGRAPHER:  Here begins media two.  The
17 time on the video monitor is 11:34 a.m.
18 BY MS. KIM:
19     Q.   Mr. Gray, before break we were going
20 through Exhibit 4, the Background Questionnaire.
21     A.   Yes.
22     Q.   And I had a question about -- if you go to
23 page 5 of Exhibit 4, question 20.
24     A.   Okay.
25     Q.   This asks for all securities or brokerage

**Page 52**

1  accounts over which you had any control at any time
2  during the last four years.  Were there any securities
3  accounts or brokerage accounts that should have been
4  included here?  For example, with Computershare or
5  Fidelity?
6      A.   Okay, yes.  I misread that question.  I
7  was thinking it was more personal than corporate.
8          We did have a brokerage account for
9  Archipel Capital's Social Media Fund through Fidelity
10 Investments.
11     Q.   Were there any other accounts for --
12 starting with Social Media Fund LP?
13     A.   Any other brokerage accounts other than
14 that one?
15     Q.   Or securities accounts.
16     A.   No.
17     Q.   And what about for the other limited
18 partner -- Archipel Capital limited partnerships?
19     A.   We have bank accounts, but we don't have
20 any brokerage or securities accounts.
21     Q.   And I think bank accounts I will ask about
22 in a later question which I will get to.  For now just
23 sticking with brokerage or securities accounts, I know
24 you listed for a personal account Fidelity
25 Investments?

                                        13  (Pages 49 to 52)

Gregory Gray, Jr.                                                    2/24/2015

Page 53

1    A.  Yes.
2    Q.  That is the response to question 18. Are
3  there any other securities or brokerage accounts?
4    A.  No.
5    Q.  Was there a Computershare account for
6  Social Media Fund LP?
7    A.  Yes.
8    Q.  What kind of account was that?
9    A.  I don't have an answer for that. It's an
10  account for -- it's not a brokerage account, to my
11  knowledge. I don't know what you call Computershare.
12  I'm sorry. I know what Computershare is. I know
13  what they do. I just don't know how you classify
14  them in the scheme of things.
15    Q.  What was the account?
16    A.  It was where shares were held of Twitter.
17    Q.  Did you have discretionary authority over
18  the Fidelity account for Social Media Fund LP?
19    A.  I don't think I ever asked for
20  discretionary trading. Is that what you are asking?
21    Q.  Was it your -- I'm sorry. Let me
22  rephrase. Did you -- were you the one who controlled
23  it, the account?
24    A.  Yes.
25    Q.  Also, the Computershare account that held

Page 54

1  the Twitter shares, were you the one who controlled
2  that account?
3    A.  Yes.
4    Q.  For the Fidelity Investments account
5  listed under question 18, your personal account, is
6  that in your name individually?
7    A.  Yes.
8    Q.  And does anyone else have control over
9  that account?
10    A.  No.
11    Q.  And then if you go to page 6 of Exhibit 4,
12  question number 23 asks for "all accounts at financial
13  institutions over which you had any control."
14      For the record, I cut out a few words in
15  the middle of that.
16      For this one, you didn't -- you wrote NA,
17  not applicable, correct?
18    A.  Correct, yes.
19    Q.  And did you have -- now that we have been
20  discussing, do you know of accounts at financial
21  institutions over which you have control that are not
22  listed in the questionnaire?
23    A.  Yes. Now that I have additional
24  clarity -- I misread that question -- we do have
25  banking account -- bank accounts open for the

Page 55

1  following entities: BIM Management LP, Archipel
2  Capital-Bloom Energy LP, Archipel Capital-Lineagen
3  LP, Archipel Capital -- all of our entities, and they
4  are all currently held at M&T Bank.
5    Q.  And are there bank accounts for any
6  Archipel Capital-related entity at any other bank
7  currently open?
8    A.  Not to my knowledge, no. We used Bank of
9  America years ago, but to my knowledge they are all
10  closed.
11    Q.  When were you -- sorry. You said you used
12  Bank of America years ago. What did you mean by that?
13    A.  Our previous banking relationship was
14  with Bank of America.
15    Q.  When you say "our," do you mean for all
16  the Archipel Capital-related entities?
17    A.  The entities that were opened previous --
18  that were open at that time, we used to use Bank of
19  America.
20    Q.  When was that?
21    A.  To the best of my knowledge, May of 2011.
22  My guess would be the end of 2012, but I can't say
23  for certain.
24    Q.  Was there -- approximately the end of 2012
25  did you switch all the accounts from Bank of America

Page 56

1  to M&T Bank?
2    A.  Yes.
3    Q.  Why was that?
4    A.  I got fed up with the waiting on line at
5  Bank of America. I wish I could give you a better
6  answer.
7    Q.  Question 24 on the same page of Exhibit 4
8  requests other accounts other than those listed held
9  in your name, and you list PayPal. Is that an account
10  that is in your name?
11    A.  I don't know how PayPal works. I have
12  paid for things on PayPal so I wanted to put PayPal
13  down there.
14    Q.  Is it used for business purposes?
15    A.  No.
16    Q.  And then if you go to question 25 on the
17  same page of Exhibit 4, this asks about prior
18  proceedings and you list NASD-FINRA, see Gregory W
19  Gray Jr. Was that a NASDAQ action?
20    A.  Not a NASDAQ action but NASD.
21    Q.  Who brought an action?
22    A.  I believe it was NASD.
23  BY MR. RAWLINGS:
24    Q.  Could it have been the New York Stock
25  Exchange?

14 (Pages 53 to 56)

Gregory Gray, Jr.                                          2/24/2015

**Page 57**

1    A.   That was the end party so to my knowledge
2  it was NASD, and then they changed their name to
3  FINRA, and then for whatever reason it became a stock
4  exchange matter so in 2003 to 2009, it evolved from
5  one to two to three.
6    Q.   Okay.
7  BY MS. KIM:
8    Q.   It says here you testified in 2004, 2006
9  and 2008, approximately.
10    A.   Yes.
11    Q.   Were those testimonies all before
12  NASD/FINRA?
13    A.   They were on the phone with -- yes.  2004
14  and 2006 approximately were with NASD and FINRA.
15  2008 I believe was with NYSE.
16    Q.   Did you ever testify before the
17  Commission, the SEC?
18    A.   I don't believe so, no.
19       To clarify, you consider NYSE and the
20  Commission two different entities?
21    Q.   Yes.
22    A.   I don't believe so.
23  BY MR. RAWLINGS:
24    Q.   We will talk about some of that.  Just to
25  be clear, in the appeal of the NASD/NYSE action in

**Page 58**

1  which the Commission eventually wrote an opinion, did
2  you provide any testimony directly to any Commission
3  people during that period, or was it just on the
4  record of what had happened on the lower -- you know,
5  in the earlier investigative stage?
6    A.   I did not meet with the SEC, to my
7  knowledge -- I did not meet with the SEC.  To my
8  knowledge, I gave my counsel at the time the
9  information to file an appeal.
10       She may have had conversations with the
11  SEC, but I never had any direct communication with
12  them.
13    Q.   Thank you for clarification.
14  BY MS. KIM:
15    Q.   Just following up with that, during the
16  appeal, was there a hearing?
17    A.   Can you clarify which appeal?
18    Q.   So there was an appeal to the Commission
19  of the action, the New York Stock Exchange/NASD
20  action.  Was there any sort of hearing involved with
21  that?
22    A.   There was -- there was an appeal hearing
23  with the New York Stock Exchange, and then after that
24  we did a secondary appeal or third appeal -- I'm not
25  sure -- with the SEC.  We did not meet with the SEC

**Page 59**

1  or in front of the SEC so I'm not sure which appeal
2  you are referring to.
3    Q.   If you go to page 8 of the questionnaire,
4  Exhibit 4, you list three institutions here for
5  educational history.  Did you graduate from Xavier
6  University?
7    A.   No.  I actually moved before I graduated.
8    Q.   What about University of Cincinnati?
9    A.   No.  I transferred to Xavier.
10    Q.   Did you get a degree from Onondaga
11  Community College?
12    A.   No.  I transferred to the University of
13  Cincinnati.
14    Q.   So you haven't -- have you received a
15  degree from any college?
16    A.   I have not, no.
17    Q.   If you go to page 9, question 32, this
18  lists -- you list here four exams that you have taken;
19  is that correct?
20    A.   Yes.
21    Q.   So exam 6, 7, 63 and 66; is that right?
22    A.   Yes.
23    Q.   Are these -- the dates you list here, are
24  these the dates you passed?
25    A.   I presume, yes.

**Page 60**

1    Q.   Did you draft this section?
2    A.   I put in the -- well, I put in the
3  necessary exams that I passed, and then I believe my
4  counsel pulled up my broker check form, and they put
5  those dates in there.
6    Q.   Were you registered as a broker dealer at
7  any time?
8    A.   Was I registered with a broker dealer?
9    Q.   With a broker dealer.
10    A.   Yes.
11    Q.   How long were you registered, combining
12  all the registrations together, but how long; from
13  when to when?
14    A.   My best guess would be 1998, maybe even
15  1997, would have been registered with the BD, broker
16  dealer, until 2008.
17    Q.   And have you been registered with a broker
18  dealer since 2008?
19    A.   No.
20    Q.   Have you been registered as an investment
21  advisor?
22    A.   Since when?
23    Q.   At any time.
24    A.   I believe so, yes.
25    Q.   And what is the duration of that, start to

15 (Pages 57 to 60)

Gregory Gray, Jr.                                                    2/24/2015

Page 61

1    end, combining them?
2        A.   To my knowledge, when I passed the Series
3    66 exam, that was the necessary exam to be qualified
4    as an investment advisor.
5        Q.   Were you registered with any state when
6    you passed the Series 66 exam?
7        A.   I was probably registered with many
8    states, but I would have to check my forms to figure
9    out which states I was registered in at that point in
10   time.
11       Q.   And are you still a registered investment
12   advisor?
13       A.   No.
14       Q.   And when did you cease to be a registered
15   investment advisor?
16       A.   I just learned in December of 2014 that I
17   am not a registered investment advisor.
18       Q.   You learned this information, I suppose,
19   from counsel. I am not seeking that information, but
20   how did you learn that?
21          MR. LAWRENCE:  If you can answer the
22   question without revealing the communications between
23   you and me or anyone on your legal team representing
24   you in this investigation, feel free to. You should.
25   If not, then I instruct you not to answer.

Page 62

1        A.   I can't.
2        Q.   Are you unable to answer the question
3    because it is attorney-client privilege?
4          MR. LAWRENCE:  It would require him to
5    reveal attorney-client communications.
6        A.   Yes.
7          MR. RAWLINGS:  Just to be clear, those
8    would be communications with his current counsel now
9    you?
10         MR. LAWRENCE:  Me. Not Nixon Peabody.
11         MR. RAWLINGS:  Understood. I wanted to
12   make it perfectly clear.
13         I am going to ask a question, and I want
14   you to see whether you want to object or not.
15         MR. LAWRENCE:  Sure.
16   BY MR. RAWLINGS:
17       Q.   Did you ever discuss your belief that you
18   were a registered investment advisor with Nixon
19   Peabody at any time?
20         MR. LAWRENCE:  I guess we would just
21   instruct him that we -- if you --
22         MR. RAWLINGS:  Let me withdraw that.
23   There is a point in time, and we will deal with that
24   at that point in time so let me withdraw that and move
25   on.

Page 63

1          MR. LAWRENCE:  I think you will get all
2    you want and need to address the staff's concerns,
3    hopefully. With the waiver, that was our intention.
4    BY MS. KIM:
5        Q.   Let me go to -- we will cover that a
6    little bit later.
7          Page 10 of Exhibit 4, under question 36
8    you state that your employer's name is Archipel
9    Capital.
10       A.   Yes.
11       Q.   Would you consider Archipel your employer?
12       A.   For the purposes of this form, yes. I
13   mean -- yes.
14       Q.   I'm just trying to get a sense, because I
15   know you said Archipel Capital is sort of a brand name
16   and BIM Management passes through the fees; is that
17   right?
18       A.   Yes.
19       Q.   So I think I am just trying to get a sense
20   of more what the work is that Archipel Capital does.
21       A.   So the world knows Archipel Capital as a
22   brand. The investors know Archipel Capital as the
23   brand, but our PPM, our legal documents, show the
24   monies get paid to the general partner, which is BIM
25   Management.

Page 64

1    BY MR. RAWLINGS:
2        Q.   Archipel has office space in Buffalo,
3    correct?
4        A.   Yes.
5        Q.   Who is on the lease for that office space;
6    is it Archipel LLC or is it BIM?
7        A.   Currently there isn't a lease. They
8    invited us to be on their campus. The lease I have
9    in front of me currently is Archipel Capital LLC.
10       Q.   Is that an executed lease going forward?
11       A.   I just got it Friday so I haven't even
12   looked at it other than I have it.
13       Q.   So going back a year ago or so when you
14   had the address in Buffalo and the address for
15   Archipel LLC, was there any fees at that time? Were
16   you paying any rent, or no?
17       A.   We were paying rent, yes. There wasn't a
18   lease.
19       Q.   Was the lease being paid by BIM or by
20   Archipel LLC?
21       A.   By BIM Management LP.
22   BY MS. KIM:
23       Q.   When you said they invited Archipel
24   Capital to be on campus, what does that mean?
25       A.   So Archipel Capital is on the medical

DIVERSIFIED REPORTING SERVICES
(202) 467-9200

Gregory Gray, Jr.                                                      2/24/2015

Page 65

1   campus for the University of Buffalo, and Buffalo is
2   thriving and looking at creating an incubator program
3   as a spinoff from Roswell Park, which is a cancer
4   hospital there locally, and the University of Buffalo
5   is moving their medical campus to the medical
6   corridor as well.
7          So the University of Buffalo probably
8   states that they have a venture capital firm on their
9   campus, which is Archipel Capital.
10          We couldn't solicit office space there.
11   They had to ask us to join their building, because it
12   is a government -- a university-sponsored building.
13      Q.   And you don't currently pay rent to the
14   University of Buffalo?
15      A.   No. We do. We used to pay quarterly.
16   Now we pay monthly.
17      Q.   Did you say earlier that there was no
18   lease with the University of Buffalo?
19      A.   Correct.
20      Q.   There is currently a lease?
21      A.   We just --
22      Q.   Go ahead.
23      A.   We just received a lease on Friday to
24   execute for this year.
25      Q.   Is Archipel Capital on that lease?

Page 66

1      A.   Yes.
2      Q.   But BIM Management LP pays the rent to
3   University of Buffalo?
4      A.   Yes.
5      Q.   Under question 36, you have :
6          Is that the University of Buffalo address?
7      A.   Yes.
8      Q.   .
9          The phone number given, is that your cell
10   phone number?
11      A.   Yes.
12      Q.   And does Archipel Capital have a landline
13   number?
14      A.   The -- so Brad LaSalle has an office at
15   the Center -- it is called the Center of Excellence
16   building at             He has a landline number
17   there, but Archipel Capital as a company does not
18   have an individual number per se.
19      Q.   Is Mr. LaSalle affiliated with the
20   University of Buffalo?
21      A.   No.
22   BY MR. RAWLINGS:
23      Q.   Is there anyone else besides Mr. LaSalle
24   who uses the .           address?
25      A.   Myself, Mr. LaSalle, our website and our

Page 67

1   legal documents.
2      Q.   I'm just curious. Is it a shared space or
3   is there like, you know, cubicles, like corners;
4   Archipel Capital in that corner, another incubator in
5   that corner? How does it work? I'm just curious.
6      A.   On our floor we have the Hunter's Hope
7   Foundation, which is Jim Kelly's research facility,
8   former quarterback, and then it's Archipel Capital
9   and a conference room.
10          So not nearly as big, obviously, as here
11   when you get your own space, but when you go up to
12   the floor you need a key card to get in. Archipel
13   Capital, our signage is outside, large conference
14   room such as this.
15      Q.   Okay. Thank you.
16   BY MS. KIM:
17      Q.   So the one thing I would also point out
18   for question 36, it asks for your employment
19   activities beginning at present and working backwards
20   to the date you completed high school. It looks like
21   from question 35 there are a number of entities that
22   are not listed in 36.
23          Just for clarity's sake, are the entities
24   Morgan Stanley, UBS Paine Webber, Fidelity Brokerage
25   Services and McDonald & Company Securities, places

Page 68

1   that you worked in high school?
2      A.   Yes.
3      Q.   You can put that aside.
4          MR. RAWLINGS: I just want to note for the
5   record Nancy Brown has entered. Nancy Brown is a
6   trial staff attorney on the staff.
7      Q.   I am going to ask you a couple of
8   questions about Archipel Capital LLC. Where did the
9   name Archipel Capital come from?
10      A.   Approximately 2005, we were hosting
11   Easter dinner in Chicago, Illinois, and I was --
12   needed to get a break from my in-laws so I said I
13   will go get a bottle of wine, and went down to a
14   restaurant called Charlie Trotters to go. In Charlie
15   Trotters I pick my wine by the design label, and
16   there is a small boutique vineyard there called
17   Archipel Wines. It turns out it is my favorite wine
18   I ever had in the world, a 2001 meritage blend.
19          During my research about the wine, I love
20   their story, meaning they don't produce a wine every
21   single year. They only produce it when the climate
22   is right, the grapes are red, et cetera.
23          We have kind of taken that business model
24   and that approach to Archipel Capital, hence the
25   name. We don't always do an offering just to do an

17 (Pages 65 to 68)

Gregory Gray, Jr.                                                    2/24/2015

Page 69

1    offering. We only do it when the climate is right
2    for us and our investors.
3        It's a great wine too.
4        Q.    You stated that you, Mr. Edwards and
5    Mr. Oram own Archipel Capital?
6        A.    Yes.
7        Q.    And I know we went through some
8    percentages of ownership. Is the percentage of
9    ownership for Archipel divided with the three of you
10   the same as the ownership for BIM Management?
11       A.    The intention is yes, and let me clarify.
12   So Nixon Peabody created BIM Management as the
13   general partner in 2011 to accept management fees
14   from Everloop; however, that operating agreement was
15   never fully executed or prepared by Nixon Peabody to
16   this day.
17       So the intent to have -- was to have
18   the same percentage ownership from Archipel Capital
19   to BIM Management LP.
20       Q.    So what is the percent ownership for BIM
21   Management LP?
22       A.    The legal percentage? I don't have an
23   answer for you, and the reason why, again, is Nixon
24   Peabody has not finished that document. We have
25   repeatedly -- meaning "we" Greg Edwards, Tony Oram

Page 70

1    and myself -- have repeatedly asked Nixon for four
2    years to finish the document, and to this date it was
3    never finished.
4        The intent was, again, to have the same
5    percentage ownership from Archipel Capital to BIM
6    Management LP, and amongst the three of us we have
7    always treated it that way.
8        Q.    When you say you treated it the same way,
9    how does that work in practice?
10       A.    So the only -- well, how we work is --
11   let's just hypothetically use a million dollars
12   investment. Out of a million dollars investment, we
13   charge -- well, we would receive a 5 percent
14   management fee or $50,000. That $50,000 would be
15   paid to BIM Management LP.
16       In terms of operating BIM Management, I
17   receive that $50,000, meaning I could use to benefit
18   the entity.
19       Greg Edwards and Tony Oram and myself
20   divide the carried interest accordingly with the
21   percentages I just gave you.
22       Do you need me to clarify on those
23   points? It can be a little -- I just want to make
24   sure we are on the same page.
25       Q.    Can you explain what you mean by carried

Page 71

1    interest?
2        A.    So the carried interest is another term
3    for profit. Our structure at Archipel Capital for
4    entities, we charge a 5 percent management fee
5    up-front and a 10 percent carried interest on the
6    profit so what that means is if an investor put in
7    $100,000, we would charge a 5 percent management fee
8    or $95,000 would be invested in that entity.
9        Upon a liquidity event, merger, an IPO,
10   that client would get their full hundred thousand
11   dollars back before any carried interest was assessed
12   to their profit.
13       Q.    Is that the same -- is the fee structure
14   the same for all the Archipel Capital investments?
15       A.    Yes.
16       Q.    By investments, I mean the limited
17   partnership.
18       A.    Yes.
19       Q.    Have any of the limited partnerships had
20   this -- the liquidity event that you mentioned?
21       A.    Obviously Twitter, and I don't mean to
22   say obviously. Social Media Fund had a liquidity
23   event, and depending on how you classify or
24   categorize liquidity event, I would say Everloop had
25   a liquidity event as well.

Page 72

1        Q.    That is for Everloop. What does it depend
2    on for the Everloop Limited Partnership, why does that
3    depend on how you classify the event?
4        A.    People view a liquidity event as usually
5    a merger, acquisition or IPO. None of those three
6    occurred with regard to Everloop. It was more just a
7    settlement between us and the company that we
8    received money back to pay our investors.
9        For intents and purposes, monies were
10   distributed to the investors.
11       Q.    After the liquidity event for those two
12   partnerships, Social Media Fund LP and Everloop LP, do
13   the partnerships still exist?
14       A.    For a period of time, meaning, we'll use,
15   Social Media Fund for example. Social Media Fund
16   would exist until all the monies are distributed,
17   cash and stock, which was done, and then our legal
18   counsel at the time would do what is called a
19   wind-down of the fund, wind down of the limited
20   partnership with the State of Delaware, and they
21   would wind down the partnership.
22       Q.    Has Social Media Fund LP then wound down?
23       A.    I don't know the answer to that. I know
24   Nixon Peabody has stated in the past they would start
25   to wind down the process once all monies were sent,

18  (Pages 69 to 72)

DIVERSIFIED REPORTING SERVICES
(202) 467-9200

Gregory Gray, Jr.                                                    2/24/2015

---

**Page 73**

1  which was completed I believe in July of 2014.
2          Usually I don't start that process until
3  now when our K-1s will start being distributed, but
4  that is something I will need to follow up with Nixon
5  Peabody regarding.
6      Q.   When are the K-1s distributed?
7      A.   Usually mid-March. This year it might be
8  a week later just because we transitioned over to
9  KRFS.
10     Q.   Are there -- apart from the owners of
11 Archipel, are there other principals of Archipel?
12     A.   Other than Greg Edwards, Tony Oram and
13 myself? No.
14     Q.   And you are the senior managing director
15 of Archipel, right?
16     A.   Yes.
17     Q.   Does Mr. Edwards have a title for
18 Archipel?
19     A.   We have given him the title chairman of
20 the board since he is the most senior one of us with
21 the greatest resume, if you will.
22     Q.   And who else is on the board of Archipel?
23     A.   The advisory board?
24     Q.   You said Edwards is the chairman of the
25 board. What board is that referencing?

---

**Page 74**

1      A.   Really he is just the chairman of
2  Archipel, which is the title given over to the
3  corporation, if you will.
4      Q.   So is there a board of directors of
5  Archipel Capital?
6      A.   We have an advisory board.
7      Q.   What does the advisory board do?
8      A.   Every advisor has a different role. I
9  can go advisor by advisor if you like and let you
10 know what they do for us or have done for us, but
11 their job is, in essence, utilize their relationships
12 to help drive the valuation of our intended portfolio
13 company.
14         So with respect to each individual
15 advisor, they may have specific areas of expertise in
16 one of our portfolio companies; chances are not all.
17     Q.   What do you mean by use relationships to
18 drive valuation?
19     A.   So in our -- in the venture capital
20 community, unlike the public markets, we look at the
21 price of the stock increasing $30, $40. That's an
22 increase in stock price.
23         In our language, think of valuation as a
24 stock price so we look at our circle, if you will,
25 and look at -- we'll use Everloop for an example.

---

**Page 75**

1  Everloop was failing as an investment. What could
2  Archipel Capital do to try to help the investors,
3  still try to save this investment and drive that
4  valuation, either for an exit or to get more users
5  onboard.
6          So we looked at who our investors were,
7  who our advisors were, and how can we help this
8  company be in a better place going forward?
9          So we looked at Tim Green. Tim Green is
10 an advisor to Archipel Capital. Tim is a former NFL
11 player. He is a lawyer, he is a Rhodes scholar, he
12 is a New York Times best selling author.
13         So we would engage Tim Green -- Archipel
14 Capital would engage Tim Green to help utilize his
15 resources, his network to bring users to Everloop to
16 try to increase the valuation in the company.
17     Q.   So was Tim Green on Archipel's advisory
18 board?
19     A.   Yes.
20     Q.   And you said Archipel would engage someone
21 like Tim Green. Does Archipel pay Tim Green?
22     A.   Tim is the only paid member of any of our
23 advisors, and the rationale behind that is Tim -- his
24 ability to cut through bureaucracy to get us the
25 right person was invaluable to Everloop, and for

---

**Page 76**

1  other relationships.
2          Case in point, we brought Everloop
3  through -- Archipel Capital brought Everloop to the
4  number two person at the NFL for a meeting.
5          The NFL wanted to be a part of the
6  Everloop story in particular because of Tim Green.
7          Unfortunately, Everloop could not execute
8  the next phase of that, and we never wound up getting
9  the NFL brand on our platform.
10         Same thing with Tim Green's publisher,
11 which was Harper Collins. Tim would engage us with
12 Harper Collins, which obviously has a tremendous
13 audience for kids' books so Tim would get us in front
14 of his publisher. We could tell the Everloop story
15 to, again, try to get kids, Harper Collins kids,
16 under Everloop's platform.
17         Everloop was a social network for kids in
18 a controlled safe environment called COPPA
19 compliance, C-O-P-P-A.
20         MR. LAWRENCE: Just to interject, all of
21 that is interesting but I don't think responsive to
22 her question.
23         THE WITNESS: Sorry.
24         MR. LAWRENCE: We will be here a long time
25 if we go over the life story of all your investments.

19 (Pages 73 to 76)

Gregory Gray, Jr.                                                    2/24/2015

Page 77

1      A.   Sorry.
2          MR. LAWRENCE:  I think you answered it at
3    the beginning.  You provided a lot of context.
4          MS. KIM:  That's fine.
5          MR. LAWRENCE:  You can't remember the
6    question.  I understand.
7          MR. RAWLINGS:  To be fair, Hane will chime
8    in to move things along when she feels it is
9    necessary.
10         MR. LAWRENCE:  And I waited until he was
11   done.
12         MR. RAWLINGS:  You certainly did, which
13   was good.
14         So noted.
15         THE WITNESS:  My apologies.
16         MR. LAWRENCE:  I was just thinking we
17   probably want to conclude some time today.
18   BY MS. KIM:
19     Q.   Mr. Edwards was the chairman of the board;
20   that is his title?
21     A.   Yes.
22     Q.   Does Mr. Oram have a title?
23     A.   No.
24     Q.   And do each of you have separate duties
25   and responsibilities for Archipel?

Page 78

1      A.   Yes.
2      Q.   What are your duties and responsibilities?
3      A.   My duties really are finding the
4    investors.
5          Again, working with the investments we
6    have and utilizing our network to help drive that
7    valuation of that company for a successful exit.
8      Q.   What does Mr. Edwards do, his duties and
9    responsibilities?
10     A.   I best can categorize Mr. Edwards as
11   almost a godfather in the sense that Greg can see
12   things -- Greg Edwards, that is -- can see things
13   three to five steps down the road so he is my mentor,
14   my sounding board, with regard to pretty much
15   everything we do at Archipel Capital or its entities.
16     Q.   What about Mr. Oram?
17     A.   So Tony, Tony Oram, he was the head of
18   institutional trading for a wide variety of firms in
19   Toronto.  At this point in time, Tony is more silent
20   than anything else.  His relationships are too big
21   for us to fill their demand, if you will, so what I
22   mean by that is when Tony -- prior to Twitter --
23   well, when Twitter went public, Tony came to me and
24   said "I have a client who wants $300 million of
25   Twitter."  Well, we don't have that supply.

Page 79

1    So Tony's relationships are more in the
2    institutional world, the Canadian Pension Plan, the
3    Quebec Pension Plan, Ontario Teachers Pension Plan.
4    Those are just too big relationships for us too
5    handle right now so he is more of a silent investor
6    than anything else.
7      Q.   You said you would find investors for the
8    Archipel Capital investments; is that right?
9      A.   Yes.
10     Q.   That is for the limited partnership and
11   LLC entities?
12     A.   Yes.
13     Q.   Did you have other people help find
14   investors for the limited partnerships and LLC
15   entities?
16     A.   Yes.
17     Q.   Who were those people?
18     A.   Devin Stelljes, Andrew Russo, his partner
19   Ryan McMahon.  I don't know if you want to lump them
20   together or separate.  Brad LaSalle and Bill
21   S-H-R-I-M-P-F.
22     Q.   S-C-H-R-I-M-P-F.
23         Were these people Archipel Capital
24   employees?
25     A.   Devin Stelljes was.  Andrew Russo was

Page 80

1    the -- is a CFA and registered representative.  Bill
2    Schrimpf was a registered representative, and Brad
3    LaSalle works for Archipel Capital.
4      Q.   So Brad LaSalle is an employee?
5      A.   Yes.
6      Q.   Aside from Mr. Stelljes and Mr. LaSalle,
7    has Archipel Capital have any other employees?
8      A.   We had one assistant 2010, named Jessica
9    Buscaglia, B-U-S-C-A-G-L-I-A, probably for a
10   six-month period of time, and then she left to take a
11   new job.  And then my assistant, Kristy Cicchitti.
12   Kristy was with us for, I believe, three years.
13     Q.   And your wife is Cynthia Hyde Gray;
14   correct?
15     A.   Yes.
16     Q.   Is she an Archipel employee?
17     A.   Tricky subject.  My wife was going to --
18   my wife did resign from her job at Roswell Park in
19   September to take over for Kristy Cicchitti's
20   responsibilities to be my assistant and get more
21   involved.
22         My definition of resignation is actually
23   quitting your job and moving -- depending how you
24   look at it, she decided to keep her job at Roswell
25   Park so we are now looking to hire a new assistant so

                                          20 (Pages 77 to 80)

Gregory Gray, Jr.                                    2/24/2015

### Page 81

1  the answer is she is not really with Archipel
2  Capital.
3        We were looking to transition her into
4  that role.  She never took that role.  She kept her
5  job at Roswell.
6     Q.   You mention Russo, Mr. Russo and
7  Mr. McMahon and Mr. Schrimpf.  What is their
8  relationship with Archipel?
9     A.   They were advisors who introduced their
10  relationships to our offerings.
11     Q.   Were they paid for this?
12     A.   They received part of our management fee,
13  yes.
14     Q.   And by management fee, do you mean that
15  up-front 5 percent fee?
16     A.   Yes.
17     Q.   And did they receive any part of the
18  carried interest?
19     A.   If there is going to be a liquidity
20  event, they would be entitled to part of the carried
21  interest, yes.
22     Q.   With the advisory board, I know you said
23  they advise on the investments.  Is that --
24     A.   Well, they advise on more of a macro
25  point of view around the space than the actual

### Page 82

1  company we are investing in.
2        Case in point, Todd Lucksinger,
3  L-U-C-K-S-I-N-G-E-R, is part of our advisory board.
4  In full disclosure, he is also an investor, but Todd
5  has a son that is autistic, and when doing our due
6  diligence on one of our portfolio companies,
7  Lineagen, he would help us understand the overall
8  space in autism rather than the company as an
9  investment.
10     Q.   What about Mark Adam Smith?
11     A.   So Mark is the head of national business
12  development for one of our portfolio companies,
13  Lineagen.
14     Q.   And is he paid by Archipel?
15     A.   So in 2014, Archipel Capital on behalf of
16  Lineagen applied to get Lineagen tax free status in
17  the State of New York, what is known as Start-Up New
18  York.  It is a Governor Cuomo initiated plan.
19        Lineagen was the first company to be
20  announced winning Start-Up New York, and the governor
21  announced that before the legal language was
22  finished, so the way that the program works is you
23  could not have an employee in Start-Up New York until
24  all the legal language was done.
25        The reason I bring that up is Archipel

### Page 83

1  Capital would receive money from our -- so Lineagen,
2  the actual company, would pay Archipel Capital.
3  Archipel Capital would turn around and pay Mark
4  Smith, and the reason it was done that way is because
5  we needed to categorize Mark Smith as a hired
6  employee for the Start-Up New York campaign.
7        In addition to that, we also won New York
8  State grants for Lineagen, and, again, they all have
9  quotas attached to how many jobs we need to have in
10  New York State so we couldn't have Mark Smith, the
11  head of national business development, employed by
12  Lineagen until all the legal language was done by
13  Albany.
14     Q.   How long was Mark Smith paid by Archipel
15  Capital?
16     A.   Yes.  Today should be his last day.  So
17  we won a grant in 2013 by NYSERDA.  It is getting
18  funded in 2015, and now Mark -- that grant has been
19  fully funded to the portfolio company Lineagen, and
20  now Mark Smith can transition off of Archipel Capital
21  payroll onto Lineagen's payroll in Utah.
22     Q.   So the Lineagen-Mark Smith relationship
23  where Archipel Capital received money from Lineagen
24  Incorporated, and then Archipel would pay Mr. Smith
25  went from 2013 until yesterday?

### Page 84

1     A.   No.  It would have went from
2  approximately March of 2014 until yesterday,
3  approximately yesterday.
4     Q.   Was Mr. Smith paid by Archipel Capital
5  LLC?
6     A.   No.
7     Q.   Where did the money -- did it go to the
8  Lineagen -- Archipel Capital-Lineagen entity?
9     A.   Yes.
10     Q.   So Lineagen Inc. would pay Lineagen LP.
11  Lineagen LP would pay Mark Smith?
12     A.   Yes.
13     Q.   I want to talk about -- going back to the
14  entities that work with Archipel, so starting with
15  Freed Maxick, who at Freed Maxick did you work with?
16     A.   Bill -- tough one -- Ianerelli,
17  I-A-N-E-R-E-L-L-I, and then -- I don't remember his
18  two colleagues.
19     Q.   What about at Nixon Peabody?
20     A.   Our primary contact was John Koeppel,
21  K-O-E-P-P-E-L.
22     Q.   Were there other attorneys at Nixon
23  Peabody that you worked with?
24     A.   Yes.
25     Q.   Who were they?

21 (Pages 81 to 84)

Gregory Gray, Jr.                                                      2/24/2015

Page 85

1      A.   Bruce Copeland, C-O-P-E-L-A-N-D, and Mark
2   Molloy, M-O-L-L-O-Y, were the three primaries.
3      Q.   Did they represent you in connection with
4   creating the LP entities?
5      A.   Mr. Koeppel at Nixon Peabody is the one
6   who created the entities. The other two were
7   different matters.
8      Q.   And the other two, did those relate to
9   litigation?
10     A.   Bruce Copeland helped with a litigation
11  case, yes. Mark Molloy helped with a Department of
12  Labor case.
13     Q.   What about Carolyn Nussbaum?
14     A.   Carolyn Nussbaum, yes. She was also a
15  lawyer at Nixon Peabody. Sorry.
16     Q.   Did she represent Archipel Capital in
17  connection with creating the limited partnerships?
18     A.   No, not to my knowledge.
19     Q.   And what was the scope of her
20  representation?
21     A.   When we had a client complain --
22          MR. LAWRENCE:  Was this the labor issue?
23          THE WITNESS:  No.
24          MR. LAWRENCE:  This was not in connection
25  with the formation of the funds?

Page 86

1          THE WITNESS:  No.
2          MR. LAWRENCE:  Can you just give a one or
3   two-word --
4          THE WITNESS:  Twitter.
5          MR. LAWRENCE:  So there was a dispute
6   relating to Twitter, right?
7          THE WITNESS:  Yes.
8      Q.   What about the law firm Green & Seifter?
9      A.   Green & Seifter prepared our fund
10  formation for Agrivida.
11     Q.   That is for the Agrivida LLC?
12     A.   Yes.
13     Q.   Why did Green & Seifter work on that?
14     A.   We chose -- we had a lot of Syracuse
15  investors and Bennington Everloop, the partnership.
16  We wanted to reward our investors and give them our
17  next opportunity to be our legal counsel; just giving
18  investors greater comfort in having a law firm in
19  Syracuse.
20     Q.   You said you wanted to reward investors.
21  Were there investors at Green & Seifter?
22     A.   No. It was more rewarding Syracuse, the
23  community. I misspoke.
24     Q.   Did you use Green & Seifter on any of the
25  Archipel Capital investments?

Page 87

1      A.   No.
2      Q.   Was there a reason for that?
3      A.   Ed Green, hence the name Green & Seifter,
4   he was 87. He retired, and then the law firm really
5   split into four separate law firms so I believe we
6   had four lawyers working the case, and now they are
7   at four different law firms.
8      Q.   Nixon Peabody prepared the offering
9   documents for the Archipel Capital offerings, right?
10     A.   Other than that Agrivida, they prepared
11  every other PPM and sub doc, yes.
12     Q.   Other than Agrivida LLC, did they also
13  structure all of those partnerships?
14     A.   Could you clarify structure?
15     Q.   Who came up with the idea to use limited
16  partnerships for --
17     A.   Nixon Peabody.
18     Q.   And what was the reason for that?
19     A.   I don't recall. Sorry.
20     Q.   Is there a reason why Agrivida is an LLC?
21     A.   I don't recall.
22     Q.   For the preparation of offering documents,
23  you said Nixon Peabody prepared for other than
24  Agrivida all the PPMs and subscription documents?
25     A.   Yes.

Page 88

1      Q.   Was that Mr. Koeppel?
2      A.   Yes.
3      Q.   Was anyone else involved in that?
4      A.   Todd Tidgewell, T-I-T -- sorry --
5   T-I-D-G-E-W-E-L-L, so our primary contact at Nixon
6   initially was Todd and John.
7      Q.   Does Mr. Tidgewell -- did that
8   relationship end at any point?
9      A.   With Nixon Peabody or with Archipel?
10     Q.   With Archipel.
11     A.   No. I don't know if he still works at
12  the firm. I haven't heard from him since Everloop
13  so . . .
14     Q.   So he only worked on the Everloop?
15     A.   To the best of my knowledge, yes.
16     Q.   So BIM Management has been the general
17  partner or managing member of all of the Archipel
18  Capital limited partnerships?
19     A.   Yes.
20     Q.   And then it would have been a managing
21  member for Agrivida LLC?
22     A.   It is still the general partner. I
23  believe BIM Management is the general partner on
24  every offering.
25     Q.   What about Archipel Capital-Amyris

22  (Pages 85 to 88)

Gregory Gray, Jr.                                                2/24/2015

Page 85

1    A.  Bruce Copeland, C-O-P-E-L-A-N-D, and Mark
2  Molloy, M-O-L-L-O-Y, were the three primaries.
3    Q.  Did they represent you in connection with
4  creating the LP entities?
5    A.  Mr. Koeppel at Nixon Peabody is the one
6  who created the entities.  The other two were
7  different matters.
8    Q.  And the other two, did those relate to
9  litigation?
10   A.  Bruce Copeland helped with a litigation
11  case, yes.  Mark Molloy helped with a Department of
12  Labor case.
13   Q.  What about Carolyn Nussbaum?
14   A.  Carolyn Nussbaum, yes.  She was also a
15  lawyer at Nixon Peabody.  Sorry.
16   Q.  Did she represent Archipel Capital in
17  connection with creating the limited partnerships?
18   A.  No, not to my knowledge.
19   Q.  And what was the scope of her
20  representation?
21   A.  When we had a client complain --
22      MR. LAWRENCE:  Was this the labor issue?
23      THE WITNESS:  No.
24      MR. LAWRENCE:  This was not in connection
25  with the formation of the funds?

Page 86

1      THE WITNESS:  No.
2      MR. LAWRENCE:  Can you just give a one or
3  two-word --
4      THE WITNESS:  Twitter.
5      MR. LAWRENCE:  So there was a dispute
6  relating to Twitter, right?
7      THE WITNESS:  Yes.
8    Q.  What about the law firm Green & Seifter?
9    A.  Green & Seifter prepared our fund
10  formation for Agrivida.
11   Q.  That is for the Agrivida LLC?
12   A.  Yes.
13   Q.  Why did Green & Seifter work on that?
14   A.  We chose -- we had a lot of Syracuse
15  investors and Bennington Everloop, the partnership.
16  We wanted to reward our investors and give them our
17  next opportunity to be our legal counsel; just giving
18  investors greater comfort in having a law firm in
19  Syracuse.
20   Q.  You said you wanted to reward investors.
21  Were there investors at Green & Seifter?
22   A.  No.  It was more rewarding Syracuse, the
23  community.  I misspoke.
24   Q.  Did you use Green & Seifter on any of the
25  Archipel Capital investments?

Page 87

1    A.  No.
2    Q.  Was there a reason for that?
3    A.  Ed Green, hence the name Green & Seifter,
4  he was 87.  He retired, and then the law firm really
5  split into four separate law firms so I believe we
6  had four lawyers working the case, and now they are
7  at four different law firms.
8    Q.  Nixon Peabody prepared the offering
9  documents for the Archipel Capital offerings, right?
10   A.  Other than that Agrivida, they prepared
11  every other PPM and sub doc, yes.
12   Q.  Other than Agrivida LLC, did they also
13  structure all of those partnerships?
14   A.  Could you clarify structure?
15   Q.  Who came up with the idea to use limited
16  partnerships for --
17   A.  Nixon Peabody.
18   Q.  And what was the reason for that?
19   A.  I don't recall.  Sorry.
20   Q.  Is there a reason why Agrivida is an LLC?
21   A.  I don't recall.
22   Q.  For the preparation of offering documents,
23  you said Nixon Peabody prepared for other than
24  Agrivida all the PPMs and subscription documents?
25   A.  Yes.

Page 88

1    Q.  Was that Mr. Koeppel?
2    A.  Yes.
3    Q.  Was anyone else involved in that?
4    A.  Todd Tidgewell, T-I-T -- sorry --
5  T-I-D-G-E-W-E-L-L so our primary contact at Nixon
6  initially was Todd and John.
7    Q.  Does Mr. Tidgewell -- did that
8  relationship end at any point?
9    A.  With Nixon Peabody or with Archipel?
10   Q.  With Archipel.
11   A.  No.  I don't know if he still works at
12  the firm.  I haven't heard from him since Everloop
13  so . . .
14   Q.  So he only worked on the Everloop?
15   A.  To the best of my knowledge, yes.
16   Q.  So BIM Management has been the general
17  partner or managing member of all of the Archipel
18  Capital limited partnerships?
19   A.  Yes.
20   Q.  And then it would have been a managing
21  member for Agrivida LLC?
22   A.  It is still the general partner.  I
23  believe BIM Management is the general partner on
24  every offering.
25   Q.  What about Archipel Capital-Amyris

22  (Pages 85 to 88)

Gregory Gray, Jr.                                                          2/24/2015

Page 89

1   Biotechnologies LLP?
2       A.   We never did anything with that.
3       Q.   Was there ever any investment in Amyris
4   Biotechnologies, the company?
5       A.   By Archipel Capital?
6       Q.   By Archipel Capital or its investors.
7       A.   Not by Archipel Capital, but our
8   principals invested in Amyris so Greg Edwards and
9   Tony Oram were both investors in Amyris.
10      MS. KIM:  Off the record for one minute.
11      VIDEOGRAPHER:  Here ends media two. The
12  time on the video monitor is 12:30 p.m.
13      (Discussion off the record.)
14      VIDEOGRAPHER:  Here begins media three.
15  The time on the video monitor is 12:31 p.m.
16      MR. RAWLINGS:  I just want to clarify with
17  respect to Ms. Brown.  She is a trial attorney, but is
18  not on the Formal Order and is not an officer and
19  won't be asking any questions.  I just wanted to make
20  that clear.
21      VIDEOGRAPHER:  The time on the video
22  monitor is 12:31 p.m.
23      (Discussion off the record.)
24      VIDEOGRAPHER:  The time is 12:36 p.m.
25      MS. KIM:  The next exhibit is NY-9143

Page 90

1   Exhibit 5.
2       (Email dated August 25th, 2014 marked
3   Exhibit 5.)
4       MS. KIM:  For the record, it is an email
5   chain.  The top email is from Mr. Gray to Daniel
6   Byles-Smith, and Ms. Cicchitti copying Mr. Iannarelli
7   and Steve Cardarelli.  It is Bates stamped A Archipel
8   032300 through 301.  It is dated August 25th, 2014.
9       Q.   Mr. Gray, first of all, do you recognize
10  this document?
11      A.   Yes.
12      Q.   What is it?
13      A.   It looks like a chain of emails between
14  us and our accounting firm Freed Maxick.
15      Q.   Who is Mr. Byles-Smith?
16      A.   He would be Bill Iannarelli's partner,
17  colleague.
18      Q.   And Steve Cardarelli?
19      A.   I am assuming the same thing.  I don't
20  know for certain.
21      Q.   But also at Freed Maxick?
22      A.   Yes.
23      Q.   And it looks like Mr. Byles-Smith sent you
24  a question regarding the BIM tax returns?
25      A.   Yes.

Page 91

1       Q.   The initial email, it appears he provides
2   a list of questions, and then there is typing after
3   the questions that is a slightly different shade of
4   gray in this document; do you see that?
5       A.   Yes.
6       Q.   Are those your responses to his questions?
7       A.   I believe so, yes.
8       Q.   If you go to the second page of Exhibit 5
9   ending with Bates number 301, you see there is a
10  question appears to come from Mr. Byles-Smith.  He
11  asks "it is indicated to us last year that there was
12  going to be a change in ownership during 2013.  What
13  is the current ownership structure of BIM?"
14      Do you see that question?
15      A.   Yes.
16      Q.   Was there a change of ownership of BIM
17  Management LP in 2013?
18      A.   What this is in reference to is the
19  incompleted BIM Management formation by Nixon Peabody
20  so for simplicity purposes, since Nixon Peabody did
21  not complete BIM Management, I was the sole --
22  legally I was the sole owner of BIM.
23      Actually, let me restate that.  I believe
24  I was the sole owner of BIM Management.  It was
25  Nixon's -- Nixon Peabody's job to create a BIM

Page 92

1   Management and put the appropriate ownership and
2   percentages in there for the year, for the respective
3   year.
4       Q.   Mr. Byles-Smith asks "In 2012 it consisted
5   of Gregory Gray, 75 percent, and Greg Edwards,
6   25 percent, but with a zero dollar K-1."  Do you see
7   that?
8       A.   Yes.
9       Q.   Why in 2012 was Mr. Edwards a 25 percent
10  owner but then in 2013 -- it appears that in 2013 you
11  were then the 100 percent owner of BIM Management LP?
12      A.   So the 5 percent management fee, so in
13  2012 -- well, for all entities, the 5 percent
14  management fee always goes to BIM Management.  It
15  doesn't get distributed via pro rata ownership so the
16  back-end carried interest, it doesn't matter who owns
17  what percentage because nothing was distributed on a
18  carried interest perspective.
19      So Freed Maxick came up with a structure,
20  because Nixon Peabody didn't finalize BIM
21  Management's agreement yet to put it in there, so
22  they came up with a structure to have it this way.
23  BY MR. RAWLINGS:
24      Q.   When you say "this way," what is the way
25  that the structure is contemplated?

23  (Pages 89 to 92)

Gregory Gray, Jr.                                              2/24/2015

## Page 93

1    A.   Well --
2    Q.   This is a question and answer.  Maybe you
3  could tell us your understanding of what BIM was and
4  what it is supposed to be or will be.
5    A.   Fair enough.  I think that is a better --
6  so BIM was created to accept a management fee, was
7  created by Nixon Peabody to accept a management fee.
8    Q.   Created incompletely?
9    A.   Correct.
10    Q.   You said created, but the fact is at some
11  point you learned that maybe it wasn't fully created,
12  correct?
13    A.   To this day it still isn't fully created.
14    Q.   When did you understand BIM was supposed
15  to have been created?
16    A.   BIM was supposed to be created with --
17  May of 2011 when Nixon Peabody created the Bennington
18  Everloop Limited Partnership.  They created -- they
19  filed for the tax ID number on the same day.
20    Q.   And at that time who were the owners of
21  BIM supposed to be?
22    A.   Greg Edwards, myself and Tony Oram, the
23  three of us.
24    Q.   In what percentages?
25    A.   The same percentages so 65.1 myself,

## Page 94

1  25 -- Greg Edwards had an escalation clause depending
2  how much monies were raised so I may have misspoke,
3  and that may be why this is a little bit different.
4  I would have to look at that document.  And then Tony
5  Oram would have been 10.1 -- 9.9.  Sorry.
6    Q.   Did there come a time when you realized
7  that BIM hadn't been created properly?
8    A.   We learned in 2012 when doing our taxes,
9  Freed Maxick asked us for a copy of the operating
10  agreement.  I sent an email to John Koeppel "Hey, can
11  you send this to us" -- at Nixon Peabody -- and he
12  responded "We haven't done it yet."
13    Q.   What happened then with respect to BIM's
14  ownership structure?
15    A.   It has been on hold, the ownership
16  structure.  That is why I am saying the three
17  principals, if you will, have an understanding how it
18  is supposed to be, and we honor that agreement
19  amongst us, but the legal definition, if you will,
20  has never been fully completed by Nixon Peabody.
21        So we, the partners, drafted our own
22  agreement probably November of 2014, just because we
23  got fed up with this, with not -- the incompletion by
24  Nixon Peabody.
25    Q.   So there is another agreement that Nixon

## Page 95

1  is not involved in that you three put together
2  yourselves, right?
3    A.   We sent that to Nixon.
4    Q.   Oh, okay, got it.
5    A.   They didn't input one way or the other.
6  It was more or less Greg Edwards saying "Hey, we are
7  tired of you not dealing with us.  We did our own
8  agreement.  Here it is."
9    Q.   When you say that it should be 100 percent
10  me, that's just -- for purposes of answering this
11  question, the fundamental ownership structure is still
12  as you've talked about, the 85 -- I might be saying it
13  wrong, but whatever you testified to previously?
14    A.   Yes.
15    Q.   We talked about carried interest.  Does
16  BIM have a value now?  Do you know approximately how
17  much the worth of the carried interest BIM has or
18  expected carried interest on the investments that are
19  out there?
20    A.   I have hypotheticals, but that is all it
21  is, in the sense that we expect a return on Bloom
22  Energy to be X.  On that X, we would hope to get
23  this.
24    Q.   If that happened now, what would that X
25  be, approximately?

## Page 96

1    A.   I think the last value I had was about
2  7 million.
3    Q.   Okay.  And then that would be split
4  according to the ratios you described by BIM to you,
5  Edwards and this other guy?
6    A.   Yes.
7    Q.   Okay.  And the other entity that is --
8  without being technical -- in the money, like
9  Lineagen, is Lineagen in the money or --
10    A.   Can you clarify "in the money"?
11    Q.   Where there exists a positive carried
12  interest.
13    A.   Well, the carried interest isn't
14  recognized until there is actually a liquidity event.
15    Q.   That I understand.
16    A.   Okay.
17    Q.   A hypothetical positive carried interest
18  if a liquidity event happened.
19    A.   It is hypothetical in my head.  So, yes,
20  I do think Lineagen will be at -- a very good success
21  story for Archipel.
22    Q.   Do you have any value that you can put on
23  that liquidity, what you think it might be?
24    A.   We're hoping -- I believe.  Again, this
25  is me, not projected with any other investors -- we

24 (Pages 93 to 96)