Gregory Gray, Jr.                                                    2/24/2015

Page 97

1  think we should get around three to $4 million for
2  Lineagen.
3  BY MS. KIM:
4      Q.   That would be the carried interest?
5      A.   That would be the carried interest, yes.
6          MR. LAWRENCE:  Can I just ask a follow-up
7  question so you understand?
8          MR. RAWLINGS:  Sure.
9          MR. LAWRENCE:  For the investors, what
10 would the return be on Lineagen that you are
11 anticipating for them, just by a multiple of what they
12 have invested?
13         THE WITNESS:  It is a dollar per share
14 they invested and a dollar per share now.
15         MR. LAWRENCE:  As you project the success
16 of Lineagen, what do you anticipate it will be?
17         THE WITNESS:  We hope for a $500 million
18 exit in the next two to three years.
19         MR. LAWRENCE:  Which would be how many
20 multiples of --
21         THE WITNESS:  About a 20 X return.
22 BY MR. RAWLINGS:
23     Q.   What I think you are trying to get at
24 another way is the number you are giving us is the
25 5 percent carry, or is it 10 percent carry?

Page 98

1      A.   10 percent carry.
2      Q.   So if we say "We think it is worth
3  30 million," then 300,000 -- 300 million would go to
4  the investors?
5      A.   For example, to put it in perspective,
6  for rough numbers we have basically a $2 million
7  investment in Lineagen.  We think, again -- our
8  internal projections -- 20 X return would put that at
9  $40 million minus 2 percent original investment is
10 $38 million in profit.  10 percent of that is
11 $3.8 million.
12     Q.   That is helpful.  Thank you.
13     A.   Rough numbers.
14     Q.   Rough numbers and not realized at all?  I
15 mean, that is another thing that BIM has, but that is
16 just --
17     A.   Right.  But, again, that is where we used
18 our valuation in the marketplace to help drive that
19 valuation to get closer to that exit.
20     Q.   Understood.
21 BY MS. KIM:
22     Q.   So returning back to Exhibit 5, the same
23 page there is a mention here of Tony.  It says -- this
24 is Mr. Byles-Smit writing -- he writes "Per your
25 discussion with Bill at some point over the six months

Page 99

1  you mentioned Tony became a partner."  Can you provide
2  more detail on this question and your response?
3      A.   So, again, Tony Oram invested into
4  Archipel Capital.  At this point in time the BIM
5  Management LP was not created, and this is me trying
6  to simplify our tax return for BIM Management,
7  because Nixon Peabody did not complete the necessary
8  forms.
9      Q.   I apologize if you already answered this,
10 but when did Mr. Oram invest in Archipel Capital?
11     A.   I don't recall.  I don't recall.  I'm
12 sorry.
13     Q.   Was it before 2012?
14     A.   It was either 2011 or 2012.
15     Q.   For example, when BIM Management LP was
16 formed, was Mr. Oram a part of the picture?
17     A.   I don't know.  I can't recall.
18         So to add color, Tony Oram and Greg
19 Edwards both live in Toronto, Ontario.  They both
20 know each other.  It is fully open dialogue amongst
21 all of us.  I just don't know the exact dates when
22 Tony was an investor.
23     Q.   And they both were your clients when you
24 were at Advanced Equities?
25     A.   Yes.

Page 100

1      Q.   Is there a relationship between Mr. Oram
2  and Mr. Edwards?
3      A.   Yes.
4      Q.   What is that apart from Archipel Capital?
5      A.   Apart from Archipel Capital?  They are
6  respectful, they are very cordial to one another,
7  respect each other.  Different generations, though.
8      Q.   Did they have a business relationship?
9      A.   Outside of Archipel?  No.  They may have
10 shared an investment together.  Let me clarify that.
11 They were in investments together.  I don't know if
12 that matters, but they were in investments together.
13     Q.   What does that mean, they were in
14 investments together?
15     A.   At Advanced Equities, they created an
16 investment vehicle to invest in our deal flow, in our
17 deals, and they created the equivalent of an LLC in
18 Toronto.  I don't remember what it is called.  They
19 would invest in that LLC to invest in our deal flow.
20     Q.   Did Mr. Oram and Mr. Edwards create the
21 LLC in Toronto to invest in Advanced Equities deal
22 flow?
23     A.   I don't know who created the LLC, but it
24 wasn't just Edwards and Oram.  It was a group of 15
25 investors.

                                        25  (Pages 97 to 100)

Gregory Gray, Jr.                                                    2/24/2015

Page 101

1    Q.  At BIM Management, do you have a title?
2    A.  General partner.
3    Q.  And is Mr. Edwards also a general partner?
4    A.  Yes.
5    Q.  And Mr. Oram?
6    A.  Technically, I don't even know if Tony
7    Oram is a part of BIM Management right now legally,
8    because, again, the incomplete docs so he does not
9    have a title in my eyes that I am aware of.
10    Q.  But with the incomplete docs, does that
11    also mean Mr. Edwards doesn't have a title?
12    A.  No.  Because when the docs were created
13    by Nixon, even incomplete, they put our biographies
14    as the general partner in BIM Management.
15    Q.  Does BIM Management have employees?
16    A.  No.
17    Q.  And I know you had mentioned a number of
18    people like Mr. Russo, Mr. McMahon, who helped bring
19    investors the Archipel offerings.  Are those
20    people – do they have a relationship with BIM
21    Management?
22    A.  Yes.
23    Q.  What is that relationship?
24    A.  Well, ultimately BIM Management receives
25    the 5 percent management fee, and then BIM pays the

Page 102

1    advisors accordingly.
2    Q.  How much money did you receive in 2014
3    from BIM Management, from your ownership interest in
4    BIM Management?
5    A.  I don't know unless it is on here.
6    Q.  Do you know approximately?
7    A.  2014?  I don't know.  I'm sorry.
8    Q.  Do you know how much money you received
9    from BIM Management in any years before 2014?
10    A.  I can't recall.  I'm sorry.
11    Q.  Has Mr. Edwards ever been compensated by
12    BIM Management?
13    A.  He has carried interest in Social Media
14    Funds.
15    Q.  And that was in 2014?
16    A.  Yes.
17    Q.  And before 2014 was he compensated by BIM
18    Management at all?
19    A.  Not to my knowledge, no.
20    Q.  Was Mr. Oram compensated by BIM
21    Management?
22    A.  Just his ownership in Social Media Fund.
23    Q.  And that is – sorry.  When you say the
24    ownership in Social Media Fund, does that mean –
25    A.  Carried interest.

Page 103

1    Q.  Was he separately an investor in Social
2    Media Fund?
3    A.  Tony was not, no.
4    Q.  Was Mr. Edwards?
5    A.  No.
6    Q.  Were you?
7    A.  In Social Media Fund?  No, outside the
8    carried interest, no.
9    Q.  So Mr. Oram has received carried interest
10    in connection with the Social Media Fund in 2014.  Did
11    he receive any compensation from BIM Management before
12    2014?
13    A.  No.
14    Q.  I would like to ask a few questions about
15    Bennington Investment Management Incorporated.
16    A.  Okay.
17    Q.  What is that?
18    A.  It was an equivalent of a Canadian broker
19    dealer, Ontario broker dealer.
20    Q.  When you said it was the equivalent of a
21    Canadian broker dealer, what do you mean by was?
22    A.  It is no longer in existence.
23    Q.  Does it do any business at all presently?
24    A.  No.
25    Q.  When did it – you said it is no longer in

Page 104

1    existence since when?
2    A.  I don't know.  You would have to ask Greg
3    Edwards.  I don't know.
4    Q.  Was Mr. Edwards a principal of Bennington
5    Investment Management?
6    A.  I believe he was the sole owner.
7    Q.  Did you have any relationship with
8    Bennington Investment Management?
9    A.  Outside of helping with deal flow, no.
10    Q.  And what was helping with deal flow?
11    A.  Analyzing venture capital offerings.
12    Q.  Did you analyze venture capital offerings
13    on behalf of Bennington Investment Management?
14    A.  I think it would be more in conjunction
15    with Archipel.
16        MR. RAWLINGS:  Off the record for a quick
17    second.
18        VIDEOGRAPHER:  We are now off the record.
19    The time on the video monitor is 12:58 p.m.
20        (Discussion off the record.)
21        VIDEOGRAPHER:  We are on the record.  The
22    time on the video monitor is 12:59 p.m.
23        We are now off the record.  The time on
24    the video monitor is 12:59 p.m.
25        (A luncheon recess was taken.)

26  (Pages 101 to 104)

DIVERSIFIED REPORTING SERVICES
(202) 467-9200

Gregory Gray, Jr.                                    2/24/2015

**Page 101**

1    Q.  At BIM Management, do you have a title?
2    A.  General partner.
3    Q.  And is Mr. Edwards also a general partner?
4    A.  Yes.
5    Q.  And Mr. Oram?
6    A.  Technically, I don't even know if Tony
7    Oram is a part of BIM Management right now legally,
8    because, again, the incomplete docs so he does not
9    have a title in my eyes that I am aware of.
10   Q.  But with the incomplete docs, does that
11   also mean Mr. Edwards doesn't have a title?
12   A.  No.  Because when the docs were created
13   by Nixon, even incomplete, they put our biographies
14   as the general partner in BIM Management.
15   Q.  Does BIM Management have employees?
16   A.  No.
17   Q.  And I know you had mentioned a number of
18   people like Mr. Russo, Mr. McMahon, who helped bring
19   investors to the Archipel offerings.  Are those
20   people -- do they have a relationship with BIM
21   Management?
22   A.  Yes.
23   Q.  What is that relationship?
24   A.  Well, ultimately BIM Management receives
25   the 5 percent management fee, and then BIM pays the

**Page 102**

1    advisors accordingly.
2    Q.  How much money did you receive in 2014
3    from BIM Management, from your ownership interest in
4    BIM Management?
5    A.  I don't know unless it is on here.
6    Q.  Do you know approximately?
7    A.  2014?  I don't know.  I'm sorry.
8    Q.  Do you know how much money you received
9    from BIM Management in any years before 2014?
10   A.  I can't recall.  I'm sorry.
11   Q.  Has Mr. Edwards ever been compensated by
12   BIM Management?
13   A.  He has carried interest in Social Media
14   Funds.
15   Q.  And that was in 2014?
16   A.  Yes.
17   Q.  And before 2014 was he compensated by BIM
18   Management at all?
19   A.  Not to my knowledge, no.
20   Q.  Was Mr. Oram compensated by BIM
21   Management?
22   A.  Just his ownership in Social Media Fund.
23   Q.  And that is -- sorry.  When you say the
24   ownership in Social Media Fund, does that mean --
25   A.  Carried interest.

**Page 103**

1    Q.  Was he separately an investor in Social
2    Media Fund?
3    A.  Tony was not, no.
4    Q.  Was Mr. Edwards?
5    A.  No.
6    Q.  Were you?
7    A.  In Social Media Fund?  No, outside the
8    carried interest, no.
9    Q.  So Mr. Oram has received carried interest
10   in connection with the Social Media Fund in 2014.  Did
11   he receive any compensation from BIM Management before
12   2014?
13   A.  No.
14   Q.  I would like to ask a few questions about
15   Bennington Investment Management Incorporated.
16   A.  Okay.
17   Q.  What is that?
18   A.  It was an equivalent of a Canadian broker
19   dealer, Ontario broker dealer.
20   Q.  When you said it was the equivalent of a
21   Canadian broker dealer, what do you mean by was?
22   A.  It is no longer in existence.
23   Q.  Does it do any business at all presently?
24   A.  No.
25   Q.  When did it -- you said it is no longer in

**Page 104**

1    existence since when?
2    A.  I don't know.  You would have to ask Greg
3    Edwards.  I don't know.
4    Q.  Was Mr. Edwards a principal of Bennington
5    Investment Management?
6    A.  I believe he was the sole owner.
7    Q.  Did you have any relationship with
8    Bennington Investment Management?
9    A.  Outside of helping with deal flow, no.
10   Q.  And what was helping with deal flow?
11   A.  Analyzing venture capital offerings.
12   Q.  Did you analyze venture capital offerings
13   on behalf of Bennington Investment Management?
14   A.  I think it would be more in conjunction
15   with Archipel.
16       MR. RAWLINGS:  Off the record for a quick
17   second.
18       VIDEOGRAPHER:  We are now off the record.
19   The time on the video monitor is 12:58 p.m.
20       (Discussion off the record.)
21       VIDEOGRAPHER:  We are on the record.  The
22   time on the video monitor is 12:59 p.m.
23       We are now off the record.  The time on
24   the video monitor is 12:59 p.m.
25       (A luncheon recess was taken.)

26  (Pages 101 to 104)

Gregory Gray, Jr.                                                         2/24/2015

Page 105

1    (Archipel Capital PPMs premarked
2    Exhibit 6.)
3        VIDEOGRAPHER: We are now on the record.
4    The time on the video monitor is 1:45 p.m.
5        Q.  Mr. Gray, before the break you had
6    mentioned something Nixon Peabody addressed, a
7    partnership agreement that you had put together with
8    Mr. Edwards and Mr. Oram for, I think, BIM Management
9    LP; is that right?
10       A.  Yes.
11       Q.  Have you produced a copy of that draft
12   partnership agreement?
13       A.  It was in my email. I don't know if it
14   has been produced other than you giving access -- in
15   my email documents to you. I'm not sure where we are
16   in that process.
17       MS. KIM: So we would request a copy of
18   this document from counsel.
19       Q.  Mr. Gray, earlier you were discussing when
20   we were talking about the Background Questionnaire,
21   you mentioned an action, a disciplinary action by
22   NASD/FINRA which became a New York Stock Exchange
23   action; is that correct?
24       A.  To my knowledge, yes.
25       Q.  Can you describe that action?

Page 106

1        A.  The action was regulatory governing body
2    for potential unauthorized trades in customer
3    accounts.
4        Q.  Were there any other -- was the
5    investigation purely for unauthorized trading are?
6        A.  I think it was also that, and interaction
7    with customers. It depends on which investigation
8    you are referring to, because FINRA -- the NASD, the
9    FINRA and NYSE, they are all different members and
10   different people.
11       Q.  So the action that ultimately went up to
12   appeal with Commission, that related to unauthorized
13   trading and also harassment of customers, correct?
14       A.  Yes.
15       Q.  And you had done unauthorized trading in
16   customer accounts?
17       A.  That's what the allegations were.
18       Q.  Is that not true?
19       A.  I admitted to one unauthorized trade with
20   my employer at that time in 2003, and my employer was
21   aware of it, and my employer gave me a letter of
22   don't do it again reprimand.
23       Q.  And who was that employer?
24       A.  Quick & Reilly.
25       Q.  And there was a second allegation of

Page 107

1    unauthorized trading?
2        A.  With regard to the Exchange matter?
3        Q.  So there were two customers that you --
4    there were allegations relating to unauthorized
5    trading with two customers; is that correct?
6        A.  The initial allegation was probably 15
7    customers back in 2003.
8        Q.  And what happened with those other 13
9    customers?
10       A.  They all got dismissed.
11       Q.  Can you explain what happened there?
12       A.  So my firm at the time, Quick & Reilly,
13   was acquired by -- we were owned by Fleet Boston.
14   Bank of America bought out Fleet Boston which owned
15   Quick & Reilly. We were not offered -- the brokers
16   were not offered a retention bonus to stay at Quick &
17   Reilly.
18       A group of us decided we were going to go
19   to a different firm. Our branch manager made a
20   threat to us that if we left he would mark up our U5.
21   We left anyway, and he put -- our branch manager put
22   false information on our form U5 when we left the
23   firm.
24       Q.  The Commission sustained findings of the
25   New York Stock Exchange that you had done unauthorized

Page 108

1    trading in two customer accounts?
2        A.  Yes.
3        Q.  There were also allegations relating to
4    interactions with customers, you said?
5        A.  Yes.
6        Q.  Can you describe those?
7        A.  I had phone conversations with Harold
8    Sharp and a Mr. Wierzbiecki, W-I-E-R-Z-B-I-E-C-K-I.
9        Q.  What were the phone conversations with
10   Mr. Sharp?
11       A.  Mr. Sharp was a house account, a
12   designated house account at H&R Block which got put
13   into my rep number at H&R Block.
14       He called the customer service, 800
15   customer service number, to make a complaint about
16   getting -- he didn't get a statement, or something to
17   that effect.
18       And since my registered rep number was
19   attached to his account, I got flagged with a
20   customer complaint, even though I had never had any
21   interaction, communication with this client ever.
22       Q.  Did you have interactions or
23   communications with Mr. Sharp after you were flagged
24   for the complaint?
25       A.  Yes.

27 (Pages 105 to 108)

Gregory Gray, Jr.                                                    2/24/2015

Page 109

1    Q.  Can you go into those?
2    A.  I contacted Mr. Sharp about his complaint
3    so he would try to clarify his complaint was with the
4    investor center and the firm and not against me,
5    because I never met him, spoke to him, had any
6    communication with him whatsoever.
7    Q.  How many times did you speak with
8    Mr. Sharp?
9    MR. LAWRENCE:  I'm sorry, counsel.  I
10   would like to interpose an objection, maybe see if
11   there is some way we can deal with this.
12   I am certain he gave detailed testimony in
13   these cases so I don't know why the staff wants to go
14   into the allegations again about it.
15   I mean, certainly we are here to be
16   cooperative and helpful and answer questions you have,
17   but I am very sensitive to the fact that this witness
18   testified about exactly what you are asking him
19   questions about probably 10 years ago.
20   MR. RAWLINGS:  Off the record for a quick
21   second.
22   VIDEOGRAPHER:  We are now off the record.
23   The time on the video monitor is 1:53 p.m.
24   (Discussion off the record.)
25   VIDEOGRAPHER:  We are now on the record.

Page 110

1    The time on the video monitor is 1:54 p.m.
2    Q.  Before we just broke we were speaking
3    about the New York Stock Exchange action/SEC/NASD
4    What discipline did you receive as a result of the
5    action?
6    A.  Three-year censure.
7    Q.  Was there also a bar?
8    A.  Censure, bar, same thing.
9    Q.  What was the duration of the bar?
10   A.  Three years.
11   Q.  From when to when?
12   A.  February 2008 till February 2011.
13   Q.  Have you ever disclosed -- so I am going
14   to describe this, or in shorthand I am going to call
15   it disciplinary history.
16   Have you ever disclosed this disciplinary
17   history to any person?
18   A.  Any person?  Sure.
19   Q.  In connection with Archipel Capital or
20   related entities.
21   A.  Are you looking for -- can you clarify
22   person?
23   Q.  For example, did you disclose it to Nixon
24   Peabody?
25   A.  Yes.

Page 111

1    Q.  And when was that?
2    A.  It would have been disclosed to Nixon
3    approximately April, May 2011.
4    Q.  And who did you tell at Nixon Peabody?
5    A.  I believe my counsel, John Koeppel.
6    Q.  Do you remember that conversation?
7    A.  Not specifically, no.
8    Q.  Did he ask about it?
9    A.  Mr. Koeppel asked us for, just more or
10   less, our bio so he asked -- he sent an email to us
11   asking us for our bio to put in the PPMs, and I gave
12   him a copy of our investment presentation.
13   Q.  Did that investment presentation disclose
14   your disciplinary history?
15   A.  That presentation did not.
16   Q.  Speaking about when you disclosed the
17   disciplinary history to Nixon Peabody, was that done
18   by email?
19   A.  That would have been done on the phone.
20   Q.  What prompted the disclosure?
21   A.  Well, we talked more or less about
22   Archipel Capital, whether we needed to be a
23   registered broker dealer, whether we didn't need to
24   be a broker dealer, what licenses I had, what
25   licenses I didn't have, and how best to create this

Page 112

1    fund structure going forward.
2    At that point in time, my licenses were
3    not, you know -- I was not with a firm at the point
4    in time.  We didn't want to be a broker dealer.  We
5    didn't want to do anything with stocks, bonds, funds,
6    et cetera.  We only wanted to work in the venture
7    capital space.
8    Q.  Are these -- is that something you told
9    Mr. Koeppel about in that time period you were
10   mentioning, April of 2011?
11   A.  Yes.
12   BY MR. RAWLINGS:
13   Q.  I am just curious.  What was your
14   relationship with Mr. Koeppel at that time?  Were you
15   new acquaintances because you had recently become
16   affiliated, or had you known him for some time?
17   A.  Both.  So in 2008 Greg Edwards and myself
18   went to go meet John Koeppel at Nixon Peabody about
19   launching an offshore fund.  Due to the world
20   economic crisis, we did not.
21   And then we looked at reestablishing our
22   venture fund, if you will.  We looked at having a
23   larger profile law firm in Buffalo, New York where I
24   reside.  There is really one law firm, Nixon Peabody,
25   and we felt very comfortable with John and Nixon and

28  (Pages 109 to 112)

Gregory Gray, Jr.                                    2/24/2015

Page 113

1   his firm, and we engaged him at that time.
2       Q.   In the phone call -- I know you don't
3   really recall exactly -- was it just you and Mr.
4   Koeppel on the phone, or do you think there might have
5   been others?
6       A.   No.  There was one other party.  I think
7   his name was Charlie Jacobs, but I can't be certain.
8   It was something Jacobs for sure.
9       Q.   Did you in that call have a conversation
10  with him about whether or not the disciplinary history
11  needed to be disclosed to investors?
12      A.   I don't recall.
13      Q.   Isn't it true at that time you were
14  actually still subject to the bar from the Exchange?
15      A.   No.
16      Q.   No?
17      A.   I'm sorry.
18      Q.   It was a three-year bar that began when?
19      A.   February 2008.
20      Q.   So it was over in 2011?
21      A.   The bar started in February 2008 and
22  ended in February 2011.
23      Q.   So when would you say this call at Nixon
24  Peabody was?
25      A.   We began probably discussions with Nixon

Page 114

1   in April 2011.
2       Q.   You mentioned you drafted a biography to
3   send to Nixon Peabody, correct?
4       A.   I or one of my colleagues.  Nixon Peabody
5   asked us for our bios.  We sent them a copy of a beta
6   investment presentation that was either prepared by
7   myself or a colleague of mine, Devin Stelljes.
8       Q.   Did they ask you to send the bio before or
9   after the conversation you were referring to in which
10  you orally made them aware of your disciplinary
11  history?
12      A.   I don't recall.  I am sorry.
13  BY MS. KIM:
14      Q.   Who is Charlie Jacob?
15      A.   If it is Charlie, he was an attorney at
16  Nixon Peabody.  I believe it is Charlie, just to
17  clarify.  I can't be certain.
18      Q.   We previously marked a binder that
19  contains all the PPMs that we have been able to find
20  for the Archipel Capital offerings as NY-9143
21  Exhibit 6.  I am going to mark next or have the court
22  reporter mark next NY-9143 Exhibit 7.
23          (Email dated May 12, 2011 marked
24  Exhibit 7.)
25      A.   Are we done with that?

Page 115

1       Q.   We will use that shortly.  Since we had
2   previously marked it I wanted to announce it for the
3   record.
4           MS. KIM:  Exhibit 7 is, for the record, an
5   email from Mr. Gray to Mr. Koeppel dated May 12, 2011,
6   Bates range including an attachment is ARCHIPEL 048556
7   through ARCHIPEL 048582.
8       Q.   Mr. Gray, do you recognize this email?
9       A.   Yes.  It is an email chain between Nixon
10  Peabody, Devin and myself.
11      Q.   And earlier you mentioned that you had
12  sent Nixon Peabody information relating to your
13  biography?
14      A.   Yes.
15      Q.   And is that this information, the
16  attachment to this email?
17      A.   The attachment is here (indicating).
18      Q.   Does this contain the information, your
19  biographical information that you provided to Nixon
20  Peabody?  Go to Bates 48577.
21      A.   That is correct.
22      Q.   It states here four bullet points down on
23  page 48577 that you are, or it states "registered
24  investment advisor; NASD licenses:  Series 6, 7, 63,
25  65."  Am I reading that accurately?

Page 116

1       A.   Yes.
2       Q.   Did you draft this biography?
3       A.   Either myself or Devin Stelljes.
4       Q.   So you wrote that you are a registered
5   investment advisor; is that what this page indicates?
6       A.   Yes.
7       Q.   You now know that that is incorrect?
8       A.   Yes.
9       Q.   And you testified earlier, I think,
10  December 2014 you found that out?
11      A.   Yes.
12      Q.   Did Mr. Koeppel ask you about this
13  biography?
14      A.   He asked me to provide a copy of the
15  biography.
16      Q.   Do you know why he wanted to include your
17  biography?  It looks like, for example, in the initial
18  email, the cover email, he writes "We are working on
19  offering -- on the offering/equity docs for Bennington
20  Everloop LP."
21          And then he proceeds to ask for a bio
22  from you.  Do you know why he was asking for a bio
23  from you?
24      A.   For a bio in the offering docs.
25      Q.   And bio would be biography?

29  (Pages 113 to 116)

Gregory Gray, Jr.                                                    2/24/2015

Page 117

1    A.  Yes. I'm sorry.
2    Q.  Just for the record.
3        And do you know if that biography was
4    included in the offering documents?
5    A.  It was.
6  BY MR. RAWLINGS:
7    Q.  Just so we understand, this PowerPoint
8    that you were sending to him was prepared by either
9    you or Devin Stelijes at some time before the
10   Bennington Everloop offering?
11   A.  I can't say for certain, but I would
12   presume that, yes.  I mean, it had to be done before
13   Q.  Did you have any consultation with counsel
14   in the preparation of this particular document, like
15   page 20, as to what should or shouldn't be included in
16   it?
17   A.  Let me make sure I understand your
18   question.  Did I speak with counsel about page 20?
19   Q.  Yes.  About page 20 of the original
20   PowerPoint presentation.
21   A.  This is page 20 (indicating)?
22       MR. LAWRENCE:  That's what he is asking.
23   A.  Other than Nixon Peabody asking for my
24   bio, we sent them a copy of our bio.
25   Q.  I guess what I am trying to get at, at the

Page 118

1    time when either you or Devin wrote this bio -- let me
2    posit an issue -- it doesn't say anything about
3    disciplinary history.  I just want to know do you
4    recall thinking subjectively to yourself when you did
5    this bio or provided information to Stelijes on this
6    bio thinking about whether or not that incident needed
7    to be disclosed?
8    A.  No.
9    Q.  And do you have any recollection of
10   getting any legal advice with respect to whether or
11   not it should be disclosed on this document on
12   page 20?
13   A.  No.
14   Q.  Okay.  And then just quickly through, when
15   you say member of Bennington Investment Management
16   advisory board, we talked about that very briefly
17   before, but what was it that you had been doing for
18   Bennington Investment Management advisory board that
19   this bullet refers to?
20   A.  It is more or less analyzing venture
21   capital deal flow.
22   Q.  How many deals were there?
23   A.  That we looked at?
24   Q.  Yes.
25   A.  Again, depending on what you constitute

Page 119

1    as the word "look."  I mean, we get pitched on deals
2    daily so you could easily say 50 to 100 deals.
3        I mean, again, depends what your level of
4    due diligence is.  If somebody pitches me a deal, I
5    don't really say I looked at it.  Again, depending on
6    how you categorize look, 50 or 100.
7    Q.  How many investments had Bennington
8    Investment Management made prior to this time which
9    is, say, in the two years leading up to the
10   preparation of this document, which had to have been
11   sometime around 2011?
12   A.  I can't say for certain.  Low end six,
13   high end 12.
14   Q.  Do you recall a conversation with Devin
15   Stelijes about your disciplinary history at any time?
16   A.  The only conversation I recall, yes, was
17   one we had when a group of Agrivida investors asked
18   me about it off-line on a conference call.
19   Q.  And what was the conversation you had with
20   Devin at that time?
21   A.  Devin just asked me about the regulatory
22   history, what is my side of the events, my side of
23   the story, and I explained it to him, and that was
24   that.
25   Q.  Was he unaware of the regulatory history

Page 120

1    before that time?
2    A.  I don't know.  I can't say.
3    Q.  But he said nothing to you beforehand that
4    would have indicated he was aware of it; is that
5    right?
6    A.  Correct.
7    Q.  And what is your best estimate as to that
8    placement in time?
9    A.  When that conference call took place?
10   February 2012.
11  BY MS. KIM:
12   Q.  And are the investors -- you said it was
13   Agrivida investors asked you about it?
14   A.  Yes.
15   Q.  Had they already invested in the Agrivida
16   LLC at that point?
17   A.  No.
18   Q.  So they were potential investors?
19   A.  Yes, and they did invest after our
20   conversation.
21   Q.  They did?
22   A.  Yes.
23  BY MR. RAWLINGS:
24   Q.  Can you remember anything more about the
25   conversation?  Was this -- the conference call ends,

                                        30  (Pages 117 to 120)

Gregory Gray, Jr.                                           2/24/2015

Page 121

1  and then Devin Stelljes asks you about what the
2  investors -- that information they brought to your
3  attention? Is that how the conversation went with
4  Devin?
5      A.  I can't recall for certain. The client
6  in question was a gentleman named Jack Berrin. Jack
7  says "There is something I would like to discuss with
8  you."
9          Jack was kind of the leader, if you will,
10 of the conference call. There were about three guys
11 on the call including Devin and myself.
12         And then at length Jack, Arunis,
13 A-R-U-N-I-S, last name Chesnois, C-H-E-S-N-O-I-S, we
14 discussed the SEC censure, and I don't recall Devin
15 and I -- I don't remember Devin and I's conversation
16 after that.
17     Q.  Just to be clear, you don't remember it in
18 detail, but you recall that he did ask you about it
19 afterwards, correct?
20     A.  Yes.
21 BY MS. KIM:
22     Q.  And the people had who were on that call,
23 you said it was Mr. Berrin, Mr. Chesnois. Was there
24 anybody else apart from you and Mr. Stelljes?
25     A.  There was one other party, but I can't

Page 122

1  remember his name.
2      Q.  But the third party was also an Agrivida
3  LLC investor?
4      A.  Arunis and Jack were investors, and the
5  other gentleman, I can't say for certain. I don't
6  remember who the person was. I don't want to
7  misstate.
8      Q.  Did Mr. Stelljes ever ask you -- after
9  that conversation, did he ask you for more information
10 relating to the disciplinary history?
11     A.  I can't say for certain. Devin and I had
12 known each other for years, since high school, but I
13 can't say for certain.
14     Q.  Did he ask you to include it -- did Mr.
15 Stelljes ask you to include your disciplinary history
16 in any documents going out to investors?
17     A.  No, not that I recall.
18     Q.  I am going back to something Mr. Rawlings
19 asked you about in your biography. It says here you
20 are a member of Bennington Investment Management
21 advisory board. When did you join the advisory board?
22     A.  So I would probably say 2010 through
23 2011.
24         Bennington Investment Management was only
25 in existence for a two-year -- maybe two-year period

Page 123

1  of time.
2      Q.  So as of this date, which was May 2011,
3  you were still a member of its advisory board?
4      A.  Yes.
5      Q.  But after in 2012 were you still a member
6  of the advisory board for Bennington Investment
7  Management?
8      A.  I believe 2012 was the last year of
9  existence for -- whenever Bennington Investment
10 Management didn't do anything anymore, that was the
11 last year I was part of that, and I believe that was
12 2012.
13     Q.  And who else was on this board?
14     A.  It was just Greg and I, Greg Edwards.
15     Q.  Did an attorney help you draft the
16 attachment to Exhibit 7?
17         MR. LAWRENCE: I object to the foundation
18 on that. To be fair, he has already told you he is
19 not familiar with whether he drafted it or not.
20         MS. KIM: I apologize.
21     Q.  Do you know, was an attorney involved in
22 drafting the attachment to Exhibit 7? So, for
23 example, if you go to the last page, it contains a
24 notice.
25     A.  I can't say for certain, but to the best

Page 124

1  of my knowledge I don't believe we have used an
2  attorney. This is actually a beta version so the
3  actual version you see in front of us I don't think
4  was actually even show shown to clients. I could be
5  wrong.
6          To the best of my knowledge, it was a
7  beta version that we used for internal purposes only.
8      Q.  Do you know who drafted this last page?
9      A.  I don't.
10     Q.  Have you ever disclosed your disciplinary
11 history to any investor with an Archipel Capital
12 investment unprompted?
13     A.  "Unprompted" meaning --
14     Q.  You tell them before they ask you about
15 it.
16     A.  Yes.
17     Q.  Who are these -- who -- can you name the
18 investors?
19     A.  Our Late Stage Fund investors, our
20 Archipel Capital-Late Stage Fund LP investors.
21 BY MR. RAWLINGS:
22     Q.  Just a question. In the conversation with
23 the Agrivida investors when they brought it up, do you
24 know how they became aware of it?
25     A.  I am not trying to hide it. I mean, it

31 (Pages 121 to 124)

Gregory Gray, Jr.                                                    2/24/2015

Page 125

1   is something I disagree with, but if you Google
2   search my name, it's there. My investors are very
3   sophisticated, they are very technologically savvy,
4   and they do their due diligence on me, and our firm,
5   we do on them. To this day it is still there.
6        Q.   Did the investor -- I know you testified
7   previously who it was who raised it -- did he
8   specifically say he conducted a Google search and saw
9   it online?
10       A.   Yes.
11       Q.   Did he say at that time that he wished you
12  had told him that before he invested?
13       A.   It was disclosed to him before he
14  invested.
15       Q.   Sorry. Right. Of course. I apologize.
16  Thank you.
17  BY MS. KIM:
18       Q.   Are there investors who invested without
19  knowing about your disciplinary history?
20       A.   I don't know.
21       Q.   Have investors told you that they were
22  unaware of your disciplinary history before they
23  invested with an Archipel Capital investment?
24       A.   I can't recall.
25       Q.   And you said you have disclosed your

Page 126

1   disciplinary history to the Late Stage Fund investors,
2   you know, without them asking about it first. Are
3   there any other investors you disclosed your history
4   to without that investor asking about it first?
5        A.   I can't recall anybody specifically.
6        Q.   For the Late Stage Fund LP investors, how
7   did you disclose your disciplinary history to them?
8        A.   Nixon Peabody disclosed it in our private
9   placement memorandum.
10       Q.   Did any of those Late Stage Fund LP
11  investors ask you about your disclosure in the private
12  placement memorandum?
13       A.   A couple of them did, yes.
14       Q.   Do you know who?
15       A.   One or two, because I was on a
16  simultaneous conference call. I believe it was
17  Michael Foonberg, but I can't -- F-O-O-N-B-E-R-G, but
18  I can't be for certain.
19       Q.   Has any potential investor refused to
20  invest because of your disciplinary history?
21       A.   Not to my knowledge.
22  BY MR. RAWLINGS:
23       Q.   Because we think this would be subject to
24  the waiver we discussed, can you describe your
25  conversations with Nixon Peabody that led to the

Page 127

1   decision to disclose it in the Late Stage Fund?
2        A.   So in -- I can --
3        MR. LAWRENCE: Absolutely.
4        A.   In approximately May 2014, I got an email
5   from John Koeppel asking me to look at certain things
6   in our PPM. The bio was one, and he wanted to add a
7   statement, if you will, regarding my past SEC
8   regulatory history.
9        Q.   This was in an email to you or just a
10  phone conversation?
11       A.   This was an email to me. Was there
12  something else I missed or no?
13       Q.   So that is -- that was in May 2014?
14       A.   Yes.
15       Q.   And then the Late Stage Fund PPM came out
16  when?
17       A.   June 2014, approximately.
18       Q.   Was there any -- did he discuss with you
19  why he thought he wanted to change the bio and the
20  PPM?
21       A.   His rationale to me was that he wanted to
22  get in front of -- get in front of the issue.
23       Again, all of our investors doing their
24  due diligence on me know about it. I paid my time.
25  It is something I am fully aware of. I can't hide it

Page 128

1   and I want to move on, but it is something that he
2   and the firm wanted to get ahead of and disclose it
3   in the documents.
4        Q.   And he relayed that to you. Do you think
5   he put that for justification to get ahead of it in
6   the email, or was that orally in the conversation?
7        A.   I would probably say a phone
8   conversation, but I can't be certain.
9        Q.   Do you recall if there was any discussion
10  about supplementing the previous PPMs to include that
11  information?
12       A.   I have had that conversation --
13       MR. LAWRENCE: If you have had that
14  conversation with anyone other than Nixon Peabody and
15  in connection with remedial efforts that one might
16  take, then we are claiming privilege on that, because
17  the waiver is a limited waiver.
18       MR. RAWLINGS: Understood.
19       MR. LAWRENCE: To the extent you had these
20  discussions in May of 2014 or before this
21  investigation began I think is probably a good
22  starting point, and backwards, if you can answer the
23  question for that period, but for a subsequent period
24  we are going to claim privilege for communications
25  with attorneys about that, okay?

32  (Pages 125 to 128)

Gregory Gray, Jr.                                         2/24/2015

Page 129

1      THE WITNESS: Okay.
2          So we have never had that discussion with
3  Nixon.
4      Q.  When you say "that discussion," a
5  discussion about supplementing the previously issued
6  PPMs to include information about the disciplinary
7  history?
8      A.  For example, Bloom Energy has been open
9  for a period of time, and so we haven't had any
10 discussions regarding Bloom Energy, Lineagen LP, and
11 so on and so forth.
12     Q.  You said there were no discussions.  I
13 just want to make sure.  You did not raise that with
14 him?  When he gave the suggestion or the advice or the
15 solution "We should get out in front of this and put
16 this information in your biography," did you say to
17 him "Well, what about these other offerings?"
18     A.  I can't recall.
19     Q.  Do you recall if he said something about
20 the other offerings, about wanting not to supplement
21 the other offerings?
22     A.  I believe he said "I don't think there's
23 a reason to rock the boat," but I can't say for
24 certain.
25 BY MS. KIM:

Page 130

1      Q.  Did he ask you in the May 2014 time frame,
2  did Mr. Koeppel ask you to change your bio in the PPM
3  for the Late Stage Fund LP?
4      A.  He asked me to review -- he gave me a
5  laundry list of four or five items to review.
6          MR. LAWRENCE:  We provided that email that
7  he is referring to.
8          MS. KIM:  I ask the court reporter to
9  mark.
10         (Email dated May 12th, 2014 marked
11 Exhibit 8.)
12         MS. KIM:  For the record, this is NY-9143
13 Exhibit 8, an email from Mr. Koeppel to Mr. Gray dated
14 May 12th, 2014, Bates ARCHIPEL 049057 through 9081
15 It is an email and an attachment.
16     Q.  .Mr. Koeppel -- do you recognize this
17 email?
18         MS. KIM:  Strike that.
19     Q.  Do you recognize this email?
20     A.  Yes.
21     Q.  Can you explain what this is?
22     A.  This is an email from my counsel, John
23 Koeppel, at Nixon Peabody to myself asking to review
24 items in the PPM, private placement memorandum.
25     Q.  And he asked you to review the management

Page 131

1  bios; is that right?
2      A.  Yes.
3      Q.  And then also risk factors?
4      A.  Yes.
5      Q.  And he writes, Mr. Koeppel writes, "As
6  previously discussed, we added a new risk factor on
7  page 7 called prior securities violation."
8          Did I read that correctly?
9      A.  Yes.
10     Q.  Do you remember a previous discussion with
11 Mr. Koeppel about this risk factor?
12     A.  Yes.
13     Q.  And is that the discussion you described
14 to Mr. Rawlings?
15     A.  Yes.
16     Q.  If you go to the page Bates stamped 49066
17 of Exhibit 8, this is a page that lists -- it is
18 titled General Partner Management and provides
19 biographical information for Mr. Edwards, you and
20 Mr. LaSalle; is that correct?
21     A.  Yes.
22     Q.  And here it states -- there is a statement
23 here under your name -- "He is also an advisory board
24 member of Bennington Investment Management Inc."
25         At this time in May 2014, were you an

Page 132

1  advisory board member of Bennington Investment
2  Management Inc.?
3      A.  I am sorry.  Can you repeat the question?
4  I just -- I guess I have a concern that -- I'm sorry.
5  Can you repeat the question?
6      Q.  As of May 2014, were you an advisory board
7  member of Bennington Investment Management
8  Incorporated?
9      A.  Yes.
10     Q.  And Bennington Investment Management
11 Incorporated is the entity that had stopped operating
12 in 2012?
13     A.  Okay.  Well, so BIM Management.  Can you
14 ask your previous question again?  I'm sorry.
15         You kind of threw me off guard, because
16 this bio isn't the one in Late Stage Fund.  That's
17 why I am confused --
18     Q.  This appears to be an earlier draft that
19 Mr. Koeppel sent to you.
20     A.  Sorry.  Can you repeat the -- about the
21 Bennington --
22         MR. LAWRENCE:  Just so we can reset too,
23 just try to answer questions that she has relating to
24 this document, and I think you are trying to jump
25 ahead maybe in your mind, which is a normal and

Gregory Gray, Jr.                                    2/24/2015

Page 133

1   natural human discussion besides attorneys and
2   testimony -- no offense to anybody in this room -- but
3   focus on this document, please.
4        THE WITNESS: Sorry.
5        Q.   So as of this date, were you an advisory
6   board member of Bennington Investment Management
7   Incorporated?
8        A.   No.
9        Q.   Was that line included in the private
10  placement memorandum that was provided to Late Stage
11  Fund Investors?
12       A.   I don't believe this version was ever
13  sent to Late Stage Fund investors.
14       Q.   Why don't we look at tab 11 of what we
15  labeled as Exhibit 6. If you go to the General
16  Partner page on this document,
17       MS. KIM: Just for the record, the
18  document is called Confidential Private Placement
19  Memorandum May 2014, Archipel Capital-Late Stage Fund
20  LP.
21       Q.   If you are on page 5 of the document which
22  has the Bates MP-SEC-0000713, this has a bio for you;
23  is that correct?
24       A.   Yes.
25       Q.   And is this the final bio that went out to

Page 134

1   investors of the Late Stage Fund Limited Partnership?
2        A.   My guess is yes. I can't say for
3   certain.
4        Q.   It might be easier to have this tab 11 of
5   Exhibit 6 up while we look at Exhibit 8, which I
6   believe you put --
7        A.   Okay.
8        Q.   So tab 11, it still contains the language
9   that you are an advisory board member of Bennington
10  Investment Managment Incorporated; is that correct?
11       A.   Yes.
12       Q.   And that was not true at the time?
13       A.   Bennington Investment Managment was
14  particularly Just Greg Edwards and myself so the deal
15  flows, the deals, the offerings that Mr. Edwards had
16  made during that period of time were still open so we
17  still advised him on his investments during that
18  offering.
19       Q.   You testified earlier, though, that you
20  were no longer an advisory board member as of 2012?
21       A.   The entity in which Bennington Investment
22  Management I believe concluded business, either in
23  2012 or 2013, but the investments that were made were
24  still open and are still open so we still have a
25  responsibility to monitor those investments.

Page 135

1   BY MR. RAWLINGS:
2        Q.   Who was the investor in those investments?
3        A.   Greg Edwards.
4        Q.   Greg Edwards. So the investor was not
5   Bennington Investment Managment?
6        A.   So it would be either Greg Edwards
7   personally. Sometimes Canadian law, Ontario
8   securities laws are tricky so sometimes he would do
9   Edboro Software, is an entity he owns, he created
10  Bennington Investment Management so he could do
11  options trading and venture capital offerings.
12  Sometimes it was just himself personally. It just
13  depends on how Greg decided best to do it.
14  BY MS. KIM:
15       Q.   So you see in Exhibit 8 on the bio page
16  your bio states "Mr. Gray is a registered investment
17  advisor for NASD licenses, Series 6, 7, 63 and 65."
18       A.   Yes.
19       Q.   And does that line appear --
20       MS. KIM: Strike that.
21       Q.   That line is not in the tab 11 of
22  Exhibit 6, which is the PPM that went to investors of
23  Late Stage Fund LP, correct?
24       A.   Correct.
25       Q.   Why was that changed?

Page 136

1        A.   NASD was no longer in existence so we
2   updated the NASD to the proper terminology, FINRA.
3   That statement in number 8 was a typo in a sense you
4   cannot be a registered investment advisor for NASD.
5   That is just grammatically incorrect, a typo.
6        Lastly, I thought the registered
7   investment advisor is just too confusing for our
8   investors. Again, we are a venture capital firm.
9   That's all we do. I don't want to be known as
10  someone who advises people on stocks, bonds, funds,
11  munis, et cetera, so I took it out.
12       VIDEOGRAPHER: We are now off the record.
13  The time on the individual monitor is 2:33 p.m.
14       (Discussion off the record.)
15       VIDEOGRAPHER: We are now on the record.
16  The time on the video monitor is 2:40 p.m.
17       Q.   Mr. Gray, I wanted to go back through a
18  little bit of the timeline. Around the May 2011 time
19  period, Nixon Peabody is putting together offering
20  documents for the Everloop LP deal; is that right?
21       A.   Yes.
22       Q.   And around that time you disclosed to them
23  about your disciplinary history?
24       A.   Yes.
25       Q.   You disclosed to Nixon Peabody about your

34  (Pages 133 to 136)

Gregory Gray, Jr.                                           2/24/2015

Page 137

1   disciplinary history?
2       A.   Yes.
3       Q.   And you also provide them a bio that
4   contains information about you?
5       A.   Yes.
6       Q.   And that is in the pitch book?
7       A.   Yes.
8       Q.   When did you start accepting investors
9   into Everloop LP?
10      A.   My guess would be June 2011.
11      Q.   Do you remember ever having a conversation
12  with the Everloop LP investors before June 2011 about
13  your disciplinary history?
14      A.   I don't recall.
15      Q.   Did you have a conversation with the
16  Everloop LP investors after June 2011 about your
17  disciplinary history, say from June 2011 until
18  February 2012?
19      A.   I can't recall.
20      Q.   Do you know if any investor for Everloop
21  LP asked you about the disciplinary history from
22  June 2011 until February 2012?
23      A.   I can't say for certain the dates and who
24  asked me what and when and the dates. Sorry.
25          MS. KIM:  Counsel, did you say something?

Page 138

1          MR. LAWRENCE:  Just a second, please.  I
2   am sorry. I wanted to see if I wanted to ask a
3   clarifying question or -- no. I'm fine.
4       Q.   February 2012 you have a call with some
5   potential investors for Agrivida LLC in which they ask
6   you --
7   BY MR. RAWLINGS:
8       Q.   Sorry. Before this, can we just go back
9   to -- I want to take the PPM that is for the Everloop
10  PPM, which is in tab 1 of Exhibit --
11         MS. KIM:  Exhibit 6.
12      Q.   If you go to page 5 of that PPM and pull
13  out page 20 of Exhibit 7 --
14  ·     A.   Say that again?
15      Q.   Page 20 of Exhibit 7.
16         MR. LAWRENCE:  The presentation.
17      Q.   The presentation. You sent this
18  presentation to Mr. Koeppel, as the email says, in the
19  middle of May 2011, correct?
20      A.   Yes.
21      Q.   The PPM which is tab one of the exhibit
22  you are looking for for Everloop is dated May 2011.  I
23  just wanted to ask you, if you look back on the
24  signature page, it is May 2011. Do you recall that
25  that was when the PPM for Everloop was dated?

Page 139

1          MS. KIM:  It is also on the first page.
2       A.   Around there, yeah.
3       Q.   Just comparing -- I want to go to your
4   bio, which is on page 5. I just want to -- you sent
5   him bullet points, but then there is a bio here. Who
6   wrote that? Did Nixon write that or did you write
7   that?
8          MR. LAWRENCE:  By "that," you are
9   referring to tab one which is the PPM --
10         MR. RAWLINGS:  Everloop PPM.
11      A.   To my knowledge, Nixon Peabody wrote it.
12      Q.   For example, on page 20 of the email,
13  member of Bennington Investment Management advisory
14  board was like the seventh bullet, but when you go to
15  page 5 of PPM one, it is the second sentence. Do you
16  see that?
17      A.   Yes.
18      Q.   Did you have any discussions with Nixon
19  about where to put in investment -- managment advisory
20  board in the bio?
21      A.   No.
22      Q.   There is also the difference between --
23  the sentence about 12 years of experience in the
24  investment community. That is bullet two, right?
25      A.   Yes.

Page 140

1       Q.   But it is sentence three in the bio. Did
2   you have any discussions with Nixon about where it
3   should go in the bio?
4       A.   No.
5       Q.   Because the sentence "Mr. Gray" -- I am
6   reading now from page 5 -- "Mr. Gray is a registered
7   investment advisor for NASD licenses Series 6, 7, 63
8   and 65." That is bullet 4 on page 20, right?
9       A.   Yeah.
10         MS. KIM:  Other than the word "for."
11      Q.   Other than the word "for."
12      A.   So bullet point on page 20, registered
13  investment advisor, NASD, licenses Series 6, 7, 63,
14  65 so that's what I wrote. What Nixon Peabody wrote
15  was something different, and just -- you can't be a
16  registered investment advisor for NASD. You just
17  can't. I mean, it's not . . .
18      Q.   When did you come to have that
19  realization?
20      A.   When did I know you couldn't be a --
21  well, I've known that forever. You need -- if you
22  want me to clarify?
23      Q.   Clarify, sure.
24      A.   To be a registered investment advisor I
25  would need to be a registered investment advisor with

Gregory Gray, Jr.                                                    2/24/2015

Page 141

1  a firm. The NASD is a regulatory body -- was a
2  regulatory body. Now it is FINRA -- so it is just an
3  incorrect statement that -- it is just a factually
4  incorrect statement.
5       Q.  I guess what I am wondering, then, if you
6  would have reviewed this PPM in draft when Nixon sent
7  it back to you, why didn't you catch the factually
8  incorrect statement that Mr. Gray is a registered
9  investment advisor for NASD licenses:  Series 6, 7,
10  63, 65?
11      A.  I reviewed it.  I missed it.
12      Q.  Did you ever have a discussion with Nixon
13  that it is an incorrect statement?
14      A.  I can't recall.
15      Q.  And I really want to -- do you recall any
16  specific discussion with Nixon about a decision to not
17  mention anything about the disciplinary history either
18  in the bio or in some other place of the private
19  placement memorandum that is Exhibit 1?
20      A.  For Everloop?
21      Q.  Correct.
22      A.  Nixon Peabody asked me in this email for
23  everything.  I told them everything about employment
24  history, board -- who I was with on the board, et
25  cetera, so I gave them everything they needed to know

Page 142

1  so I relied on counsel to put information in here
2  they thought was relevant.
3       Q.  When you say you gave them everything they
4  needed to know, you are referring to the phone
5  conversation which you told him about your
6  disciplinary history, correct?
7       A.  Yes.
8       Q.  And presumably also you sending them this
9  bio, correct?
10      A.  Yes.
11      Q.  So you are relying on them but you don't
12  specifically -- do you specifically recall a
13  discussion with them about do I or -- do I need to
14  disclose this in a PPM?
15      A.  I don't recall a conversation.
16      Q.  But you know that they knew about it
17  because you told them about it, correct?
18      A.  Yes.
19      Q.  And you told them about it before you sent
20  them this email; is that correct?
21      A.  Yes.  So approximately April'ish 2011 I
22  sent the CEO of Everloop -- Hilary DeCesare, doing
23  her due diligence on Archipel Capital, asked me about
24  "Hey" -- was doing her due diligence on us.  "Can you
25  explain this document to me?"

Page 143

1       Again Google search Greg Gray or
2  Archipel -- it is Gregory W. Gray, Jr., and in an
3  email to her I described exactly to her exactly what
4  went on, my side of the story, and over that period
5  of time we had discussions with Nixon Peabody about
6  broker dealer, how do we -- you know, what is the
7  best course of action for us to proceed to accept
8  money for our clients.
9       MS. KIM:  For the record, I asked the
10  court reporter to mark as Exhibit 9 an email from
11  Hilary DeCesare to Mr. Gray copying Mr. Edwards dated
12  March 2nd, 2011, Bates range is ARCHIPEL 025797
13  through 799.
14       (Email dated March 2, 2011 marked Exhibit
15  9.)
16  BY MR. RAWLINGS:
17      Q.  Very brief question.  Is this the email
18  you were referring to, that you were just talking
19  about?
20      A.  Yes.
21      Q.  And your response to Hilary about the
22  disciplinary action, we can assume that at the time
23  you wrote this email, those were your true firmly held
24  beliefs about the disciplinary action at the time?
25      A.  Yes.

Page 144

1       Q.  How soon after the May 2011 Everloop PPM
2  became final did you start soliciting investors in
3  Everloop?
4       A.  I would say almost instantaneous.  Nixon
5  Peabody or an entity thereof was an investor.  Greg
6  Edwards our chairman was an investor almost
7  immediately so I would say within a two-week time
8  period.
9       Q.  Were there also investor presentations in
10  which you met large groups of investors to ask them if
11  they were interested in Everloop?
12      A.  We would have roadshows with Hilary
13  DeCesare, the CEO, and we would fly her into Syracuse
14  to meet with investors either on a one-on-one basis
15  or a larger forum.
16      Q.  At any of those presentations do you
17  recall your regulatory history coming up, at any of
18  those presentations?
19      A.  I don't believe it did.
20      Q.  I just want to make sure.  So you during
21  those presentations did not orally inform any of the
22  prospective investors "Look, I want you to know I have
23  this disciplinary history"?
24      A.  I wasn't doing the presentation, just to
25  clarify.  My job was bringing in the CEO of the

36 (Pages 141 to 144)

Gregory Gray, Jr.                                               2/24/2015

Page 145

1   overall investment, and she was the one doing the
2   presentation so it wasn't my forum to speak.
3      Q.   Got it.  Did you ever talk to Hillary about
4   whether or not the people who -- the people who were
5   gathered to do the investment, you got them to there,
6   right?  So it is Archipel.  You are the one who is
7   sort of getting the investors together?
8      A.   Archipel we mentioned earlier.  We had
9   people we worked with such as Mr. Russo, Mr. McMahon.
10  Again, utilizing their network, we would fill the
11  room, yes.
12     Q.   Did you ever have any conversation with
13  Hillary about whether or not there was any obligation
14  or duty, or it would be a good idea to let those
15  prospective investors know about your prior
16  disciplinary history?
17     A.   I don't recall.
18     Q.   Okay.  I just kind of want to get the
19  facts.  She sees it, she asks you about it, you give
20  her an explanation.  Then you go out and solicit
21  investors.  I just want to know if the two of you ever
22  talked about whether or not it was something that you
23  should tell everybody before they invest or not.
24          I think you are answering that question
25  no.  I just want to make sure I made it clear what I

Page 146

1   was asking.
2      A.   Correct.
3      Q.   Did you ever tell Hillary that you told
4   Nixon Peabody about the investor history -- not the
5   investor history -- about the disciplinary history?
6      A.   I can't recall.
7      Q.   Okay, all right.
8   BY MS. KIM:
9      Q.   Did you tell Nixon Peabody that she had
10  asked you about the disciplinary history, that Ms.
11  DeCesare asked you about the disciplinary history?
12     A.   Yes.
13     Q.   Did you tell them that -- when did you
14  tell them that?
15     A.   Shortly thereafter.  Again, when we
16  were -- we, meaning Greg Edwards, myself, Nixon
17  Peabody -- were trying to formulate a game plan to
18  best legally accept monies from investors, this is
19  how we went about doing it.
20          So we used that email from Hillary
21  basically saying "Okay, she has a concern.  She
22  looked at it.  She is not comfortable with me, with
23  us.  What is the best way to proceed; broker dealer,
24  not a broker dealer, Bennington Investment
25  Management," so on and so forth.

Page 147

1   BY MR. RAWLINGS:
2      Q.   Just walking through the binder, tab two
3   is updated as of June 2012, Bennington Everloop LP.
4   If you turn to page 5, you will see that the language
5   in your bio did not change.  I just want to confirm,
6   you don't recall any conversations with Nixon about
7   whether or not the bio should change between May and
8   June, correct?
9      A.   Correct.
10     Q.   And actually, I misspoke.  The difference
11  is between May 2011 and June 2012 so it is actually a
12  whole year-and-a-half has gone by?
13     A.   Correct.
14     Q.   Even so, you don't recall any discussions
15  with Nixon about whether or not the bio should be
16  changed in the June 2012 Everloop supplement, we will
17  call it?
18     A.   Correct.
19  BY MS. KIM:
20     Q.   So the Agrivida private placement
21  memorandum comes up September 2011; is that right?
22  That would be tab three of Exhibit 6?
23     A.   September 2011, yes.
24     Q.   And this one on page 5 of the private
25  placement memorandum, Bates ARCHIPEL 00921, it

Page 148

1   contains the bios on managing member management, and
2   this contains your bio, and this is unchanged from the
3   Everloop PPM; is that correct?
4      A.   It looks that way.
5      Q.   The attorneys on this deal were different,
6   correct?
7      A.   Correct.
8      Q.   Did you provide this page to Green &
9   Seifter?
10     A.   We gave a template of our Everloop docs
11  to Green & Seifter.
12     Q.   Did they use that template then to create
13  this private placement memorandum?
14     A.   Yes.
15  BY MR. RAWLINGS:
16     Q.   Recognizing, and I want you to be alert to
17  this, recognizing we have a particular waiver in place
18  that belongs to Nixon and not this other entity, I
19  don't want to know the content of any of the legal
20  advice, but --
21          MR. LAWRENCE:  Actually, we intend to
22  waive with regards to the preparation for the PPM with
23  regards to Agrivida as well so you have some rope here
24  to ask questions.
25     Q.   Do you recall any conversations with those

37  (Pages 145 to 148)

Gregory Gray, Jr.                                                2/24/2015

Page 149

1   lawyers, the lawyers for tab three, about your
2   disciplinary history?
3       A.  I don't recall.
4       Q.  Do you think they knew or didn't know?  I
5   mean, do you have a sense?  Is there any way you
6   can --
7       A.  Actually -- let me recant my first
8   statement.  They did know.  They sent me an email to
9   fill out with state registration that they pre-filled
10  out the boxes about have you ever been subject to
11  regulatory history, so on and so forth, and they
12  pre-filled it out, and that is when I called them and
13  said that's not right, so on and so forth.
14          For whatever reason they didn't file the
15  necessary forms with the state.  They went with a
16  different exemption, if you will.
17      Q.  Just the time period for that would have
18  been sometime before September 2011?
19      A.  I don't know.  I can't recall.  I am
20  sorry.
21          MR. LAWRENCE:  I think counsel is pointing
22  you to the date of the Agrivida PPM dated
23  September 2011 and saying logically it would be before
24  the finalization of this PPM.
25      A.  I can't recall specifically the date that

Page 150

1   we had that conversation.
2       Q.  Okay.  And how soon after September 2011
3   did you start selling interest in Agrivida LLC?
4       A.  I believe we didn't actually invest until
5   2012.  I am pretty accurate with that so 90 days.
6       Q.  And this is the investment we talked
7   about.  The conference call was Agrivida investors who
8   raised the issue of your disciplinary history,
9   correct?
10      A.  Yes.  Mr. Berrin, Mr. Chesnois.
11      Q.  And seeing the September 2011 date of
12  this, does that help you place in time when that
13  happened?  Does that change to any extent the time you
14  told us before, which I believe was early 2012?
15      A.  No.  I still think we had the conference
16  call with them -- I want to say February.
17      Q.  Your best --
18      A.  To my best knowledge.
19  BY MS. KIM:
20      Q.  If you go to tab four, this is the private
21  placement memorandum for Bloom Energy LP dated
22  March 2012; is that right?
23      A.  Yes.
24      Q.  And page 5 of the document, Bates
25  NP-SEC-0000154 is again the bio page for Mr. Edwards

Page 151

1   you and Mr. Steiljes?
2       A.  Correct.
3       Q.  And the bio is unchanged for you here?
4       A.  Yes.
5       Q.  Unchanged from the PPMs for Everloop,
6   Bennington Everloop LP and Agrivida LLC?
7       A.  Yes.
8   BY MR. RAWLINGS:
9       Q.  Just to continue on with the time line, so
10  February of 2012 is your best recollection the
11  Agrivida investors raise it with you, right?
12      A.  Yes.
13      Q.  Do you recall going back to Nixon Peabody
14  after they raised it with you, you had a conversation
15  with Devin Steiljes about your background?
16      A.  Yes.
17      Q.  When I say background, I mean your
18  disciplinary history, correct?
19      A.  Yes.
20      Q.  Do you recall any conversations with Nixon
21  Peabody between that conference call, which would have
22  been February of 2012, and the finalization of this
23  PPM in March 2012 in which you alerted Nixon Peabody
24  to the fact that some investors in Agrivida asked you
25  about the disciplinary history?

Page 152

1       A.  So when the investors brought it to my
2   attention, we were using Green & Seifter at that time
3   so we did go back and then reuse Nixon whenever the
4   date was with this, March 2012, and said we need to
5   form a new entity, Bloom Energy LP, and that's when
6   they formed it, but I don't recall specifically a
7   conversation.
8       Q.  Did Nixon know that you were using the
9   other law firm for the other deal?
10      A.  Yes.
11      Q.  So there wouldn't have been any reason for
12  you to keep that conversation from Nixon?
13      A.  Correct.
14      Q.  When I say "that conversation," I am
15  speaking the February conversation with Agrivida
16  investors.
17      A.  Correct.
18      Q.  I just want to make sure, you can't recall
19  going back to Nixon with respect to the March 2012
20  PPM?
21      A.  I don't.
22      Q.  On whether or not it should be disclosed
23  to investors?
24      A.  Correct.
25  BY MS. KIM:

38  (Pages 149 to 152)

Gregory Gray, Jr.                                                    2/24/2015

Page 153

1    Q.  Tab six is the March 2012 PPM for Archipel
2  Capital-Lineagen LP.  That is the same date as this
3  Bloom Energy LP PPM, same month?
4    A.  Yes.
5    Q.  So Mr. Rawlings' questions would apply for
6  this PPM as well; that you would not have gone back to
7  Nixon Peabody in the interim to discuss the
8  disciplinary history?
9    A.  Correct, yes.
10   Q.  If you go to tab eight, this is the
11  June 2012 confidential private placement memorandum
12  for Archipel Capital-Social Media Fund LP.
13   A.  Yes.
14   Q.  And on page 5 of this private placement
15  memorandum, again has a bio page for you, Mr. Edwards
16  and Mr. Stelljes?
17   A.  Yes.
18   Q.  And the language here for your bio reads
19  the same as in the earlier private placement
20  memorandum?
21   A.  Correct, yes.
22   Q.  So between March 2012 when the Bloom
23  Energy LP and Lineagen LP PPMs came out and this
24  June 2012 PPM for Social Media Fund LP, do you recall
25  any conversations with Nixon Peabody regarding your

Page 154

1  disciplinary history?
2    A.  We would just have continued
3  conversations on a yearly basis about making sure we
4  are properly registered so we would spend five or
5  $10,000 a year as Dodd Frank would continue to evolve
6  making sure that we are compliant.
7  BY MR. RAWLINGS:
8    Q.  When you say properly registered, what are
9  you referring to?  Because you weren't a registered
10  broker dealer, right?
11   A.  That's what we would visit, in a sense
12  that we always thought that would be a possibility.
13  Next week, next month, next year, we always thought
14  that listen, we might have to be a broker dealer some
15  day.  Okay.
16       But it is very costly.  We don't want to
17  get in on the funds, stocks, bonds.  That is not who
18  we are.  That is not what we want to do.
19       So we were just properly kept up to speed
20  about how best to proceed as a firm, and we relied on
21  Nixon's advice and what we needed to do.
22  BY MS. KIM:
23   Q.  When you sold the securities, you didn't
24  register the offerings for the Archipel
25  Capital-related entities, right?

Page 155

1    A.  I would have to ask our counsel.
2    Q.  Is there a registration statement for the
3  offerings?
4    A.  I don't know.  We would have relied on
5  counsel for that.
6    Q.  Do you know were the investors for the
7  Archipel Capital-related investment opportunities,
8  were those all accredited investors?
9    A.  Yes.
10   Q.  How do you know they were accredited?
11   A.  We had them fill out subscription
12  documents attesting to that fact.
13   Q.  Did you do anything to further confirm
14  they were accredited?
15   A.  They were all personal relationships of
16  mine or the affiliated representative who knew they
17  would be able to take on this level of risk so there
18  was a personal relationship involved.
19   Q.  Were any investors unaccredited?
20   A.  Not to my knowledge, no.
21   Q.  So going back to the documents.
22       MS. KIM:  Please.
23       (Email dated October 28th, 2012, marked
24  Exhibit 10.)
25       MS. KIM:  I have asked our court reporter

Page 156

1  to mark NY 9143 Exhibit 10.  This is an email from
2  Mr. Russo to Mr. Gray and Mr. Koeppel copying Mr.
3  McMahon dated October 28th, 2012, Bates stamped
4  ARCHIPEL 006945 through 6948.
5    Q.  Do you recognize this email, this chain of
6  emails?
7    A.  Yes.
8    Q.  Mr. Russo and you have an exchange
9  regarding your disciplinary history, correct?
10   A.  Yes.
11   Q.  Do you know why Mr. Koeppel was included
12  on this email?
13   A.  No.
14   Q.  Before October 28, 2012, did you have any
15  conversations with Mr. Russo about your disciplinary
16  history?
17   A.  Mr. Russo and his family are a very
18  sophisticated family, and I can't recall exactly when
19  it came up, but I'm sure it came up.
20   Q.  When you say "it came up," what do you
21  mean?
22   A.  My past regulatory history.
23   Q.  Did you -- is it your understanding that
24  they knew about your disciplinary history before
25  investing?

DIVERSIFIED REPORTING SERVICES
(202) 467-9200

Gregory Gray, Jr.                                    2/24/2015

Page 157

1    A.  Yes.  Andy Russo is extremely
2    technologically savvy and thorough, and he would have
3    done his due diligence on me and my firm prior to him
4    and his family investing.
5    Q.  Just for the record, Mr. Russo and his
6    family members have invested in Archipel Capital
7    entities?
8    A.  Yes.
9    Q.  Do you recall why you guys had -- do you
10   recall why you and Mr. Russo had this conversation
11   about your disciplinary history?
12   A.  Yes.
13   Q.  Can you explain?
14   A.  Around this time, Andy Russo was named
15   the CFO of one of our portfolio companies, Everloop,
16   and I was extremely agitated that he was unqualified
17   to be the CFO of the company at that point in time.
18   Two, Everloop needed board approval to
19   hire a CFO, which they did not get.
20   Q.  So what -- how did that lead to this
21   exchange?
22   A.  This is Andy Russo trying to change the
23   conversation, meaning that we had a group of Everloop
24   investors now realizing that this investment was in
25   trouble, because everybody in Everloop, the

Page 158

1    investment, knows Andy Russo, knows he is unfit and
2    unqualified to be the CFO of a company, who lives in
3    Syracuse, New York; how he could be the CFO of a
4    company in San Francisco, approximately around San
5    Francisco?
6    And I wanted to be accurate with our
7    clients and let them know he is not fit, and to my
8    experience he is not fit to be CFO, and it became a
9    personal battle between Andy Russo and myself, and he
10   was trying to change the conversation with him and
11   his investors.
12   Q.  Do you remember speaking with Mr. Koeppel
13   about this email?
14   A.  Not specifically this email.
15   MR. LAWRENCE:  This question gets a little
16   dicey, because now we are getting past the fund
17   formation, and I don't -- we want to be as helpful as
18   possible to the staff, and to the extent that these
19   communications become relevant and the drafting of a
20   subsequent document, then maybe we can tie it in that
21   way, but just -- there is this dispute and there is
22   also disputes -- disputes may be too strong of a word,
23   but there is disagreements and arguing, if you will,
24   about Twitter, Twitter shares and distribution after
25   all the money is made with the investors, and I know

Page 159

1    that Nixon Peabody was consulted concerning that too
2    so we want to -- we are limiting our waiver with
3    regard to those because, frankly, those areas,
4    although I can't see how an investor would have a
5    potential claim against them, there obviously was the
6    potential for litigation so the communications between
7    Mr. Gray and Nixon Peabody for that purpose would have
8    been in anticipation of potential litigation so we are
9    going to go ahead and assert privilege over those
10   communications for now.
11   MR. RAWLINGS:  Let me ask the question a
12   different way, which will explain that we are getting
13   exactly at disclosure.
14   BY MR. RAWLINGS:
15   Q.  If you could turn your attention to tab 10
16   of the PPM, which is the April 2014 Archipel
17   Capital-Social Media Fund LP.
18   A.  Sorry.  What page?
19   Q.  Tab 10.  If you turn to page 5 of that
20   PPM, you will see the background, and you will see
21   that the background has not changed from the previous
22   PPMs.  I guess the question we are trying to get at,
23   as it pertains to whether or not the issues that were
24   being discussed in the October 28, 2012 email
25   pertaining to the disciplinary history that Mr.

Page 160

1    Koeppel is being aware of, because he is cc'd on this,
2    did you have any discussions with him at any time
3    between October and April 2013 as to whether or not
4    the biography should be changed in the Social Media
5    Fund LP to say anything about the disciplinary
6    history?
7    A.  No.
8    Q.  Given what you have already told us, which
9    is that sometime in 2014 Koeppel tells you "We should
10   get out in front of this," I would assert probably
11   that on October 28, 2012, the issue is being
12   presented, and I am just sort of wondering as a person
13   who has dealt with Mr. Koeppel, why do you think the
14   admonition to get out in front of it, being your
15   disciplinary history, wouldn't have occurred to either
16   him or you as a topic of conversation to address
17   between late October and the next PPM, which is
18   April 2013?
19   A.  You would have to ask him.  I mean, at
20   the end of the day, he asked me what I needed to be
21   in the PPM.  I gave him everything he asked for, and
22   he put it in the PPM.  Nixon Peabody created the
23   documents.
24   This isn't the only email that, you know,
25   pertains to my regulatory history.  There is another

40  (Pages 157 to 160)

Gregory Gray, Jr.                                                    2/24/2015

**Page 161**

1  one a month from there, two months from there when
2  Andy Russo and I had our battle royale, if you will,
3  so that would be a better question to ask Nixon.
4  When they prepared the documents, I gave them what
5  they asked for.
6      Q.  I mean, that's -- we could go through a
7  bunch of those.  We have seen a bunch of those so we
8  all know that there was a battle royale about your
9  disciplinary history, but the thing that is strange is
10  that that battle royale does not seem to correspond to
11  the 2014 Late Stage Fund PPM.  It seems to in our mind
12  to have affected perhaps or logically might have
13  affected previous PPMs like the Social Media Fund.  I
14  am just wondering if you know if helping frame it that
15  way helps you recognize at what point in time then or
16  what incident it might have been that would have
17  spurned Mr. Koeppel to say "Okay, now let's get out in
18  front of it and let's put it in the Late Stage Fund
19  PPM"?
20      A.  It was really the email, the email in
21  May 2014.  He said "Hey, let's look at these items,
22  and let's try to get in front of this issue."
23          MR. LAWRENCE:  That is from his
24  perspective.
25          Can I ask a question?

**Page 162**

1          Given -- you were relying on Nixon Peabody
2  to tell you what needed to be disclosed in the PPMs,
3  correct?
4          THE WITNESS:  Correct.
5          MR. LAWRENCE:  So even though you didn't
6  have a discussion explicitly regarding whether or not
7  your regulatory disclosure -- regulatory history
8  needed to be disclosed in a PPM, you were nonetheless
9  relying upon them to put it in the PPM if it was
10  required, correct?
11          THE WITNESS:  Correct.
12          MR. LAWRENCE:  Given that your lawyers
13  weren't indicating it was necessary to be disclosed in
14  the PPM, why didn't you suggest that your prior
15  regulatory history be disclosed in the PPM?
16          THE WITNESS:  I didn't know it needed to
17  be disclosed.  Nixon gave me everything, and they said
18  "Here's what we need from you."  I gave them
19  everything we needed, and I relied on their guidance.
20      Q.  How about in solicitations for votes in
21  the April 2013 Social Media Fund?  When you gave
22  roadshows and presentations to those investors, was
23  there anything in those presentations that would have
24  generally let people know that there is a disciplinary
25  history that may or may not be an issue, but alerted

**Page 163**

1  them to that?
2      A.  We didn't do roadshows for Twitter.  So
3  our business model is kind of two-fold.  One, we got
4  actively with a company like Lineagen and Everloop
5  through the COs; others ones like Twitter and Bloom
6  Energy, we just got invited to the party, if you
7  will.  The ones we got invited to the party we didn't
8  do roadshows.  Usually those clients came from our
9  existing relationships and/or referrals from existing
10  relationships.  Does that better answer your
11  question?
12      Q.  It does, although I guess any prospective
13  investor in the Late Stage Fund, in Social Media Fund,
14  their information about the fund, they would then be
15  getting it from the PPM, correct?
16      A.  Right.  I would say to better answer your
17  question or further explain, our largest investors,
18  the majority of our investors in Social Media Fund
19  were relationships of Andy Russo, either an entity he
20  controlled specifically or his relationships
21  directly.
22          Most, if not all, those investments came
23  after October 20th, 2012.
24          So to be blunt, we had a brouhaha, kissed
25  and made up like you do in a business relationship.

**Page 164**

1  To be blunt, he hated what I did.  He recognized
2  Everloop is failing and he couldn't circle the
3  wagons, so then he started kissing my butt again to
4  try to distance himself from that failure.
5          Then when he was done with me again at
6  Twitter, he threw me on the curb again.  I mean, he
7  is a great manipulator.
8          But, again, if you are looking at all the
9  relationships he brought to the table, these were all
10  his investors after October 20th, 2012 so they would
11  have been aware through Mr. Russo about my regulatory
12  history.
13          MR. LAWRENCE:  I would just caution the
14  witness that metaphors don't read well in a transcript
15  although we all know what they mean.
16          THE WITNESS:  I will change.
17          MR. LAWRENCE:  Try to use a little more
18  precise language.
19      Q.  Just to make clear what you are saying,
20  what you are saying is that you think because Andrew
21  Russo is raising the issue in October 2012, that the
22  vast majority of the Social Media Fund investors from
23  April 2013 came through him, and so they would have
24  been told by him about your background?
25      A.  Yes.

41  (Pages 161 to 164)

Gregory Gray, Jr.                                        2/24/2015

Page 165

1    Q.   Okay.
2    A.   Case in point is all these -- most of
3    these social media investors now know about the SEC
4    investigation through Mr. Russo, and then they call
5    me regarding it.
6         So I know for a fact that that is how he
7    operates.
8    BY MS. KIM:
9    Q.   Did those -- you said those investors are
10   calling you now about the disciplinary history?
11   A.   No.  Just about -- "Hey, Andy Russo is
12   calling me about this SEC thing.  What's going on?"
13   Q.   You mean this investigation, correct?
14   A.   Yes.  Sorry.
15   Q.   So the bios sometimes have Devin Stelijes,
16   sometimes don't have a third party and sometimes have
17   Bradford LaSalle.  Can you explain how that changed?
18   A.   So approximately, I would say, right
19   around this email, October 28th'ish, obviously Andy
20   Russo and I had a severe disagreement.
21        Andy was trying to manipulate Devin to
22   come work for him so Devin left my firm, Archipel
23   Capital, and went to go work with Andrew Russo at
24   that point in time.
25        So he would have been taken out of the

Page 166

1    PPMs, because he no longer worked for Archipel
2    Capital, and then I don't exactly recall when Brad
3    LaSalle joined the firm, but he would have been
4    inserted into our PPMs.
5    Q.   Did you ask for Mr. LaSalle to be removed
6    from that bio section?
7    A.   Probably.
8    Q.   You would have told -- you would have told
9    Nixon Peabody to remove him?
10   A.   Yes.
11   Q.   And then later you would have told Nixon
12   Peabody to add Mr. LaSalle?
13   A.   Yes.
14   Q.   And at that time did you review the bio
15   section?
16   A.   Mine or Brad's?
17   Q.   The bio page in general.
18   A.   No.  I don't believe so.
19   Q.   Which offerings are still accepting
20   investors?
21   A.   New monies or that are open?
22   Accepting -- just to clarify.
23   Q.   Accepting new money.
24   A.   Archipel Capital-Bloom Energy LP and
25   Archipel Capital-Late Stage Fund.

Page 167

1    Q.   What about -- what are still open?
2    A.   Archipel Capital-Agrivida LP or LLC is
3    open without a liquidity event.  We do not plan on
4    investing more currently.
5         Archipel Capital-Lineagen LP just closed
6    in December 2014.  If they need another round of
7    financing, we will reevaluate at that time so we are
8    not accepting any new money as it just closed.  I
9    think that's it.
10   Q.   You said Bloom Energy LP and Late Stage
11   Fund LP are accepting new investors?
12   A.   Yes.
13   Q.   Is that happening in 2015?
14   A.   Yes.
15   Q.   Have you received any investments in 2015
16   for any of those entities?
17   A.   I received one investment for -- from one
18   investor, yes.
19   Q.   And who was that investor?
20   A.   Mr. Huang, H-U-A-N-G.
21   Q.   And which entity did Mr. -- do you know
22   his first name?
23   A.   I don't.  I am sorry.
24   Q.   Which entity did Mr. Huang invest in?
25   A.   The Archipel Capital-Bloom Energy LP.

Page 168

1    Q.   What was the date of that investment?
2    A.   The investment is not complete.  It is a
3    staggered investment, if you will, takes about a
4    month process from start to finish for the investment
5    so the investment won't be finished until next week.
6         The investment amount will be, I believe,
7    470,000 when it is all said and done.  It comes in
8    different tranches.
9    Q.   Has he started to -- has Mr. Huang started
10   to give you the investment tranches for Bloom Energy
11   LP?
12   A.   Yes.
13   Q.   When did that start?
14   A.   Middle part of February, to the best of
15   my knowledge.
16        MR. LAWRENCE:  Can I ask a follow-up
17   regarding that?
18        Did you tell -- not very good with names
19   here -- Mr. Huang to wait until March when the
20   documents were completed with new counsel on board
21   before sending the money?
22        THE WITNESS:  Yes.  Originally Mr. Huang
23   was supposed to make the investment in December 2014
24   I spoke with them January.  I said "We want to take
25   the investment in March.  Let us update our documents

Gregory Gray, Jr.                                              2/24/2015

---

### Page 169

1  to reflect 2015."
2       At that point in time they said not a
3  problem; they will be ready to go then.
4       Approximately two weeks later he said "The
5  currency is getting killed right now. Our investors
6  want to start to process now."
7       "It takes a month anyway. We will update
8  the documents."
9       "When you get them updated, we will sign
10 the paperwork then."
11 BY MR. RAWLINGS:
12     Q. You mentioned currency. Is he in another
13 country?
14     A. Yes.
15     Q. What country?
16     A. China.
17     Q. Do you talk with him directly or do you
18 have an intermediary?
19     A. I have an intermediary.
20     Q. Who is that?
21     A. Yunhan, Y-U-N-H-A-N, last same Z-H-A-N-G.
22 BY MS. KIM:
23     Q. Just sticking with Bloom Energy LP, can
24 you generally walk us through that investment?
25     A. What would you like?

---

### Page 170

1      Q. What is the investment? How is it
2  structured?
3      A. You don't want to know about the actual
4  company, what they do?
5      Q. No.
6      A. I could tell you.
7         The structure is a 5 percent management
8  fee up front with a 10 percent carried interest.
9      Q. And how did you get the opportunity to
10 invest in Bloom Energy Corporation?
11     A. So I have been -- Greg Edwards has been a
12 personal investor in Bloom Energy since approximately
13 2007. I was the soliciting broker at that point in
14 time through Advanced Equities. It has always been a
15 personal favorite of our investments.
16        When looking at companies that fit our
17 portfolio, revenue-based companies, last money in,
18 first money out, 3 to 5 X return, we identify Bloom
19 as a perfect fit for our portfolio.
20     Q. Did Bloom Energy LP invest directly into
21 Bloom Energy Corporation?
22     A. Yes.
23     Q. Was that done through purchase of shares
24 from Bloom Energy Corporation or was that done through
25 the secondary market in some way?

---

### Page 171

1      A. The answer is both. So Bloom Energy is
2  aware of the transaction. There is a stock transfer
3  agreement that Bloom and its whomever, let's say
4  CFO -- actually, I don't know who signs on their
5  behalf.
6         So they have a seller, a buyer, there are
7  documents that Nixon Peabody reviewed so it is common
8  stock issued by Bloom Energy.
9         (Spreadsheet marked Exhibit 11.)
10        (Bloom Energy stock certificate marked
11 Exhibit 12.)
12     Q. I have asked the court reporter to mark as
13 Exhibit 11 documents that have been Bates stamped
14 ARCHIPEL 00805 through 810, and it appears to be a
15 printout of a spreadsheet.
16        Mr. Gray, do you recognize this document?
17     A. Yes.
18     Q. Can you explain what it is?
19     A. This would be a document of our investors
20 and the investment amount.
21     Q. This is a document which shows investors
22 for Lineagen LP, Bloom Energy LP and Agrivida LLC; is
23 that right?
24     A. Yes.
25     Q. I have also given you a document that has

---

### Page 172

1  been stamped as NY-9143 Exhibit 12, and this is Bates
2  stamped ARCHIPEL 012355. Do you recognize this
3  document?
4      A. Yes.
5      Q. Can you describe what it is?
6      A. This is a stock certificate issued on
7  behalf of Bloom Energy Corporation to Archipel
8  Capital.
9      Q. Is that to Archipel Capital-Bloom Energy
10 LP?
11     A. Sorry.
12        To Archipel Capital-Bloom Energy LP.
13     Q. And it is for 30,000 shares?
14     A. Correct, yes.
15     Q. And it is dated November 16, 2012 at the
16 bottom just above the center?
17     A. Yes.
18     Q. Does this document, Exhibit 12, reflect a
19 purchase of Bloom Energy Corp. common stock?
20     A. Yes.
21     Q. Do you know who you purchased this 30,000
22 set of shares from?
23     A. This block? I don't. I am sorry --
24 well, yeah. Bloom Energy. Does that answer your
25 question?

43  (Pages 169 to 172)

Gregory Gray, Jr.                                                    2/24/2015

Page 173

1    Q.   Was it purchased from Bloom Energy the
2  corporation?
3    A.   Yes.
4    Q.   So Archipel Capital-Bloom Energy LP
5  received about 30,000 shares of common stock on or
6  about November 16th, 2012; is that right?
7    A.   Yes.
8    Q.   If you go become to Exhibit No. 11, if you
9  look at the page that is Bates stamped ARCHIPEL
10  00808 --
11    A.   Okay.
12    Q.   So on this page there is a yellow
13  highlighting title that says Bloom 2.  Under that it
14  says 3,160,566.25 raise.  What is that?
15    A.   That is the amount of money we raised
16  from investors to invest in Bloom Energy.
17    Q.   Then under that is negative 2,844,300,
18  wire 149,700 shares.  What is that?
19    A.   That would be the amount, the cost,
20  associated with the shares purchased.
21    Q.   Sorry.  That means Bloom Energy LP paid
22  this amount, the 2.8 million, to purchase this many
23  shares, 149,700 shares?
24    A.   I believe that is accurate, yes.  I would
25  want to check the spreadsheet on this.

Page 174

1  BY MR. RAWLINGS:
2    Q.   This says Bloom 2, but just pointing to
3  the page ARCHIPEL 807, that is the sum for what looks
4  to be three separate offerings of Bloom Energy; is
5  that correct?  Do you see there is one group of
6  investors that are 1.5 million --
7    A.   That is just broken down by year so I
8  believe the top investors would have been when we
9  started the investment, would be 2012.  The next
10  group would be 2013, would be 520,000, et cetera.
11  2014 would have been the last tranche.
12    Q.   When you say Bloom 2, is there a Bloom 1
13  or --
14    A.   I don't know why it says Bloom 2, to be
15  honest.  I don't know that.
16    Q.   So the investor that you mentioned just
17  recently -- I might get his name wrong so I am not
18  going to say it --
19    A.   Huang.
20    Q.   Huang.  He is not on here because as of
21  the time you made this sheet he wasn't -- his purchase
22  wasn't firm, right?
23    A.   Yes.
24  BY MS. KIM:
25    Q.   Just for timing purposes, I believe this

Page 175

1  was produced to us towards the end of December of las
2  year, 2014, so this would have been -- the investor
3  information on the second page would have been
4  up-to-date as of the date of production; is that
5  right?
6    A.   I believe so.  I am not sure what you are
7  getting at, but I believe so.
8    Q.   I am just trying to get a sense of is this
9  a list you created in 2009?
10    A.   No.  The investors that you see on
11  page -- the investors you see for Bloom Energy on
12  page 0800807, all the investors were up to date when
13  we produced it for you.
14  BY MR. RAWLINGS:
15    Q.   Aside from Mr. Huang, were there others
16  for Bloom Energy?
17    A.   In 2015?
18    Q.   Yes.
19    A.   No.
20  BY MS. KIM:
21    Q.   If you go back to page 808, there is a
22  line that says cash, $237.20 MTB.  What does that
23  mean?
24    A.   After all the transactions closed, it
25  would be approximately $237.20 in M&T Bank.

Page 176

1    Q.   So MTB is M&T Bank?
2    A.   MTB is their ticker symbol so I just use
3  MTB.
4    Q.   And then there is a list of expenses here.
5  There is $74,013.94 that goes to legal.  Is that Nixon
6  Peabody?
7    A.   Yes.
8    Q.   And 9,000 for Freed Maxick, that is for
9  accounting?
10    A.   Yes.
11    Q.   What is CT Corp.?
12    A.   So we register -- Archipel Capital-Bloom
13  Energy registers all of its limited partnerships or
14  partnerships in the State of Delaware, and we get an
15  annual filing fee and tax notice to file in that
16  particular state so even though it says CT, that is
17  the name of the actual corporation, but it is
18  actually a Delaware tax and filing fee, if you will.
19    Q.   And then there is an entry for acquisition
20  costs, five entries under that totaling $158,000.74
21    A.   That is cumulative of the legal, the
22  accounting, the taxes and the acquisition cost.  The
23  total fee is 158.  Not just the acquisition costs.
24    Q.   What are the acquisition costs, then?
25    A.   So we would use a third party

44  (Pages 173 to 176)

Gregory Gray, Jr.                                            2/24/2015

Page 177

1   intermediary to help us facilitate the transaction to
2   meet our criteria.
3      Q.  Who was the third party?
4      A.  We have a variety of them. Gentry
5   Financial, Oceanic Ventures, Micro Ventures, Shares
6   Post.
7   BY MR. RAWLINGS:
8      Q.  Is this their commission for brokering the
9   transaction?
10     A.  Yes.
11     Q.  Just getting back to Hane's question about
12   the number of shares and the amount 2.8, I will
13   represent to you that if you take 2,844,300 divided by
14   the number of shares, it comes out to be about $19 per
15   share.
16     A.  Correct.
17     Q.  When we were talking before about what the
18   anticipated carry might be on Bloom Energies, do you
19   have any idea what Bloom Energies stock would be
20   trading at now? In other words, if this is -- let's
21   call 19 your basis, the average purchase price. Do
22   you have any idea what Bloom Energies is trading at
23   now?
24     A.  Bloom Energy just raised $160 million in
25   December 2014 at 26.53 so they are going to file -- I

Page 178

1   guess I can tell you. If I can't tell you, I can't
2   tell anybody.
3      Q.  Our investigations are confidential.
4      A.  They will be filing their S-1 in Q3 of
5   this year.
6   BY MS. KIM:
7      Q.  You said there is one investor, the
8   Chinese investor who has been putting in money, in
9   2015 investing in Bloom Energy LP. Have there been
10   any additional purchases of Bloom Energy Corporation
11   shares by Bloom Energy LP in 2015?
12     A.  We are about to. We want to wait until
13   March.
14     Q.  How many shares will that be?
15     A.  Ballpark? 50,000.
16        I am assuming we are going to go on to
17   the next investment, but before we do that, can we
18   take a break?
19        VIDEOGRAPHER: We are now off the record.
20   The time on the video monitor is 3:39 p.m.
21        (A recess was taken.)
22        VIDEOGRAPHER: We are now on the record.
23   The time on the video monitor is 3:52 p.m.
24     Q.  So the next Archipel Capital offering that
25   I would like to ask you about is Lineagen LP.

Page 179

1     A.  Okay.
2     Q.  What does Lineagen LP invest in?
3     A.  We invest in the overall company called
4   Lineagen.
5     Q.  I think you said earlier something in the
6   neighborhood of a dollar per share?
7     A.  Lineagen stock is a dollar per share,
8   yes.
9     Q.  If you are looking at Exhibit 11, which is
10   the spreadsheet that we had spoken about earlier, the
11   first page has a list of the Lineagen LP investors; is
12   that correct?
13     A.  Yes.
14     Q.  And is this spreadsheet up to date?
15     A.  Yes.
16     Q.  The second page, similar to what there was
17   with Bloom Energy LP, a page with some numbers and the
18   title is Lineagen; is that right?
19     A.  Yes.
20     Q.  And the Bates number is, for the record,
21   00806. What is -- does 1,888,876.91 raised mean that
22   that is how much money you have received from
23   investors?
24     A.  Yes.
25     Q.  And by "you" I mean Lineagen LP has

Page 180

1   received from investors?
2     A.  Yes.
3     Q.  What does $1,700,000 wire mean?
4     A.  That is the amount we invested or sent
5   Lineagen, the company.
6     Q.  MTB is the fifth line down on this page.
7   Is that also M&T Bank?
8     A.  Yes.
9     Q.  And it says negative $44,143.85. What
10   does that mean?
11     A.  Well, it is just accounting. So it is
12   actually the other way around. So we raised 1.8 and
13   we sent 1.7, our fee, our fee, so on and so forth.
14     Q.  When you say "our fee, our fee" do you
15   mean you have a management fee and then the
16   partnership expenses?
17     A.  Should be the other way around, meaning
18   that we raised should be the negative, and everything
19   else should be the positives, and it shows the
20   positives, but this one we did the other way around.
21   Sorry.
22        Does that make sense? Do you want me to
23   clarify?
24        So if you take the $1,700,000 and you add
25   the 94,000, you have 1.794. Then you add that 50 on

45 (Pages 177 to 180)

Gregory Gray, Jr.                                    2/24/2015

Page 181

1  top of it and then the cash balance. That is going
2  to come out to 1.88 -- eight seventy six ninety one
3  so in reality if you take the negative sign where it
4  says raise and keep everything else in the positive
5  side, I just -- that one we did it reversed. We did
6  it the true accounting way.
7       Q.  And then under expenses there is an entry
8  for Mark Smith, $5,400. I know earlier you testified
9  that Lineagen the company paid you -- paid Lineagen
10  Limited Partnership who then paid Mark Smith?
11      A.  Correct.
12      Q.  So how come this $5,400 is an expense
13  here?
14      A.  This is the one that hasn't got
15  reimbursed yet so that has not been updated and
16  corrected.
17      Q.  What does Howlett dinner Commission $3,000
18  mean?
19      A.  It is just Howlett dinner. Forget the
20  commission. It's just Howlett dinner.
21           Michael Howlett is the former secretary,
22  ministry secretary in the Province of Ontario. He is
23  a very -- probably the most respected person when it
24  comes to developmental delay in all of Ontario. He
25  was helping Lineagen build -- get these appropriate

Page 182

1  government funding to build a lab in the province of
2  Ontario.
3           We sponsored a dinner for his
4  developmental delay charity event that Lineagen
5  partook in; got the name in the brochure, had a table
6  with our name on it, so it is a way we could give
7  back to him for everything he did for us.
8       Q.  When you say "we sponsored," you mean
9  Lineagen LP sponsored?
10      A.  Yes.
11      Q.  I believe you said this partnership closed
12  in December 2014?
13      A.  Yes.
14      Q.  Have there been any additional expenses
15  since that time?
16      A.  There will be, meaning we obviously will
17  have accounting expenses for 2014 incurred in 2015.
18           Just some record keeping, miscellaneous
19  Mark Smith payments were still in there for January
20  and February, which got evened out now.
21           Other than that, I don't believe any
22  other expenses, to my knowledge.
23      Q.  For Bloom Energy company, you said there
24  has been a different raise, and that was done at $26
25  and some change?

Page 183

1       A.  Nothing to do with us.
2       Q.  Just out there in the news?
3       A.  Yes.
4       Q.  Has there been anything similar with
5  Lineagen where the company has been valued?
6       A.  Well, they just closed on $13.3 million
7  so they did a press release, but they just closed on
8  this investment six weeks ago so the company won't be
9  revalued in a sense until either, A, there is an M&A,
10  merger and acquisition, we get acquired by somebody,
11  or, B, we do another round of financing, or, C, we do
12  an IPO.
13      Q.  When you say "we," you mean Lineagen the
14  company?
15      A.  Yes.
16           MR. LAWRENCE: Just to add context to that
17  for a second, do you actively get involved with
18  working with Lineagen on its business model and
19  executing on its business plan?
20           THE WITNESS: 100 percent, yes.
21           MR. LAWRENCE: What percent of your time
22  do you spend on activities relating to the companies
23  that your LPs are invested in?
24           THE WITNESS: Versus fund raising for new
25  opportunities?

Page 184

1           MR. LAWRENCE: Right.
2           THE WITNESS: That's a good question. I
3  would probably say 60 percent of my time is dedicated
4  towards keeping tabs on existing portfolio
5  opportunities, and 20 percent of my time is spent fund
6  raising, 20 percent of my time is other stuff.
7           MR. LAWRENCE: So one of the values that
8  you bring to the LPs is you actually work with and for
9  the portfolio companies?
10           THE WITNESS: Yes. For example, Lineagen
11  LP, as I mentioned earlier, we won Start-Up New York,
12  which gives the company ten years tax free in the
13  State of New York. We have a partnership with
14  Columbia University here in the city to actually
15  handle all of our genetic tests for autism, and then
16  we won them $250,000 in free grants to hire employees
17  for the State of New York as well.
18           So this is one of our business models
19  similar to Everloop but a success story that we get
20  actively involved in, utilize our relationships with
21  the company and drive the valuation of the company.
22      Q.  So Everloop was like that, Lineagen
23  Incorporated is like that, and was there another one
24  that is similar to that model?
25      A.  Yeah. I snicker because it was supposed

46 (Pages 181 to 184)

Gregory Gray, Jr.                                          2/24/2015

Page 185

1   to be Just Be Friends, but for reasons we don't need
2   to get into right now -- it is not relevant.
3       Q.   For the Late Stage Fund LP investment,
4   what does that partnership invest in?
5       A.   Has a wide range of opportunities. It is
6   really transitioned over a period of time. Our
7   original intent was to get an allocation in Uber
8   shares, but the criteria gives us a flexibility to
9   invest in Lineagen, Uber, DropBox -- I am drawing
10  blanks on companies now -- the card that you swipe,
11  plug in your card and swipe it -- it is about seven
12  or eight different companies that it gives us the
13  opportunity to invest in.
14      Q.   Was that Sellpointe?
15      A.   That was is not Sellpointe. It was
16  Square. Sorry. So Square, and then once we reupdate
17  our documents here with our new counsel, we will be
18  adding to that list and having our clients sign
19  addendums to what we are about to do.
20           (Email dated August 8, 2014 marked
21  Exhibit 13.)
22           (Spreadsheet marked Exhibit 14.)
23      Q.   I have asked the court reporter to mark
24  Exhibit NY-9143 Exhibit 13. This is an email from you
25  to John Hall dated August 8, 2014, Bates stamped

Page 186

1   ARCHIPEL 010010 through 13.
2            I have also asked the court reporter to
3   mark as Exhibit 14 a document that is a place holder
4   image on top, which indicates that the document was
5   produced in native, and then I am going to represent
6   that this is a printout of the spreadsheet that was
7   produced in native, and the Bates number for that is
8   ARCHIPEL 002092.
9            Start withing Exhibit 13, what is this
10  email?
11      A.   This is an email from myself to John
12  Hall.
13      Q.   Who is John Hall?
14      A.   John Hall is Bill McEssy's CFO. He also
15  was an investor in Archipel Capital-Social Media
16  Fund, and he also an investor in Archipel
17  Capital-Lineagen LP.
18      Q.   If you see, the attachment to this
19  document is Bates ranged ARCHIPEL 010011 through 13.
20  Does this -- it looks like these are signature pages
21  for a stock transfer agreement?
22      A.   Yes.
23      Q.   Did Late Stage Fund LP purchase 175,438
24  shares of common stock of Uber from Thinh Pho,
25  T-H-I-N-H P-H-O?

Page 187

1       A.   No. The transaction never got done. It
2   got ROFR'd away from us.
3       Q.   What does that mean?
4       A.   Right of first refusal.
5       Q.   Can you explain more?
6       A.   What the right of first refusal is? A
7   right of first refusal is we entered into a
8   transaction to get the transaction done for the
9   client, and the company wouldn't allow it to go
10  through.
11      Q.   These are the execution pages of a stock
12  transfer agreement; is that right?
13      A.   Correct, yes.
14      Q.   And if you look at the third page, it is
15  also signed by the company?
16      A.   It looks so, yes.
17      Q.   Did Mr. Hall ask for this attachment?
18  Like why were you sending that to Mr. Hall?
19      A.   Originally we intended to give him an
20  allocation -- we intended to give Mr. McEssy an
21  allocation of Uber. Now we are going to be moving
22  that allocation into Lyft. You cannot be an investor
23  into both so we are moving my allocation into Lyft,
24  which is a competitor of Uber.
25      Q.   L-Y-F-T?

Page 188

1       A.   Like the competitor -- yeah, L-Y-F-T.
2   Sorry.
3       Q.   I think you previously mentioned for Late
4   Stage Fund there would be DropBox, Uber --
5       A.   There will be an addendum. As I
6   mentioned, once we have new counsel in place, either
7   Vedder & Price and/or Barnes & Thornberg
8   this week, we will be sending out an addendum for our
9   investors to sign off on.
10           Actually, Spotify may have been in the
11  late stage docs as well. We are making an investment
12  in Spotify as well. I believe Spotify was, but I
13  can't be certain for sure.
14  BY MR. RAWLINGS:
15      Q.   How does the right of first refusal impact
16  the stock transfer agreement?
17      A.   It doesn't go through.
18      Q.   Is that something that -- I just didn't
19  see anything in here that sort of refers to a right of
20  first refusal.
21      A.   Uber is very, very tricky. What I mean
22  by that is -- and I may get this backwards, so I
23  apologize in advance. It is one of two ways.
24           Uber is called -- I want to get this
25  right. Uber was originally called Uber Technologies,

47  (Pages 185 to 188)

Gregory Gray, Jr.                                              2/24/2015

Page 189

1  and there are a series of investors in Uber
2  Technologies that had the ability to transfer their
3  shares. The new name of the company might just be
4  Uber Inc.
5      Q.  We are talking about the card service?
6      A.  Yes.
7      Q.  I want to make sure we are talking about
8  the same thing.
9      A.  Uber Inc. does not allow the ability to
10  transfer shares.
11         So Uber Technologies was created
12  2010'ish. 2012, they rolled over Uber Technologies
13  into Uber Inc. The investors in Uber Technologies
14  had the ability to transfer shares, small
15  conglomerate of investors. Those are the investor
16  shares we intended to purchase our shares from.
17      Q.  Sorry. What was the time? When did Uber
18  Technologies become Uber Inc.?
19      A.  I believe 2012, but I want to double
20  check.
21         At that point in time we tried many
22  different ways to try to get access to Uber shares at
23  a valuation all over the place.
24         Originally we discussed valuation around
25  six, seven -- call it seven. Now Uber is at

Page 190

1  $44 billion so it has gone through the roof.
2         Uber Inc., if I don't have this
3  backwards, is not allowing any transactions to go
4  through, and they buy out -- they go through the
5  process, try to go through the process, and then they
6  actually buy out their investors, if you will --
7  their employees.
8         Unlike Bloom Energy where we have
9  employees selling their stock to us, we have never
10  had our shares ROFR'd away from Bloom or Twitter, for
11  example. Uber, this transaction, got ROFR'd.
12      Q.  What was the last word?
13      A.  Right of first refusal.
14      Q.  So that is short for right of first
15  refusal away?
16      A.  So the shares got ROFR'd away.
17      Q.  When did that happen, approximately? It
18  doesn't have to be exact.
19      A.  October'ish, November'ish.
20      Q.  At the time when you are sending that to
21  Mr. Gray in -- sorry. At the time you are sending
22  this to Mr. Hall in 2014, was it your understanding
23  that you had entered into a stock transfer agreement
24  to get Uber shares?
25      A.  Yes.

Page 191

1      Q.  And the understanding was -- you are
2  sending this on August 08, but it is dated July 7th,
3  July 7th, 2014?
4      A.  Yes.
5      Q.  So the second page, that is your signature
6  there, right?
7      A.  Correct.
8      Q.  From Archipel Capital-Late Stage Fund. On
9  July 7th, 2014 you had entered into a transaction with
10  whoever the seller is to purchase 175,438 shares of
11  common stock on that date, right?
12      A.  Yes.
13      Q.  And seller, I guess, Thinh Pho, do you
14  know who that is?
15      A.  No.
16      Q.  But then -- so from your state of mind
17  when you sent that to Mr. Hall, you thought the
18  subject matter is executed -- you thought you had a
19  sale of shares, correct?
20      A.  Yes.
21      Q.  But then later on Uber comes in over the
22  top and says "Well, whatever price you are willing to
23  pay, we are going to pay more than that and we're
24  taking those shares"?
25      A.  Actually, believe it or not, it is the

Page 192

1  other way around.
2      Q.  How -- what way is it?
3      A.  Uber is buying the shares from their
4  employees at 10 billion valuation.
5      Q.  At $10 billion?
6      A.  Valuation, and we were getting shares --
7  we were willing to pay the seller more than that so
8  Uber is actually, in my opinion, doing their
9  employees a disjustice and service, but that's just
10  me.
11         So that is Uber basically using their war
12  chest, if you will, to their advantage.
13      Q.  Got it.
14      A.  But they have executed a great business
15  model so good for them.
16  BY MS. KIM:
17      Q.  And then if you turn to Exhibit 14, this
18  is -- looks like a similar spreadsheet to the earlier
19  one I showed you for Bloom, Lineagen and Agrivida, the
20  entities, the Archipel Capital entities, Exhibit 11.
21  Is this a list of the investors in Late Stage Fund?
22      A.  Yes.
23      Q.  If you turn to the first page -- sorry --
24  the second page, so not the place holder page but the
25  first page of the spreadsheet, this has a title that

48  (Pages 189 to 192)

Gregory Gray, Jr.                                        2/24/2015

## Page 193

```
1   says LSF.  Does that mean Late Stage Fund?
2       A.   Yes.
3       Q.   And this provides some numbers and it
4   looks similar to what we saw for Bloom Energy LP and
5   Lineagen LP, right?
6       A.   Yes.
7       Q.   So the $6,020,640 raised, is that how much
8   Late Stage Fund LP has raised from investors?
9       A.   Yes.
10      Q.   Have there been any additional investors
11  since this list was created?
12      A.   No.
13      Q.   And then the second line says negative
14  $5 million wire.  What does that mean?
15      A.   Those are investments we funded.
16      Q.   Where did they go?
17      A.   Bloom, Lyft, Spotify.
18      Q.   So you have already funded investments
19  into Bloom Corporation -- Bloom Energy Corporation,
20  Lyft the company and Spotify the company?
21      A.   Or entities that hold those investments.
22      Q.   What does that mean?
23      A.   So when we did Bloom Energy, we looked at
24  that -- you asked me about the acquisition cost on
25  Bloom, and you asked me who got those moneys.  Those
```

## Page 194

```
1   are investments we made with our partner -- what we
2   consider our partners so they would have an entity
3   that had already established an investment into Lyft,
4   for example, so we would invest directly into them as
5   they have invested directly into us in the past.
6   BY MR. RAWLINGS:
7       Q.   What entities were those again?  Were
8   those were the entities you listed on the -- so what
9   sort of entities would it be that you hold, for
10  example, Spotify shares through?
11      A.   The name of it?
12      Q.   Yes.
13      A.   That would be Gentry Financial something.
14  Lyft was Oceanic Ventures Series I or something.
15      Q.   So it is Gentry Financial fund, and does
16  that fund own Spotify and other stocks or just solely
17  dedicated to Spotify?
18      A.   That Gentry and Oceanic have special
19  purpose entities solely for -- Gentry is for Spotify,
20  Oceanic is for Lyft.
21      Q.   Got it.
22      A.   And we will be doing a much larger
23  investment in Lyft here shortly.
24  BY MS. KIM:
25      Q.   You said you were planning on the Late
```

## Page 195

```
1   Stage Fund LP would be updating the private placement
2   memorandum.
3       A.   Yes.
4       Q.   To account for some of these other
5   companies?
6       A.   Yes.
7       Q.   Why wasn't the private placement
8   memorandum updated before you invested?
9       A.   Time constraints.  I have emails from
10  every investor about what our intentions are, and
11  just because at the end of the day we are up against
12  the clock to get these transactions closed and so
13  please send me an email you are okay with this
14  allocation.  Everyone is okay with the allocation.
15  BY MR. RAWLINGS:
16      Q.   The investors you are referring to are the
17  ones on the second page?
18      A.   Yes.
19      Q.   Andrew Ciccone and Beverly Ciccone.
20  BY MS. KIM:
21      Q.   What is Cellar Door investment?
22      A.   They are an investment arm out of Utah.
23  I don't know what city.  Sorry.  My brain is getting
24  fried.  They are out of Utah.
25      Q.   And the investors for Late Stage Fund
```

## Page 196

```
1   other than Mr. McEssy, they haven't invested with
2   Archipel Capital before?
3       A.   Correct.
4       Q.   And how did you -- how did you get in
5   touch with them?
6       A.   So Sellpointe you mentioned earlier, the
7   CEO of Sellpointe is a gentleman named Brian O'Keefe.
8   Brian and I have worked together for 10 years.  He
9   was a former investment banker with me at Advanced
10  Equities.  He was then an investment banker at a
11  company called Pharus, P-H-A-R-U-S, Advisors who
12  helped us secure shares in Twitter, and then he took
13  over his CEO position of Sellpointe.
14          Brian O'Keefe's cousin is a gentleman
15  named Sean Thomas who runs Cellar Door Investments.
16  From there Cellar Door Investments had their own LLC
17  to invest in our deal flow, had a few people wanted
18  to invest directly, and then from there we had
19  referrals from those investors as well.
20      Q.   Is Cellar Door Investment a -- were they
21  paid to refer people?
22      A.   They have not been paid as of yet, no.
23      Q.   Is the idea that they will be paid
24  eventually?
25      A.   We are in discussions with it.
```

49  (Pages 193 to 196)

Gregory Gray, Jr.                                              2/24/2015

Page 197

1    Q.   And Brian O'Keefe is on your advisory
2  board, right?
3    A.   Yes. That we will be updating in 2015
4  too. He is the CEO of a company now that is making
5  it a little conflicting him because now he is
6  going to be going public, so we will be updating when
7  we are allowed to update. I don't know what the
8  proper term is. But in the next month we will be
9  updating that just to give him greater flexibility,
10  if you will, with you guys when he files his S-1.
11    Q.   Updating what?
12    A.   We will be removing Brian from our
13  advisory board so he doesn't have to disclose it when
14  he files to the public.
15  BY MR. RAWLINGS:
16    Q.   Before Hane moves on to the next topic, I
17  just wanted to ask sort of a sweep-up topic that deals
18  with a topic two topics again.
19        We talked about discussions you had with
20  Nixon Peabody related to your disciplinary history.
21        Hilary DeCesare asked you about your
22  disciplinary history. Were there any conversations
23  with Bloom Energies or any executives at Bloom
24  Energies about your disciplinary history, prior
25  disciplinary history?

Page 198

1    A.   The answer is no. I don't know any
2  executives at Bloom Energy.
3        Again, breaking down our business model
4  into two, I believe we were actively involved in,
5  helped that company, got intimately involved -- not
6  intimately -- we got involved with the company and
7  helped use our -- used our relationships to drive
8  that company. Same thing on Lineagen.
9        So Hilary DeCesare is aware, was aware of
10  my past issues with the SEC, and Dr. Michael Paul,
11  the CEO of Lineagen, is also aware, as is the board
12  of Lineagen.
13        The other companies such as Twitter, I
14  don't know Dick Costello from Adam. I don't,
15  obviously, so I can't call him on the phone and just
16  say "Hey, we are investing in your company. Do you
17  know about my past?"
18        That was we used our relationships to get
19  access to those companies.
20        Same thing with Bloom, so on and so
21  forth.
22    Q.   What I want to get, how about -- so if I
23  were to ask you do you recall any conversations with
24  people from other -- well, Lineagen you said knew
25  about your disciplinary history. Do you know, were

Page 199

1  there conversations about your disciplinary history in
2  which Nixon Peabody was a party where they knew that
3  Lineagen knew about your disciplinary history?
4    A.   Let me just make sure I -- were there
5  conversations I had with Lineagen that Nixon Peabody
6  knew about that I disclosed my sanctions to them?
7    Q.   Um hum.
8    A.   I don't believe so, no.
9    Q.   Also, I just want to -- did Nixon Peabody
10  also help you negotiate sale purchases? In other
11  words, Nixon Peabody has been putting PPM documents
12  together. When you would then go like Hane showed
13  you, the Bloomberg -- not the Bloomberg -- the Bloom
14  stock certificate, did Nixon help you in those
15  transactions to sort of acquire those shares?
16    A.   So I think this answers your question.
17  They didn't help us find a buyer -- sorry -- find a
18  seller so when we closed with Bloom Energy, Twitter,
19  whatever the case may be, there is -- I am going to
20  use an example. Bloom's Energy's counsel is Fenwick
21  & West, large law firm in California.
22        Nixon Peabody is on our side.
23        Sometimes the seller has counsel,
24  sometimes they don't.
25        And there is a similar typical business

Page 200

1  stock transfer agreement. "Hey, you are buying.
2  Here are these shares, this price," so on and so
3  forth.
4        Nixon Peabody would read those documents
5  and "They are okay. We don't have an issue with
6  them."
7        If that is what you mean by -- does that
8  answer your question? So they were at the closing
9  table with us to close the transaction, if you will.
10    Q.   Right. So they were your counsel to help
11  you acquire shares of the companies when you would go
12  out and get them, correct?
13    A.   Correct, yes.
14    Q.   For example, the Social Media Fund when
15  you are out buying shares of Twitter, did you use
16  Nixon Peabody to help you buy the shares of Twitter?
17    A.   Yes.
18    Q.   Did any purchasers or sellers of shares to
19  you ever reference your disciplinary history at all?
20    A.   Not that I am aware. I don't recall.
21    Q.   You used this other counsel for the
22  Agrivida LLC. Say when you were working on a
23  particular offering like Bloom and Nixon is helping
24  you get the shares of Bloom, was there any other law
25  firms that you might use to help acquire shares of

50 (Pages 197 to 200)

Gregory Gray, Jr.                                               2/24/2015

**Page 201**

1  Bloom, or it would always be Nixon?
2      A.  For Bloom it would always be Nixon.
3      Q.  What about say the Social Media Fund; was
4  it always Nixon helping you get the Twitter shares?
5      A.  Yes.  Twitter had, call it what you want,
6  they had a -- Twitter took a fee to do a share
7  transfer so there were fees we had to pay.  Sometimes
8  certain agreements asked for us to pay the seller's
9  counsel, like Holland & Knight for example, was a law
10  firm.  So we would have to -- in order to get the
11  Twitter shares, we would agree to pay the seller's
12  counsel's fees in the transaction.
13          Twitter had an administrative fee, if you
14  will, to change the stock from seller's name to our
15  name for, I think it is, $5,000; might have been 15.
16  I don't remember, to be honest with you.
17          Does that answer -- is that what you are
18  looking for?
19      Q.  I guess.  I guess what I am looking for is
20  so those transactions required legal representation in
21  some instances, but it would always be Nixon who did
22  it?
23      A.  On our side, yes.
24      Q.  On your side, right.  Would Nixon have any
25  reason to think you had some other law firm working on

**Page 202**

1  those transactions?
2      A.  Not to my knowledge, no.
3      Q.  Okay.
4  BY MS. KIM:
5      Q.  And for the Agrivida transaction, was it
6  Green & Seifter that represented you on that
7  transaction?
8      A.  On the Agrivida closing?  Yes.
9      Q.  So the closing like where Agrivida LLC
10  purchased from Agrivida Incorporated?
11      A.  So Agrivida was different in a sense that
12  was a true round of financing so Twitter, Bloom, Lyft
13  in its current state, Spotify in its current state
14  are all secondary transactions.
15          The firm, as I mentioned earlier, Bloom
16  is in a $160 million raise.  That is a true raise, so
17  Agrivida when we invested in them was actually doing
18  a true round of financing so we participated in that
19  preferred round of financing so we had pref shares of
20  Agrivida.
21          At that point in time we were working
22  directly with their lead venture capital firms and
23  the company itself to issue us our stock.
24          MS. KIM:  Mark this one.
25          (Agrivida stock certificate marked

**Page 203**

1  Exhibit 15.)
2      Q.  I am showing you what the court reporter
3  has marked as NY-9143 Exhibit 15, Bates stamped
4  ARCHIPEL 01103 through 104.  Do you recognize this
5  document?
6      A.  Yes.
7      Q.  This reflects that Archipel
8  Capital-Agrivida LLC owns 105,853 shares of Series B
9  Plus preferred stock of Agrivida Inc.; is that
10  correct?
11      A.  Yes.
12      Q.  And this certificate is dated June 27th,
13  2012?
14      A.  Yes.
15      Q.  So on or about that time the Agrivida LLC
16  owned these shares?
17      A.  Yes.
18  BY MR. RAWLINGS:
19      Q.  Agrivida is another one of those companies
20  that hasn't had a liquidity event?
21      A.  Yes.
22      Q.  Do you know what the Agrivida shares
23  are -- do you know what they are trading at now?
24      A.  They are actively involved in a financing
25  as we speak.  The lead VC -- I can't remember the

**Page 204**

1  name of them -- anyway, they have not put a value.
2  They are going to the marketplace right now.
3      Q.  Got it.
4      A.  I can tell you -- I can't see if that is
5  B or B plus, whatever round.
6          So when we invested, we invested at a
7  pre-money valuation of about $47 million.  There was
8  a round after our round which was then at
9  $74 million, and then this round is going to be a
10  down round.  I just don't know at what valuation.
11      Q.  Got it.
12          MR. RAWLINGS:  Off the record for one
13  minute.
14          VIDEOGRAPHER:  We are now off the record.
15  The time on the video monitor is 4:29 p.m.
16          (Discussion off the record.)
17          VIDEOGRAPHER:  We are now on the record.
18  The time on the video monitor is 4:31 p.m.
19  BY MR. SUTHAMMANONT:
20      Q.  I am going to ask you some questions about
21  Everloop.  You mentioned earlier in your testimony
22  investor presentations with Hilary DeCesare and I
23  think Anthony Russo and --
24      A.  Andrew.
25      Q.  Andy.  Sorry.  Thank you.

51  (Pages 201 to 204)

Gregory Gray, Jr.                                          2/24/2015

Page 205

1     Generally, who was at those presentations
2  in terms of pitching the investors?
3     A.  On our side or --
4     Q.  On your side.
5     A.  Usually it would be in Syracuse it would
6  be Andrew Russo, Ryan McMahon, Devin Stelljes and
7  myself.
8     Q.  And I think you mentioned earlier that Ms.
9  DeCesare did most of the talking at those
10  presentations?
11     A.  Yes.
12     Q.  And before she would make those
13  presentations, would she discuss with you what she was
14  going to say or how she was going to pitch the
15  investment into the company?
16     A.  Hilary is a very independent woman,
17  smart, sophisticated, articulate.  She had her own
18  agenda.
19     Q.  How did you meet Ms. DeCesare?
20     A.  Actually, my chairman Greg Edwards saw
21  her present in Silicon Valley approximately February
22  2011, pulled her aside, said "I love what you are
23  doing about the company.  I want to personally invest
24  in your seed round," which he did, "and I would like
25  to talk to you about taking an investment from" -- he

Page 206

1  said Archipel Capital, but, you know (inaudible).
2     MR. SUTHAMMANONT:  I want to mark an
3  exhibit here.  What are up to?  16.
4     (Email dated April 25, 2011 marked
5  Exhibit 16.)
6     Q.  While you are reviewing, I will describe
7  it for the record.  It's an email from Greg
8  Edwards, an email chain, the last of which is an email
9  from Greg Edwards to Hilary DeCesare and someone named
10  Bill Mac on April 25, 2011, and the Bates number is
11  ARCHIPEL 025727.
12     We have this from your production.  Do
13  you recall receiving this email in some fashion
14  before?
15     A.  Yes.
16     Q.  Who is Bill Mac?
17     A.  A gentleman named Bill Thompson.  I don't
18  know why he goes by Bill Mac, but it is Bill
19  Thompson, He -- Bill Thompson.
20     Q.  What was Bill Thompson's relation to
21  Everloop?
22     A.  Bill Thompson was supposed to be the lead
23  investor or bring together monies to be the lead
24  investor in Everloop once we came into play.
25     Q.  I am going to show you another exhibit

Page 207

1  here, a document we can mark.
2     (Email dated July 21, 2011 marked
3  Exhibit 17.)
4     Q.  While you are reviewing that document, I
5  will describe it for the record.  It is an email from
6  you to Bill Schrimpf on July 21st, 2011.  The Bates
7  number is ARCHIPEL 009142.  Do you recognize this
8  email?
9     A.  I do, yes.
10     Q.  And on this email it describes Bill
11  Thompson as the president of I-SAFE.  Was he the
12  president of i-SAFE?
13     Withdrawn.  Let me ask you this question.
14  How did you learn the information that you put here
15  next to Bill Thompson's name?
16     A.  We received this information from Hillary
17  DeCesare.
18     Q.  And how did you receive this information
19  from her?
20     A.  In our discussions before we made an
21  investment into Everloop, we made it clear to Hilary
22  and Everloop's board we are a co-investment firm, and
23  that Bill Thompson would put together a syndicate of
24  his own monies, and he would be on-boarding his
25  relationship with the i-SAFE school systems.

Page 208

1     Q.  It says here manager of the Walton Walmart
2  family monies.  Is that something you heard from Ms.
3  DeCesare?
4     A.  Yes.
5     Q.  Did you ever speak to Mr. Thompson?
6     A.  Yes.
7     Q.  In 2011?
8     A.  I believe Greg Edwards and I did a
9  conference call with Bill Thompson in 2011.
10     Q.  Is it -- would he have mentioned this as
11  well in the conference call?
12     MR. SUTHAMMANONT:  Withdrawn.
13     Q.  What was the conference call about?
14     A.  Just to get familiar with our due
15  diligence, that there are going to be other monies in
16  Everloop, and what criteria around it that we were
17  not swimming in a boat without a paddle, if you will.
18     Sorry.  I won't do that again.
19     MR. SUTHAMMANONT:  I am going to mark
20  another document.
21     (Email dated June 30, 2013 marked
22  Exhibit 18.)
23     Q.  You have been handed what has been marked
24  Exhibit 18, an email from Andrew Russo to you on
25  June 30th, 2013, and as you review it, the Bates

52 (Pages 205 to 208)

Gregory Gray, Jr.                                              2/24/2015

Page 209

1  number is ARCHIPEL 008753. Do you recognize this
2  email chain?
3      A.  I do, yes.
4      Q.  In it you discuss Mr. Thompson, correct?
5      A.  Yes.
6      Q.  Does this help refresh your recollection
7  as all in terms of what, if anything, Mr. Thompson
8  told you or promised as you mentioned down here on the
9  June 30th email at 8:00 p.m. in this email chain?
10     MR. LAWRENCE:  I'm sorry, counsel.  If I
11  could just have a minute because I have never seen
12  this.  Do you mind?
13     MR. SUTHAMMANONT:  Sure.
14     (Pause in the proceedings.)
15     A.  Can I ask a question of my counsel?  You
16  may not know the answer.
17     MR. LAWRENCE:  Does it involve
18  attorney-client privilege?
19     THE WITNESS:  No.
20     MR. LAWRENCE:  Then just answer his
21  question.
22     Sorry.  I put a halt to the proceedings.
23  Just -- sorry.
24     MR. SUTHAMMANONT:  I withdraw my question
25  for the record.

Page 210

1      Q.  In the -- there is a June 30, 8:00 p.m.
2  email from you where it says Gregory W. Gray Jr.  It
3  says "We invested because of Bill Thompson.  He
4  promised on multiple occasions as did Hilary that he
5  would invest $5 million into Everloop."
6      My question is about that statement
7  there, which is when did -- first of all, did they in
8  fact say that?
9      A.  Did Bill Thompson and Hilary say --
10     Q.  Say that Bill would invest $5 million into
11  Everloop.
12     A.  Many, many, many times.
13     Q.  Do you recall the first time he said that?
14  You could break it into each of them.
15     A.  Prior to us investing one dollar, prior
16  to Bennington Everloop Limited Partnership investing
17  one dollar into Everloop, Everloop the entity.
18     Q.  Who told you they were going to invest
19  first; was it Ms. DeCesare or Mr. Thompson?
20     A.  I can't say for certain.  I would presume
21  Ms. DeCesare, because we spoke with her daily, where
22  I believe we only had one phone call with
23  Mr. Thompson prior to --
24     Q.  Investing?
25     A.  Right.

Page 211

1      Q.  Now, the second sentence in that says that
2  he runs money for the family of Walmart and Russell
3  Simmons, and I assume that Russell Simmons means
4  Russell Simmons the celebrity?
5      A.  Yes.
6      Q.  Do you recall when he said that?
7      A.  That was Hilary DeCesare telling us that.
8      Q.  Do you recall when she told you that?
9      A.  Again, prior -- I want to say prior to us
10  investing or very close thereabouts.
11     Q.  And the last line of that same paragraph
12  says "He was the one who overhyped the i-SAFE
13  potential."
14     A.  I don't want to say the only reason, but
15  in the presentation that Hilary DeCesare gave to
16  Silicon Valley in February 2011 that Greg Edwards saw
17  in the seed round, her claim to fame in that pitch,
18  if you will, was creating a social network compliant
19  for kids, and her entrance to get many, many, many
20  users is getting school systems onboard, and that she
21  had this signed, sealed, delivered relationship with
22  i-SAFE, the school system, a nonprofit i-SAFE, to get
23  access to, I want to say, 56,000 schools.
24     So prior to us investing we had the
25  document showing the signed partnership between

Page 212

1  Everloop, i-SAFE, and we also felt comfortable
2  because Bill Thompson was, I want to say, president
3  or -- I don't recall exactly, but I want to say he
4  was the president of i-SAFE for profit or something
5  along that line that gave us comfort that if Bill
6  Thompson here that was going to be a board member --
7  I don't think he ever turned out to be a board
8  member -- with Hilary DeCesare in a signed contract
9  showing their entrance into i-SAFE for 56,000
10  schools, where I could be all the money on the table,
11  there is going to be another investor coming in to be
12  the lead with a co, which is what we do, and we felt
13  comfortable taking that leap of faith because we will
14  be the first money in, Bill Thompson is going to
15  raise money for his fund.  He's got Walmart, Russell
16  Simmons, et cetera.  They are going to close the fund
17  at the end of 2011, and then we are off to the races,
18  good to go.
19     Q.  Do you recall ever, just taking it person
20  by person, do you recall whether you yourself ever
21  passed this information about the other investors in
22  Everloop, meaning the Waltons or Russell Simmons, or
23  whoever, to investors that you were bringing in?
24     A.  Did I?
25     Q.  Correct.

53 (Pages 209 to 212)

Gregory Gray, Jr.                                    2/24/2015

Page 213

1    A.   I don't believe I ever did.

2    Q.   Do you know if Devin Steltjes ever did?

3    A.   I believe Devin has, yes.

4    Q.   Why do you believe that?

5    A.   When Andy Russo was the CFO of Everloop

6    when this was written, and a period when Everloop

7    started going south, so right around here, there was

8    a big battle now between Hilary DeCesare and Andrew

9    Russo.

10        Andrew Russo produced a doc -- produced a

11   document to me saying "Hey, have you seen this

12   document?"

13        And I don't remember seeing the document.

14   He said "But Devin produced it."

15        I said "Well, I wouldn't say that

16   either."

17        Then it turns out that supposedly,

18   allegedly, Hilary DeCesare called me -- again, we

19   were not on talking terms at this point in time

20   between Hilary and I -- Hilary called me and said

21   "Andy Russo is changing documents within our Dropbox

22   criteria to reflect improper dealings."

23        So at the end of the day, I don't know

24   if -- I know the document you are referring to. Andy

25   Russo brought it to my attention in '13. I told him

Page 214

1    I have never seen it. Devin said he didn't produce

2    it.

3        All I know is that Hilary claimed that

4    Andy was changing files that only had access in the

5    Everloop hard drive iCloud, if you will, for

6    Everloop.

7    Q.   During the investor presentations -- so

8    now I asked you about you, Mr. Steltjes -- did Ms.

9    DeCesare ever mention any of these facts to the

10   investors during the presentations?

11   A.   I-SAFE?

12   Q.   Not i-SAFE, the other co-investors; for

13   example the Walton family, Russell Simmons.

14   A.   Well, the Walton family would have came

15   in through Bill Thompson, so she would always refer

16   to Bill Thompson, which was Predictive Edge -- so

17   Bill Thompson ran a firm called Predictive Edge.

18   Predictive Edge was always in Hilary's presentations

19   as the other investor.

20   Q.   I see. Okay.

21   A.   So those would be his limited -- I'm

22   sorry to interrupt you -- Russell Simmons and the

23   Waltons would be limited partners in Predictive Edge,

24   so we thought.

25   Q.   There came a time, correct, when there was

Page 215

1    a threatened dispute with Everloop, when Bennington

2    Everloop LLP threatened some kind of action against

3    Everloop Inc.?

4    A.   Yes.

5    Q.   How did that resolve? Without revealing

6    any kind of attorney-client privilege.

7        MR. LAWRENCE: He may also be under a

8    confidentiality agreement, because I believe there was

9    a settlement reached.

10       I have no -- probably a lot less than

11   everyone in the room about this, but I know enough to

12   know that it certainly is sensitive from a disclosure

13   perspective.

14       First off, don't convey any communications

15   that you had privately with your attorneys regarding

16   this.

17       Secondly, I think -- are you aware whether

18   there was a confidentiality agreement to the

19   settlement?

20       MR. SUTHAMMANONT: I am aware there has

21   been a position taken that it would not apply in this

22   circumstance where there is a subpoena on the table.

23       MR. LAWRENCE: So that we wouldn't have to

24   produce anymore?

25       MR. SUTHAMMANONT: That is my

Page 216

1    understanding. I myself have not seen the agreement.

2        MR. RAWLINGS: Let's go off the record.

3        VIDEOGRAPHER: We are now off the record.

4    The time on the video monitor is 4:46 p.m.

5        (Discussion off the record.)

6        VIDEOGRAPHER: We are now on the record.

7    The time on the video monitor is 4:47 p.m.

8        MR. SUTHAMMANONT: These are the same

9    document. One is printed from native.

10       (Email marked Exhibit 19.)

11       MR. SUTHAMMANONT: In order to show the

12   blank carbon copies I printed the unstapled page from

13   the native document.

14   A.   So this is the same thing?

15   Q.   Correct. It is the same email. One has

16   the attachment. One is just the face email showing

17   the blank carbon copy addresses. I am only going to

18   ask you about the email with the stapled attachment to

19   it, which is, for the record, ARCHIPEL 012017. It is

20   an email from Mr. Gray to a bunch of blind-copied

21   recipients.

22       With respect to that first paragraph

23   there -- and this email was produced to us -- you

24   mention that BELP received a settlement --

25       MR. LAWRENCE: Sorry. Can we talk for a

54   (Pages 213 to 216)

Gregory Gray, Jr.                                    2/24/2015

Page 217

1  second?
2        MR. SUTHAMMANONT: Of course.
3        MR. LAWRENCE: I think this might be
4  something that was produced in error as well, that the
5  result of this -- this is subject to a clawback.
6        I'm sorry, but I am just trying to respect
7  everything that he is doing, and sometimes these
8  things slip through the crack.
9        There was one document, for example, that
10 we found that slipped through the crack.
11       I think this might be privileged, and I
12 would like a chance to evaluate that and get back to
13 staff on that.
14       MR. RAWLINGS: That is absolutely fine.
15       Actually, while the testimony is still
16 open, court reporter, are you allowed to take 19 out
17 of the record at this point? Because it has been
18 entered as an exhibit.
19       VIDEOGRAPHER: We are now off the record.
20 The time on the video monitor is 4:50 p.m.
21       (Discussion off the record.)
22       VIDEOGRAPHER: We are now on the record.
23 The time on the video monitor is 4:50 p.m.
24       MR. RAWLINGS: For the record, if you
25 could hand me back Exhibit 19, hand it to me.

Page 218

1        I am just representing to counsel we are
2  putting it in this folder, and I am giving it to this
3  intern here, and we are not going to look at it
4  anymore until you resolve the issue of whether or not
5  it is privileged.
6        MR. LAWRENCE: I appreciate it.
7        MR. RAWLINGS: Do you have any additional
8  questions?
9        MR. SUTHAMMANONT: No.
10 BY MS. KIM:
11       Q.   Briefly --
12       MR. RAWLINGS: Hold on. Can we ask in a
13 real general way -- maybe we can't -- did Everloop
14 investors get any money as part of a settlement? Is
15 there an answer to that that can be answered?
16       MR. LAWRENCE: I think he answered there
17 was a liquidation event as part of Everloop --
18       THE WITNESS: Listen. If I am not going
19 to get in trouble, I will tell you whatever you want
20 to know.
21       MR. LAWRENCE: They know that. They know
22 we are trying to be cooperative.
23       MR. RAWLINGS: I will withdraw that
24 question.
25       We have a few other questions.

Page 219

1        It is 4:51. If we go to 5:10, is that
2  okay?
3        THE WITNESS: Can I ask -- not off the
4  record, but to get to LaGuardia from here, hour, this
5  time of day?
6        MR. RAWLINGS: In a car it will probably
7  be about an hour and 15.
8        MR. LAWRENCE: If you have to sleep at
9  my --
10       THE WITNESS: Sorry.
11 BY MS. KIM:
12       Q.   We have discussed in the past Archipel
13 Capital-Social Media Fund LP, and I believe you
14 testified earlier there were four, so I, II, III and
15 IV; is that correct?
16       A.   Yes.
17       Q.   Can you explain what the differences were
18 with I, II, III and IV?
19       A.   I, II and III were the same; IV just had
20 a higher average share price.
21       Q.   What was -- what was the share price for
22 I, II and III?
23       A.   I believe 19.03, approximately.
24       Q.   And what about IV?
25       A.   25.50.

Page 220

1        Q.   Sorry. For the record, that is Social
2  Media Fund IV?
3        A.   Yes.
4        Q.   Were there different offering documents
5  for Social Media Fund IV?
6        A.   There were only three investors, if I am
7  correct, in IV. We had -- we closed a very small
8  tranche.
9        So our plan was to do new docs to reflect
10 the price -- actually, I take that back. Yes, there
11 were docs. So our original documents stated a price
12 not to exceed $26 per share. We just didn't have the
13 Roman -- we have used those docs for Social Media
14 Fund IV. We were planning to update those docs until
15 Twitter filed their S-1 too early. There were only
16 three investors in it. Those three investors at the
17 time didn't necessarily care.
18       Q.   They didn't necessarily --
19       A.   Care to spend the money to update, to put
20 a Roman numeral IV in.
21       Q.   It seems like there were some issues
22 relating to people getting their shares from
23 Computershare?
24       A.   Yes.
25       Q.   And this was after -- so Twitter went

55  (Pages 217 to 220)

Gregory Gray, Jr.                                                    2/24/2015

Page 221

1  public in November 2013; is that correct?
2       A.   They started trading, but we were
3  handcuffed, if you will, for 180 days until May -- I
4  believe May, May something.
5       Q.   May, 2014?
6       A.   Yes.
7       Q.   Were there issues getting people shares of
8  Twitter in May 2014?  By people I mean were there
9  issues getting the investors of Social Media Fund LP
10 shares of Twitter in May 2014?
11      A.   We told our investors the process will
12 take anywhere from 30 to 45 days.  The majority of
13 our investors got their shares within that time
14 period.  A handful of investors did experience a
15 delay, yes.
16      Q.   At some point did you transfer the shares
17 from Computershare to Fidelity?
18      A.   Yes.
19      Q.   And that was from -- I know we discussed
20 earlier with the Background Questionnaire -- was that
21 Social Media Fund LP account at Computershare?
22      A.   Yes.
23      Q.   And then a Social Media Fund LP account at
24 Fidelity?
25      A.   Yes.

Page 222

1       Q.   So the Social Media Fund LP transferred
2  Twitter shares from Computershare to Fidelity?
3       A.   Yes.
4       Q.   And were those the shares of investors?
5       A.   Yes.
6       Q.   And why were they transferred?
7       A.   So at this time I had a second run-in
8  with Mr. Russo, and Mr. Russo was -- and Mr. Goldberg
9  and others -- were impersonating the general partner
10 to get access to our Computershare account so the
11 head of fraud, Computershare fraud, called me and
12 said "We've had 13 people call on this today.  I
13 don't believe any of them are you.  We need to shut
14 this account down."
15           So the account was placed in fraud.  We
16 went ahead and removed the remaining shares from
17 Computershare, and we opened a brokerage account at
18 Fidelity.
19           Now I can talk about that ordeal if you
20 want.
21      Q.   What was that ordeal?
22      A.   In the essence of saving time, not to
23 jump a step ahead, we had opened 15 bank accounts
24 before as general partners, meaning my partners are
25 Canadian; never had a problem.  Bank of America, M&T

Page 223

1  no problem.
2           I went into the Fidelity branch at -- in
3  Chicago and said "Here is my statement for
4  Computershare.  We need to open up a brokerage
5  account."
6           She said "No problem.  Fill out the
7  paperwork, send us a copy of the operating agreement
8  or partnership agreement, whatever the required
9  documentation was.
10          So I emailed everything to her, and she
11 said "Greg, we have a problem.  We have two Canadians
12 on your partnership agreement for Social Media Fund."
13          So I will take responsibility for that so
14 I called John Koeppel at Nixon Peabody and I said --
15          MR. LAWRENCE:  Attorney-client privilege,
16 communication.  Not regarding the formation of funds.
17 I instruct you not to answer.
18 BY MR. RAWLINGS:
19      Q.   Without getting into what he said or what
20 you asked, what did you do next?
21      A.   We created a new entity removing the
22 Canadians from the general partners.
23      Q.   What was the name of the entity?
24      A.   The same name.  It was Archipel
25 Capital-Social Media Fund LP.  All we did was, for

Page 224

1  the essence of saving time, removed the two Canadians
2  from the general partnership and just have me as the
3  sole general partner so we could facilitate the
4  transfer of shares.
5           Once that was completed and the documents
6  were produced to Fidelity, we provided them a letter
7  of instruction DTC'ing the transfer to each
8  individual's respective brokerage account.
9  BY MS. KIM:
10      Q.   When did the transfer occur?
11      A.   Which one?
12      Q.   When did the transfer from Computershare
13 to Fidelity occur?
14      A.   I would say June of 2014.
15      Q.   How long did that process at Fidelity take
16 about, where you were dealing with the Canadian
17 partner issue?
18      A.   I would say probably 10 days.  I mean, it
19 was pretty quick.  To do what we did in ten days?
20 Ten days sounds like a long time to our investors,
21 but ten days, two weeks.  Then it took about three to
22 five business days after that for our investors to
23 receive their shares.
24          One last point I will add in the essence
25 of saving time, all our investors had a higher share

                                      56 (Pages 221 to 224)

Gregory Gray, Jr.                                                    2/24/2015

Page 225

1   price so none of the investors were impacted
2   financially for a lower share price than if the
3   shares were transferred at an earlier date.
4       Q.    You mean when the shares were transferred
5   in June time frame or late June, it was higher than
6   when it --
7       A.    Could have been transferred.
8       Q.    Could have been transferred in May?
9       A.    Yes.
10      Q.    And then did you after all the shares were
11  distributed to the Social Media Fund LP I, II, III and
12  IV investors, so the shares were distributed to all
13  four funds --
14      MS. KIM:  Strike that.  I apologize.
15      Q.    During this May, June time frame, were
16  Twitter shares distributed to all the investors for
17  the four Social Media funds?
18      A.    Yes.
19      Q.    Did you distribute after that money back
20  to the investors?
21      A.    There was a cash balance left to
22  investors, and it was distributed via pro rata share
23  or their ownership they had of the fund, the evidence
24  of the K-1 that was prepared by Freed Maxick.
25      Q.    When you say cash balance left, you mean

Page 226

1   the Social Media Fund I, II, III and IV had a cash
2   balance left?
3       A.    I don't recall IV having a cash balance.
4   I believe Social Media Fund I was the only fund we
5   had that as a cash balance.
6       Q.    And that was just -- can you explain what
7   the cash balance was, what it represented?
8       A.    So we were at the closing table to
9   acquire more Twitter shares, had signed stock
10  transfer agreements with the seller, and we were
11  getting ready -- say this was a Tuesday -- we were
12  getting ready to close on a Friday.
13      I am making up the dates, but on
14  Wednesday we received notice that Twitter filed their
15  S-1.  We received the restriction information from
16  Goldman Sachs.  There weren't any other transfers
17  being allowed so that last tranche of shares we were
18  set to acquire never closed; hence the reason why we
19  had a cash balance in our account.
20  BY MR. RAWLINGS:
21      Q.    Just one last question.  With respect
22  to -- we saw some document you guys gave us with
23  respect to the Late Stage Fund.  Is there a potential
24  possibility that the Late Stage Fund might be
25  purchased by an investor in whole or in parts sometime

Page 227

1   in 2015?
2       A.    Yes.
3       Q.    Could you describe that?
4       A.    So we are working with a Chinese
5   institution to acquire -- so I mentioned earlier we
6   have a hard time catering to institutions because our
7   supply is limited.  We are a small boutique firm.  So
8   we are looking at creating a relationship.  We have
9   created a relationship in China with an institution
10  who wants to invest a larger sum of money, so
11  therefore we need to gather enough supply, if you
12  will, in Late Stage Fund I, gather that supply, and
13  then depending on intervals of pricing and our
14  supply, what we are able to achieve and accomplish,
15  then, yes, the Chinese investor may come out and buy
16  out Late Stage Fund I and create Late Stage Fund II.
17      Does that make sense check?  It's getting
18  late.  Sorry.
19      Q.    So there exists right now a Late Stage
20  Fund I?
21      A.    Yes.
22      Q.    I think you mentioned -- I mean, Hane
23  showed you that document that said wire transfer
24  5 million, and you even said that that constitutes
25  shares of a couple of entities.  One of them was

Page 228

1   Spotify, correct?
2       A.    Yes.
3       Q.    So that is Late Stage Fund I; is that
4   correct?
5       A.    It is just Late Stage Fund.
6       Q.    It's Late Stage Fund.  Is that entity that
7   a potential Chinese investor is potentially
8   considering purchasing in whole?
9       A.    That is one option we are looking at,
10  yes.
11      Q.    One option you are looking at.  And then
12  the investment would include that and some other Late
13  Stage Fund II -- in other words, it would be that plus
14  some other investment, correct?
15      A.    So case in point is we are looking at
16  Lyft, for example.  Right now we have access to Lyft
17  shares at a pre-money valuation of about 1.5 billion,
18  what is openly in the marketplace right now with
19  either Yahoo, Apple, Google or Alibaba leading this
20  round of financing at $3 billion so my limited
21  partners have come to me and said "Listen, if we take
22  $10 million" -- I am making up a money because we
23  haven't finalized a number yet -- "of Lyft, do your
24  documents allow the opportunity for us cash out or
25  transfer our shares at 3 billion, or two years from

57  (Pages 225 to 228)

Gregory Gray, Jr.                                                    2/24/2015

| Page 229 | Page 231 |
|---|---|

**Page 229**

1   now at 10 billion?" I am just making up numbers.
2       Q.    Sure.
3       A.    And the answer is yes. Our documents do
4   allow the ability to transfer shares. There is an
5   assignment of interest form that was prepared by
6   Nixon Peabody that we have used for one death, one
7   divorce to transfer shares. Also, the opportunity
8   for us to buy out investments for whatever reason
9   that we would use in this particular instance.
10      So our Chinese investors are looking
11  at more -- we have our investors are U.S. -- our
12  local U.S. investors, if you will, are looking at a
13  way they can invest large sums of money now, not have
14  to wait to the IPO or merger acquisition date, but
15  realize a higher valuation.
16      Our Chinese entity on the other hand is
17  more looking at how can we legally get large sums of
18  money out, and we have a Chinese investor who is a
19  ship builder who as long as he, they, the, the entity
20  invests in something surrounding transportation, they
21  can move large sums of money out, and that's what
22  they are looking to do.
23      So that is where the Lyft opportunity --
24  Bloom Energy, for example, would be another
25  opportunity where we look at our ability to acquire

**Page 230**

1   shares at $19. Bloom just raised money at 26.53, and
2   the same thing with Lyft where we can invest 1.5
3   billion dollars now, and fast forward down the line,
4   we can potentially sell to a larger conglomerate at
5   $3 billion.
6       Q.    Where do you get the access the shares?
7   Like Lyft, is that talking to Lyft directly, or is
8   that through some broker or some other intermediary?
9       A.    It is actually both. It started with an
10  intermediary. The relationship has evolved, and we
11  will be participating in this new pref round of
12  financing when the terms come to an agreement.
13      I don't think we'll be actively involved
14  in the company. It's too big for us, but we will be
15  a pref holder in this next round of financing.
16      Q.    Got it. And so, for instance, Bloom, I
17  asked you and you said "I don't know anyone at Bloom."
18  When you get shares of Bloom, who do you work with to
19  get those shares?
20      A.    There is a girl at Bloom named Giovanni
21  Manca. She is the one that handles everything for
22  us.
23      Q.    And just sort of now that we have you
24  here, looking forward, what are the investment things
25  that you are planning like in the next three months

**Page 231**

1   that we should be aware of that are occurring? So
2   there is this Chinese investment that is happening,
3   right?
4       A.    I would start before that. I would say
5   before we accept any new monies in the partnership,
6   we have to have our documents buttoned up, plain and
7   simple.
8       We are working on finalizing that this
9   week with new counsel, one of the two firms that we
10  mentioned.
11      In addition, prior to us accepting any
12  further money, we want to have the fund admin fully
13  on board in place so once we have those two
14  components in place, the only investments we are
15  looking at doing for 2015, continuing investment in
16  the Bloom Energy, as they fit our criteria, Spotify
17  and Lyft, is what I feel comfortable now saying to
18  you.
19      Q.    And those are Late Stage --
20      A.    Late Stage Funds.
21      Q.    So Late Stage Funds and Bloom Energies?
22      A.    Correct.
23      Q.    Got it. Okay.
24      Let's just take a quick off the record.
25      VIDEOGRAPHER: We are now off the record.

**Page 232**

1   Time on the video monitor is 5:07 p.m.
2       (Pause in the proceedings.)
3       VIDEOGRAPHER: We are now on the record.
4   The time on the video monitor is 5:10 p.m.
5       MS. KIM: We have no further questions at
6   this time.
7       We may, however, call you again to testify
8   in this investigation. Should this be necessary, we
9   will contact your counsel.
10      Do you wish to clarify anything or add
11  anything to the statements you have made today?
12      THE WITNESS: Only question I have, so
13  regarding the Everloop that we can't talk about, are
14  we going to just set up a call?
15      MR. LAWRENCE: I will take care of it.
16      THE WITNESS: I have nothing else.
17      MS. KIM: In terms of clarifying anything
18  you said or adding anything to what you said today?
19      THE WITNESS: I don't believe so, no.
20      MS. KIM: Mr. Lawrence, do you wish to ask
21  any clarifying questions?
22      MR. LAWRENCE: No, and I appreciate the
23  courtesy to allow me to interject a few times. Thank
24  you.
25      MS. KIM: As a reminder, the investigation

DIVERSIFIED REPORTING SERVICES
(202) 467-9200

Gregory Gray, Jr.                                               2/24/2015

Page 233

```
1    is nonpublic.  We request that you do not discuss the
2    investigation with anyone except for your counsel.
3            We can go off the record.
4            VIDEOGRAPHER:  We are now off the record
5    The time on the video monitor is 5:11 p.m.
6            (Time noted: 5:11 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 235

```
1            UNITED STATES
2    SECURITIES AND EXCHANGE COMMISSION
3            REPORTER'S CERTIFICATE
4
5
6            I, HELENE GRUBER, reporter, hereby certify
7    that the foregoing transcript of 236 pages is a
8    complete, true and accurate transcript of the
9    testimony indicated, held on February 24, 2015 at
10   200 Vesey Street, New York, New York, in the Matter of
11   Archipel Capital.
12           I further certify that this proceeding
13   Was reported by me and that the foregoing
14   transcript Was prepared under my direction.
15
16
17
18   _____     _____
     Helene Gruber          Date
19
20
21
22
23
24
25
```

Page 234

```
1
2            SCOPIST CERTIFICATE
3
4            I, HELENE GRUBER, hereby certify that
5    the foregoing transcript consisting of 236 pages is
6    a complete, true and accurate transcript of the
7    investigative hearing, held on February 24, 2015 at
8    200 Vesey Street, New York, New York, in the matter of
9    Archipel Capital.
10           I, further certify that this proceeding
11   was reported by Helene Gruber and that the
12   foregoing transcript has been scoped by me.
13
14
15
16   _____     _____
17   Helene Gruber          Date
18
19
20
21
22
23
24
25
```

Page 236

```
1
2            PROOFREADER'S CERTIFICATE
3
4    In the Matter of: Archipel Capital
5
6    Witness:      Gregory Gray, Jr.
7    File Number:  NY-9143
8    Date:         February 24, 2015
9    Location:     200 Vesey Street
                   New York, New York
10
11           This is to certify that I, Helene
12   Gruber, the undersigned, do hereby swear and affirm
13   that the attached proceedings before the United
14   States Securities and Exchange Commission were held
15   according to the record and that this is the
16   original, complete, true and accurate transcript
17   that has been compared to the reporting or
18   recording accomplished at the hearing.
19
20
     _____     _____
21   Helene Gruber          Date
22
23
24
25
```

59 (Pages 233 to 236)

DIVERSIFIED REPORTING SERVICES
(202) 467-9200